# EXHIBIT A
# PART 1

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

MANUFACTURERS AND TRADERS )
TRUST COMPANY, as Successor Indenture )
Trustee for the 7.75% Contingent )
Convertible Notes Due 2015 issued by Calpine )
Corporation )
 )
 )
            Plaintiff, )
 )
       - against - )
 )
HSBC BANK USA, National Association, as )
Successor Indenture Trustee for the 7.625% )
Senior Notes Due 2006, the 8.75% Senior Notes )
Due 2007, the 8.75% Senior Notes Due 2008, and )
the 7.75% Senior Notes Due 2009 issued by )
Calpine Corporation, )
 )
       - and - )
 )
U.S. BANK NATIONAL ASSOCIATION, as )
Indenture Trustee for the 10.50% Senior Notes )
Due 2006 issued by Calpine Corporation )
 )
            Defendants. )

**IMAGED**

08600534

**SUMMONS**
Index No. _____
Plaintiff designates New York County
as the place for trial. The basis for
venue is CPLR § 503(c).

**FILED**
FEB 21 2008
COUNTY CLERK'S OFFICE
NEW YORK

**To The Above-Named Defendant:**

You are hereby summoned and required to serve upon Plaintiff's attorney an answer to

the complaint in this action within twenty (20) days after the date of service of this Summons

upon you, exclusive of the day of service, or within thirty (30) days after the date of service is

complete if this Summons is not personally delivered to you within the State of New York.  In

the case of your failure to answer, judgment will be taken against you by default for the relief

demanded in the annexed complaint.

Dated:   New York, New York
         February 21, 2008

STROOCK & STROOCK & LAVAN LLP

By: _____
        Kristopher M. Hansen
        Daniel A. Ross
        Erez E. Gilad
        180 Maiden Lane
        New York, New York 10038
        212-806-5400

        YOUNG CONAWAY STARGATT
        & TAYLOR, LLP
        Pauline K. Morgan, Esq.
        Ian S. Fredericks, Esq.
        The Brandywine Building
        1000 West Street, 17th Floor
        P.O. Box 391
        Wilmington, Delaware  19899-0391
        302-571-6600
        *Attorneys for Plaintiff Manufacturers*
        *and Traders Trust Company, as*
        *Successor Indenture Trustee for the*
        *7.75% Convertible Notes Due 2015*
        *issued by Calpine Corporation*

HSBC Bank USA, National
Association
452 Fifth Avenue
New York, New York 10018

U.S. Bank National Association
633 West 5th Street
Los Angeles, California 90071

2

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

| | |
|---|---|
| MANUFACTURERS AND TRADERS TRUST COMPANY, as Successor Indenture Trustee for the 7.75% Contingent Convertible Notes Due 2015 issued by Calpine Corporation | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| - against - | ) ) |
| HSBC BANK USA, National Association, as Successor Indenture Trustee for the 7.625% Senior Notes Due 2006, the 8.75% Senior Notes Due 2007, the 8.75% Senior Notes Due 2008, and the 7.75% Senior Notes Due 2009 issued by Calpine Corporation, | ) ) ) ) ) ) ) |
| - and - | ) ) |
| U.S. BANK NATIONAL ASSOCIATION, as Indenture Trustee for the 10.50% Senior Notes Due 2006 issued by Calpine Corporation | ) ) ) ) |
| Defendants. | ) |

IMAGED

**COMPLAINT**
Index No. _____

08600534

FILED
COUNTY CLERKS OFFICE
FEB 21 2008
NEW YORK

## COMPLAINT

Manufacturers and Traders Trust Company, in its capacity as successor indenture trustee (solely in its capacity as such, "M&T") on behalf of the holders (the "7.75% Convertible Note Holders") of the 7.75% Contingent Convertible Notes Due 2015 (the "7.75% Convertible Notes") issued by Calpine Corporation ("Calpine") pursuant to that certain Indenture, dated as of August 10, 2000 (the "Base Indenture"), between Calpine and Wilmington Trust Company, as predecessor indenture trustee ("WTC"), as supplemented by the Third Supplemental Indenture, dated as of June 23, 2005 (the "Supplemental Indenture," and together with the Base Indenture, the "Indenture"), by and through its undersigned counsel, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.     By this action, M&T respectfully asks this Court to resolve a straightforward contract dispute under New York state law as to the meaning of the subordination provisions of the Indenture. The dispute arises between holders of senior and subordinated debt instruments of Calpine, an energy company that entered bankruptcy at the end of 2005 and emerged in January of this year. The subordinated debt holders, on whose behalf the present action is brought, acknowledge that under the terms of the Indenture the senior debt holders are entitled to receive priority with respect to the payment of principal and "pre-petition interest" arising under the senior debt instruments — and indeed the senior debt holders have now received such payment in full. However, the senior debt holders assert that their priority further extends to "post-petition interest" arising under the senior debt instruments, a position that Plaintiff disputes and respectfully submits is contrary to the "Rule of Explicitness" set forth by the New York Court of Appeals in a case squarely on point.

2.     Under Calpine's confirmed plan of reorganization, a portion of the subordinated debt holders' bankruptcy distribution, in the aggregate amount of approximately $170 million, is being (or shortly will be) deposited in escrow pending resolution of the dispute by a court of competent jurisdiction. Towards this end, this declaratory judgment action has been brought.

## SUMMARY OF ACTION

3.     On December 20, 2005 (the "Petition Date"), Calpine commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The crux of the present dispute between M&T, in its capacity as successor indenture trustee for the

2

7.75% Convertible Notes, and each of the Defendants, in their respective capacities as indenture trustees for five (5) series of senior notes issued by Calpine (the "Senior Notes," and the holders of such notes, the "Senior Note Holders"), involves whether the 7.75% Convertible Notes are subordinated in right of payment to "post-petition interest" (*i.e.*, interest that accrues following the Petition Date through the date of emergence and/or thereafter) and certain other amounts arising under the Senior Notes, and whether the 7.75% Convertible Note Holders are required to pay over such amounts to the Senior Note Holders.

4.    Specifically, the governing Indenture provides that the 7.75% Convertible Notes are subordinated in right of payment to the prior payment in full of "all amounts (including principal, premium, if any, and interest)" due under "Senior Debt," as expressly defined therein to include the Senior Notes.  M&T concedes that the 7.75% Convertible Notes are subordinated in right of payment to any principal amount due under the Senior Notes as well as any "pre-petition interest" (*i.e.*, interest that accrued prior to the Petition Date but remained unpaid as of the Petition Date) arising under such Senior Notes.  Indeed, the Senior Note Holders have already been paid in full for all such amounts.

5.    However, consistent with binding precedent handed down by the New York Court of Appeals on the precise issue currently before this Court, the Indenture does *not* provide for the subordination of the 7.75% Convertible Notes with respect to any post-petition interest arising under Senior Debt.  The Court of Appeals has unequivocally adopted the "Rule of Explicitness" as a "guiding interpretive principle of State contract dispute resolution," such that "New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of the senior creditor's post-petition interest demand." *In re Southeast Banking Corp. (Chemical Bank v. First Trust of New York, N.A.)*, 93

3

N.Y.2d 178, 183-88 (1999). In other words, under New York law, a senior creditor's claim for post-petition interest against a junior creditor will not be allowed unless the subordination agreement explicitly and unambiguously alerts the junior creditor to the risk of subordination with respect to post-petition interest.

6.    The Indenture here — virtually identical to that addressed by the New York Court of Appeals in *In re Southeast Banking Corp.* — falls well short of satisfying the Rule of Explicitness. The Indenture fails to make any reference at all to the subordination of post-petition interest arising under Senior Debt, even though there are specific references to post-petition interest in other sections of the Indenture.

7.    Given the dispute as to the meaning and extent of the subordination provisions contained in the Indenture, Calpine's confirmed plan of reorganization provides that a portion of the 7.75% Convertible Note Holders' distribution will be held in escrow and released upon entry of a final determination from a court of competent jurisdiction as to the meaning of the subordination provisions.

8.    Accordingly, M&T respectfully seeks a judgment from this Court, as a "court of competent jurisdiction," declaring that the 7.75% Convertible Notes are *not* subordinated in right of payment to the prior payment in full of any post-petition interest arising under the Senior Notes (including any post-emergence date interest, whether at the contractual rate or otherwise).

9.    M&T also respectfully seeks a judgment from this Court declaring that the 7.75% Convertible Notes are *not* subordinated with respect to any "breach of contract damage claims" and/or fees and expenses asserted by the Senior Note Holders on similar grounds, namely that the Indenture fails to explicitly and unambiguously provide that the 7.75%

4

Convertible Notes are subordinated to such claims, and on the grounds that any claims for breach of contract damages (1) have been waived, and (2) do not constitute "premiums" for purposes of the subordination provisions of the Indenture.

## PARTIES

10.     Plaintiff M&T is the successor indenture trustee for the 7.75% Convertible Notes.  M&T is a New York banking corporation with an office located at 25 South Charles Street, Baltimore, Maryland 21201.

11.     Defendant HSBC Bank USA, National Association is the successor indenture trustee (solely in its capacity as such "HSBC") for each of the following series of Senior Notes issued by Calpine:  (a) $102,194,000 of the 7.625% Senior Notes due 2006, (b) $190,299,000 of the 8.75% Senior Notes due 2007, (c) $173,761,000 of the 7.875% Senior Notes due 2008, and (d) $180,602,000 of the 7.75% Senior Notes due 2009.  HSBC is a national banking association with an office located at 452 Fifth Avenue, New York, New York 10018. .

12.     Defendant U.S. Bank National Association is the indenture trustee (solely in its capacity as such, "USB," and together with HSBC, the "Senior Notes Trustees") for the $139,205,000 of 10.50% Senior Notes due 2006 issued by Calpine.[1]  USB is a national banking association with an office located at 633 West 5th Street, Los Angeles, California 90071.

## FACTS

I.     **The 7.75% Convertible Notes:**

13.     On August 10, 2000, WTC and Calpine entered into the Base Indenture, a true and correct copy of which is annexed hereto as Exhibit A.  On June 23, 2005, Calpine and

---

[1]    Upon information and belief, such amounts represent principal amounts outstanding (net of repurchases) as of the Effective Date (as defined herein).

WTC entered into the Supplemental Indenture, a true and correct copy of which is annexed hereto as Exhibit B, which supplemented the terms of the Base Indenture as provided therein.

14.    Under the Supplemental Indenture, Calpine issued $650,000,000 in aggregate principal amount of 7.75% Convertible Notes.

15.    Pursuant to an order of the Bankruptcy Court, M&T succeeded to WTC as the indenture trustee for the 7.75% Convertible Notes.

16.    Section 10.11 of the Base Indenture provides that "[t]he laws of the State of New York govern this Indenture and the Securities, without regard to the conflicts of laws rules thereof." Base Indenture, Ex. A § 10.11. In addition, Section 12.07 of the Supplemental Indenture provides that "[t]his Third Supplemental Indenture and each Note shall be governed by and construed in accordance with the laws of the State of New York." Supplemental Indenture, Ex. B, § 12.07.

**II.    Subordination Provisions of the Indenture:**

17.    The Supplemental Indenture provides that the 7.75% Convertible Notes are subordinated in right of payment to the prior payment in full in cash of Senior Debt "to the extent and in the manner" provided in Article XI of the Supplemental Indenture. Supplemental Indenture, Ex. B, § 11.01(a).

18.    Section 11.03 of the Supplemental Indenture, which governs subordination with respect to distributions made as a result of a bankruptcy proceeding, provides, in relevant part, as follows:

> Upon any direct or indirect payment by or on behalf of [Calpine] or direct or indirect distribution of assets of [Calpine] of any kind or character, whether in cash, property or securities, by set-off or otherwise, to creditors upon any dissolution or winding up or

6

> liquidation or reorganization of [Calpine] or assignment for the
> benefit of creditors or marshaling of assets, whether voluntary or
> involuntary, or in bankruptcy, insolvency, receivership or other
> proceedings, *all amounts (including principal, premium, if any,
> and interest)* due or to become due upon all Senior Debt shall first
> be paid in full in cash, or such payment thereof provided for in
> money in accordance with its terms, before any payment or
> distribution is made on account of the principal (and premium, if
> any), interest or any other Obligation relating to the [7.75%
> Convertible] Notes[.]

Supplemental Indenture, Ex. B, § 11.03 (emphasis added).[2]

19.    The Supplemental Indenture defines "Senior Debt" as secured debt of Calpine as well as five issuances of Senior Notes issued by Calpine, but makes no mention of post-petition interest. *See* Supplemental Indenture, Ex. B, § 1.01(b).

20.    The Supplemental Indenture makes no explicit reference *at all* to post-petition interest arising under the Senior Notes, either in the operative subordination provisions or in the definition of Senior Debt.

21.    Therefore, under the "Rule of Explicitness," which governs the interpretation of the Indenture here, the 7.75% Convertible Notes are *not* subordinated to post-petition interest arising under the Senior Notes.

**IV.    Certain Senior Note Holders' Breach of Contract Claims:**

22.    For similar reasons, the 7.75% Convertible Notes are *not* subordinated in right of payment to the prior payment in full of breach of contract damages, either as asserted on behalf of a sub set of Senior Note Holders or as allowed by final order of the Bankruptcy Court.

---

[2]    By way of instructive comparison, the indentures considered by the New York Court of Appeals in *In re Southeast Banking Corp.*, and found insufficient to satisfy the Rule of Explicitness, provided in relevant part that "[u]pon . . . any payment or distribution of assets of [Southeast] . . . in bankruptcy, *all principal, premium, if any, and interest* due or to become due upon all Senior Indebtedness shall first be paid in full . . . before any payment is made on account of the principal or, premium, if any, or interest on the Debentures . . . ." 93 N.Y.2d at 181 (emphasis added).

23.    On September 19, 2007, Calpine filed its Motion for Approval of Stipulation with Calpine Unsecured Noteholders and HSBC Bank USA, N.A., as Indenture Trustee (the "HSBC Settlement Motion") with the Bankruptcy Court seeking approval of that certain Stipulation Resolving Objections by the Indenture Trustee for the Calpine Unsecured Notes and Calpine Unsecured Noteholders to Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims dated September 19, 2007 (the "HSBC Stipulation"). A true and correct copy of the HSBC Settlement Motion, including the HSBC Stipulation attached thereto as an exhibit, is annexed hereto as Exhibit C.

24.    As described in the HSBC Settlement Motion, HSBC, on behalf of holders of two (2) series of Senior Notes, asserted general unsecured claims in the amount of approximately $7,300,000 for breach of contract damages against Calpine (the "Asserted Breach of Contract Claims") arising from Calpine's purported violation of the "no-call" provisions of the two series of Senior Notes (holders of such two (2) series of Senior Notes, together with HSBC, the "Settling Senior Note Holders").

25.    Pursuant to the HSBC Stipulation, as approved by order of the Bankruptcy Court dated October 10, 2007 (the "HSBC Order") (a true and correct copy of which is annexed hereto as Exhibit D), HSBC, on behalf of the Settling Senior Note Holders, was granted an allowed general unsecured claim in the total amount of $3,650,000 (the "Allowed Breach of Contract Claims") in satisfaction of and in exchange for the Asserted Breach of Contract Claims.

26.    Upon information and belief, shortly after the Effective Date (as defined below) and on or about February 1, 2008, HSBC received, on behalf of the Settling Senior Note Holders, a distribution directly from reorganized Calpine in the form of shares of New Calpine Common Stock representing approximately 84.8% of the Settling Senior Note Holders' Allowed

8

Breach of Contract Claims. Thus, upon information and belief, as of the date hereof, approximately $554,800 remains unpaid on account of the Settling Senior Note Holders' Allowed Breach of Contract Claims.

27.     The Settling Senior Note Holders have asserted that the 7.75% Convertible Notes are subordinated in right of payment to the unpaid balance of the Settling Senior Note Holders' Allowed Breach of Contract Claim.

28.     M&T disputes the Settling Senior Note Holders' assertions.

29.     The HSBC Stipulation and the HSBC Order provide that the Settling Senior Note Holders waived any rights of subordination under the Indenture with respect to their Asserted Breach of Contract Claims or Allowed Breach of Contract Claims.

30.     Specifically, paragraph 4 of the HSBC Order approving the HSBC Stipulation states as follows:

> The Calpine Unsecured Noteholders and HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Notes, retain any and all rights that they now have or may hereafter have against other parties or property under or with respect to subordination provisions, including, but not limited to, those contained in the [7.75% Convertible Notes] issued by Calpine *other than with respect to the Unsecured Makewhole Claims.*

HSBC Settlement, Ex. D, at 8 (emphasis added).

31.     The term "Unsecured Makewhole Claims" is defined in the Settlement Motion as including "the makewhole premium and damages claims asserted by the holders of the Calpine Unsecured Notes and HSBC." HSBC Settlement Motion, Ex. C, at p. 2.

9

### V.    Debtors' Plan of Reorganization:

32.    Pursuant to the Debtors' Sixth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code dated December 19, 2007 (the "Plan") (a true and correct copy of which is annexed hereto as Exhibit E), as confirmed by order of the Bankruptcy Court, generally speaking, holders of allowed unsecured claims against Calpine will receive, in exchange for and in satisfaction of their claims, *pro rata* distributions of shares of common stock of reorganized Calpine ("New Calpine Common Stock") based on the imputed value of approximately $17.36 per share under the Plan.

33.    With respect to the treatment of the 7.75% Convertible Note Holders' claims under the 7.75% Convertible Notes, the Plan provides, in relevant part, that the claims of the 7.75% Convertible Note Holders are subordinated in right of payment to the extent necessary to satisfy in full that portion of the Senior Note Holders' claims attributable to principal and pre-petition interest. *See* Plan, Ex. E, Art. III.B. ¶ 7, at 36-37.

34.    However, the Plan expressly provides that the extent to which the 7.75% Convertible Note Holders are subordinated with respect to any other amounts "shall be determined by a court of competent jurisdiction" as part of the "Intercreditor Subordination Dispute," defined in the Plan as the dispute as to the scope of the subordination provisions contained in the Indenture as they relate to the claims of the Senior Note Holders. Plan, Ex. E, Art. III.B. ¶ 7, at 36-37; Art.I.A. ¶¶ 151-153.

35.    As part of the Intercreditor Subordination Dispute, the Plan contemplates that the Debtors will establish an Intercreditor Subordination Dispute Escrow Account, defined in the Plan as an "escrow account established for the benefit of the Holders of Allowed Senior

10

Note Claims and Allowed Subordinated Note Claims pending resolution of the Intercreditor Subordination Dispute by Final Order." *Id.*

36.    On January 31, 2008, Calpine issued the notice of the occurrence of the effective date of the Plan (the "Effective Date"), a true and correct copy of which is annexed hereto as Exhibit F.

37.    Also on January 31, 2008, Calpine issued a press release (the "Press Release"), a true and correct copy of which is annexed hereto as Exhibit G, wherein Calpine projected, based on the Debtors' litigation risk-adjusted analysis, that general unsecured creditors will recover approximately 84.8% on account of their allowed claims for principal, pre-petition interest and "makewhole" or breach of contract claims as part of an "initial distribution" to be made by reorganized Calpine soon after the Effective Date, and will ultimately recover approximately 99.9% on account of such claims.

38.    Upon information and belief, shortly after the Effective Date and on or about February 1, 2008, the Senior Notes Trustees received, on behalf of the Senior Note Holders, a distribution directly from reorganized Calpine in the form of shares of New Calpine Common Stock representing approximately 84.8% of the Senior Note Holders' claims in the aggregate for principal, pre-petition interest and Allowed Breach of Contract Claims.

39.    Upon information and belief, shortly after the Effective Date and on or about February 1, 2008, a portion of the distribution that was otherwise distributable to M&T on behalf of the 7.75% Convertible Note Holders, equal to an amount necessary to satisfy in full the remaining 15.2% of the Senior Note Holders' claims for principal and pre-petition interest, was re-directed by reorganized Calpine and distributed to the Senior Notes Trustees for the benefit of the Senior Note Holders.

11

40.    The Senior Note Holders' claims for principal and pre-petition interest have been paid in full.

## V.    Subordination Dispute:

41.    On January 28, 2008, the Senior Notes Trustees sent a joint letter to counsel for M&T demanding that M&T consent to the deposit of shares of New Calpine Common Stock in the Intercreditor Subordination Dispute Escrow Account in an amount estimated by the Senior Notes Trustees to satisfy in full the Senior Notes Trustees' and the Senior Note Holders' asserted claims for (a) post-petition interest accruing at the contractual rate set forth in the Indenture, including interest on interest, (b) "post-emergence date" interest from the Effective Date through final resolution of the Intercreditor Subordination Dispute, (c) fees and expenses, and (d) certain amounts related to the Breach of Contract Claims.

42.    M&T disputes the Senior Note Holders' entitlement to any of the foregoing from the 7.75% Convertible Note Holders under the Indenture, the Plan or otherwise.

43.    On January 30, 2008, counsel to the Senior Notes Trustees and counsel to M&T memorialized their agreement regarding the amount to be deposited into the Intercreditor Subordination Dispute Escrow Account. *See* E-Mail correspondence, dated January 30, 2008, a copy of which is attached hereto as Exhibit H.

44.    Specifically, counsel to the Senior Notes Trustees agreed that shares of New Calpine Common Stock representing a total dollar value of $169,253,136.11 should be deposited into the Intercreditor Subordination Dispute Escrow Account. *Id.*

45.    Upon information and belief, consistent with the foregoing, on or about February 1, 2008, the Debtors withheld 9,752,258 shares of New Calpine Common Stock from

12

distributions otherwise distributable to M&T, on behalf of the 7.75% Convertible Noteholders, for deposit into the Intercreditor Subordination Dispute Escrow Account in connection with the Intercreditor Subordination Dispute.

## COUNT 1 – DECLARATORY RELIEF:  POST-PETITION INTEREST

46.    M&T repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth herein.

47.    By reason of the foregoing, an actual justiciable controversy exists among the parties as to whether, under the governing Indenture, the 7.75% Convertible Note Holders are subordinated in right of payment to the prior payment in full of the Senior Note Holders' post-petition interest.  Indeed, Calpine's Plan expressly recognizes the existence of such a controversy, and provides for the deposit of shares of New Calpine Common Stock subject to the Intercreditor Subordination Dispute to be held in escrow pending a judicial declaration as to the respective rights of the parties.

48.    It is well-established law in the State of New York, based on binding precedent from the New York State Court of Appeals, that, in accordance with the Rule of Explicitness, a subordination agreement must include specific and explicit language that is sufficient to alert a junior creditor to its assumption of the risk and burden of allowing the payment of post-petition interest to a senior creditor.

49.    The subordination provisions of the Indenture do not specifically and explicitly state that the 7.75% Convertible Notes are subordinated in right of payment to the prior payment in full of any post-petition interest arising under the Senior Notes.

13

50.    In fact, no reference at all is made to post-petition interest in the subordination provisions of the Indenture.

51.    As a result, the 7.75% Convertible Note Holders are *not* subordinate to the payment of post-petition interest arising under the Senior Notes, and the 7.75% Convertible Note Holders are not required to pay over any portion of their distributions attributable to post-petition interest (including any post-Effective Date interest, whether at the contractual rate or otherwise) arising under the Senior Notes to the Senior Notes Trustees or the Senior Note Holders, under the Indenture, the Plan or otherwise.

52.    Accordingly, M&T respectfully seeks a judgment declaring that the 7.75% Convertible Notes are *not* subordinate to the payment of post-petition interest arising under the Senior Notes, and the 7.75% Convertible Note Holders are not required to pay over any portion of their initial or future distributions (whether currently held in or to be deposited into escrow, or otherwise) attributable to post-petition interest (including any post-Effective Date interest, whether at the contractual rate or otherwise) arising under the Senior Notes to, or for the benefit of, the Senior Notes Trustees or the Senior Note Holders, under the Indenture, the Plan or otherwise.

## COUNT II – DECLARATORY RELIEF:  BREACH OF CONTRACT CLAIMS

53.    M&T repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length herein.

54.    By reason of the foregoing, an actual justiciable controversy exists among the parties as to whether, under the present circumstances and in accordance with the governing Indenture, the 7.75% Convertible Note Holders are subordinated in right of payment to the prior

payment in full of any of the Settling Senior Note Holders' Asserted Breach of Contract Claims or Allowed Breach of Contract Claims. Indeed, Calpine's Plan expressly recognizes the existence of such a controversy, and provides for the deposit of shares of New Calpine Common Stock subject to the Intercreditor Subordination Dispute to be held in escrow pending a judicial declaration as to the respective rights of the parties.

55.     The subordination provisions of the Indenture do not specifically and explicitly state that the 7.75% Convertible Notes are subordinated in right of payment to the prior payment in full of any Asserted Breach of Contract Claims asserted by the Settling Senior Note Holders or the Allowed Breach of Contract Claims.

56.     In fact, no reference at all is made to any such claims in the subordination provisions of the Indenture.

57.     Moreover, pursuant to the HSBC Stipulation and the HSBC Order, the Settling Senior Note Holders waived any right of subordination with respect to the Asserted Breach of Contract Claims, whether as originally asserted or as allowed by order of the Bankruptcy Court.

58.     In addition, the Asserted Breach of Contract Claims and/or the Allowed Breach of Contract Claims do not constitute "premiums" for purposes of the subordination provisions of the Indenture.

59.     As a result, the 7.75% Convertible Note Holders are not subordinate to the payment of Asserted Breach of Contract Claims or the Allowed Breach of Contract Claims arising under the Senior Notes, and the 7.75% Convertible Note Holders are not required to pay over any portion of their distributions attributable to such claims (including any interest that may

15

accrue on account of such claims) to the Senior Notes Trustees or the Senior Note Holders, under the Indenture, the Plan or otherwise.

60.    Accordingly, M&T respectfully seeks a judgment declaring that the 7.75% Convertible Notes are not subordinate to the payment of the Settling Senior Note Holders' Asserted Breach of Contract Claims or Allowed Breach of Contract Claims, and the 7.75% Convertible Note Holders are not required to pay over any portion of their initial or future distributions (whether currently held in or to be deposited into escrow, or otherwise) attributable to such claims (including any interest that may accrue on account of such claims) to, or for the benefit of, the Settling Senior Note Holders, under the Indenture, the Plan or otherwise.

## COUNT III – DECLARATORY RELIEF: FEES AND EXPENSES

61.    M&T repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length herein.

62.    By reason of the foregoing, an actual justiciable controversy exists among the parties as to whether, under the governing Indenture, the 7.75% Convertible Note Holders are subordinated in right of payment to the prior payment in full of any fees and expenses incurred by the Senior Notes Trustees or the Senior Note Holders.  Indeed, Calpine's Plan expressly recognizes the existence of such a controversy, and provides for the deposit of shares of New Calpine Common Stock subject to the Intercreditor Subordination Dispute to be held in escrow pending a judicial declaration as to the respective rights of the parties.

63.    The subordination provisions of the Indenture do not specifically and explicitly state that the 7.75% Convertible Note Holders are subordinate to the payment in full of any fees and expenses incurred by the Senior Notes Trustees or the Senior Note Holders.

64.    In fact, no reference at all is made to fees and expenses in section 11.03 of the Supplemental Indenture or the definition of Senior Debt.

65.    As a result, the 7.75% Convertible Note Holders are not subordinate to the payment of any fees and expenses arising under the Senior Notes, and the 7.75% Convertible Note Holders are not required to pay over any portion of their distributions attributable to such claims to the Senior Notes Trustees or the Senior Note Holders, under the Plan or otherwise.

66.    Accordingly, M&T respectfully seeks a judgment declaring that the 7.75% Convertible Notes are not subordinate to the payment of any fees and expenses incurred by the Senior Notes Trustees or the Senior Notes Holders, and the 7.75% Convertible Note Holders are not required to pay over any portion of their initial or future distributions (whether currently held in or to be deposited into escrow, or otherwise) attributable to such claims (including any post-emergence date interest that may accrue on account of such claims) to, or for the benefit of, the Senior Notes Trustees or the Senior Note Holders, under the Indenture, the Plan or otherwise.

17

**WHEREFORE** M&T respectfully prays for relief against the Senior Notes Trustees as follows: (a) the entry of declaratory judgments in accordance with Counts I through III; (b) costs and disbursements of this action, including reasonable counsel fees and costs; and (c) such other and further relief as the Court deems just.

Dated: New York, New York
      February 21, 2008

Respectfully Submitted

STROOCK & STROOCK & LAVAN LLP

By: _____
    Kristopher M. Hansen
    Daniel A. Ross
    Erez E. Gilad
    180 Maiden Lane
    New York, New York  10038-4982
    Telephone:  (212) 806-5400
    Facsimile:  (212) 806-6006

Co-counsel to Manufacturers and Traders Trust Company, as Successor Indenture Trustee for the 7.75% Contingent Convertible Notes Due 2015 issued by Calpine Corporation with respect to Counts I and II

YOUNG CONAWAY STARGATT & TAYLOR, LLP

    Rolin P. Bissell
    Norman M. Powell
    Ian S. Fredericks
    The Brandywine Building
    1000 West Street, 17th Floor
    P.O. Box 391
    Wilmington, Delaware  19899-0391
    Telephone:  (302) 571-6600
    Facsimile:  (302) 571-1253

Co-counsel to Manufacturers and Traders Trust Company, as Successor Indenture Trustee for the 7.75% Contingent Convertible Notes Due 2015 issued by Calpine Corporation with respect to Counts I and II, and Counsel with respect to Count III

18

Exhibit A

CALPINE CORPORATION

and

WILMINGTON TRUST COMPANY, Trustee

Indenture

Dated as of August 10, 2000

Debt Securities

701415/00021/217633 V6

TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS AND INCORPORATION BY REFERENCE

| | | |
|---|---|---|
| SECTION 1.1 | Definitions | 5 |
| SECTION 1.2 | Other Definitions | 11 |
| SECTION 1.3 | Incorporation by Reference of TIA | 11 |
| SECTION 1.4 | Rules of Construction | 12 |

ARTICLE II
THE SECURITIES

| | | |
|---|---|---|
| SECTION 2.1 | Securities Issuable in Series | 12 |
| SECTION 2.2 | Form and Dating | 14 |
| SECTION 2.3 | Execution and Authentication | 15 |
| SECTION 2.4 | Registrar and Paying Agent | 16 |
| SECTION 2.5 | Paying Agent To Hold Money in Trust | 16 |
| SECTION 2.6 | Securityholder Lists | 17 |
| SECTION 2.7 | Transfer and Exchange | 17 |
| SECTION 2.8 | Replacement Securities | 19 |
| SECTION 2.9 | Outstanding Securities | 19 |
| SECTION 2.10 | Determination of Holders' Action | 20 |
| SECTION 2.11 | Temporary Securities | 20 |
| SECTION 2.12 | Cancellation | 20 |
| SECTION 2.13 | Defaulted Interest | 20 |

ARTICLE III
COVENANTS

| | | |
|---|---|---|
| SECTION 3.1 | Payment of Securities | 21 |
| SECTION 3.2 | Maintenance of Office or Agency | 21 |
| SECTION 3.3 | Limitation on Sale/Leaseback Transactions | 21 |
| SECTION 3.4 | Limitation on Liens | 22 |
| SECTION 3.5 | Compliance Certificate | 23 |
| SECTION 3.6 | SEC Reports | 23 |
| SECTION 3.7 | Further Instruments and Acts | 24 |
| SECTION 3.8 | Waiver of Certain Covenants | 24 |

ARTICLE IV
CONSOLIDATION, MERGER, SALE AND LEASE

| | | |
|---|---|---|
| SECTION 4.1 | Merger and Consolidation of Company | 24 |
| SECTION 4.2 | Successor Substituted | 25 |

2

Page

ARTICLE V
DEFAULTS AND REMEDIES                                                                      25

SECTION 5.1    Events of Default.................................................................    27
SECTION 5.2    Acceleration.........................................................................    27
SECTION 5.3    Other Remedies ...................................................................    27
SECTION 5.4    Waiver of Past Defaults.......................................................    27
SECTION 5.5    Control by Majority..............................................................    28
SECTION 5.6    Limitation on Suits ..............................................................    28
SECTION 5.7    Rights of Holders To Receive Payment ...............................    28
SECTION 5.8    Collection Suit by Trustee ...................................................    29
SECTION 5.9    Trustee May File Proofs of Claim .......................................    29
SECTION 5.10   Priorities...............................................................................    29
SECTION 5.11   Undertaking for Costs..........................................................    30
SECTION 5.12   Waiver of Stay or Extension Laws .......................................

ARTICLE VI
TRUSTEE                                                                                              30

SECTION 6.1    Duties of Trustee ..................................................................    31
SECTION 6.2    Rights of Trustee ..................................................................    32
SECTION 6.3    Individual Rights of Trustee.................................................    32
SECTION 6.4    Trustee's Disclaimer ............................................................    32
SECTION 6.5    Notice of Defaults.................................................................    32
SECTION 6.6    Reports by Trustee to Holders .............................................    32
SECTION 6.7    Compensation and Indemnity ..............................................    33
SECTION 6.8    Replacement of Trustee........................................................    35
SECTION 6.9    Successor Trustee by Merger, etc.........................................    35
SECTION 6.10   Eligibility; Disqualification; Conflicting Interests ..............    35
SECTION 6.11   Preferential Collection of Claims Against Company .............

ARTICLE VII
SATISFACTION AND DISCHARGE OF INDENTURE                                              35

SECTION 7.1    Discharge of Liability on Securities......................................    36
SECTION 7.2    Termination of Company's Obligations.................................    37
SECTION 7.3    Defeasance and Discharge of Indenture ..............................    38
SECTION 7.4    Defeasance of Certain Obligations.......................................    40
SECTION 7.5    Application of Trust Money ..................................................    40
SECTION 7.6    Repayment to Company.......................................................    40
SECTION 7.7    Reinstatement ......................................................................
SECTION 7.8    Deposited Money and U.S. Government Obligations to be Held in Trust;    41
               Miscellaneous Provisions ....................................................

ARTICLE VIII
AMENDMENTS AND SUPPLEMENTS                                                             41

SECTION 8.1    Without Consent of Holders .................................................    42
SECTION 8.2    With Consent of Holders .....................................................

3

| | | Page |
|---|---|---|
| SECTION 8.3 | Compliance with Trust Indenture Act | 42 |
| SECTION 8.4 | Revocation and Effect of Consents | 42 |
| SECTION 8.5 | Notation on or Exchange of Securities | 43 |
| SECTION 8.6 | Trustee To Sign Amendments | 43 |
| SECTION 8.7 | Fixing of Record Dates | 43 |

### ARTICLE IX
### REDEMPTION

| | | |
|---|---|---|
| SECTION 9.1 | Applicability of Article | 44 |
| SECTION 9.2 | Election to Redeem; Notice to Trustee | 44 |
| SECTION 9.3 | Selection by Trustee of Securities to be Redeemed | 44 |
| SECTION 9.4 | Notice of Redemption | 44 |
| SECTION 9.5 | Deposit of Redemption Price | 45 |
| SECTION 9.6 | Securities Redeemed in Part | 45 |

### ARTICLE X
### MISCELLANEOUS

| | | |
|---|---|---|
| | | 46 |
| SECTION 10.1 | Trust Indenture Act Controls | 46 |
| SECTION 10.2 | Notices | 47 |
| SECTION 10.3 | Communication by Holders with Other Holders | 47 |
| SECTION 10.4 | Certificate and Opinion as to Conditions Precedent | 47 |
| SECTION 10.5 | Statements Required in Certificate or Opinion | 47 |
| SECTION 10.6 | Rules by Trustee and Agents | 47 |
| SECTION 10.7 | Legal Holidays | 48 |
| SECTION 10.8 | Successors; No Recourse Against Others | 48 |
| SECTION 10.9 | Duplicate Originals | 48 |
| SECTION 10.10 | Other Provisions | 48 |
| SECTION 10.11 | Governing Law | 49 |
| SIGNATURES | | A-1 |
| EXHIBIT A -- Form of Security | | |

4

INDENTURE, dated as of August 10, 2000, between Calpine Corporation, a Delaware corporation (the "Company"), and Wilmington Trust Company, a Delaware banking corporation (the "Trustee").

WHEREAS, the Company desires to issue debt securities in one or more series from time to time hereunder in an unlimited aggregate principal amount; and

WHEREAS, the Trustee desires to act as Trustee with respect to such securities;

NOW, THEREFORE, each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the holders of such securities or of series thereof:

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.1  Definitions.

"Affiliate" of any specified Person means any other Person, directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means, with respect to any Series of Securities, any Registrar, Paying Agent, authenticating agent, co-registrar or additional paying agent appointed pursuant to this Indenture with respect to such Series.

"Attributable Debt" in respect of a Sale/Leaseback Transaction means, as at the time of determination, the present value (discounted at the rate of interest set forth or implicit in the terms of such lease (or, if not practicable to determine such rate, the weighted average rate of interest borne by the Securities outstanding hereunder (calculated, in the event of the issuance of any original issue discount Securities, based on the imputed interest rate with respect thereto)), compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale/Leaseback Transaction (including any period for which such lease has been extended).

"Average Life" means, as of the date of determination, with respect to any Indebtedness or Preferred Stock, the quotient obtained by dividing (i) the sum of the products of (A) the numbers of years from the date of determination to the dates of each successive scheduled principal payment of such Indebtedness or scheduled redemption or similar payment with respect to such Indebtedness or Preferred Stock multiplied by (B) the amount of such payment by (ii) the sum of all such payments.

"Board of Directors" means the Board of Directors of the Company or any authorized committee thereof.

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

5

"Business Day" means each day which is not a Legal Holiday.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation or any and all equivalent ownership interests in a Person (other than a corporation).

"Capitalized Lease Obligations" of any Person means the rental obligations under any lease of any property (whether real, personal or mixed) of which the discounted present value of the rental obligations of such Person as lessee, in conformity with GAAP, is required to be capitalized on the balance sheet of such Person; the Stated Maturity of any such lease shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Stock" means the Common Stock, par value $.001 per share, of the Company.

"Company" means the party named as such in this Indenture until a successor replaces it pursuant to the terms and conditions of this Indenture and thereafter means the successor.

"Consolidated Current Liabilities," as of the date of determination, means the aggregate amount of consolidated liabilities of the Company and its consolidated Restricted Subsidiaries which may properly be classified as current liabilities (including taxes accrued as estimated), after eliminating (i) all inter-company items between the Company and its Subsidiaries and (ii) all current maturities of long-term Indebtedness, all as determined in accordance with GAAP.

"Consolidated Net Tangible Assets" means, as of any date of determination, as applied to the Company, the total amount of Consolidated assets (less accumulated depreciation or amortization, allowances for doubtful receivables, other applicable reserves and other properly deductible items) under GAAP which would appear on a Consolidated balance sheet of the Company and its Subsidiaries, determined in accordance with GAAP, and after giving effect to purchase accounting and after deducting therefrom, to the extent otherwise included, the amounts of: (i) Consolidated Current Liabilities; (ii) minority interests in consolidated Restricted Subsidiaries held by Persons other than the Company or a Restricted Subsidiary; (iii) excess of cost over fair value of assets of businesses acquired, as determined in good faith by the Board of Directors; (iv) any revaluation or other write-up in value of assets subsequent to December 31, 1993 as a result of a change in the method of valuation in accordance with GAAP; (v) unamortized debt discount and expenses and other unamortized deferred charges, goodwill, patents, trademarks, service marks, trade names, copyrights, licenses, organization or developmental expenses and other intangible items; (vi) treasury stock; and (vii) any cash set apart and held in a sinking or other analogous fund established for the purpose of redemption or other retirement of Capital Stock to the extent such obligation is not reflected in Consolidated Current Liabilities.

"Consolidation" means, with respect to any Person, the consolidation of accounts of such Person and each of its subsidiaries if and to the extent the accounts of such Person and such subsidiaries are consolidated in accordance with GAAP. The term "Consolidated" shall have a correlative meaning.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

6

"Defaulted Interest" means any interest on any Security which is payable, but is not punctually paid or duly provided for on any Interest Payment Date, such Defaulted Interest to accrue (except as otherwise provided in accordance with Section 2.1) at the same rate per annum as interest accrued or accreted, as the case may be, on the Business Day immediately preceding such Interest Payment Date.

"Depository" means The Depository Trust Company, its nominees, and their respective successors until a successor Depository shall have become such pursuant to the applicable provisions of this Indenture and thereafter "Depository" shall mean or include each Person who is then a Depository hereunder.

"Directors' Certificate" means a certificate signed by two members of the Board of Directors.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"GAAP" means generally accepted accounting principles in the United States of America as in effect and, to the extent optional, adopted by the Company, on the date of the Indenture, consistently applied.

"Guarantee" means, as applied to any obligation, contingent or otherwise, of any Person, (i) a guarantee, direct or indirect, in any manner, of any part or all of such obligation (other than by endorsement of negotiable instruments for collection in the ordinary course of business) and (ii) an agreement, direct or indirect, contingent or otherwise, the practical effect of which is to insure in any way the payment or performance (or payment of damages in the event of nonperformance) of any part or all of such obligation, including the payment of amounts drawn down under letters of credit.

"Holder" or "Securityholder" means the Person in whose name a Security is registered on the Registrar's books.

"Incur" means, as applied to any obligation, to create, incur, issue, assume, guarantee or in any other manner become liable with respect to, contingently or otherwise, such obligation, and "Incurred," "Incurrence" and "Incurring" shall each have a correlative meaning; provided, however, that any amendment, modification or waiver of any provision of any document pursuant to which Indebtedness was previously Incurred shall not be deemed to be an Incurrence of Indebtedness as long as (i) such amendment, modification or waiver does not (A) increase the principal or premium thereof or interest rate thereon, (B) change to an earlier date the Stated Maturity thereof or the date of any scheduled or required principal payment thereon or the time or circumstances under which such Indebtedness may or shall be redeemed, (C) if such Indebtedness is contractually subordinated in right of payment to the Securities, modify or affect, in any manner adverse to the Holders, such subordination or (D) if the Company is the obligor thereon, provide that a Restricted Subsidiary shall be an obligor and (ii) such Indebtedness would, after giving effect to such amendment, modification or waiver as if it were an Incurrence, comply with clause (i) of the first proviso to the definition of "Refinancing Indebtedness."

"Indebtedness" of any Person means, without duplication, (i) the principal in respect of indebtedness of such Person for money borrowed and; (ii) all Capitalized Lease Obligations of such Person; (iii) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in (i) and (ii) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than

7

the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit; (iv) all obligations of the type referred to in clauses (i) through (iii) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise; and (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation on any date of determination being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured. The amount of Indebtedness of any Person at any date shall be, with respect to unconditional obligations, the outstanding balance at such date of all such obligations as described above and, with respect to any contingent obligations at such date, the maximum liability determined by such Person's board of directors, in good faith, as, in light of the facts and circumstances existing at the time, reasonably likely to be incurred upon the occurrence of the contingency giving rise to such obligation.

"Indenture" means, with respect to each Series of Securities, this Indenture as originally executed or as it is amended or supplemented from time to time by one or more indentures supplemental hereto entered into in accordance with the applicable provisions hereof, and shall include the terms of each particular Series of Securities established as contemplated by Section 2.1.

"Interest Payment Date" means, with respect to any Series, the stated maturity of an installment of interest on the Securities of such Series.

"Lien" means any mortgage, lien, pledge, charge, or other security interest or encumbrance of any kind (including any conditional sale or other title retention agreement and any lease in the nature thereof).

"Officer" means the Chairman, the President, any Vice President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, the Secretary, any Assistant Treasurer, any Assistant Secretary or the Controller or Principal Accounting Officer of the Company.

"Officers' Certificate" means a certificate signed by two Officers, one of whom must be the President, the Treasurer or a Vice President. Each Officers' Certificate (other than certificates provided pursuant to TIA Section 314(a)(4)) shall include the statements provided for in TIA Section 314(e), if applicable.

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel, if so acceptable, may be an employee of or counsel to the Company or the Trustee. Each such Opinion of Counsel shall include the statements provided for in TIA Section 314(e), if applicable.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Preferred Stock", as applied to the Capital Stock of any corporation, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such corporation, over shares of Capital Stock of any other class of such corporation.

8

"Principal" of a Security means the principal of the Security plus, if applicable, the premium on the Security due on the Stated Maturity or on a Redemption Date.

"Redemption Date" means, when used with respect to any Security of any Series to be redeemed, the date fixed for such redemption by or pursuant to this Indenture.

"Redemption Price" means, when used with respect to any Security of any Series to be redeemed, the price specified in such Security at which it is to be redeemed pursuant to this Indenture.

"Refinancing Indebtedness" means Indebtedness that refunds, refinances, replaces, renews, repays or extends (including pursuant to any defeasance or discharge mechanism) (collectively, "refinances," and "refinanced" shall have a correlative meaning) any Indebtedness of the Company or a Restricted Subsidiary existing on the date of this Indenture or Incurred in compliance with the Indenture (including Indebtedness of the Company that refinances Indebtedness of any Restricted Subsidiary and Indebtedness of any Restricted Subsidiary that refinances Indebtedness of another Restricted Subsidiary) including Indebtedness that refinances Refinancing Indebtedness; provided, however, that (i) if the Indebtedness being refinanced is contractually subordinated in right of payment to the Securities, the Refinancing Indebtedness shall be contractually subordinated in right of payment to the Securities to at least the same extent as the Indebtedness being refinanced, (ii) the Refinancing Indebtedness is scheduled to mature either (a) no earlier than the Indebtedness being refinanced or (b) after the Stated Maturity of the Securities, (iii) the Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being refinanced and (iv) such Refinancing Indebtedness is in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding (plus fees and expenses, including any premium, swap breakage and defeasance costs) under the Indebtedness being refinanced; and provided, further, that Refinancing Indebtedness shall not include (x) Indebtedness of a Subsidiary of the Company that refinances Indebtedness of the Company or (y) Indebtedness of the Company or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Company that is not designated an Unrestricted Subsidiary by the Board of Directors.

"Sale/Leaseback Transaction" means an arrangement relating to property now owned or hereafter acquired whereby the Company or a Subsidiary transfers such property to a Person and leases it back from such Person, other than leases for a term of not more than 36 months or between the Company and a Wholly Owned Subsidiary or between Wholly Owned Subsidiaries.

"SEC" means the Securities and Exchange Commission.

"Securities" means unsecured debentures, notes or other evidence of indebtedness of the Company that are issued under and pursuant to the terms of this Indenture.

"Securities Act" means the Securities Act of 1933, as amended.

"Senior Indebtedness" means all indebtedness incurred, assumed or guaranteed by the Company, whether or not represented by bonds, debentures notes or other securities, for money borrowed, and any deferrals, renewals

9

or extensions or refunding of any such indebtedness, unless in the instrument creating or evidencing any such indebtedness or pursuant to which the same is outstanding it is specifically stated, at or prior to the time the Company becomes liable in respect thereof, that any such indebtedness or such deferral, renewal, extension or refunding thereof is not Senior Indebtedness.

"Significant Subsidiary" means any Subsidiary (other than an Unrestricted Subsidiary) that would be a "Significant Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency).

"Subsidiary" means, as applied to any Person, any corporation, partnership, trust, association or other business entity of which an aggregate of at least 50% of the outstanding Voting Shares or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more Subsidiaries of such Person.

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date first above written.

"Trustee" means the party named as such above until a successor replaces it and thereafter means the successor, and if at any time there is more than one such Person, "Trustee" as used with respect to the Securities of any Series shall mean the Trustee with respect to the Securities of that Series.

"Trust Officer" means any officer of the Trustee assigned by the Trustee to administer its corporate trust matters or to whom any corporate trust matter is referred because of that officer's knowledge of and familiarity with the particular subject.

"Uniform Commercial Code" means the New York Uniform Commercial Code as in effect from time to time.

"Unrestricted Subsidiary" means (i) any Subsidiary that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors in the manner provided below and (ii) any Subsidiary of an Unrestricted Subsidiary. The Board of Directors may designate any Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary owns any Capital Stock of, or owns or holds any Lien on any property of, the Company or any other Subsidiary that is not a Subsidiary of the Subsidiary to be so designated; provided, that the Subsidiary to be so designated and all other Subsidiaries previously so designated at the time of any determination hereunder shall, in the aggregate, have total assets not greater than 5% of Consolidated Net Tangible Assets as determined based on the Consolidated balance sheet of the Company as of the end of the most recent fiscal quarter for which financial statements are available. The Board of Directors may designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company; provided, however, that immediately after giving effect to such designation no Default or Event of Default shall have occurred and be continuing. Any such designation by the Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a Board Resolution giving effect to such

10

designation and an Officers' Certificate certifying that such designation complied with the foregoing provision; provided, however, that the failure to so file such resolution and/or Officers' Certificate with the Trustee shall not impair or affect the validity of such designation.

"U.S. Government Obligations" means securities that are (i) direct obligations of the United States of America for the payment of which its full faith and credit is pledged or (ii) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America, which, in either case under clauses (i) or (ii) are not callable or redeemable before the Stated Maturity thereof.

"Voting Shares," with respect to any corporation, means the Capital Stock having the general voting power under ordinary circumstances to elect at least a majority of the board of directors (irrespective of whether or not at the time stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

"Wholly Owned Subsidiary" means a Subsidiary (other than an Unrestricted Subsidiary) all the Capital Stock of which (other than directors' qualifying shares) is owned by the Company or another Wholly Owned Subsidiary.

SECTION 1.2 Other Definitions.

| TERM | DEFINED IN SECTION |
|---|---|
| "Additional Securities" | 2.1 |
| "Bankruptcy Law" | 5.1 |
| "Custodian" | 5.1 |
| "Event of Default" | 5.1 |
| "Global Securities" | 2.2 |
| "Legal Holiday" | 10.7 |
| "Notice of Default" | 5.1 |
| "Paying Agent" | 2.4 |
| "Registrar" | 2.4 |
| "Series" | 2.1 |
| "Successor Corporation" | 4.1(i) |

SECTION 1.3 Incorporation by Reference of TIA.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA terms used in this Indenture have the following meanings:

"Commission" means the SEC;

"indenture securities" means the Securities;

"indenture security holder" means a Holder or Securityholder;

11

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the indenture securities means the Company or any other obligor on the indenture securities.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule under the TIA have the meanings assigned to them by the TIA.

SECTION 1.4 Rules of Construction.

Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) "generally accepted accounting principles" means, and any accounting term not otherwise defined has the meaning assigned to it and shall be construed in accordance with, GAAP;

(c) "or" is not exclusive;

(d) words in the singular include the plural, and in the plural include the singular;

(e) provisions apply to successive events and transactions;

(f) "including" means "including, without limitation";

(g) unsecured debt shall not be deemed to be subordinate or junior to secured debt merely by virtue of its nature as unsecured debt;

(h) the principal amount of any non-interest bearing or other discount Security at any date shall be the principal amount thereof that would be shown on a balance sheet of the Company dated such date prepared in accordance with generally accepted accounting principles; and

(i) the principal amount (if any) of any Preferred Stock shall be the greatest of (i) the stated value, (ii) the redemption price or (iii) the liquidation preference of such Preferred Stock.

ARTICLE II

THE SECURITIES

SECTION 2.1 Securities Issuable in Series.

Securities may be issued hereunder in one or more series, each series (a "Series") having identical terms but for authentication date and public offering price. Securities of any one Series need not be issued at the same

12

time and, unless specifically provided otherwise, a Series may be reopened, without the consent of the Holders, for issuances of additional Securities of such Series.

Securities issued hereunder shall be issued pursuant to authority granted by or pursuant to a Board Resolution and, prior to the issue hereunder of the first Securities of a Series, the Company shall set forth in a Directors' Certificate, or establish in one or more indentures supplemental hereto, the following terms which shall be applicable to such Series:

(1) the title, including CUSIP number, of the Series (which shall distinguish the Securities of such Series from all other Securities);

(2) any limit upon the aggregate principal amount of the Securities of such Series which may be authenticated and delivered under this Agreement (except for Securities authenticated and delivered upon registration of transfer of, or in exchange for, or for replacement of, or in lieu of, other Securities of the Series pursuant to Sections 2.7, 2.8, 2.11, 8.5 or 9.6);

(3) the date or dates on which the principal of the Securities of the Series are payable;

(4) the rate or rates, or the method of determination thereof, at which the Securities of the Series shall bear interest, if any, the date or dates from which such interest shall accrue, the Interest Payment Dates on which such interest shall be payable and the record dates for the determination of Holders to whom interest is payable;

(5) the place or places where the principal of, and interest on Securities of the Series shall be payable;

(6) the obligation, if any, of the Company to redeem, purchase or repay the Securities of such Series pursuant to any right to do so contained in the Securities or pursuant to sinking fund or analogous provisions or at the option of a Holder thereof and the price or prices at which and the period or periods within which and the terms and conditions upon which the Securities of such Series shall be redeemed, purchased or repaid, in whole or in part, pursuant to such obligation;

(7) the denominations in which the Securities of such Series shall be issuable, if other than integral multiples of $1,000;

(8) if other than the principal amount thereof, the portion of the principal amount of the Securities of such Series which shall be payable upon the declaration of acceleration of the maturity thereof pursuant to Section 5.2;

(9) any Events of Default or covenants with respect to the Securities of such Series, if not set forth in this Indenture;

(10) if other than those named herein, any other depositaries, authenticating or paying agents, transfer agents or registrars or any other agents with respect to such Series;

(11) the stock exchanges, if any, on which the Securities will be listed and related information;

13

(12) any applicable restrictions on the transfer of any of the Securities of such Series;

(13) if other than the currency of the United States of America, the currency, currencies or currency units in which the principal of or interest, if any, on any Securities of the Series shall be payable and the manner of determining the equivalent thereof in the currencies of the United States of America for any purpose;

(14) if applicable, the terms of any right to convert Securities of the Series into, or to exchange Securities of the Series for, shares of Common Stock or other securities or property; and

(15) Whether the Securities of the Series shall be issued in whole or in part in the form of one or more Global Securities, the Depository for the Series, if other than The Depository Trust Company or its successors, and any circumstances in addition to or in lieu of those set forth in Section 2.7 in which any Global Security may be exchanged in whole or in part for Securities registered, and any transfer of such Global Security in whole or in part may be registered, in the name or names of Persons other than the Depository for such Global Security or a nominee thereof;

(16) any other terms of the Series (which terms shall not be inconsistent with the provisions of this Indenture).

All Securities of any one Series shall be substantially identical except as to denomination and except as may otherwise be provided in or pursuant to such Directors' Certificate.

Additional Securities of the same Series may be issued subsequent to the original issue date of any Securities of such Series (hereinafter called "Additional Securities") following the receipt of the Trustee of a Directors' Certificate pertaining to such Additional Securities, which Directors' Certificate will identify the Series to which such Additional Securities belongs and the issue date and aggregate principal amount of the Securities of such Additional Securities. Any such Additional Securities shall be issued on original issue as provided in Section 2.3.

Additional Securities, together with each prior and subsequent Securities of the same Series, shall constitute one and the same Series of Securities for all purposes under this Indenture.

SECTION 2.2  Form and Dating.

The Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A annexed hereto, which is part of this Indenture, with such appropriate insertions, omissions and other variations as are required or permitted by this Indenture, and may have such legends or endorsements placed thereon as the Officers executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Indenture. The Securities may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Security shall be dated the date of its authentication.

The terms and provisions contained in the form of Securities annexed hereto as Exhibit A shall constitute, and are expressly made, a part of this Indenture. To the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

14

Securities issued in the form of one or more permanent global Securities in registered form, substantially in the form as above recited (the "Global Securities"), shall be deposited with or on behalf of the Trustee, as custodian for the Depository, duly executed by the Company and authenticated by the Trustee as hereinafter provided. Each Global Security shall bear such legend as may be required or reasonably requested by the Depository.

The definitive Securities shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any securities exchange on which the Securities may be listed, all as determined by the officers executing such Securities, as evidenced by their execution of such Securities.

SECTION 2.3  Execution and Authentication.

Two Officers shall sign the Securities for the Company by manual or facsimile signature.

If an Officer whose signature is on a Security no longer holds that office at the time the Security is authenticated, the Security shall nevertheless be valid.

A Security shall not be valid until authenticated by the manual signature of an authorized officer of the Trustee. The signature shall be conclusive evidence that the Security has been authenticated under this Indenture.

The Trustee shall authenticate Securities upon a written order of the Company signed by two Officers. Such order shall specify the Series and the amount of the Securities to be authenticated and the date on which such Securities are to be authenticated. The aggregate principal amount of Securities outstanding at any time is unlimited. In authenticating such Securities and in accepting the additional responsibilities under this Indenture in relation to such Securities, the Trustee shall be entitled to receive and shall be fully protected in relying upon, an Opinion of Counsel stating.

(1) that the form or forms of such Securities have been established in conformity with the provisions of this Indenture;

(2) that the terms of such Securities have been established in conformity with the provisions of this Indenture; and

(3) that such Securities, when authenticated and delivered by the Trustee and issued by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute valid and legally binding obligations of the Company enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

The Trustee shall initially act as authenticating agent and may subsequently appoint another Person acceptable to the Company as authenticating agent to authenticate Securities. Unless limited by the terms of such appointment, an authenticating agent may authenticate Securities whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with the Company or an Affiliate of the Company.

15

Provided that the authentication agent has entered into an agreement with the Company concerning the authentication agent's duties, the Trustee shall not be liable for any act or any failure of the authenticating agent to perform any duty either required herein or authorized herein to be performed by such Person in accordance with this Indenture.

The Trustee shall have the right to decline to authenticate and deliver any Securities under this Section if the Trustee, being advised by counsel, determines that such action may not lawfully be taken or if the Trustee in good faith shall determine that such action would expose the Trustee to personal liability to existing Holders or would affect the Trustee's own rights, duties or immunities under the Securities and this Indenture or otherwise in a manner which is not reasonably acceptable to the Trustee.

The Securities shall be issued only in registered form without coupons and shall be dated the date of their authentication.

## SECTION 2.4  Registrar and Paying Agent.

The Company shall maintain an office or agency where Securities may be presented for registration of transfer or for exchange ("Registrar") and an office or agency where Securities may be presented for payment ("Paying Agent"). The Registrar shall keep a register of the Securities and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Paying Agent" includes any additional paying agent and the term "Registrar" includes any co-registrar.

The Company shall enter into an appropriate agency agreement with any Registrar, Paying Agent or co-registrar not a party to this Indenture. The agreement shall implement the provisions of this Indenture that relate to such agent. The Company shall promptly notify the Trustee of the name and address of any such agent and any change in the address of such agent. If the Company fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 6.7. The Company or any Subsidiary or Affiliate of the Company may act as Paying Agent, Registrar, co-registrar or transfer agent.

The Company initially appoints the Trustee as Registrar and Paying Agent in connection with the Securities.

## SECTION 2.5  Paying Agent To Hold Money in Trust.

On or prior to 11:00 a.m., New York City time, on each due date of the principal and interest on any Security, the Company shall deposit with the Paying Agent a sum of money denominated in the currency of such payment, in immediately available funds, sufficient to pay such principal and interest in funds available when such becomes due. The Company shall require each Paying Agent (other than the Trustee) to agree in writing that the Paying Agent shall hold in trust for the benefit of Securityholders or the Trustee all money held by the Paying Agent for the payment of principal of or interest on the Securities (whether such money has been paid to it by the Company or any other obligor on the Securities) and shall notify the Trustee of any default by the Company (or any other obligor on the Securities) in making any such payment. If the Company or a Subsidiary or an Affiliate of the Company acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund for the benefit of the Securityholders. If the Company defaults in its obligation to deposit funds for the payment of principal and interest the Trustee may, during the continuation of such default, require a Paying Agent to pay all money held by it to the Trustee. The Company at

16

any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it. Upon doing so, the Paying Agent (other than the Company or a Subsidiary or Affiliate of the Company) shall have no further liability for the money delivered to the Trustee.

SECTION 2.6  Securityholder Lists.

The Trustee shall preserve in as current a form as reasonably practicable the most recent list available to it of the names and addresses of Securityholders. If the Trustee is not the Registrar, the Company shall furnish to the Trustee at least five Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Securityholders, and the Company shall otherwise comply with TIA Section 312(a).

SECTION 2.7  Transfer and Exchange.

The Securities shall be transferable only upon the surrender of a Security to the Registrar for registration of transfer. When a Security is presented to the Registrar or a co-registrar with a request to register a transfer, the Registrar shall register the transfer as requested if the requirements of Section 8-401(a) of the Uniform Commercial Code are met (and the Registrar shall be entitled to assume such requirements have been met unless it receives written notice to the contrary) and, if so required by the Trustee or the Company, if the Security presented is accompanied by a written instrument of transfer in form satisfactory to the Trustee and the Company, duly executed by the registered owner or by his or her attorney duly authorized in writing, in which case, the Registrar shall deliver one or more new Securities of the same Series, of any authorized denominations and of a like aggregate principal amount. When Securities are presented to the Registrar or a co-registrar with a request to exchange them for an equal principal amount of Securities of the same Series and of other authorized denominations, the Registrar shall make the exchange as requested if the same requirements are met. To permit registration of transfers and exchanges, the Company shall execute and the Trustee shall authenticate Securities at the Registrar's or co-registrar's request. The Depository shall, by acceptance of a Global Security, agree that transfers of beneficial interests in such Global Security may be effected only through a book-entry system maintained by the Depository (or its agent), and that ownership of a beneficial interest in the Global Security shall be required to be reflected in a book entry.

No service charge shall be made for any registration of transfer or exchange of the Securities, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange pursuant to Section 2.11, 8.5 or 9.6).

Prior to the due presentation for registration of transfer of any Security, the Company, the Trustee, the Paying Agent, the Registrar or any co-registrar may deem and treat the person in whose name a Security is registered as the absolute owner of such Security for the purpose of receiving payment of principal of and interest (subject to the record date provisions thereof) on such Security and for all other purposes whatsoever, whether or not such Security is overdue, and none of the Company, the Trustee, the Paying Agent, the Registrar or any co-registrar shall be affected by notice to the contrary.

Notwithstanding any other provisions of this Section 2.7, unless and until it is exchanged in whole or in part for Securities of any Series in definitive registered form, a Global Security representing all or a portion of the Securities of a Series may not be transferred except as a whole by the Depository to a nominee of such

17

Depository or by a nominee of such Depository to such Depository or another nominee of such Depository or by such Depository or any such nominee to a successor Depository or a nominee of such successor Depository.

If the Depository notifies the Company that it is unwilling or unable to continue as Depository for the Global Securities of any Series or if at any time the Depository shall no longer be eligible under the next sentence of this paragraph, the Company shall appoint a successor Depository with respect to such Securities. Each Depository appointed pursuant to this Section 2.7 must, at the time of its appointment and at all times while it serves as Depository, be a clearing agency registered under the Exchange Act and any other applicable statute or regulation. The Company will execute, and the Trustee will authenticate and deliver upon a written order of the Company signed by two Officers, Securities in definitive registered form in any authorized denominations representing Securities of a Series in exchange for such Global Security or Securities of such Series if (i) the Depository notifies the Company that it is unwilling or unable to continue as Depository for the Global Securities of such Series or if at any time the Depository shall no longer be eligible to serve as Depository and a successor Depository for the Securities of such Series is not appointed by the Company within 90 days after the Company receives such notice or becomes aware of such ineligibility or (ii) an Event of Default with respect to the Securities of such Series has occurred and is continuing.

The Company may at any time and in its sole discretion determine that the Securities of a Series shall no longer be represented by a Global Security or Securities. In such event the Company will execute, and the Trustee will authenticate and deliver upon a written order of the Company signed by two Officers, Securities of such Series in definitive registered form in any authorized denominations representing such Securities in exchange for such Global Security or Securities.

Upon the exchange of a Global Security for Securities in definitive registered form without coupons, in authorized denominations, such Global Security shall be cancelled by the Trustee. Securities in definitive registered form issued in exchange for a Global Security pursuant to this Section 2.7 shall be registered in such names and in such authorized denominations as the Depository for such Global Security, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Trustee. The Trustee shall deliver such Securities to or as directed by the Persons in whose names such Securities are so registered.

No holder of a beneficial interest in any Global Security held on its behalf by a Depository shall have any rights under this Indenture with respect to such Global Security, and such Depository may be treated by the Company, the Trustee, and any agent of the Company or the Trustee as the owner of such Global Security for all purposes whatsoever. None of the Company, the Trustee or any agent of the Company or the Trustee will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Security or maintaining, supervising or reviewing any records relating to such beneficial ownership interests. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by a Depository or impair, as between a Depository and such holders of beneficial interests, the operation of customary practices governing the exercise of the rights of the Depository (or its nominee) as Holder of any Security.

The Company shall not be required (A) to issue, register the transfer of or exchange any Securities of a Series during a period beginning at the opening of business 15 days before the day of the mailing of a notice of redemption of any such Securities selected for redemption under Section 9.3 and ending at the close of business

18

on the day of such mailing or (B) to register the transfer of or exchange any Security so selected for redemption in whole or in part, except the unredeemed portion of any Security being redeemed in part.

All Securities issued upon any transfer or exchange pursuant to the terms of this Indenture will evidence the same debt and will be entitled to the same benefits under this Indenture as the Securities surrendered upon such transfer or exchange.

SECTION 2.8  Replacement Securities.

If a mutilated Security is surrendered to the Registrar or if the Holder of a Security claims that the Security has been lost, destroyed or wrongfully taken and the Holder furnishes to the Company and the Trustee evidence to their satisfaction of such loss, destruction or wrongful taking, the Company shall issue and the Trustee shall, in the absence of notice to the Company or the Trustee that such Security has been acquired by a bona fide purchaser, authenticate a replacement Security of the same Series if the requirements of Section 8-405 of the Uniform Commercial Code are met (and the Registrar shall be entitled to assume such requirements have been met unless it receives written notice to the contrary) and if there is delivered to the Company and the Trustee such security or indemnity as may be required to save each of them harmless, satisfactory to the Company and the Trustee. The Company and the Trustee may charge the Holder for their expenses in replacing a Security.

In case any such mutilated, lost, destroyed or wrongfully taken Security has become or is about to become due and payable, the Company in its discretion may, instead of issuing a new Security, pay such Security.

Every replacement Security of each Series is an additional obligation of the Company and shall be entitled to the benefits of this Indenture.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Securities.

SECTION 2.9  Outstanding Securities.

The Securities of each Series outstanding at any time are all the Securities authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, and those described in this Section as not outstanding.

If a Security is replaced or paid pursuant to Section 2.8, it ceases to be outstanding unless the Trustee and the Company receive proof satisfactory to them that the replaced or paid Security is held by a bona fide purchaser.

If all the principal and interest on any Securities of any Series are considered paid under Section 3.1, the Securities of such Series cease to be outstanding under this Indenture and interest on the Securities of such Series shall cease to accrue.

If the Paying Agent (other than the Company or a Subsidiary or an Affiliate of the Company) holds in accordance with this Indenture on a maturity or redemption date money sufficient to pay all principal and interest due on that date with respect to Securities of any Series then on and after that date such Securities cease to be outstanding and interest on them ceases to accrue (unless there shall be a default in such payment).

19

# EXHIBIT A
# PART 1

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

| | |
|---|---|
| MANUFACTURERS AND TRADERS TRUST COMPANY, as Successor Indenture Trustee for the 7.75% Contingent Convertible Notes Due 2015 issued by Calpine Corporation | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| - against - | ) ) |
| HSBC BANK USA, National Association, as Successor Indenture Trustee for the 7.625% Senior Notes Due 2006, the 8.75% Senior Notes Due 2007, the 8.75% Senior Notes Due 2008, and the 7.75% Senior Notes Due 2009 issued by Calpine Corporation, | ) ) ) ) ) ) ) ) |
| - and - | ) ) |
| U.S. BANK NATIONAL ASSOCIATION, as Indenture Trustee for the 10.50% Senior Notes Due 2006 issued by Calpine Corporation | ) ) ) ) ) |
| Defendants. | ) ) |

IMAGED

08600534

**SUMMONS**
Index No. _____
Plaintiff designates New York County as the place for trial. The basis for venue is CPLR § 503(c).

FILED
FEB 21 2008
COUNTY CLERK'S OFFICE
NEW YORK

To The Above-Named Defendant:

You are hereby summoned and required to serve upon Plaintiff's attorney an answer to the complaint in this action within twenty (20) days after the date of service of this Summons upon you, exclusive of the day of service, or within thirty (30) days after the date of service is complete if this Summons is not personally delivered to you within the State of New York. In the case of your failure to answer, judgment will be taken against you by default for the relief demanded in the annexed complaint.

Dated:   New York, New York
         February 21, 2008

STROOCK & STROOCK & LAVAN LLP

By:  _____

Kristopher M. Hansen
Daniel A. Ross
Erez E. Gilad
180 Maiden Lane
New York, New York 10038
212-806-5400

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Pauline K. Morgan, Esq.
Ian S. Fredericks, Esq.
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
302-571-6600
*Attorneys for Plaintiff Manufacturers
and Traders Trust Company, as
Successor Indenture Trustee for the
7.75% Convertible Notes Due 2015
issued by Calpine Corporation*

HSBC Bank USA, National
Association
452 Fifth Avenue
New York, New York 10018

U.S. Bank National Association
633 West 5th Street
Los Angeles, California 90071

2

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

| | |
|---|---|
| MANUFACTURERS AND TRADERS TRUST COMPANY, as Successor Indenture Trustee for the 7.75% Contingent Convertible Notes Due 2015 issued by Calpine Corporation | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| - against - | ) ) |
| HSBC BANK USA, National Association, as Successor Indenture Trustee for the 7.625% Senior Notes Due 2006, the 8.75% Senior Notes Due 2007, the 8.75% Senior Notes Due 2008, and the 7.75% Senior Notes Due 2009 issued by Calpine Corporation, | ) ) ) ) ) ) |
| - and - | ) ) |
| U.S. BANK NATIONAL ASSOCIATION, as Indenture Trustee for the 10.50% Senior Notes Due 2006 issued by Calpine Corporation | ) ) ) ) ) |
| Defendants. | ) |

**COMPLAINT**

Index No. _____

08600534

IMAGED

FILED
COUNTY CLERKS OFFICE
NEW YORK
FEB 2 1 2008

## COMPLAINT

Manufacturers and Traders Trust Company, in its capacity as successor indenture trustee (solely in its capacity as such, "M&T") on behalf of the holders (the "7.75% Convertible Note Holders") of the 7.75% Contingent Convertible Notes Due 2015 (the "7.75% Convertible Notes") issued by Calpine Corporation ("Calpine") pursuant to that certain Indenture, dated as of August 10, 2000 (the "Base Indenture"), between Calpine and Wilmington Trust Company, as predecessor indenture trustee ("WTC"), as supplemented by the Third Supplemental Indenture, dated as of June 23, 2005 (the "Supplemental Indenture," and together with the Base Indenture, the "Indenture"), by and through its undersigned counsel, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.     By this action, M&T respectfully asks this Court to resolve a straightforward contract dispute under New York state law as to the meaning of the subordination provisions of the Indenture.  The dispute arises between holders of senior and subordinated debt instruments of Calpine, an energy company that entered bankruptcy at the end of 2005 and emerged in January of this year.  The subordinated debt holders, on whose behalf the present action is brought, acknowledge that under the terms of the Indenture the senior debt holders are entitled to receive priority with respect to the payment of principal and "pre-petition interest" arising under the senior debt instruments — and indeed the senior debt holders have now received such payment in full.  However, the senior debt holders assert that their priority further extends to "post-petition interest" arising under the senior debt instruments, a position that Plaintiff disputes and respectfully submits is contrary to the "Rule of Explicitness" set forth by the New York Court of Appeals in a case squarely on point.

2.     Under Calpine's confirmed plan of reorganization, a portion of the subordinated debt holders' bankruptcy distribution, in the aggregate amount of approximately $170 million, is being (or shortly will be) deposited in escrow pending resolution of the dispute by a court of competent jurisdiction.  Towards this end, this declaratory judgment action has been brought.

## SUMMARY OF ACTION

3.     On December 20, 2005 (the "Petition Date"), Calpine commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The crux of the present dispute between M&T, in its capacity as successor indenture trustee for the

2

7.75% Convertible Notes, and each of the Defendants, in their respective capacities as indenture trustees for five (5) series of senior notes issued by Calpine (the "Senior Notes," and the holders of such notes, the "Senior Note Holders"), involves whether the 7.75% Convertible Notes are subordinated in right of payment to "post-petition interest" (*i.e.*, interest that accrues following the Petition Date through the date of emergence and/or thereafter) and certain other amounts arising under the Senior Notes, and whether the 7.75% Convertible Note Holders are required to pay over such amounts to the Senior Note Holders.

4.    Specifically, the governing Indenture provides that the 7.75% Convertible Notes are subordinated in right of payment to the prior payment in full of "all amounts (including principal, premium, if any, and interest)" due under "Senior Debt," as expressly defined therein to include the Senior Notes.  M&T concedes that the 7.75% Convertible Notes are subordinated in right of payment to any principal amount due under the Senior Notes as well as any "pre-petition interest" (*i.e.*, interest that accrued prior to the Petition Date but remained unpaid as of the Petition Date) arising under such Senior Notes.  Indeed, the Senior Note Holders have already been paid in full for all such amounts.

5.    However, consistent with binding precedent handed down by the New York Court of Appeals on the precise issue currently before this Court, the Indenture does *not* provide for the subordination of the 7.75% Convertible Notes with respect to any post-petition interest arising under Senior Debt.  The Court of Appeals has unequivocally adopted the "Rule of Explicitness" as a "guiding interpretive principle of State contract dispute resolution," such that "New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of the senior creditor's post-petition interest demand." *In re Southeast Banking Corp. (Chemical Bank v. First Trust of New York, N.A.)*, 93

3

N.Y.2d 178, 183-88 (1999). In other words, under New York law, a senior creditor's claim for post-petition interest against a junior creditor will not be allowed unless the subordination agreement explicitly and unambiguously alerts the junior creditor to the risk of subordination with respect to post-petition interest.

6.     The Indenture here — virtually identical to that addressed by the New York Court of Appeals in *In re Southeast Banking Corp.* — falls well short of satisfying the Rule of Explicitness. The Indenture fails to make any reference at all to the subordination of post-petition interest arising under Senior Debt, even though there are specific references to post-petition interest in other sections of the Indenture.

7.     Given the dispute as to the meaning and extent of the subordination provisions contained in the Indenture, Calpine's confirmed plan of reorganization provides that a portion of the 7.75% Convertible Note Holders' distribution will be held in escrow and released upon entry of a final determination from a court of competent jurisdiction as to the meaning of the subordination provisions.

8.     Accordingly, M&T respectfully seeks a judgment from this Court, as a "court of competent jurisdiction," declaring that the 7.75% Convertible Notes are *not* subordinated in right of payment to the prior payment in full of any post-petition interest arising under the Senior Notes (including any post-emergence date interest, whether at the contractual rate or otherwise).

9.     M&T also respectfully seeks a judgment from this Court declaring that the 7.75% Convertible Notes are *not* subordinated with respect to any "breach of contract damage claims" and/or fees and expenses asserted by the Senior Note Holders on similar grounds, namely that the Indenture fails to explicitly and unambiguously provide that the 7.75%

4

Convertible Notes are subordinated to such claims, and on the grounds that any claims for breach of contract damages (1) have been waived, and (2) do not constitute "premiums" for purposes of the subordination provisions of the Indenture.

## PARTIES

10.     Plaintiff M&T is the successor indenture trustee for the 7.75% Convertible Notes.  M&T is a New York banking corporation with an office located at 25 South Charles Street, Baltimore, Maryland 21201.

11.     Defendant HSBC Bank USA, National Association is the successor indenture trustee (solely in its capacity as such "HSBC") for each of the following series of Senior Notes issued by Calpine:  (a) $102,194,000 of the 7.625% Senior Notes due 2006, (b) $190,299,000 of the 8.75% Senior Notes due 2007, (c) $173,761,000 of the 7.875% Senior Notes due 2008, and (d) $180,602,000 of the 7.75% Senior Notes due 2009.  HSBC is a national banking association with an office located at 452 Fifth Avenue, New York, New York 10018. .

12.     Defendant U.S. Bank National Association is the indenture trustee (solely in its capacity as such, "USB," and together with HSBC, the "Senior Notes Trustees") for the $139,205,000 of 10.50% Senior Notes due 2006 issued by Calpine.[1]  USB is a national banking association with an office located at 633 West 5th Street, Los Angeles, California 90071.

## FACTS

I.     **The 7.75% Convertible Notes:**

13.     On August 10, 2000, WTC and Calpine entered into the Base Indenture, a true and correct copy of which is annexed hereto as Exhibit A.  On June 23, 2005, Calpine and

---

[1]     Upon information and belief, such amounts represent principal amounts outstanding (net of repurchases) as of the Effective Date (as defined herein).     .

5

WTC entered into the Supplemental Indenture, a true and correct copy of which is annexed hereto as Exhibit B, which supplemented the terms of the Base Indenture as provided therein.

14.    Under the Supplemental Indenture, Calpine issued $650,000,000 in aggregate principal amount of 7.75% Convertible Notes.

15.    Pursuant to an order of the Bankruptcy Court, M&T succeeded to WTC as the indenture trustee for the 7.75% Convertible Notes.

16.    Section 10.11 of the Base Indenture provides that "[t]he laws of the State of New York govern this Indenture and the Securities, without regard to the conflicts of laws rules thereof." Base Indenture, Ex. A § 10.11.  In addition, Section 12.07 of the Supplemental Indenture provides that "[t]his Third Supplemental Indenture and each Note shall be governed by and construed in accordance with the laws of the State of New York." Supplemental Indenture, Ex. B, § 12.07.

**II.    Subordination Provisions of the Indenture:**

17.    The Supplemental Indenture provides that the 7.75% Convertible Notes are subordinated in right of payment to the prior payment in full in cash of Senior Debt "to the extent and in the manner" provided in Article XI of the Supplemental Indenture.  Supplemental Indenture, Ex. B, § 11.01(a).

18.    Section 11.03 of the Supplemental Indenture, which governs subordination with respect to distributions made as a result of a bankruptcy proceeding, provides, in relevant part, as follows:

> Upon any direct or indirect payment by or on behalf of [Calpine] or direct or indirect distribution of assets of [Calpine] of any kind or character, whether in cash, property or securities, by set-off or otherwise, to creditors upon any dissolution or winding up or

6

> liquidation or reorganization of [Calpine] or assignment for the
> benefit of creditors or marshaling of assets, whether voluntary or
> involuntary, or in bankruptcy, insolvency, receivership or other
> proceedings, *all amounts (including principal, premium, if any,
> and interest)* due or to become due upon all Senior Debt shall first
> be paid in full in cash, or such payment thereof provided for in
> money in accordance with its terms, before any payment or
> distribution is made on account of the principal (and premium, if
> any), interest or any other Obligation relating to the [7.75%
> Convertible] Notes[.]

Supplemental Indenture, Ex. B, § 11.03 (emphasis added).[2]

19.     The Supplemental Indenture defines "Senior Debt" as secured debt of Calpine as well as five issuances of Senior Notes issued by Calpine, but makes no mention of post-petition interest. *See* Supplemental Indenture, Ex. B, § 1.01(b).

20.     The Supplemental Indenture makes no explicit reference *at all* to post-petition interest arising under the Senior Notes, either in the operative subordination provisions or in the definition of Senior Debt.

21.     Therefore, under the "Rule of Explicitness," which governs the interpretation of the Indenture here, the 7.75% Convertible Notes are *not* subordinated to post-petition interest arising under the Senior Notes.

**IV.     Certain Senior Note Holders' Breach of Contract Claims:**

22.     For similar reasons, the 7.75% Convertible Notes are *not* subordinated in right of payment to the prior payment in full of breach of contract damages, either as asserted on behalf of a sub set of Senior Note Holders or as allowed by final order of the Bankruptcy Court.

---

[2]     By way of instructive comparison, the indentures considered by the New York Court of Appeals in *In re Southeast Banking Corp.*, and found insufficient to satisfy the Rule of Explicitness, provided in relevant part that "[u]pon . . . any payment or distribution of assets of [Southeast] . . . in bankruptcy, *all principal, premium, if any, and interest* due or to become due upon all Senior Indebtedness shall first be paid in full . . . before any payment is made on account of the principal or, premium, if any, or interest on the Debentures . . . ." 93 N.Y.2d at 181 (emphasis added).

23. On September 19, 2007, Calpine filed its Motion for Approval of Stipulation with Calpine Unsecured Noteholders and HSBC Bank USA, N.A., as Indenture Trustee (the "HSBC Settlement Motion") with the Bankruptcy Court seeking approval of that certain Stipulation Resolving Objections by the Indenture Trustee for the Calpine Unsecured Notes and Calpine Unsecured Noteholders to Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims dated September 19, 2007 (the "HSBC Stipulation"). A true and correct copy of the HSBC Settlement Motion, including the HSBC Stipulation attached thereto as an exhibit, is annexed hereto as Exhibit C.

24. As described in the HSBC Settlement Motion, HSBC, on behalf of holders of two (2) series of Senior Notes, asserted general unsecured claims in the amount of approximately $7,300,000 for breach of contract damages against Calpine (the "Asserted Breach of Contract Claims") arising from Calpine's purported violation of the "no-call" provisions of the two series of Senior Notes (holders of such two (2) series of Senior Notes, together with HSBC, the "Settling Senior Note Holders").

25. Pursuant to the HSBC Stipulation, as approved by order of the Bankruptcy Court dated October 10, 2007 (the "HSBC Order") (a true and correct copy of which is annexed hereto as Exhibit D), HSBC, on behalf of the Settling Senior Note Holders, was granted an allowed general unsecured claim in the total amount of $3,650,000 (the "Allowed Breach of Contract Claims") in satisfaction of and in exchange for the Asserted Breach of Contract Claims.

26. Upon information and belief, shortly after the Effective Date (as defined below) and on or about February 1, 2008, HSBC received, on behalf of the Settling Senior Note Holders, a distribution directly from reorganized Calpine in the form of shares of New Calpine Common Stock representing approximately 84.8% of the Settling Senior Note Holders' Allowed

8

Breach of Contract Claims.  Thus, upon information and belief, as of the date hereof, approximately $554,800 remains unpaid on account of the Settling Senior Note Holders' Allowed Breach of Contract Claims.

27.     The Settling Senior Note Holders have asserted that the 7.75% Convertible Notes are subordinated in right of payment to the unpaid balance of the Settling Senior Note Holders' Allowed Breach of Contract Claim.

28.     M&T disputes the Settling Senior Note Holders' assertions.

29.     The HSBC Stipulation and the HSBC Order provide that the Settling Senior Note Holders waived any rights of subordination under the Indenture with respect to their Asserted Breach of Contract Claims or Allowed Breach of Contract Claims.

30.     Specifically, paragraph 4 of the HSBC Order approving the HSBC Stipulation states as follows:

> The Calpine Unsecured Noteholders and HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Notes, retain any and all rights that they now have or may hereafter have against other parties or property under or with respect to subordination provisions, including, but not limited to, those contained in the [7.75% Convertible Notes] issued by Calpine *other than with respect to the Unsecured Makewhole Claims.*

HSBC Settlement, Ex. D, at 8 (emphasis added).

31.     The term "Unsecured Makewhole Claims" is defined in the Settlement Motion as including "the makewhole premium and damages claims asserted by the holders of the Calpine Unsecured Notes and HSBC." HSBC Settlement Motion, Ex. C, at p. 2.

9

V.    **Debtors' Plan of Reorganization:**

32.    Pursuant to the Debtors' Sixth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code dated December 19, 2007 (the "Plan") (a true and correct copy of which is annexed hereto as Exhibit E), as confirmed by order of the Bankruptcy Court, generally speaking, holders of allowed unsecured claims against Calpine will receive, in exchange for and in satisfaction of their claims, *pro rata* distributions of shares of common stock of reorganized Calpine ("New Calpine Common Stock") based on the imputed value of approximately $17.36 per share under the Plan.

33.    With respect to the treatment of the 7.75% Convertible Note Holders' claims under the 7.75% Convertible Notes, the Plan provides, in relevant part, that the claims of the 7.75% Convertible Note Holders are subordinated in right of payment to the extent necessary to satisfy in full that portion of the Senior Note Holders' claims attributable to principal and pre-petition interest. *See* Plan, Ex. E, Art. III.B. ¶ 7, at 36-37.

34.    However, the Plan expressly provides that the extent to which the 7.75% Convertible Note Holders are subordinated with respect to any other amounts "shall be determined by a court of competent jurisdiction" as part of the "Intercreditor Subordination Dispute," defined in the Plan as the dispute as to the scope of the subordination provisions contained in the Indenture as they relate to the claims of the Senior Note Holders.  Plan, Ex. E, Art. III.B. ¶ 7, at 36-37; Art.I.A. ¶¶ 151-153.

35.    As part of the Intercreditor Subordination Dispute, the Plan contemplates that the Debtors will establish an Intercreditor Subordination Dispute Escrow Account, defined in the Plan as an "escrow account established for the benefit of the Holders of Allowed Senior

10

Note Claims and Allowed Subordinated Note Claims pending resolution of the Intercreditor Subordination Dispute by Final Order." *Id.*

36.    On January 31, 2008, Calpine issued the notice of the occurrence of the effective date of the Plan (the "Effective Date"), a true and correct copy of which is annexed hereto as Exhibit F.

37.    Also on January 31, 2008, Calpine issued a press release (the "Press Release"), a true and correct copy of which is annexed hereto as Exhibit G, wherein Calpine projected, based on the Debtors' litigation risk-adjusted analysis, that general unsecured creditors will recover approximately 84.8% on account of their allowed claims for principal, pre-petition interest and "makewhole" or breach of contract claims as part of an "initial distribution" to be made by reorganized Calpine soon after the Effective Date, and will ultimately recover approximately 99.9% on account of such claims.

38.    Upon information and belief, shortly after the Effective Date and on or about February 1, 2008, the Senior Notes Trustees received, on behalf of the Senior Note Holders, a distribution directly from reorganized Calpine in the form of shares of New Calpine Common Stock representing approximately 84.8% of the Senior Note Holders' claims in the aggregate for principal, pre-petition interest and Allowed Breach of Contract Claims.

39.    Upon information and belief, shortly after the Effective Date and on or about February 1, 2008, a portion of the distribution that was otherwise distributable to M&T on behalf of the 7.75% Convertible Note Holders, equal to an amount necessary to satisfy in full the remaining 15.2% of the Senior Note Holders' claims for principal and pre-petition interest, was re-directed by reorganized Calpine and distributed to the Senior Notes Trustees for the benefit of the Senior Note Holders.

40.    The Senior Note Holders' claims for principal and pre-petition interest have been paid in full.

## V.    Subordination Dispute:

41.    On January 28, 2008, the Senior Notes Trustees sent a joint letter to counsel for M&T demanding that M&T consent to the deposit of shares of New Calpine Common Stock in the Intercreditor Subordination Dispute Escrow Account in an amount estimated by the Senior Notes Trustees to satisfy in full the Senior Notes Trustees' and the Senior Note Holders' asserted claims for (a) post-petition interest accruing at the contractual rate set forth in the Indenture, including interest on interest, (b) "post-emergence date" interest from the Effective Date through final resolution of the Intercreditor Subordination Dispute, (c) fees and expenses, and (d) certain amounts related to the Breach of Contract Claims.

42.    M&T disputes the Senior Note Holders' entitlement to any of the foregoing from the 7.75% Convertible Note Holders under the Indenture, the Plan or otherwise.

43.    On January 30, 2008, counsel to the Senior Notes Trustees and counsel to M&T memorialized their agreement regarding the amount to be deposited into the Intercreditor Subordination Dispute Escrow Account. *See* E-Mail correspondence, dated January 30, 2008, a copy of which is attached hereto as Exhibit H.

44.    Specifically, counsel to the Senior Notes Trustees agreed that shares of New Calpine Common Stock representing a total dollar value of $169,253,136.11 should be deposited into the Intercreditor Subordination Dispute Escrow Account. *Id.*

45.    Upon information and belief, consistent with the foregoing, on or about February 1, 2008, the Debtors withheld 9,752,258 shares of New Calpine Common Stock from

12

distributions otherwise distributable to M&T, on behalf of the 7.75% Convertible Noteholders, for deposit into the Intercreditor Subordination Dispute Escrow Account in connection with the Intercreditor Subordination Dispute.

## COUNT I – DECLARATORY RELIEF:  POST-PETITION INTEREST

46.     M&T repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth herein.

47.     By reason of the foregoing, an actual justiciable controversy exists among the parties as to whether, under the governing Indenture, the 7.75% Convertible Note Holders are subordinated in right of payment to the prior payment in full of the Senior Note Holders' post-petition interest.  Indeed, Calpine's Plan expressly recognizes the existence of such a controversy, and provides for the deposit of shares of New Calpine Common Stock subject to the Intercreditor Subordination Dispute to be held in escrow pending a judicial declaration as to the respective rights of the parties.

48.     It is well-established law in the State of New York, based on binding precedent from the New York State Court of Appeals, that, in accordance with the Rule of Explicitness, a subordination agreement must include specific and explicit language that is sufficient to alert a junior creditor to its assumption of the risk and burden of allowing the payment of post-petition interest to a senior creditor.

49.     The subordination provisions of the Indenture do not specifically and explicitly state that the 7.75% Convertible Notes are subordinated in right of payment to the prior payment in full of any post-petition interest arising under the Senior Notes.

13

50.     In fact, no reference at all is made to post-petition interest in the subordination provisions of the Indenture.

51.     As a result, the 7.75% Convertible Note Holders are *not* subordinate to the payment of post-petition interest arising under the Senior Notes, and the 7.75% Convertible Note Holders are not required to pay over any portion of their distributions attributable to post-petition interest (including any post-Effective Date interest, whether at the contractual rate or otherwise) arising under the Senior Notes to the Senior Notes Trustees or the Senior Note Holders, under the Indenture, the Plan or otherwise.

52.     Accordingly, M&T respectfully seeks a judgment declaring that the 7.75% Convertible Notes are *not* subordinate to the payment of post-petition interest arising under the Senior Notes, and the 7.75% Convertible Note Holders are not required to pay over any portion of their initial or future distributions (whether currently held in or to be deposited into escrow, or otherwise) attributable to post-petition interest (including any post-Effective Date interest, whether at the contractual rate or otherwise) arising under the Senior Notes to, or for the benefit of, the Senior Notes Trustees or the Senior Note Holders, under the Indenture, the Plan or otherwise.

## COUNT II – DECLARATORY RELIEF:  BREACH OF CONTRACT CLAIMS

53.     M&T repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length herein.

54.     By reason of the foregoing, an actual justiciable controversy exists among the parties as to whether, under the present circumstances and in accordance with the governing Indenture, the 7.75% Convertible Note Holders are subordinated in right of payment to the prior

14

payment in full of any of the Settling Senior Note Holders' Asserted Breach of Contract Claims or Allowed Breach of Contract Claims. Indeed, Calpine's Plan expressly recognizes the existence of such a controversy, and provides for the deposit of shares of New Calpine Common Stock subject to the Intercreditor Subordination Dispute to be held in escrow pending a judicial declaration as to the respective rights of the parties.

55.     The subordination provisions of the Indenture do not specifically and explicitly state that the 7.75% Convertible Notes are subordinated in right of payment to the prior payment in full of any Asserted Breach of Contract Claims asserted by the Settling Senior Note Holders or the Allowed Breach of Contract Claims.

56.     In fact, no reference at all is made to any such claims in the subordination provisions of the Indenture.

57.     Moreover, pursuant to the HSBC Stipulation and the HSBC Order, the Settling Senior Note Holders waived any right of subordination with respect to the Asserted Breach of Contract Claims, whether as originally asserted or as allowed by order of the Bankruptcy Court.

58.     In addition, the Asserted Breach of Contract Claims and/or the Allowed Breach of Contract Claims do not constitute "premiums" for purposes of the subordination provisions of the Indenture.

59.     As a result, the 7.75% Convertible Note Holders are not subordinate to the payment of Asserted Breach of Contract Claims or the Allowed Breach of Contract Claims arising under the Senior Notes, and the 7.75% Convertible Note Holders are not required to pay over any portion of their distributions attributable to such claims (including any interest that may

15

accrue on account of such claims) to the Senior Notes Trustees or the Senior Note Holders, under the Indenture, the Plan or otherwise.

60.     Accordingly, M&T respectfully seeks a judgment declaring that the 7.75% Convertible Notes are not subordinate to the payment of the Settling Senior Note Holders' Asserted Breach of Contract Claims or Allowed Breach of Contract Claims, and the 7.75% Convertible Note Holders are not required to pay over any portion of their initial or future distributions (whether currently held in or to be deposited into escrow, or otherwise) attributable to such claims (including any interest that may accrue on account of such claims) to, or for the benefit of, the Settling Senior Note Holders, under the Indenture, the Plan or otherwise.

## COUNT III – DECLARATORY RELIEF:  FEES AND EXPENSES

61.     M&T repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though fully set forth at length herein.

62.     By reason of the foregoing, an actual justiciable controversy exists among the parties as to whether, under the governing Indenture, the 7.75% Convertible Note Holders are subordinated in right of payment to the prior payment in full of any fees and expenses incurred by the Senior Notes Trustees or the Senior Note Holders.  Indeed, Calpine's Plan expressly recognizes the existence of such a controversy, and provides for the deposit of shares of New Calpine Common Stock subject to the Intercreditor Subordination Dispute to be held in escrow pending a judicial declaration as to the respective rights of the parties.

63.     The subordination provisions of the Indenture do not specifically and explicitly state that the 7.75% Convertible Note Holders are subordinate to the payment in full of any fees and expenses incurred by the Senior Notes Trustees or the Senior Note Holders.

16

64.     In fact, no reference at all is made to fees and expenses in section 11.03 of the Supplemental Indenture or the definition of Senior Debt.

65.     As a result, the 7.75% Convertible Note Holders are not subordinate to the payment of any fees and expenses arising under the Senior Notes, and the 7.75% Convertible Note Holders are not required to pay over any portion of their distributions attributable to such claims to the Senior Notes Trustees or the Senior Note Holders, under the Plan or otherwise.

66.     Accordingly, M&T respectfully seeks a judgment declaring that the 7.75% Convertible Notes are not subordinate to the payment of any fees and expenses incurred by the Senior Notes Trustees or the Senior Notes Holders, and the 7.75% Convertible Note Holders are not required to pay over any portion of their initial or future distributions (whether currently held in or to be deposited into escrow, or otherwise) attributable to such claims (including any post-emergence date interest that may accrue on account of such claims) to, or for the benefit of, the Senior Notes Trustees or the Senior Note Holders, under the Indenture, the Plan or otherwise.

**WHEREFORE** M&T respectfully prays for relief against the Senior Notes Trustees as follows: (a) the entry of declaratory judgments in accordance with Counts I through III; (b) costs and disbursements of this action, including reasonable counsel fees and costs; and (c) such other and further relief as the Court deems just.

Dated: New York, New York
      February 21, 2008

Respectfully Submitted

STROOCK & STROOCK & LAVAN LLP

By: _____
    Kristopher M. Hansen
    Daniel A. Ross
    Erez E. Gilad
    180 Maiden Lane
    New York, New York  10038-4982
    Telephone:  (212) 806-5400
    Facsimile:  (212) 806-6006

Co-counsel to Manufacturers and Traders Trust Company, as Successor Indenture Trustee for the 7.75% Contingent Convertible Notes Due 2015 issued by Calpine Corporation with respect to Counts I and II

YOUNG CONAWAY STARGATT & TAYLOR, LLP

    Rolin P. Bissell
    Norman M. Powell
    Ian S. Fredericks
    The Brandywine Building
    1000 West Street, 17th Floor
    P.O. Box 391
    Wilmington, Delaware  19899-0391
    Telephone:  (302) 571-6600
    Facsimile:  (302) 571-1253

Co-counsel to Manufacturers and Traders Trust Company, as Successor Indenture Trustee for the 7.75% Contingent Convertible Notes Due 2015 issued by Calpine Corporation with respect to Counts I and II, and Counsel with respect to Count III

18

Exhibit A

CALPINE CORPORATION

and

WILMINGTON TRUST COMPANY, Trustee

Indenture

Dated as of August 10, 2000

Debt Securities

701415/00021/217633 V6

TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.1    Definitions ........................................................................ 5
SECTION 1.2    Other Definitions .............................................................. 11
SECTION 1.3    Incorporation by Reference of TIA ................................... 11
SECTION 1.4    Rules of Construction ....................................................... 12

ARTICLE II
THE SECURITIES

SECTION 2.1    Securities Issuable in Series ............................................ 12
SECTION 2.2    Form and Dating ............................................................... 14
SECTION 2.3    Execution and Authentication ........................................... 15
SECTION 2.4    Registrar and Paying Agent .............................................. 16
SECTION 2.5    Paying Agent To Hold Money in Trust ............................... 16
SECTION 2.6    Securityholder Lists .......................................................... 17
SECTION 2.7    Transfer and Exchange ..................................................... 17
SECTION 2.8    Replacement Securities ..................................................... 19
SECTION 2.9    Outstanding Securities ...................................................... 19
SECTION 2.10   Determination of Holders' Action ..................................... 20
SECTION 2.11   Temporary Securities ........................................................ 20
SECTION 2.12   Cancellation ..................................................................... 20
SECTION 2.13   Defaulted Interest ............................................................. 20

ARTICLE III
COVENANTS

SECTION 3.1    Payment of Securities ....................................................... 21
SECTION 3.2    Maintenance of Office or Agency ...................................... 21
SECTION 3.3    Limitation on Sale/Leaseback Transactions ..................... 21
SECTION 3.4    Limitation on Liens ........................................................... 22
SECTION 3.5    Compliance Certificate ..................................................... 23
SECTION 3.6    SEC Reports ...................................................................... 23
SECTION 3.7    Further Instruments and Acts ........................................... 24
SECTION 3.8    Waiver of Certain Covenants ............................................ 24

ARTICLE IV
CONSOLIDATION, MERGER, SALE AND LEASE

SECTION 4.1    Merger and Consolidation of Company .............................. 24
SECTION 4.2    Successor Substituted ....................................................... 25

Page

## ARTICLE V
### DEFAULTS AND REMEDIES

|  |  |  |
|---|---|---|
| | | 25 |
| SECTION 5.1 | Events of Default | 27 |
| SECTION 5.2 | Acceleration | 27 |
| SECTION 5.3 | Other Remedies | 27 |
| SECTION 5.4 | Waiver of Past Defaults | 27 |
| SECTION 5.5 | Control by Majority | 28 |
| SECTION 5.6 | Limitation on Suits | 28 |
| SECTION 5.7 | Rights of Holders To Receive Payment | 28 |
| SECTION 5.8 | Collection Suit by Trustee | 29 |
| SECTION 5.9 | Trustee May File Proofs of Claim | 29 |
| SECTION 5.10 | Priorities | 29 |
| SECTION 5.11 | Undertaking for Costs | 30 |
| SECTION 5.12 | Waiver of Stay or Extension Laws | |

## ARTICLE VI
### TRUSTEE

|  |  |  |
|---|---|---|
| | | 30 |
| SECTION 6.1 | Duties of Trustee | 31 |
| SECTION 6.2 | Rights of Trustee | 32 |
| SECTION 6.3 | Individual Rights of Trustee | 32 |
| SECTION 6.4 | Trustee's Disclaimer | 32 |
| SECTION 6.5 | Notice of Defaults | 32 |
| SECTION 6.6 | Reports by Trustee to Holders | 32 |
| SECTION 6.7 | Compensation and Indemnity | 33 |
| SECTION 6.8 | Replacement of Trustee | 35 |
| SECTION 6.9 | Successor Trustee by Merger, etc. | 35 |
| SECTION 6.10 | Eligibility; Disqualification; Conflicting Interests | 35 |
| SECTION 6.11 | Preferential Collection of Claims Against Company | |

## ARTICLE VII
### SATISFACTION AND DISCHARGE OF INDENTURE

|  |  |  |
|---|---|---|
| | | 35 |
| SECTION 7.1 | Discharge of Liability on Securities | 36 |
| SECTION 7.2 | Termination of Company's Obligations | 37 |
| SECTION 7.3 | Defeasance and Discharge of Indenture | 38 |
| SECTION 7.4 | Defeasance of Certain Obligations | 40 |
| SECTION 7.5 | Application of Trust Money | 40 |
| SECTION 7.6 | Repayment to Company | 40 |
| SECTION 7.7 | Reinstatement | |
| SECTION 7.8 | Deposited Money and U.S. Government Obligations to be Held in Trust; Miscellaneous Provisions | 41 |

## ARTICLE VIII
### AMENDMENTS AND SUPPLEMENTS

|  |  |  |
|---|---|---|
| | | 41 |
| SECTION 8.1 | Without Consent of Holders | 42 |
| SECTION 8.2 | With Consent of Holders | |

3

|  |  | Page |
|---|---|---|
| SECTION 8.3 | Compliance with Trust Indenture Act | 42 |
| SECTION 8.4 | Revocation and Effect of Consents | 42 |
| SECTION 8.5 | Notation on or Exchange of Securities | 43 |
| SECTION 8.6 | Trustee To Sign Amendments | 43 |
| SECTION 8.7 | Fixing of Record Dates | 43 |

ARTICLE IX
REDEMPTION

| SECTION 9.1 | Applicability of Article | 44 |
|---|---|---|
| SECTION 9.2 | Election to Redeem; Notice to Trustee | 44 |
| SECTION 9.3 | Selection by Trustee of Securities to be Redeemed | 44 |
| SECTION 9.4 | Notice of Redemption | 44 |
| SECTION 9.5 | Deposit of Redemption Price | 45 |
| SECTION 9.6 | Securities Redeemed in Part | 45 |

ARTICLE X
MISCELLANEOUS

| SECTION 10.1 | Trust Indenture Act Controls | 46 |
|---|---|---|
| SECTION 10.2 | Notices | 46 |
| SECTION 10.3 | Communication by Holders with Other Holders | 47 |
| SECTION 10.4 | Certificate and Opinion as to Conditions Precedent | 47 |
| SECTION 10.5 | Statements Required in Certificate or Opinion | 47 |
| SECTION 10.6 | Rules by Trustee and Agents | 47 |
| SECTION 10.7 | Legal Holidays | 47 |
| SECTION 10.8 | Successors; No Recourse Against Others | 48 |
| SECTION 10.9 | Duplicate Originals | 48 |
| SECTION 10.10 | Other Provisions | 48 |
| SECTION 10.11 | Governing Law | 48 |
| SIGNATURES | | 49 |
| EXHIBIT A -- Form of Security | | A-1 |

4

INDENTURE, dated as of August 10, 2000, between Calpine Corporation, a Delaware corporation (the "Company"), and Wilmington Trust Company, a Delaware banking corporation (the "Trustee").

WHEREAS, the Company desires to issue debt securities in one or more series from time to time hereunder in an unlimited aggregate principal amount; and

WHEREAS, the Trustee desires to act as Trustee with respect to such securities;

NOW, THEREFORE, each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the holders of such securities or of series thereof:

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.1  Definitions.

"Affiliate" of any specified Person means any other Person, directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means, with respect to any Series of Securities, any Registrar, Paying Agent, authenticating agent, co-registrar or additional paying agent appointed pursuant to this Indenture with respect to such Series.

"Attributable Debt" in respect of a Sale/Leaseback Transaction means, as at the time of determination, the present value (discounted at the rate of interest set forth or implicit in the terms of such lease (or, if not practicable to determine such rate, the weighted average rate of interest borne by the Securities outstanding hereunder (calculated, in the event of the issuance of any original issue discount Securities, based on the imputed interest rate with respect thereto)), compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale/Leaseback Transaction (including any period for which such lease has been extended).

"Average Life" means, as of the date of determination, with respect to any Indebtedness or Preferred Stock, the quotient obtained by dividing (i) the sum of the products of (A) the numbers of years from the date of determination to the dates of each successive scheduled principal payment of such Indebtedness or scheduled redemption or similar payment with respect to such Indebtedness or Preferred Stock multiplied by (B) the amount of such payment by (ii) the sum of all such payments.

"Board of Directors" means the Board of Directors of the Company or any authorized committee thereof.

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

5

"Business Day" means each day which is not a Legal Holiday.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation or any and all equivalent ownership interests in a Person (other than a corporation).

"Capitalized Lease Obligations" of any Person means the rental obligations under any lease of any property (whether real, personal or mixed) of which the discounted present value of the rental obligations of such Person as lessee, in conformity with GAAP, is required to be capitalized on the balance sheet of such Person; the Stated Maturity of any such lease shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Stock" means the Common Stock, par value $.001 per share, of the Company.

"Company" means the party named as such in this Indenture until a successor replaces it pursuant to the terms and conditions of this Indenture and thereafter means the successor.

"Consolidated Current Liabilities," as of the date of determination, means the aggregate amount of consolidated liabilities of the Company and its consolidated Restricted Subsidiaries which may properly be classified as current liabilities (including taxes accrued as estimated), after eliminating (i) all inter-company items between the Company and its Subsidiaries and (ii) all current maturities of long-term Indebtedness, all as determined in accordance with GAAP.

"Consolidated Net Tangible Assets" means, as of any date of determination, as applied to the Company, the total amount of Consolidated assets (less accumulated depreciation or amortization, allowances for doubtful receivables, other applicable reserves and other properly deductible items) under GAAP which would appear on a Consolidated balance sheet of the Company and its Subsidiaries, determined in accordance with GAAP, and after giving effect to purchase accounting and after deducting therefrom, to the extent otherwise included, the amounts of: (i) Consolidated Current Liabilities; (ii) minority interests in consolidated Restricted Subsidiaries held by Persons other than the Company or a Restricted Subsidiary; (iii) excess of cost over fair value of assets of businesses acquired, as determined in good faith by the Board of Directors; (iv) any revaluation or other write-up in value of assets subsequent to December 31, 1993 as a result of a change in the method of valuation in accordance with GAAP; (v) unamortized debt discount and expenses and other unamortized deferred charges, goodwill, patents, trademarks, service marks, trade names, copyrights, licenses, organization or developmental expenses and other intangible items; (vi) treasury stock; and (vii) any cash set apart and held in a sinking or other analogous fund established for the purpose of redemption or other retirement of Capital Stock to the extent such obligation is not reflected in Consolidated Current Liabilities.

"Consolidation" means, with respect to any Person, the consolidation of accounts of such Person and each of its subsidiaries if and to the extent the accounts of such Person and such subsidiaries are consolidated in accordance with GAAP. The term "Consolidated" shall have a correlative meaning.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

6

"Defaulted Interest" means any interest on any Security which is payable, but is not punctually paid or duly provided for on any Interest Payment Date, such Defaulted Interest to accrue (except as otherwise provided in accordance with Section 2.1) at the same rate per annum as interest accrued or accreted, as the case may be, on the Business Day immediately preceding such Interest Payment Date.

"Depository" means The Depository Trust Company, its nominees, and their respective successors until a successor Depository shall have become such pursuant to the applicable provisions of this Indenture and thereafter "Depository" shall mean or include each Person who is then a Depository hereunder.

"Directors' Certificate" means a certificate signed by two members of the Board of Directors.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"GAAP" means generally accepted accounting principles in the United States of America as in effect and, to the extent optional, adopted by the Company, on the date of the Indenture, consistently applied.

"Guarantee" means, as applied to any obligation, contingent or otherwise, of any Person, (i) a guarantee, direct or indirect, in any manner, of any part or all of such obligation (other than by endorsement of negotiable instruments for collection in the ordinary course of business) and (ii) an agreement, direct or indirect, contingent or otherwise, the practical effect of which is to insure in any way the payment or performance (or payment of damages in the event of nonperformance) of any part or all of such obligation, including the payment of amounts drawn down under letters of credit.

"Holder" or "Securityholder" means the Person in whose name a Security is registered on the Registrar's books.

"Incur" means, as applied to any obligation, to create, incur, issue, assume, guarantee or in any other manner become liable with respect to, contingently or otherwise, such obligation, and "Incurred," "Incurrence" and "Incurring" shall each have a correlative meaning; provided, however, that any amendment, modification or waiver of any provision of any document pursuant to which Indebtedness was previously Incurred shall not be deemed to be an Incurrence of Indebtedness as long as (i) such amendment, modification or waiver does not (A) increase the principal or premium thereof or interest rate thereon, (B) change to an earlier date the Stated Maturity thereof or the date of any scheduled or required principal payment thereon or the time or circumstances under which such Indebtedness may or shall be redeemed, (C) if such Indebtedness is contractually subordinated in right of payment to the Securities, modify or affect, in any manner adverse to the Holders, such subordination or (D) if the Company is the obligor thereon, provide that a Restricted Subsidiary shall be an obligor and (ii) such Indebtedness would, after giving effect to such amendment, modification or waiver as if it were an Incurrence, comply with clause (i) of the first proviso to the definition of "Refinancing Indebtedness."

"Indebtedness" of any Person means, without duplication, (i) the principal in respect of indebtedness of such Person for money borrowed and; (ii) all Capitalized Lease Obligations of such Person; (iii) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in (i) and (ii) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than

7

the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit; (iv) all obligations of the type referred to in clauses (i) through (iii) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise; and (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation on any date of determination being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured. The amount of Indebtedness of any Person at any date shall be, with respect to unconditional obligations, the outstanding balance at such date of all such obligations as described above and, with respect to any contingent obligations at such date, the maximum liability determined by such Person's board of directors, in good faith, as, in light of the facts and circumstances existing at the time, reasonably likely to be incurred upon the occurrence of the contingency giving rise to such obligation.

"Indenture" means, with respect to each Series of Securities, this Indenture as originally executed or as it is amended or supplemented from time to time by one or more indentures supplemental hereto entered into in accordance with the applicable provisions hereof, and shall include the terms of each particular Series of Securities established as contemplated by Section 2.1.

"Interest Payment Date" means, with respect to any Series, the stated maturity of an installment of interest on the Securities of such Series.

"Lien" means any mortgage, lien, pledge, charge, or other security interest or encumbrance of any kind (including any conditional sale or other title retention agreement and any lease in the nature thereof).

"Officer" means the Chairman, the President, any Vice President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, the Secretary, any Assistant Treasurer, any Assistant Secretary or the Controller or Principal Accounting Officer of the Company.

"Officers' Certificate" means a certificate signed by two Officers, one of whom must be the President, the Treasurer or a Vice President. Each Officers' Certificate (other than certificates provided pursuant to TIA Section 314(a)(4)) shall include the statements provided for in TIA Section 314(e), if applicable.

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel, if so acceptable, may be an employee of or counsel to the Company or the Trustee. Each such Opinion of Counsel shall include the statements provided for in TIA Section 314(e), if applicable.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Preferred Stock", as applied to the Capital Stock of any corporation, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such corporation, over shares of Capital Stock of any other class of such corporation.

8

"Principal" of a Security means the principal of the Security plus, if applicable, the premium on the Security due on the Stated Maturity or on a Redemption Date.

"Redemption Date" means, when used with respect to any Security of any Series to be redeemed, the date fixed for such redemption by or pursuant to this Indenture.

"Redemption Price" means, when used with respect to any Security of any Series to be redeemed, the price specified in such Security at which it is to be redeemed pursuant to this Indenture.

"Refinancing Indebtedness" means Indebtedness that refunds, refinances, replaces, renews, repays or extends (including pursuant to any defeasance or discharge mechanism) (collectively, "refinances," and "refinanced" shall have a correlative meaning) any Indebtedness of the Company or a Restricted Subsidiary existing on the date of this Indenture or Incurred in compliance with the Indenture (including Indebtedness of the Company that refinances Indebtedness of any Restricted Subsidiary and Indebtedness of any Restricted Subsidiary that refinances Indebtedness of another Restricted Subsidiary) including Indebtedness that refinances Refinancing Indebtedness; provided, however, that (i) if the Indebtedness being refinanced is contractually subordinated in right of payment to the Securities, the Refinancing Indebtedness shall be contractually subordinated in right of payment to the Securities to at least the same extent as the Indebtedness being refinanced, (ii) the Refinancing Indebtedness is scheduled to mature either (a) no earlier than the Indebtedness being refinanced or (b) after the Stated Maturity of the Securities, (iii) the Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being refinanced and (iv) such Refinancing Indebtedness is in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding (plus fees and expenses, including any premium, swap breakage and defeasance costs) under the Indebtedness being refinanced; and provided, further, that Refinancing Indebtedness shall not include (x) Indebtedness of a Subsidiary of the Company that refinances Indebtedness of the Company or (y) Indebtedness of the Company or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Company that is not designated an Unrestricted Subsidiary by the Board of Directors.

"Sale/Leaseback Transaction" means an arrangement relating to property now owned or hereafter acquired whereby the Company or a Subsidiary transfers such property to a Person and leases it back from such Person, other than leases for a term of not more than 36 months or between the Company and a Wholly Owned Subsidiary or between Wholly Owned Subsidiaries.

"SEC" means the Securities and Exchange Commission.

"Securities" means unsecured debentures, notes or other evidence of indebtedness of the Company that are issued under and pursuant to the terms of this Indenture.

"Securities Act" means the Securities Act of 1933, as amended.

"Senior Indebtedness" means all indebtedness incurred, assumed or guaranteed by the Company, whether or not represented by bonds, debentures notes or other securities, for money borrowed, and any deferrals, renewals

9

or extensions or refunding of any such indebtedness, unless in the instrument creating or evidencing any such indebtedness or pursuant to which the same is outstanding it is specifically stated, at or prior to the time the Company becomes liable in respect thereof, that any such indebtedness or such deferral, renewal, extension or refunding thereof is not Senior Indebtedness.

"Significant Subsidiary" means any Subsidiary (other than an Unrestricted Subsidiary) that would be a "Significant Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency).

"Subsidiary" means, as applied to any Person, any corporation, partnership, trust, association or other business entity of which an aggregate of at least 50% of the outstanding Voting Shares or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more Subsidiaries of such Person.

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date first above written.

"Trustee" means the party named as such above until a successor replaces it and thereafter means the successor, and if at any time there is more than one such Person, "Trustee" as used with respect to the Securities of any Series shall mean the Trustee with respect to the Securities of that Series.

"Trust Officer" means any officer of the Trustee assigned by the Trustee to administer its corporate trust matters or to whom any corporate trust matter is referred because of that officer's knowledge of and familiarity with the particular subject.

"Uniform Commercial Code" means the New York Uniform Commercial Code as in effect from time to time.

"Unrestricted Subsidiary" means (i) any Subsidiary that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors in the manner provided below and (ii) any Subsidiary of an Unrestricted Subsidiary. The Board of Directors may designate any Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary owns any Capital Stock of, or owns or holds any Lien on any property of, the Company or any other Subsidiary that is not a Subsidiary of the Subsidiary to be so designated; provided, that the Subsidiary to be so designated and all other Subsidiaries previously so designated at the time of any determination hereunder shall, in the aggregate, have total assets not greater than 5% of Consolidated Net Tangible Assets as determined based on the Consolidated balance sheet of the Company as of the end of the most recent fiscal quarter for which financial statements are available. The Board of Directors may designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company; provided, however, that immediately after giving effect to such designation no Default or Event of Default shall have occurred and be continuing. Any such designation by the Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a Board Resolution giving effect to such

10

designation and an Officers' Certificate certifying that such designation complied with the foregoing provision; provided, however, that the failure to so file such resolution and/or Officers' Certificate with the Trustee shall not impair or affect the validity of such designation.

"U.S. Government Obligations" means securities that are (i) direct obligations of the United States of America for the payment of which its full faith and credit is pledged or (ii) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America, which, in either case under clauses (i) or (ii) are not callable or redeemable before the Stated Maturity thereof.

"Voting Shares," with respect to any corporation, means the Capital Stock having the general voting power under ordinary circumstances to elect at least a majority of the board of directors (irrespective of whether or not at the time stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

"Wholly Owned Subsidiary" means a Subsidiary (other than an Unrestricted Subsidiary) all the Capital Stock of which (other than directors' qualifying shares) is owned by the Company or another Wholly Owned Subsidiary.

SECTION 1.2  Other Definitions.

| TERM | DEFINED IN SECTION |
|---|---|
| "Additional Securities" | 2.1 |
| "Bankruptcy Law" | 5.1 |
| "Custodian" | 5.1 |
| "Event of Default" | 5.1 |
| "Global Securities" | 2.2 |
| "Legal Holiday" | 10.7 |
| "Notice of Default" | 5.1 |
| "Paying Agent" | 2.4 |
| "Registrar" | 2.4 |
| "Series" | 2.1 |
| "Successor Corporation" | 4.1(i) |

SECTION 1.3  Incorporation by Reference of TIA.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA terms used in this Indenture have the following meanings:

"Commission" means the SEC;

"indenture securities" means the Securities;

"indenture security holder" means a Holder or Securityholder;

11

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the indenture securities means the Company or any other obligor on the indenture securities.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule under the TIA have the meanings assigned to them by the TIA.

SECTION 1.4  Rules of Construction.

Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) "generally accepted accounting principles" means, and any accounting term not otherwise defined has the meaning assigned to it and shall be construed in accordance with, GAAP;

(c) "or" is not exclusive;

(d) words in the singular include the plural, and in the plural include the singular;

(e) provisions apply to successive events and transactions;

(f) "including" means "including, without limitation";

(g) unsecured debt shall not be deemed to be subordinate or junior to secured debt merely by virtue of its nature as unsecured debt;

(h) the principal amount of any non-interest bearing or other discount Security at any date shall be the principal amount thereof that would be shown on a balance sheet of the Company dated such date prepared in accordance with generally accepted accounting principles; and

(i) the principal amount (if any) of any Preferred Stock shall be the greatest of (i) the stated value, (ii) the redemption price or (iii) the liquidation preference of such Preferred Stock.

ARTICLE II

THE SECURITIES

SECTION 2.1  Securities Issuable in Series.

Securities may be issued hereunder in one or more series, each series (a "Series") having identical terms but for authentication date and public offering price. Securities of any one Series need not be issued at the same

12

time and, unless specifically provided otherwise, a Series may be reopened, without the consent of the Holders, for issuances of additional Securities of such Series.

Securities issued hereunder shall be issued pursuant to authority granted by or pursuant to a Board Resolution and, prior to the issue hereunder of the first Securities of a Series, the Company shall set forth in a Directors' Certificate, or establish in one or more indentures supplemental hereto, the following terms which shall be applicable to such Series:

(1) the title, including CUSIP number, of the Series (which shall distinguish the Securities of such Series from all other Securities);

(2) any limit upon the aggregate principal amount of the Securities of such Series which may be authenticated and delivered under this Agreement (except for Securities authenticated and delivered upon registration of transfer of, or in exchange for, or for replacement of, or in lieu of, other Securities of the Series pursuant to Sections 2.7, 2.8, 2.11, 8.5 or 9.6);

(3) the date or dates on which the principal of the Securities of the Series are payable;

(4) the rate or rates, or the method of determination thereof, at which the Securities of the Series shall bear interest, if any, the date or dates from which such interest shall accrue, the Interest Payment Dates on which such interest shall be payable and the record dates for the determination of Holders to whom interest is payable;

(5) the place or places where the principal of, and interest on Securities of the Series shall be payable;

(6) the obligation, if any, of the Company to redeem, purchase or repay the Securities of such Series pursuant to any right to do so contained in the Securities or pursuant to sinking fund or analogous provisions or at the option of a Holder thereof and the price or prices at which and the period or periods within which and the terms and conditions upon which the Securities of such Series shall be redeemed, purchased or repaid, in whole or in part, pursuant to such obligation;

(7) the denominations in which the Securities of such Series shall be issuable, if other than integral multiples of $1,000;

(8) if other than the principal amount thereof, the portion of the principal amount of the Securities of such Series which shall be payable upon the declaration of acceleration of the maturity thereof pursuant to Section 5.2;

(9) any Events of Default or covenants with respect to the Securities of such Series, if not set forth in this Indenture;

(10) if other than those named herein, any other depositaries, authenticating or paying agents, transfer agents or registrars or any other agents with respect to such Series;

(11) the stock exchanges, if any, on which the Securities will be listed and related information;

13

(12) any applicable restrictions on the transfer of any of the Securities of such Series;

(13) if other than the currency of the United States of America, the currency, currencies or currency units in which the principal of or interest, if any, on any Securities of the Series shall be payable and the manner of determining the equivalent thereof in the currencies of the United States of America for any purpose;

(14) if applicable, the terms of any right to convert Securities of the Series into, or to exchange Securities of the Series for, shares of Common Stock or other securities or property; and

(15) Whether the Securities of the Series shall be issued in whole or in part in the form of one or more Global Securities, the Depository for the Series, if other than The Depository Trust Company or its successors, and any circumstances in addition to or in lieu of those set forth in Section 2.7 in which any Global Security may be exchanged in whole or in part for Securities registered, and any transfer of such Global Security in whole or in part may be registered, in the name or names of Persons other than the Depository for such Global Security or a nominee thereof;

(16) any other terms of the Series (which terms shall not be inconsistent with the provisions of this Indenture).

All Securities of any one Series shall be substantially identical except as to denomination and except as may otherwise be provided in or pursuant to such Directors' Certificate.

Additional Securities of the same Series may be issued subsequent to the original issue date of any Securities of such Series (hereinafter called "Additional Securities") following the receipt of the Trustee of a Directors' Certificate pertaining to such Additional Securities, which Directors' Certificate will identify the Series to which such Additional Securities belongs and the issue date and aggregate principal amount of the Securities of such Additional Securities. Any such Additional Securities shall be issued on original issue as provided in Section 2.3.

Additional Securities, together with each prior and subsequent Securities of the same Series, shall constitute one and the same Series of Securities for all purposes under this Indenture.

SECTION 2.2 Form and Dating.

The Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A annexed hereto, which is part of this Indenture, with such appropriate insertions, omissions and other variations as are required or permitted by this Indenture, and may have such legends or endorsements placed thereon as the Officers executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Indenture. The Securities may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Security shall be dated the date of its authentication.

The terms and provisions contained in the form of Securities annexed hereto as Exhibit A shall constitute, and are expressly made, a part of this Indenture. To the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

14

Securities issued in the form of one or more permanent global Securities in registered form, substantially in the form as above recited (the "Global Securities"), shall be deposited with or on behalf of the Trustee, as custodian for the Depository, duly executed by the Company and authenticated by the Trustee as hereinafter provided. Each Global Security shall bear such legend as may be required or reasonably requested by the Depository.

The definitive Securities shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any securities exchange on which the Securities may be listed, all as determined by the officers executing such Securities, as evidenced by their execution of such Securities.

SECTION 2.3 Execution and Authentication.

Two Officers shall sign the Securities for the Company by manual or facsimile signature.

If an Officer whose signature is on a Security no longer holds that office at the time the Security is authenticated, the Security shall nevertheless be valid.

A Security shall not be valid until authenticated by the manual signature of an authorized officer of the Trustee. The signature shall be conclusive evidence that the Security has been authenticated under this Indenture.

The Trustee shall authenticate Securities upon a written order of the Company signed by two Officers. Such order shall specify the Series and the amount of the Securities to be authenticated and the date on which such Securities are to be authenticated. The aggregate principal amount of Securities outstanding at any time is unlimited. In authenticating such Securities and in accepting the additional responsibilities under this Indenture in relation to such Securities, the Trustee shall be entitled to receive and shall be fully protected in relying upon, an Opinion of Counsel stating.

(1) that the form or forms of such Securities have been established in conformity with the provisions of this Indenture;

(2) that the terms of such Securities have been established in conformity with the provisions of this Indenture; and

(3) that such Securities, when authenticated and delivered by the Trustee and issued by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute valid and legally binding obligations of the Company enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

The Trustee shall initially act as authenticating agent and may subsequently appoint another Person acceptable to the Company as authenticating agent to authenticate Securities. Unless limited by the terms of such appointment, an authenticating agent may authenticate Securities whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with the Company or an Affiliate of the Company.

15

Provided that the authentication agent has entered into an agreement with the Company concerning the authentication agent's duties, the Trustee shall not be liable for any act or any failure of the authenticating agent to perform any duty either required herein or authorized herein to be performed by such Person in accordance with this Indenture.

The Trustee shall have the right to decline to authenticate and deliver any Securities under this Section if the Trustee, being advised by counsel, determines that such action may not lawfully be taken or if the Trustee in good faith shall determine that such action would expose the Trustee to personal liability to existing Holders or would affect the Trustee's own rights, duties or immunities under the Securities and this Indenture or otherwise in a manner which is not reasonably acceptable to the Trustee.

The Securities shall be issued only in registered form without coupons and shall be dated the date of their authentication.

SECTION 2.4  Registrar and Paying Agent.

The Company shall maintain an office or agency where Securities may be presented for registration of transfer or for exchange ("Registrar") and an office or agency where Securities may be presented for payment ("Paying Agent"). The Registrar shall keep a register of the Securities and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Paying Agent" includes any additional paying agent and the term "Registrar" includes any co-registrar.

The Company shall enter into an appropriate agency agreement with any Registrar, Paying Agent or co-registrar not a party to this Indenture. The agreement shall implement the provisions of this Indenture that relate to such agent. The Company shall promptly notify the Trustee of the name and address of any such agent and any change in the address of such agent. If the Company fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 6.7. The Company or any Subsidiary or Affiliate of the Company may act as Paying Agent, Registrar, co-registrar or transfer agent.

The Company initially appoints the Trustee as Registrar and Paying Agent in connection with the Securities.

SECTION 2.5  Paying Agent To Hold Money in Trust.

On or prior to 11:00 a.m., New York City time, on each due date of the principal and interest on any Security, the Company shall deposit with the Paying Agent a sum of money denominated in the currency of such payment, in immediately available funds, sufficient to pay such principal and interest in funds available when such becomes due. The Company shall require each Paying Agent (other than the Trustee) to agree in writing that the Paying Agent shall hold in trust for the benefit of Securityholders or the Trustee all money held by the Paying Agent for the payment of principal of or interest on the Securities (whether such money has been paid to it by the Company or any other obligor on the Securities) and shall notify the Trustee of any default by the Company (or any other obligor on the Securities) in making any such payment. If the Company or a Subsidiary or an Affiliate of the Company acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund for the benefit of the Securityholders. If the Company defaults in its obligation to deposit funds for the payment of principal and interest the Trustee may, during the continuation of such default, require a Paying Agent to pay all money held by it to the Trustee. The Company at

16

any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it. Upon doing so, the Paying Agent (other than the Company or a Subsidiary or Affiliate of the Company) shall have no further liability for the money delivered to the Trustee.

SECTION 2.6  Securityholder Lists.

The Trustee shall preserve in as current a form as reasonably practicable the most recent list available to it of the names and addresses of Securityholders. If the Trustee is not the Registrar, the Company shall furnish to the Trustee at least five Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Securityholders, and the Company shall otherwise comply with TIA Section 312(a).

SECTION 2.7  Transfer and Exchange.

The Securities shall be transferable only upon the surrender of a Security to the Registrar for registration of transfer. When a Security is presented to the Registrar or a co-registrar with a request to register a transfer, the Registrar shall register the transfer as requested if the requirements of Section 8-401(a) of the Uniform Commercial Code are met (and the Registrar shall be entitled to assume such requirements have been met unless it receives written notice to the contrary) and, if so required by the Trustee or the Company, if the Security presented is accompanied by a written instrument of transfer in form satisfactory to the Trustee and the Company, duly executed by the registered owner or by his or her attorney duly authorized in writing, in which case, the Registrar shall deliver one or more new Securities of the same Series, of any authorized denominations and of a like aggregate principal amount. When Securities are presented to the Registrar or a co-registrar with a request to exchange them for an equal principal amount of Securities of the same Series and of other authorized denominations, the Registrar shall make the exchange as requested if the same requirements are met. To permit registration of transfers and exchanges, the Company shall execute and the Trustee shall authenticate Securities at the Registrar's or co-registrar's request. The Depository shall, by acceptance of a Global Security, agree that transfers of beneficial interests in such Global Security may be effected only through a book-entry system maintained by the Depository (or its agent), and that ownership of a beneficial interest in the Global Security shall be required to be reflected in a book entry.

No service charge shall be made for any registration of transfer or exchange of the Securities, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange pursuant to Section 2.11, 8.5 or 9.6).

Prior to the due presentation for registration of transfer of any Security, the Company, the Trustee, the Paying Agent, the Registrar or any co-registrar may deem and treat the person in whose name a Security is registered as the absolute owner of such Security for the purpose of receiving payment of principal of and interest (subject to the record date provisions thereof) on such Security and for all other purposes whatsoever, whether or not such Security is overdue, and none of the Company, the Trustee, the Paying Agent, the Registrar or any co-registrar shall be affected by notice to the contrary.

Notwithstanding any other provisions of this Section 2.7, unless and until it is exchanged in whole or in part for Securities of any Series in definitive registered form, a Global Security representing all or a portion of the Securities of a Series may not be transferred except as a whole by the Depository to a nominee of such

17

Depository or by a nominee of such Depository to such Depository or another nominee of such Depository or by such Depository or any such nominee to a successor Depository or a nominee of such successor Depository.

If the Depository notifies the Company that it is unwilling or unable to continue as Depository for the Global Securities of any Series or if at any time the Depository shall no longer be eligible under the next sentence of this paragraph, the Company shall appoint a successor Depository with respect to such Securities. Each Depository appointed pursuant to this Section 2.7 must, at the time of its appointment and at all times while it serves as Depository, be a clearing agency registered under the Exchange Act and any other applicable statute or regulation. The Company will execute, and the Trustee will authenticate and deliver upon a written order of the Company signed by two Officers, Securities in definitive registered form in any authorized denominations representing Securities of a Series in exchange for such Global Security or Securities of such Series if (i) the Depository notifies the Company that it is unwilling or unable to continue as Depository for the Global Securities of such Series or if at any time the Depository shall no longer be eligible to serve as Depository and a successor Depository for the Securities of such Series is not appointed by the Company within 90 days after the Company receives such notice or becomes aware of such ineligibility or (ii) an Event of Default with respect to the Securities of such Series has occurred and is continuing.

The Company may at any time and in its sole discretion determine that the Securities of a Series shall no longer be represented by a Global Security or Securities. In such event the Company will execute, and the Trustee will authenticate and deliver upon a written order of the Company signed by two Officers, Securities of such Series in definitive registered form in any authorized denominations representing such Securities in exchange for such Global Security or Securities.

Upon the exchange of a Global Security for Securities in definitive registered form without coupons, in authorized denominations, such Global Security shall be cancelled by the Trustee. Securities in definitive registered form issued in exchange for a Global Security pursuant to this Section 2.7 shall be registered in such names and in such authorized denominations as the Depository for such Global Security, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Trustee. The Trustee shall deliver such Securities to or as directed by the Persons in whose names such Securities are so registered.

No holder of a beneficial interest in any Global Security held on its behalf by a Depository shall have any rights under this Indenture with respect to such Global Security, and such Depository may be treated by the Company, the Trustee, and any agent of the Company or the Trustee as the owner of such Global Security for all purposes whatsoever. None of the Company, the Trustee or any agent of the Company or the Trustee will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Security or maintaining, supervising or reviewing any records relating to such beneficial ownership interests. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by a Depository or impair, as between a Depository and such holders of beneficial interests, the operation of customary practices governing the exercise of the rights of the Depository (or its nominee) as Holder of any Security.

The Company shall not be required (A) to issue, register the transfer of or exchange any Securities of a Series during a period beginning at the opening of business 15 days before the day of the mailing of a notice of redemption of any such Securities selected for redemption under Section 9.3 and ending at the close of business

18

on the day of such mailing or (B) to register the transfer of or exchange any Security so selected for redemption in whole or in part, except the unredeemed portion of any Security being redeemed in part.

All Securities issued upon any transfer or exchange pursuant to the terms of this Indenture will evidence the same debt and will be entitled to the same benefits under this Indenture as the Securities surrendered upon such transfer or exchange.

## SECTION 2.8  Replacement Securities.

If a mutilated Security is surrendered to the Registrar or if the Holder of a Security claims that the Security has been lost, destroyed or wrongfully taken and the Holder furnishes to the Company and the Trustee evidence to their satisfaction of such loss, destruction or wrongful taking, the Company shall issue and the Trustee shall, in the absence of notice to the Company or the Trustee that such Security has been acquired by a bona fide purchaser, authenticate a replacement Security of the same Series if the requirements of Section 8-405 of the Uniform Commercial Code are met (and the Registrar shall be entitled to assume such requirements have been met unless it receives written notice to the contrary) and if there is delivered to the Company and the Trustee such security or indemnity as may be required to save each of them harmless, satisfactory to the Company and the Trustee. The Company and the Trustee may charge the Holder for their expenses in replacing a Security.

In case any such mutilated, lost, destroyed or wrongfully taken Security has become or is about to become due and payable, the Company in its discretion may, instead of issuing a new Security, pay such Security.

Every replacement Security of each Series is an additional obligation of the Company and shall be entitled to the benefits of this Indenture.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Securities.

## SECTION 2.9  Outstanding Securities.

The Securities of each Series outstanding at any time are all the Securities authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, and those described in this Section as not outstanding.

If a Security is replaced or paid pursuant to Section 2.8, it ceases to be outstanding unless the Trustee and the Company receive proof satisfactory to them that the replaced or paid Security is held by a bona fide purchaser.

If all the principal and interest on any Securities of any Series are considered paid under Section 3.1, the Securities of such Series cease to be outstanding under this Indenture and interest on the Securities of such Series shall cease to accrue.

If the Paying Agent (other than the Company or a Subsidiary or an Affiliate of the Company) holds in accordance with this Indenture on a maturity or redemption date money sufficient to pay all principal and interest due on that date with respect to Securities of any Series then on and after that date such Securities cease to be outstanding and interest on them ceases to accrue (unless there shall be a default in such payment).

# EXHIBIT A
# PART 2

Subject to Section 2.10, a Security does not cease to be outstanding because the Company or an Affiliate thereof holds the Security.

## SECTION 2.10 Determination of Holders' Action.

In determining whether the Holders of the required principal amount of any Series of Securities have concurred in any direction, amendment, waiver or consent, Securities owned by or pledged to the Company, any other obligor upon the Securities or any Affiliate of the Company or such other obligor shall be disregarded and deemed not to be outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Securities which the Trustee knows are so owned or pledged shall be so disregarded.

## SECTION 2.11 Temporary Securities.

Until definitive Securities of any Series are ready for delivery, the Company may prepare and the Trustee shall authenticate temporary Securities of such Series. Temporary Securities shall be substantially in the form of definitive Securities but may have variations that the Company considers appropriate for temporary Securities. Without unreasonable delay, the Company shall prepare and the Trustee, upon the written order of the Company signed by two Officers, shall authenticate definitive Securities in exchange for temporary Securities. Until such exchange, temporary Securities of any Series shall be entitled to the same rights, benefits and privileges as definitive Securities of such Series.

## SECTION 2.12 Cancellation.

The Company at any time may deliver Securities to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Securities surrendered to them for registration of transfer, exchange or payment. The Trustee shall cancel all Securities surrendered for registration of transfer, exchange, payment or cancellation and shall deliver to the Company a certificate of cancellation. The Company may not issue new Securities to replace Securities that it has paid or delivered to the Trustee for cancellation.

## SECTION 2.13 Defaulted Interest.

If the Company defaults in a payment of interest on the Securities of any Series, it shall pay Defaulted Interest, plus any interest payable on the Defaulted Interest to the extent permitted by law, in any lawful manner. It may pay the Defaulted Interest to the Persons who are Securityholders on a subsequent special record date which date shall be at least five Business Days prior to the payment date. The Company shall fix the special record date and payment date. At least 15 days before the special record date, the Company (or the Trustee, in the name of and at the expense of the Company) shall mail to Securityholders a notice that states the special record date, payment date and amount of interest to be paid.

ARTICLE III

COVENANTS

SECTION 3.1  Payment of Securities.

The Company shall pay the principal of, and interest on the Securities of each Series on the dates and in the manner provided in such Securities. The Company shall pay interest on overdue principal at the rate borne by or provided for in such Securities; it shall pay interest on overdue installments of interest at the rate borne by or provided for in such Securities to the extent lawful. Principal and interest shall be considered paid on the date due if the Trustee or the Paying Agent (other than the Company or a Subsidiary or an Affiliate of the Company) has received from or on behalf of the Company money sufficient to pay all principal and interest then due in accordance with Section 2.5.

SECTION 3.2  Maintenance of Office or Agency.

The Company shall maintain in the Borough of Manhattan, the City of New York, an office or agency where Securities may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Company in respect of the Securities and this Indenture may be served. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office or agency or to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the address of the Trustee set forth in Section 10.2. The Company initially appoints the Trustee as its agency for the foregoing purposes in the Borough of Manhattan, the City of New York.

The Company may also from time to time designate one or more other offices or agencies where the Securities may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the Borough of Manhattan, the City of New York, for such purposes. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

SECTION 3.3  Limitation on Sale/Leaseback Transactions.

The Company shall not, and shall not permit any Restricted Subsidiary to, enter into any Sale/Leaseback Transaction unless (i) the Company or such Restricted Subsidiary would be entitled to create a Lien on such property securing Indebtedness in an amount equal to the Attributable Debt with respect to such transaction without equally and ratably securing the Securities pursuant to Section 3.4 or (ii) the net proceeds of such sale are at least equal to the fair value (as determined by the Board of Directors) of such property or asset and the Company or such Restricted Subsidiary shall apply or cause to be applied an amount in cash equal to the net proceeds of such sale to the retirement, within 180 days of the effective date of any such arrangement, of Indebtedness of the Company or any Restricted Subsidiary; provided, however, that in addition to the transactions permitted pursuant to the foregoing clauses (i) and (ii), the Company or any Restricted Subsidiary may enter into a Sale/Leaseback Transaction as long as the sum of (x) the Attributable Debt with respect to such Sale/Leaseback Transaction and all other Sale/Leaseback Transactions entered into pursuant to this proviso plus (y) the amount of outstanding Indebtedness secured by Liens Incurred pursuant to the final proviso to Section

21

3.4 does not exceed 15% of Consolidated Net Tangible Assets as determined based on the consolidated balance sheet of the Company as of the end of the most recent fiscal quarter for which financial statements are available; and provided, further, that a Restricted Subsidiary may enter into a Sale/Leaseback Transaction with respect to property or assets owned by such Restricted Subsidiary, the proceeds of which are used to explore, drill, develop, construct, purchase, repair, improve or add to property or assets of any Restricted Subsidiary, or to repay (within 365 days of the commencement of full commercial operation of any such property) Indebtedness Incurred to explore, drill, develop, construct, purchase, repair, improve or add to property or assets of any Restricted Subsidiary.

SECTION 3.4  Limitation on Liens.

The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, incur any Lien on any of its properties or assets (including Capital Stock), whether owned at the date of issuance of any Series of Securities pursuant to this Indenture or thereafter acquired, in each case to secure Indebtedness of the Company or any Restricted Subsidiary, other than (a)(1) Liens incurred by the Company or any Restricted Subsidiary securing Indebtedness Incurred by the Company or such Restricted Subsidiary, as the case may be, to finance the exploration, drilling, development, construction or purchase of or by, or repairs, improvements or additions to, property or assets of the Company or such Restricted Subsidiary, as the case may be, which Liens may include Liens on the Capital Stock of such Restricted Subsidiary or (2) Liens incurred by any Restricted Subsidiary that does not own, directly or indirectly, at the time of such original incurrence of such Lien under this clause (2) any operating properties or assets, securing Indebtedness Incurred to finance the exploration, drilling, development, construction or purchase of or by, or repairs, improvements or additions to, property or assets of any Restricted Subsidiary that does not, directly or indirectly, own any operating properties or assets at the time of such original incurrence of such Lien, which Liens may include Liens on the Capital Stock of one or more Restricted Subsidiaries that do not, directly or indirectly; own any operating properties or assets at the time of such original incurrence of such Lien, provided, however, that the Indebtedness secured by any such Lien may not be issued more than 365 days after the later of the exploration, drilling, development, completion of construction, purchase, repair, improvement, addition or commencement of full commercial operation of the property or assets being so financed; (b) Liens existing on the date of the issuance of such series of Securities (other than Liens relating to Indebtedness· or other obligations being repaid or Liens that are otherwise extinguished with the proceeds of any offering of Securities pursuant to this Indenture); (c) Liens on property, assets or shares of stock of a Person at the time such Person becomes a Subsidiary; provided, however, that any such Lien may not extend to any other property or assets owned by the Company or any Restricted Subsidiary; (d) Liens on property or assets at the time the Company or a Subsidiary acquires the property or asset, including, any acquisition by means of a merger or consolidation with or into the Company or a Subsidiary; provided, however, that such Liens are not incurred in connection with, or in contemplation of, such merger or consolidation; and provided, further, that the Lien may not extend to any other property or asset owned by the Company or any Restricted Subsidiary; (e) Liens securing Indebtedness or other obligations of a Subsidiary owing to the Company or a Restricted Subsidiary or of the Company owing to a Subsidiary; (f) Liens incurred on assets that are the subject of a Capitalized Lease Obligation to which the Company or a Subsidiary is a party, which shall include, Liens on the stock or other ownership interest in one or more Restricted Subsidiaries leasing such assets; (g) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (a), (b), (c), (d) and (f), provided, however, that (x) such new Lien shall be limited to all or part of the same property or assets that secured the original Lien (plus repairs, improvements or additions to such property or assets and Liens on the stock or other

22

ownership interest in one or more Restricted Subsidiaries beneficially owning such property or assets) and (y) the amount of the Indebtedness secured by such Lien at such time (or, if the amount that may be realized in respect of such Lien is limited, by contract or otherwise, such limited lesser amount) is not increased (other than by an amount necessary to pay fees and expenses, including premiums, related to the refinancing, refunding, extension, renewal or replacement of such Indebtedness); and (h) Liens by which the Securities are secured equally and ratably with other Indebtedness pursuant to this Section 3.4; in any such case without effectively providing that the Securities shall be secured equally and ratably with (or prior to) the obligations so secured for so long as such obligations are so secured; provided, however, that the Company or a Restricted Subsidiary may incur other Liens to secure outstanding Indebtedness as long as the sum of (x) the lesser of (A) the amount of outstanding Indebtedness secured by Liens Incurred pursuant to this proviso (or, if the amount that may be realized in respect of such Lien is limited, by contract or otherwise, such limited lesser amount) and (B) the fair value (as determined by the Board of Directors) of the property securing such item of Indebtedness, plus (y) the Attributable Debt with respect to all Sale/Leaseback Transactions entered into pursuant to the first proviso to Section 3.3 does not exceed 15% of Consolidated Net Tangible Assets as determined based on the Consolidated balance sheet of the Company as of the end of the most recent fiscal quarter for which financial statements are available.

SECTION 3.5  Compliance Certificate.

The Company shall, within 120 days after the close of each fiscal year in which Securities are outstanding hereunder, file with the Trustee an Officer's Certificate, provided that one Officer executing the same shall be the principal executive officer, the principal financial officer or the principal accounting officer of the Company, covering the period from the date of issuance of Securities hereunder to the end of the fiscal year in which the Securities were first issued hereunder, in the case of the first such certificate, and covering the preceding fiscal year in the case of each subsequent certificate, and stating whether or not, to the knowledge of each such executing Officer, the Company has complied with and performed and fulfilled all covenants on its part contained in this Indenture and is not in Default in the performance or observance of any of the terms or provisions contained in this Indenture, and, if any such signer has obtained knowledge of any Default by the Company in the performance, observance or fulfillment of any such covenant, term or provision specifying each such Default and the nature thereof. For the purpose of this Section 3.5, compliance shall be determined without regard to any grace period or requirement of notice provided pursuant to the terms of this Indenture.

SECTION 3.6  SEC Reports.

The Company shall, to the extent required by TIA Section 314(a), file with the Trustee, within 15 days after the filing with the SEC, copies of the annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the SEC may by rules and regulations prescribe) which the Company is required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act. In the event the Company is at any time no longer subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, it shall, for so long as the Securities remain outstanding, file with the Trustee, within 15 days after the Company would have been required to file such documents with the SEC, copies of the annual reports and of the information, documents and other reports which the Company would have been required to file with the SEC if the Company had continued to be subject to such Sections 13 or 15(d). The Company also shall comply with the other provisions of TIA Section 314(a).

Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

SECTION 3.7 Further Instruments and Acts.

The Company (upon the reasonable request of the Trustee) will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to enable the Trustee to exercise and enforce its rights under this Indenture and to carry out more effectively the purpose of this Indenture.

SECTION 3.8 Waiver of Certain Covenants.

The Company may omit in any particular instance to comply with any covenant or condition set forth in Sections 3.3 to 3.4, inclusive, with respect to any Series of Securities or any covenant established with respect to such Series pursuant to Section 2.1(9), if before or after the time for such compliance the Holders of at least 50% in principal amount of the Securities of such Series at the time outstanding, shall either waive such compliance in such instance or generally waive compliance with such covenant or condition, but no such waiver shall extend to or affect such covenant or condition except to the extent so expressly waived, and, until such waiver shall become effective, the obligations of the Company and the duties of the Trustee in respect of any such covenant or condition shall remain in full force and effect.

## ARTICLE IV

## CONSOLIDATION, MERGER, SALE AND LEASE

SECTION 4.1 Merger and Consolidation of Company.

The Company shall not in a single transaction or through a series of related transactions consolidate with or merge with or into any other corporation or sell, assign, convey, transfer or lease or otherwise dispose of all or substantially all of its properties and assets to any Person or group of affiliated Persons, unless:

(i) either (A) the Company shall be the continuing Person, or (B) the Person (if other than the Company) formed by such consolidation or into which the Company is merged or to which the properties and assets of the Company are sold, assigned, conveyed, transferred, disposed of or leased as aforesaid (the "Successor Corporation") shall be a corporation organized and existing under the laws of the United States or any State thereof or the District of Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all the obligations of the Company under this Indenture and each Series of Securities;

(ii) immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(iii) the Company shall have delivered, or caused to be delivered, to the Trustee an Officers' Certificate and, as to legal matters, an Opinion of Counsel, each in form reasonably satisfactory to the Trustee, each stating that such consolidation, merger, sale, assignment, conveyance, transfer, disposition or lease and such

24

supplemental indenture comply with this Indenture and that all conditions precedent herein provided for relating to such transaction have been complied with;

Notwithstanding the foregoing paragraph (ii), any Restricted Subsidiary, the Company or any Wholly Owned Subsidiary or Wholly Owned Subsidiaries may consolidate with or merge into the Company or any Wholly Owned Subsidiary and no violation of this Section shall be deemed to have occurred as a consequence thereof, as long as the requirements of paragraphs (i) and (iii) are satisfied in connection therewith.

SECTION 4.2  Successor Substituted.

(a) Upon any such consolidation or merger, or any sale, assignment, conveyance, transfer, disposition or lease of all or substantially all of the properties or assets of the Company in accordance with Section 4.1, the Successor Corporation shall succeed to and be substituted for the Company under this Indenture and each Series of Securities, and the Company shall (except in the case of a lease) thereupon be released from all obligations hereunder and under each Series of Securities and the Company, as the predecessor corporation, may thereupon or at any time thereafter be dissolved, wound up or liquidated.

(b) In the case of any consolidation, merger or sale, assignment, conveyance, transfer, disposition or lease described in Section 4.2(a) above, such changes in form (but not in substance) may be made in the Securities thereafter to be issued as may be appropriate.

## ARTICLE V

## DEFAULTS AND REMEDIES

SECTION 5.1  Events of Default.

An "Event of Default" means, with respect to any Series of Securities, any of the following events:

(a) default in the payment of interest on any Security of such Series when the same becomes due and payable, and such default continues for a period of 30 days;

(b) default in the payment of the principal of any Security of such Series when the same becomes due and payable at maturity or otherwise;

(c) material default in performance of any other covenants or agreements in the Securities of such Series or this Indenture and the default continues for 30 days after the date on which written notice of such default is given to the Company by the Trustee or to the Company and the Trustee by Holders of at least 25% in principal amount of the Securities of such Series then outstanding hereunder;

(d) there shall have occurred either (i) a default by the Company or any Restricted Subsidiary under any instrument or instruments under which there is or may be secured or evidenced any Indebtedness of the Company or any Restricted Subsidiary of the Company (other than the Securities of such Series) having an outstanding principal amount of $50,000,000 (or its foreign currency equivalent) or more individually or in the aggregate that has caused the holders thereof to declare such Indebtedness to be due and payable prior to its Stated Maturity, unless such declaration has been rescinded within 30 days or (ii) a default by the

25

Company or any Restricted Subsidiary in the payment when due of any portion of the principal under any such instrument or instruments, and such unpaid portion exceeds $50,000,000 (or its foreign currency equivalent) individually or in the aggregate and is not paid, or such default is not cured or waived, within any grace period applicable thereto, unless such Indebtedness is discharged within 30 days of the Company or a Restricted Subsidiary becoming aware of such default;

(e) the Company or any Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law:

(i) commences a voluntary case;

(ii) consents to the entry of an order for relief against it in an involuntary case;

(iii) consents to the appointment of a Custodian of it or for all or substantially all of its property;

(iv) makes a general assignment for the benefit of its creditors; or

(v) admits in writing its inability to generally pay its debts as such debts become due;

or takes any comparable action under any foreign laws relating to insolvency;

(f) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i) is for relief against the Company or any Significant Subsidiary in an involuntary case;

(ii) appoints a Custodian of the Company or any Significant Subsidiary or for all or substantially all of its property; or

(iii) orders the winding up or liquidation of the Company or any Significant Subsidiary;

or any similar relief is granted under any foreign laws; and the order or decree remains unstayed and in effect for 60 days.

The term "Bankruptcy Law" means Title 11 of the United States Code or any similar Federal or State law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

Any notice of Default given by the Trustee or Securityholders under this Section must specify the Default, demand that it be remedied and state that the notice is a "Notice of Default."

The Company shall deliver to the Trustee, within 30 days after the occurrence thereof, written notice of any event which with the giving of notice or the lapse of time or both would become an Event of Default under clause (d), (e) or (f) hereof.

Subject to the provisions of Section 6.1 and 6.2, the Trustee shall not be deemed to have notice or be charged with knowledge of any Default or Event of Default unless written notice thereof shall have been given to the

Trustee in accordance with Section 10.2 by the Company, the Paying Agent, any Holder or an agent of any Holder and such notice references the Securities and this Indenture.

SECTION 5.2 Acceleration.

If an Event of Default (other than an Event of Default specified in clause (e) and (f) of Section 5.1 with respect to the Company) occurs and is continuing with respect to the Securities of any Series, the Trustee by notice to the Company, or the Holders of at least 25% in principal amount of the Securities of such Series by notice to the Company and the Trustee, may declare the principal of and accrued and unpaid interest on all the Securities of such Series to be due and payable. Upon such declaration the principal and interest shall be due and payable immediately. If an Event of Default specified in clause (e) or (f) of Section 5.1 with respect to the Company occurs, the principal of and interest on all the Securities of each Series shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders. An acceleration and its consequences in respect of a Series of Securities shall be automatically annulled and rescinded; provided, however, that such annulment and rescission would not conflict with any judgment or decree and if all existing Events of Default with respect to such Series have been cured or waived except nonpayment of principal or interest that has become due solely because of the acceleration. No such rescission shall affect any subsequent or other Default or Event of Default or impair any consequent right.

SECTION 5.3 Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal or interest on the relevant Securities or to enforce the performance of any provision of such Securities or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

SECTION 5.4 Waiver of Past Defaults.

The Holders Of A Majority In Principal Amount Of A Series Of Securities By Notice To The Trustee May Waive An Existing Default And Its Consequences With Respect To Such Series, Except (a) A Default In The Payment Of The Principal Of Or Interest On Any Security Of Such Series or (b) a Default in respect of a provision that under Section 8.2 cannot be amended without the consent of each affected Securityholder of such Series. When a Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any consequent right.

SECTION 5.5 Control by Majority.

The Holders of a majority in principal amount of the Securities of a Series may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on it with respect to such Series. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, or, subject to Section 6.1, that the Trustee determines is unduly prejudicial to the rights of other Securityholders, or would involve the Trustee in personal liability; provided, however, that

the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction. Prior to taking any action hereunder, the Trustee shall be entitled to indemnification from Securityholders of such Series reasonably satisfactory to it against all risk, losses and expenses caused by taking or not taking such action. Subject to Section 6.1, the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of the Securityholders pursuant to this Indenture, unless such Securityholders shall have provided to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which might be incurred in compliance with such request or direction.

SECTION 5.6  Limitation on Suits.

A Securityholder of a Series may pursue a remedy with respect to this Indenture or the Securities of such Series only if:

(a) the Holder gives to the Trustee written notice of a continuing Event of Default with respect to that Series;

(b) the Holders of at least 25% in principal amount of the Securities of such Series make a written request to the Trustee to pursue the remedy;

(c) such Holder or Holders offer to the Trustee security or indemnity reasonably satisfactory to it against any loss, liability or expense;

(d) the Trustee does not comply with the request within 60 days after receipt of the notice, request and the offer of security or indemnity; and

(e) the Holders of a majority in principal amount of the Securities of such Series do not give the Trustee a direction inconsistent with the request during such 60-day period.

A Securityholder may not use this Indenture to prejudice the rights of another Securityholder or to obtain a preference or priority over another Securityholder.

SECTION 5.7  Rights of Holders To Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Security to receive payment of principal and interest on the Security, on or after the respective due dates expressed or provided for in the Security, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of the Holder.

SECTION 5.8  Collection Suit by Trustee.

If an Event of Default specified in Section 5.1(a) or (b) occurs and is continuing with respect to a Security, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company or any other obligor on such Security for the whole amount of principal and interest remaining unpaid (together with interest on such unpaid interest to the extent lawful) and the amounts provided for in Section 6.7.

SECTION 5.9  Trustee May File Proofs of Claim.

The Trustee may file such proofs of claim and other papers or documents and take such other actions including participating as a member or otherwise in any committee of creditors appointed in the matter as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the amounts provided in Section 6.7) and the Securityholders allowed in any judicial proceedings relative to the Company, its creditors or its property and, unless prohibited by law or applicable regulations, may vote on behalf of the Holders of each Series in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 6.7. To the extent that the payment of any such amount due to the Trustee under Section 6.7 out of the estate in any such proceeding shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties which the Holders of the Securities may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

No provision of this Indenture shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Securities or the rights of any Holder thereof or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding; provided, however, that the Trustee may, on behalf of the Holders, vote for the election of a trustee in bankruptcy or similar official and be a member of a creditors' or other similar committee.

SECTION 5.10  Priorities.

If the Trustee collects any money or other consideration pursuant to this Article, it shall pay out the money or other consideration in the following order:

First: to the Trustee for amounts due under Section 6.7;

Second: to Securityholders for amounts due and unpaid on the Securities of the relevant Series for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Securities of such Series for principal and interest, respectively; and

Third: to the Company.

The Trustee may fix a record date and payment date for any payment to Securityholders of such Series pursuant to this Section. At least 15 days before such record date, the Company shall give written notice to each Securityholder of such Series and the Trustee of the record date, the payment date and amount to be paid.

SECTION 5.11  Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party

29

litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 5.7, or a suit by Holders of more than 10% in principal amount of the Securities of any Series.

SECTION 5.12  Waiver of Stay or Extension Laws. ·

The Company shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Company hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE VI

TRUSTEE

SECTION 6.1  Duties of Trustee.

(a) If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.

(b) Except during the continuance of an Event of Default;

(i) The Trustee need perform only those duties that are specifically set forth in this Indenture and no others and no implied covenants or obligations shall be read into this Indenture against the Trustee.

(ii) In the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c) The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i) This paragraph does not limit the effect of paragraph (b) of this Section.

(ii) The Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts.

(iii) The Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 5.2, 5.4 or 5.5.

30

(iv) No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, unless it receives indemnity satisfactory to it against any risk, loss, liability or expense.

(d) Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section.

(e) The Trustee, in its capacity as Trustee and Registrar and Paying Agent, shall not be liable to the Company, the Securityholders or any other Person for interest on any money received by it, including, but not limited to, money with respect to principal of or interest on the Securities of any Series, except as the Trustee may agree with the Company.

(f) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

SECTION 6.2  Rights of Trustee.

(a) The Trustee may rely on any document reasonably believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document.

(b) Before the Trustee acts or refrains from acting, it may require an Officers' Certificate, an Opinion of Counsel or both covering such matters as it shall reasonably determine. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on any such Officers' Certificate or Opinion of Counsel.

(c) The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d) The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers provided, however, that the Trustee's conduct does not constitute willful misconduct, negligence or bad faith.

(e) The Trustee may consult with counsel of its selection, and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice of such counsel.

(f) The Trustee shall not be obligated to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or any other paper or document.

(g) The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders pursuant to this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

31

(h) The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

SECTION 6.3  Individual Rights of Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Company or an Affiliate with the same rights it would have if it were not Trustee. Any Agent may do the same with like rights. However, the Trustee is subject to Sections 6.10 and 6.11.

SECTION 6.4  Trustee's Disclaimer.

The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Securities of any Series, it shall not be accountable for the Company's use of the proceeds from the Securities of any Series, and it shall not be responsible for any recital or statement in this Indenture or the Securities of any Series other than its authentication. The Trustee shall have no duty to ascertain or inquire as to the performance of the Company's covenants in Article III hereof.

SECTION 6.5  Notice of Defaults.

If a Default or an Event of Default occurs and is continuing and if it is actually known to a Trust Officer of the Trustee, the Trustee shall mail to Securityholders of the affected Series a notice of the Default or Event of Default within 90 days after a Trust Officer of the Trustee has actual knowledge of the occurrence thereof. Except in the case of a Default in any payment on any Security, the Trustee may withhold the notice if and so long as a committee of its Trust Officers in good faith determines that withholding the notice is in the interests of Securityholders of the affected Series.

SECTION 6.6  Reports by Trustee to Holders.

Within 60 days after the reporting date stated in Section 10.10, the Trustee shall mail to Securityholders a brief report dated as of such date that complies with TIA Section 313(a) if required by that Section. The Trustee also shall comply with TIA Section 313(b)(2).

A copy of each report at the time of its mailing to Securityholders shall be filed with the SEC and each stock exchange on which Securities are listed. The Company shall promptly notify the Trustee when Securities are listed on any stock exchange and of any delisting thereof.

SECTION 6.7  Compensation and Indemnity.

The Company shall pay to the Trustee from time to time such compensation for its services as the parties shall agree. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Company shall reimburse the Trustee upon request for all reasonable out-of-pocket disbursements, expenses and advances incurred by it. Such expenses shall include the reasonable compensation and out-of-pocket disbursements and expenses of the Trustee's agents, counsel and other professionals.

32

The Company shall indemnify the Trustee for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, disbursements and expenses, incurred by it arising out of or in connection with the administration of this trust and the performance of its duties hereunder including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder. The Trustee shall notify the Company promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Company shall not relieve the Company of its obligations hereunder. The Company shall defend the claim and the Trustee shall cooperate in the defense. The Trustee may have separate counsel and the Company shall pay the reasonable fees and expenses of such counsel. The Company need not pay for any settlement made without its consent, which consent shall not be unreasonably withheld.

The Company need not reimburse any expense or indemnify against any loss or liability incurred by the Trustee through negligence or bad faith.

To secure the Company's payment obligations in this Section, the Trustee shall have a Lien prior to the Securities on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Securities of any Series.

Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee incurs expenses or renders services after an Event of Default specified in Section 5.1(e) or (f) occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any Bankruptcy Law.

The Company's obligations under this Section 6.7 and any Lien arising hereunder shall survive the resignation or removal of the Trustee, the discharge of the Company's obligations pursuant to Article VII of this Indenture and the termination of this Indenture.

SECTION 6.8 Replacement of Trustee.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section.

The Trustee may resign at any time with respect to any Series of Securities by so notifying the Company in writing. Provided that no Event of Default has occurred and is continuing, the Company may remove the Trustee with respect to any Series of Securities at any time by so notifying the Trustee of such Series of Securities. The Holders of a majority in principal amount of the Securities of any Series may, by written notice to the Trustee, remove the Trustee as Trustee with respect to that Series of Securities by so notifying the Trustee and the Company. The Company, by notice to such Trustee, shall remove such Trustee if:

(a) such Trustee fails to comply with Section 6.10;

(b) such Trustee is adjudged a bankrupt or an insolvent;

(c) a receiver or public officer takes charge of such Trustee or its property; or

(d) such Trustee becomes incapable of acting.

33

If the Trustee resigns or is removed or becomes incapable of acting or if a vacancy exists in the office of Trustee for any reason with respect to one or more Series of Securities, the Company by Board Resolution shall promptly appoint a successor Trustee or Trustees with respect to such Series of Securities (it being understood that any such successor Trustee may be appointed with respect to one or more or all Series of Securities and at any time there shall be only one Trustee with respect to any particular Series of Securities). Within one year after the successor Trustee of a Series of Securities takes office, the Holders of a majority in principal amount of such Securities of the affected Series may appoint a successor Trustee of such Series to replace the successor Trustee of such Series appointed by the Company.

If a successor Trustee for a particular Series of Securities does not take office within 60 days after the retiring Trustee of such Series resigns or is removed, the retiring Trustee of such Series, the Company or the Holders of at least 10% in principal amount of the Securities of the affected Series may petition any court of competent jurisdiction for the appointment of a successor Trustee for such Series.

If the Trustee for a particular Series of Securities fails to comply with Section 6.10, any Securityholder who has been a bonafide Holder of a Security for at least six months may petition any court of competent jurisdiction for the removal of the Trustee of such Series and the appointment of a successor Trustee of such Series. The Company shall give notice of each resignation and each removal of the Trustee with respect to the Securities of any Series by mailing any Series and each appointment of a successor Trustee with respect to the Securities of any Series by mailing written notice of such event by first-class mail, postage prepaid, to all Holders of Securities of such Series as their names and addresses appear in the Security Register. Each notice shall include the name of the successor Trustee with respect to the Securities of such Series and the address of its corporate trust office.

A successor Trustee of all Securities shall execute, acknowledge and deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon the resignation or removal of the retiring Trustee shall become effective, and such successor Trustee shall have all the rights, powers and duties of the retiring Trustee under this Indenture. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the Lien provided for in Section 6.7.

In case of the appointment hereunder of a successor Trustee with respect to the Securities of one or more (but not all) Series, the Company, the retiring Trustee and each successor Trustee with respect to the Securities of one or more Series shall execute and deliver an indenture supplemental hereto wherein each successor Trustee shall accept such appointment and which (1) shall contain such provisions as shall be necessary or desirable to transfer and confirm to, and to vest in, each successor Trustee all the rights, powers and duties of the retiring Trustee with respect to the Securities of that or those Series to which the appointment of such successor Trustee relates, (2) if the retiring Trustee is not retiring with respect to all Securities, shall contain such provisions as shall be deemed necessary or desirable to confirm that all the rights, powers and duties of the retiring Trustee with respect to the Securities of that or those Series as to which the retiring Trustee is not retiring shall continue to be vested in the retiring Trustee, and (3) shall add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one Trustee, it being understood that nothing herein or in such supplemental Indenture shall constitute such Trustee's co-trustees of the same trust and that each such Trustee shall be trustee of a trust of trusts hereunder separate and apart from any trust or trusts hereunder administered by any other such Trustee; and upon the execution and delivery of such supplemental indenture the resignation or removal of the retiring Trustee shall become effective to the extent provided therein and each such successor Trustee, without any further action, shall

34

become vested with all the rights, powers and duties of the retiring Trustee with respect to the Securities of that or those Series to which the appointment of such successor Trustee relates; but, on request of the Company or any successor Trustee, such retiring Trustee shall transfer to such successor Trustee all property and money held by such retiring Trustee hereunder with respect to the Securities of that or those Series to which the appointment of such successor Trustee relates, subject to the Lien provided for in Section 6.7.

Upon request of any such successor Trustee, the Company shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts referred to in the two preceding paragraphs, as the case may be.

No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be qualified and eligible under this Article.

SECTION 6.9  Successor Trustee by Merger, etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee.

SECTION 6.10  Eligibility: Disqualification; Conflicting Interests.

This Indenture shall always have a Trustee who satisfies the requirements of TIA Section 310(a)(1) and (10). The Trustee shall always have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition. The Trustee shall comply with TIA Section 310(b). Nothing herein shall prevent the Trustee from filing with the SEC the application referred to in the second-to-last paragraph of TIA Section 310(b). If the Trustee has or shall acquire any conflicting interest, with respect to the Securities of a Series, it shall within 90 days after ascertaining that it has such conflicting interest, either eliminate such conflicting interest or resign with respect to the Securities of that Series in the manner prescribed in the TIA.

SECTION 6.11  Preferential Collection of Claims Against Company.

The Trustee shall comply with TIA Section 311(a), except with respect to any creditor relationship listed in TIA Section 311(b). A Trustee who has resigned or been removed is subject to TIA Section 311(a) to the extent indicated.

ARTICLE VII

SATISFACTION AND DISCHARGE OF INDENTURE

SECTION 7.1  Discharge of Liability on Securities.

If (i) the Company delivers to the Trustee all outstanding Securities of a Series (other than Securities replaced or paid pursuant to Section 2.8 or Securities for whose payment money has theretofore been deposited in trust by the Company with the Trustee or a Paying Agent and thereafter repaid to the Company as provided in the second sentence of Section 7.6) for cancellation or (ii) all outstanding Securities of such Series have become due and payable and the Company irrevocably deposits with the Trustee as trust funds solely for the benefit of

35

the Holders for that purpose funds sufficient to pay at maturity or on redemption the principal of and all accrued interest on all outstanding Securities of such Series (other than Securities replaced or paid pursuant to Section 2.8 or Securities for whose payment money has heretofore been deposited in trust by the Company with the Trustee or Paying Agent and thereafter repaid to the Company as provided in the second sentence of Section 7.6), and if in either case the Company pays all other sums payable hereunder by the Company with respect to such Series, then, subject to Sections 7.2 and 7.7, this Indenture shall cease to be of further effect with respect to such Series. The Trustee shall acknowledge satisfaction and discharge of this Indenture with respect to such Series on demand of the Company accompanied by an Officers' Certificate and an Opinion of Counsel and at the cost and expense of the Company.

SECTION 7.2  Termination of Company's Obligations.

Except as otherwise provided in this Section 7.2, the Company may terminate its obligations under the Securities of a Series and this Indenture with respect to such Series if:

(i) the Securities of such Series mature or are redeemable within one year, (ii) the Company irrevocably deposits in trust with the Trustee or Paying Agent (other than the Company or a Subsidiary or Affiliate of the Company) under the terms of an irrevocable trust agreement in form satisfactory to the Trustee, as trust funds solely for the benefit of the Holders of such Series for that purpose, money or U.S. Government Obligations that, through the payment of interest and principal in respect thereof in accordance with its terms, will provide, not later than one Business Day prior to the applicable payment date, money sufficient (in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee), without consideration of any reinvestment of interest, to pay principal and interest on the Securities of such Series to maturity or redemption, and to pay all other sums payable by it hereunder, (iii) no Default with respect to such Series shall have occurred and be continuing on the date of such deposit, (iv) such deposit will not result in or constitute a Default or result in a breach or violation of, or constitute a default under, any other agreement or instrument to which the Company is a party or by which it is bound and (v) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the satisfaction and discharge of this Indenture with respect to such Series have been complied with; provided, however, that the Trustee or Paying Agent shall have been irrevocably instructed to apply such money or the proceeds of such U.S. Government Obligations to the payment of such principal and interest with respect to the Securities and if the Securities of the Series are to be redeemed, either the Securities have been called for redemption or are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of the notice of redemption by the Trustee in the name, and at the expense, of the Company.

With respect to the foregoing, the Company's obligations in Sections 2.2, 2.3, 2.4, 2.5, 2.6, 2.7, 2.8, 2.12, 3.1, 3.2, 6.7, 6.8, 7.5, 7.6 and 7.7 shall survive until the Securities of such Series are no longer outstanding. Thereafter, only the Company's obligations in Sections 6.7, 6.8, 7.6 and 7.7 shall survive. After any such irrevocable deposit and fulfillment of the other requirements of this Section 7.2, the Trustee upon request shall acknowledge in writing the discharge of the Company's obligations under the Securities of such Series and this Indenture with respect to such Series except for those surviving obligations specified above.

36

SECTION 7.3 Defeasance and Discharge of Indenture.

With respect to a Series of Securities, the Company will be deemed to have paid and will be discharged from any and all obligations in respect of such Series on the 123rd day after the date of the deposit referred to in clause (i) hereof, and the provisions of this Indenture will no longer be in effect with respect to such Series, in each case subject to the penultimate paragraph of this Section 7.3, and the Trustee, at the reasonable request of and at the expense of the Company, shall execute proper instruments acknowledging the same, except as to (a) rights of registration of transfer and exchange, (b) substitution of apparently mutilated, defaced, destroyed, lost or stolen Securities of such Series, (c) rights of Holders of such Series to receive payments of principal thereof and interest thereon, (d) the Company's obligations under Section 3.2, (e) the rights, obligations and immunities of the Trustee hereunder including, without limitation, those arising under Section 6.7 hereof, (f) the rights of the Holders of such Series as beneficiaries of this Indenture with respect to the property so deposited with the Trustee payable to all or any of them and (g) the rights, obligations and immunities which survive as provided in the penultimate paragraph of this Section 7.3; provided, however, that the following conditions shall have been satisfied:

(i) with reference to this Section 7.3, the Company has irrevocably deposited or caused to be irrevocably deposited with the Trustee or Paying Agent (other than the Company or a Subsidiary or Affiliate of the Company) and conveyed all right, title and interest for the benefit of the Holders of such Series, under the terms of an irrevocable trust agreement in form satisfactory to the Trustee as trust funds in trust, specifically pledged as security for, and dedicated solely to, the benefit of such Holders, in and to, (A) money in an amount, (B) U.S. Government Obligations that, through the payment of interest and principal in respect thereof in accordance with their terms, will provide, not later than one Business Day before the due date of any payment referred to in this clause (i), money in an amount or (C) a combination thereof in an amount sufficient, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay and discharge, without consideration of any reinvestment of interest and after payment of all federal, state and local taxes or other fees, charges and assessments in respect thereof payable by the Trustee or Paying Agent, the principal of and interest on the outstanding Securities of such Series when due; provided, however, that the Trustee or Paying Agent shall have been irrevocably instructed to apply such money or the proceeds of such U.S. Government Obligations to the payment of such principal and interest with respect to such Series;

(ii) such deposit will not result in or constitute a Default or result in a breach or violation of, or constitute a default under, any other agreement or instrument to which the Company is a party or by which it is bound;

(iii) no Default with respect to such Series shall have occurred and be continuing on the date of such deposit or during the period ending on the 123rd day after such date of deposit;

(iv) the Company shall have delivered to the Trustee (A) either (1) a ruling directed to the Trustee received from the Internal Revenue Service to the effect that the Holders will not recognize income, gain or loss for federal income tax purposes as a result of the Company's exercise of its option under this Section 7.3 and will be subject to federal income tax on the same amount and in the same manner and at the same times as would have been the case if such option had not been exercised or (2) an Opinion of Counsel (who may not be an employee of the Company) to the same effect as the ruling described in clause (1) accompanied by a ruling to that effect published by the Internal Revenue Service, unless there has been a change in the applicable federal income tax law since the date of this Indenture such that a ruling from the Internal

37

Revenue Service is no longer required and (B) an Opinion of Counsel to the effect that (1) the creation of the defeasance trust does not violate the Investment Company Act of 1940, (2) after the passage of 183 days following the deposit, with respect to any trust funds for the account of any Holder of such Series who may be deemed to be an "insider" for purposes of Title 11 of the United States Code, after one year following the deposit), the trust funds will not be subject to the effect of Section 547 of the United States Bankruptcy Code or Section 15 of the New York Debtor and Creditor Law in a case commenced by or against the Company under either such statute, and either (x) the trust funds will no longer remain the property of the Company (and therefore, will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally) or (y) if a court were to rule under any such law in any case or proceeding that the trust funds remained property of the Company, (I) assuming such trust funds remained in the possession of the Trustee prior to such court ruling to the extent not paid to Holders of such Series, the Trustee will hold, for the benefit of such Holders, a valid and perfected security interest in such trust funds that is not avoidable in bankruptcy or otherwise except for the effect of Section 552(b) of the United States Bankruptcy Code on interest on the trust funds accruing after the commencement of a case under such statute and (II) such Holders will be entitled to receive adequate protection of their interests in such trust funds if such trust funds are used in such case or proceeding; and

(v) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the defeasance contemplated by this Section 7.3 have been complied with.

Notwithstanding the foregoing clause (i), prior to the end of the 123-day period referred to in clause (iv)(B)(2) above, none of the Company's obligations under this Indenture with respect to such Series shall be discharged. Subsequent to the end of such 123-day period with respect to this Section 7.3, the Company's obligations in Sections 2.2, 2.3, 2.4, 2.5, 2.6, 2.7, 2.8, 2.12, 3.1, 3.2, 6.7, 6.8, 7.6 and 7.7 shall survive with respect to such Series until the Series is no longer outstanding. Thereafter, only the Company's obligations in Sections 6.7, 7.6 and 7.7 shall survive with respect to such Series. If and when a ruling from the Internal Revenue Service or Opinion of Counsel referred to in clause (iv)(A) above is able to be provided specifically without regard to, and not in reliance upon, the continuance of the Company's obligations under Section 3.1, then the Company's obligations under such Section 3.1 with respect to such Series shall cease upon delivery to the Trustee of such ruling or Opinion of Counsel and compliance with the other conditions precedent provided for herein relating to the defeasance contemplated by this Section 7.3.

After any such irrevocable deposit and the fulfillment of the other requirements of this Section 7.3, the Trustee upon request shall acknowledge in writing the discharge of the Company's obligations under the Securities of such Series and this Indenture with respect to such Series except for those surviving obligations in the immediately preceding paragraph.

Before or after a deposit pursuant to this Section, the Company may make arrangements satisfactory to the Trustee for the redemption of Securities at a future date in accordance with Article IX.

SECTION 7.4 Defeasance of Certain Obligations.

With respect to a Series of Securities, the Company may omit to comply with any term, provision or condition set forth in Sections 3.3, 3.4 and 3.7 or any covenant established with respect to such Series pursuant to Section 2.1(9), and clause (c) of Section 5.1 with respect to Sections 3.3, 3.4 and 3.7 or any such covenant,

38

and clause (d) of Section 5.1 shall be deemed not to be an Event of Default, in each case with respect to the outstanding Securities of such Series, if:

(i) with reference to this Section 7.4, the Company has irrevocably deposited or caused to be irrevocably deposited with the Trustee or Paying Agent (other than the Company or a Subsidiary or Affiliate of the Company) and conveyed all right, title and interest for the benefit of the Holders of such Series, under the terms of an irrevocable trust agreement in form satisfactory to the Trustee as trust funds in trust, specifically pledged as security for, and dedicated solely to, the benefit of the Holders of such Series, in and to, (A) money in an amount, (B) U.S. Government Obligations that, through the payment of interest and principal in respect thereof in accordance with their terms, will provide, not later than one Business Day before the due date of any payment referred to in this clause (i), money in an amount or (C) a combination thereof in an amount, sufficient, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay and discharge, without consideration of the reinvestment of such interest and after payment of all federal, state and local taxes or other fees, charges and assessments in respect thereof payable by the Trustee or Paying Agent, the principal of, premium, if any, and interest on the outstanding Securities of such Series when due; provided, however, that the Trustee or Paying Agent shall have been irrevocably instructed to apply such money or the proceeds of such U.S. Government Obligations to the payment of such principal and interest with respect to such Series;

(ii) such deposit will not result in or constitute a Default or result in a breach or violation of, or constitute a default under, any other agreement or instrument to which the Company is a party or by which it is bound;

(iii) no Default with respect to such Series shall have occurred and be continuing on the date of such deposit;

(iv) the Company has delivered to the Trustee an Opinion of Counsel who is not employed by the Company to the effect that (A) the creation of the defeasance trust does not violate the Investment Company Act of 1940, (B) the Holders of such Series have a valid first-priority security interest in the trust funds, (C) such Holders will not recognize income, gain or loss for federal income tax purposes as a result of such deposit and defeasance of certain obligations and will be subject to federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred and (D) after the passage of 123 days following the deposit (except, with respect to any trust funds for the account of any Holder who may be deemed to be an "insider" for purposes of the United States Bankruptcy Code, after one year following the deposit), the trust funds will not be subject to the effect of Section 547 of the United States Bankruptcy Code or Section 15 of the New York Debtor and Creditor Law in a case commenced by or against the Company under either such statute, and either (1) the trust funds will no longer remain the property of the Company (and therefore, will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally) or (2) if a court were to rule under any such law in any case or proceeding that the trust funds remained property of the Company, (x) assuming such trust funds remained in the possession of the Trustee prior to such court ruling to the extent not paid to such Holders, the Trustee will hold, for the benefit of such Holders, a valid and perfected security interest in such trust funds that is not avoidable in bankruptcy or otherwise except for the effect of Section 552(b) of the United States Bankruptcy Code on interest on the trust funds accruing after the commencement of a case under such statute and (y) such Holders will be entitled to receive

39

adequate protection of their interests in such trust funds if such trust funds are used in such case or proceeding; and

(v) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the defeasance contemplated by this Section 7.4 have been complied with.

Before or after a deposit pursuant to this Section, the Company may make arrangements satisfactory to the Trustee for the redemption of Securities at a future date in accordance with Article IX.

## SECTION 7.5  Application of Trust Money.

Subject to Section 7.7 of this Indenture, the Trustee or Paying Agent shall hold in trust money or U.S. Government Obligations deposited with it pursuant to Section 7.1, 7.2, 7.3 or 7.4 of this Indenture, as the case may be, and shall apply the deposited money and the money from U.S. Government Obligations in accordance with this Indenture to the payment of principal of and interest on the Securities of the relevant Series. The Trustee shall be under no obligation to invest such money or U.S. Government Obligations and in no event shall the Trustee have any liability for, or in respect of, any such investment made.

## SECTION 7.6  Repayment to Company.

Subject to Sections 6.7, 7.1, 7.2, 7.3 and 7.4 of this Indenture, the Trustee and the Paying Agent shall promptly pay to the Company upon written request any excess money or U.S. Government Obligations held by them at any time pursuant to this Article, which in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which delivery shall only be required if U.S. Government Obligations have been so provided), are in excess of the amount thereof which would then be required to be deposited to effect an equivalent discharge or defeasance in accordance with this Article VII, and thereupon shall be relieved from all liability with respect to such money. The Trustee and the Paying Agent shall pay to the Company upon written request any money held by them for the payment of principal or interest of any Series that remains unclaimed for two years; provided, however, that the Company shall if requested by the Trustee or the Paying Agent, give the Trustee or such Paying Agent indemnification reasonably satisfactory to it against any and all liability which may be incurred by it by reason of such payment. After payment to the Company, Holders entitled to such money must look to the Company for payment as general creditors unless an applicable law designates another person, and all liability of the Trustee and such Paying Agent with respect to such money shall cease.

## SECTION 7.7  Reinstatement.

If the Trustee or Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with Section 7.1, 7.2, 7.3 or 7.4 of this Indenture, as the case may be, by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's obligations under this Indenture and the Securities of the applicable Series shall be revived and reinstated as though no deposit had occurred pursuant to Section 7.1, 7.2, 7.3 or 7.4 of this Indenture, as the case may be, until such time as the Trustee or Paying Agent is permitted to apply all such money or U.S. Government Obligations in accordance with Section 7.1, 7.2, 7.3 or 7.4 of this Indenture, as the case may be; provided, however, that, if the Company has made any payment of principal of or

40

interest on any Series of Securities because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Series to receive such payment from the money or U.S. Government Obligations held by the Trustee or Paying Agent.

SECTION 7.8 Deposited Money and U.S. Government Obligations to be Held in Trust; Miscellaneous Provisions.

The Company shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the U.S. Government Obligations deposited or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of outstanding Securities.

ARTICLE VIII

AMENDMENTS AND SUPPLEMENTS

SECTION 8.1 Without Consent of Holders.

The Company, when authorized by a Board Resolution, and the Trustee may amend this Indenture or a Series of Securities or enter into an indenture or indentures supplemental hereto (which shall conform to the provisions of the Trust Indenture Act as then in effect) without notice to or the consent of any Securityholder for one or more of the following purposes:

(a) to cure any ambiguity, omission, defect or inconsistency;

(b) to comply with Article IV;

(c) to provide for uncertificated Securities of such Series in addition to certificated Securities of such Series; provided, however, that such uncertificated Securities are issued in registered form for purposes of Section 163(f) of the Code or in a manner such that such uncertificated Securities are described in Section 163(f)(2)(B) of the Code;

(d) to add additional guarantees with respect to such Series or to secure such Series;

(e) to add to the covenants of the Company for the benefit of the Holders of such Series or to surrender any right or power herein conferred upon the Company;

(f) to comply with the requirements of the SEC in connection with qualification of the Indenture under the TIA;

(g) to make any change that does not adversely affect the rights of any Securityholder of such Series; including, without limitation, changing any payment record dates as necessary to conform to then-current market practice; or

(h) to provide for the issuance of Securities with terms not currently contemplated by Section 2.1.

41

After an amendment or supplement pursuant this Section becomes effective, the Company shall mail to Securityholders a notice briefly describing such amendment or supplement. The failure to give such notice to all Securityholders, or any defect therein, shall not impair or affect the validity of an amendment or supplement under this Section.

## SECTION 8.2  With Consent of Holders.

The Company, when authorized by a Board Resolution, and the Trustee may amend or supplement this Indenture or the Securities of a Series with the written consent of the Holders of a majority in principal amount of the Securities of each Series affected by such amendment or supplement. However, without the consent of each Securityholder affected, an amendment or supplement under this Section may not:

(a) reduce the amount of Securities the Holders of which must consent to an amendment or supplement or waiver pursuant to Section 3.8;

(b) reduce the rate of or change the time for payment of interest on any Security;

(c) reduce the principal of or change the Stated Maturity of any Security;

(d) modify any redemption or repurchase right to the detriment of a Holder;

(e) make any Security payable in currency or consideration other than that stated in the Security;

(f) make any change in Section 5.4, Section 5.7 or this second sentence of this Section 8.2.

An amendment or supplement which changes or eliminates any covenant or other provision of this Indenture which has expressly been included solely for the benefit of one or more particular Series of Securities, or which modifies the rights of the Holders of Securities of such Series with respect to such covenant or other provision, shall be deemed not to affect the rights under this Indenture of the Holders of Securities of any other Series.

It shall not be necessary for the consent of the Holders under this Section 8.2 to approve the particular form of any proposed amendment or supplement, but it shall be sufficient if such consent approves the substance thereof.

After an amendment or supplement under this Section becomes effective, the Company shall mail to Securityholders a notice briefly describing such amendment or supplement. The failure to give such notice to all Securityholders, or any defect therein, shall not impair or affect the validity of an amendment or supplement under this Section.

## SECTION 8.3  Compliance with Trust Indenture Act.

Every amendment or supplement to this Indenture or the Securities shall be set forth in a supplemental indenture that complies with the TIA as then in effect.

## SECTION 8.4  Revocation and Effect of Consents.

42

Until an amendment or supplement under this Article or a waiver under Section 3.8 becomes effective, a consent to it by a Holder of any Security is a continuing consent by the Holder and every subsequent Holder of Securities of that Series or portion thereof that evidences the same debt as the consenting Holder's Security, even if notation of the consent is not made on any Security. However, any such Holder or subsequent Holder may revoke the consent as to his Security or portion of a Security if the Trustee receives the notice of revocation before the date the amendment, supplement or waiver becomes effective.

After an amendment or supplement becomes effective, it shall bind every Securityholder of the affected Series.

## SECTION 8.5  Notation on or Exchange of Securities.

If an amendment changes the terms of a Security, the Trustee may require the Holders of the Security to deliver it to the Trustee. The Trustee may place an appropriate notation on the Securities of such Series regarding the changed terms and return it to the Holders. Alternatively, if the Company or the Trustee so determines, the Company in exchange for the Securities of such Series shall issue and the Trustee shall authenticate new Securities of such Series that reflect the changed terms. Failure to make the appropriate notation or to issue a new Securities of such Series shall not affect the validity of such amendment.

## SECTION 8.6  Trustee To Sign Amendments.

The Trustee shall sign any supplemental indenture which sets forth an amendment or supplement authorized pursuant to this Article if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee under this Indenture or otherwise. If it does, the Trustee may but need not sign it. In signing such supplemental indenture the Trustee shall be entitled to receive, and (subject to Section 6.1) shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that such supplemental indenture is authorized or permitted by this Indenture and, with respect to an amendment or supplement pursuant to Section 8.2, evidence of the consents of Holders required in connection therewith.

## SECTION 8.7  Fixing of Record Dates.

The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to take any action under this Indenture by vote or consent. Except as provided herein, such record date shall be the later of 30 days prior to the first solicitation of such consent or vote or the date of the most recent list of Securityholders furnished to the Trustee pursuant to Section 2.6 prior to such solicitation. If a record date is fixed, those Persons who were Securityholders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to take such action by vote or consent or to revoke any vote or consent previously given, whether or not such Persons continue to be Holders after such record date; provided, however, that unless such vote or consent is obtained from the Holders (or their duly designated proxies) of the requisite principal amount of outstanding Securities prior to the date which is the 120th day after such record date, any such vote or consent previously given shall automatically and without further action by any Holder be canceled and of no further effect.

43

ARTICLE IX

REDEMPTION

SECTION 9.1  Applicability of Article.

Securities of any Series which are redeemable before their Stated Maturity shall be redeemable in accordance with their terms and (except as otherwise specified as contemplated by Section 2.1) in accordance with this Article.

SECTION 9.2  Election to Redeem; Notice to Trustee.

The election of the Company to redeem Securities of any Series shall be evidenced by a resolution of the Board of Directors. In case of any redemption at the election of the Company, the Company shall, at least 60 days prior to the Redemption Date fixed by the Company (unless a shorter notice shall be satisfactory to the Trustee), notify the Trustee of such Redemption Date and of the principal amount of Securities of such Series to be redeemed. In the case of any redemption of such Securities (i) prior to the expiration of any restriction on such redemption provided in the terms of such Securities or elsewhere in this Indenture or (ii) that is subject to compliance with any conditions provided for in the terms of such Securities or elsewhere in this Indenture, the Company shall furnish the Trustee with an Officers' Certificate evidencing compliance with such restriction or conditions.

SECTION 9.3  Selection by Trustee of Securities to be Redeemed.

If less than all the Securities of the Series are to be redeemed, the particular Securities to be redeemed shall be selected not more than 60 days prior to the Redemption Date by the Trustee, from the outstanding Securities of such Series not previously called for redemption, by such method as the Trustee shall deem fair and appropriate and which may provide for the selection for redemption of portions (equal to authorized denominations for Securities of that Series) of the principal amount of Securities of such Series.

The Trustee shall promptly notify the Company in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount thereof to be redeemed.

For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to the redemption of Securities of any Series shall relate, in the case of any Securities redeemed or to be redeemed only in part, to the portion of the principal amount of such Securities which has been or is to be redeemed.

SECTION 9.4  Notice of Redemption.

Notice of redemption shall be given by first-class mail, postage prepaid, mailed not less than 30 nor more than 60 days prior to the Redemption Date, to each Holder of Securities to be redeemed, at such Holder's registered address.

All notices of redemption shall identify the Securities to be redeemed (including CUSIP numbers) and shall state:

(1) the Redemption Date,

(2) the Redemption Price,

(3) if less than all the outstanding Securities of such Series are to be redeemed, the identification (and, in the case of partial redemption, the principal amounts) of the particular Securities to be redeemed,

(4) that on the Redemption Date, the Redemption Price will become due and payable upon each such Security to be redeemed and, if applicable, that interest thereon will cease to accrue on and after said date,

(5) the place or places where such Securities are to be surrendered for payment of the Redemption Price, and

(6) that the redemption is for a sinking fund, if such is the case.

Notice of redemption of Securities of any Series to be redeemed at the election of the Company shall be given by the Company or, at the Company's request, by the Trustee in the name and at the expense of the Company. The notice if mailed in the manner herein provided shall be conclusively presumed to have been duly given, whether or not the Holder receives such notice. In any case, a failure to give such notice by mail or any defect in the notice to the Holder of any Security designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Security.

SECTION 9.5  Deposit of Redemption Price.

Notice of redemption having been given as aforesaid, the Securities so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after such date (unless the Company shall default in the payment of the Redemption Price and accrued interest) such Securities shall cease to bear interest. Upon surrender of any such Security for redemption in accordance with said notice, such Security shall be paid by the Company at the Redemption Price, together with accrued interest to the Redemption Date; provided, however, that installments of interest whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Securities registered as such at the close of business on the relevant record dates according to their terms.

If any Security called for redemption shall not be so paid upon surrender thereof for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate prescribed therefor in the Security.

SECTION 9.6  Securities Redeemed in Part.

Any Security which is to be redeemed only in part shall be surrendered at the office of the Paying Agent (with, if the Company or the Trustee for such Security so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or his attorney duly authorized in writing), and the Company shall execute, and the Trustee shall authenticate and deliver to the Holder of such Security without service charge, a new Security or Securities of the same Series, of any authorized denomination as requested by such Holder, in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Security so surrendered.

45

ARTICLE X

MISCELLANEOUS

SECTION 10.1 Trust Indenture Act Controls.

If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by any of TIA Sections 310 to 317, inclusive, through operation of TIA Section 318(c), such imposed duties shall control.

SECTION 10.2 Notices.

Any notice or communication shall be in writing and delivered in person, or mailed by first-class mail (certified, return receipt requested), addressed as follows:

if to the Company:

Calpine Corporation
50 West San Fernando Street
San Jose, California 95113
Attention: Corporate Secretary

if to the Trustee:

Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, DE 19890
Attention: Corporate Trust Administration

The Company or the Trustee by notice to the others may designate additional or different addresses for subsequent notices or communications. Any notice to the Trustee under this Indenture shall be deemed given only when received by the Trustee at the address specified in this Section 10.2.

Any notice or communication to a Securityholder shall be mailed by first-class mail to the Securityholder's address shown on the register kept by the Registrar. Failure to mail a notice or communication to a Securityholder or any defect in it shall not affect its sufficiency with respect to other Securityholders.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Securityholders, it shall mail a copy to the Trustee and each Agent at the same time.

46

SECTION 10.3  Communication by Holders with Other Holders.

Securityholders may communicate pursuant to TIA Section 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities. The Company, the Trustee, the Registrar and anyone else shall have the protection of TIA Section 312(c).

SECTION 10.4  Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall, if requested by the Trustee, furnish to the Trustee:

(a) an Officers' Certificate in form reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent (including any covenants compliance with which constitutes a condition precedent), if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b) an Opinion of Counsel in form reasonably satisfactory to the Trustee stating that, in the opinion of such counsel (which may rely upon an Officers' Certificate as to factual matters), all such conditions precedent have been complied with.

SECTION 10.5  Statements Required in Certificate or Opinion.

Each Officers' Certificate or Opinion of Counsel with respect to compliance with a condition or covenant provided for in this Indenture other than certificates provided pursuant to Section 3.5 shall include:

(a) a statement that the Person making such certificate or opinion has read such covenant or condition;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c) a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d) a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

SECTION 10.6  Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or a meeting of Securityholders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

SECTION 10.7  Legal Holidays.

A "Legal Holiday" is a Saturday, a Sunday or a day on which banking institutions are not required to be open in the State of New York or the State(s) in which the offices of the Trustee or the Paying Agent are located. If a

payment date is a Legal Holiday, payment may be made at that place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period. If a regular record date is a Legal Holiday, the regular record date shall not be affected.

SECTION 10.8 Successors; No Recourse Against Others.

(a) All agreements of the Company in this Indenture and the Securities shall bind its successor. All agreements of the Trustee in this Indenture shall bind its successor.

(b) All liability of the Company described in the Securities insofar as it relates to any director, officer, employee or stockholder, as such, of the Company is waived and released by each Securityholder.

SECTION 10.9 Duplicate Originals.

The parties may sign any number of copies of this Indenture. One signed copy is enough to prove this Indenture.

SECTION 10.10 Other Provisions.

The first certificate pursuant to Section 3.5 shall be for the fiscal year ending on December 31, 2000.

The reporting date for Section 6.6 is April 15 of each year. The first reporting date is April 15, 2001.

SECTION 10.11 Governing Law.

The laws of the State of New York govern this Indenture and the Securities, without regard to the conflicts of laws rules thereof.

SIGNATURES

CALPINE CORPORATION

By _Ann B. Curtis_____

Name: Ann B. Curtis

Title: Executive Vice President and Chief
       Financial officer

WILMINGTON TRUST COMPANY,

as Trustee

By_____

Name:

Title:

Dated:    August 10, 2000

SIGNATURES

CALPINE CORPORATION

By_____
Name:
Title:

WILMINGTON TRUST COMPANY,
as Trustee

By_____
Name:          James D. Nececi
Title:         Authorized Signer

Dated:    August 10, 2000

49

EXHIBIT A

(Form of Face of Security)

· [THIS SECURITY IS ISSUED IN GLOBAL FORM AND REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC") OR A NOMINEE THEREOF. UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO., OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SECURITIES IN DEFINITIVE REGISTERED FORM IN ACCORDANCE WITH THE TERMS HEREOF AND OF THE INDENTURE (AS DEFINED BELOW), THIS SECURITY MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY DTC TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITORY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITORY.]*

CALPINE CORPORATION

% SENIOR NOTE DUE

No.\_\_\_\_

$_____
CUSIP:
ISIN:

Calpine Corporation, a Delaware corporation, promises to pay to [Cede & Co.]*, or registered assigns, the principal sum of _____ Dollars on _____.

Interest Payment Dates: _____ and _____
Record Dates: _____ and _____

Additional provisions of this Security are set forth on the reverse hereof.

IN WITNESS WHEREOF, the Company has caused this Security to be signed manually or by facsimile by its duly authorized officers.

Date: _____

CALPINE CORPORATION

By_____
   Name:
   Title:

By_____
   Name:
   Title:

TRUSTEE'S CERTIFICATE
OF AUTHENTICATION:

Wilmington Trust Company, as
Trustee, certifies that this is
one of the Securities referred to
in the Indenture.

By:_____        Dated:_____
        Authorized Officer

* Insert in Global Security only.

51

(Form of Reverse of Security)

## CALPINE CORPORATION
## ___% SENIOR NOTE DUE _____

(1)  Interest. Calpine Corporation, a Delaware corporation (such corporation, and its successors and assigns under the Indenture referred to below, being herein called the "Company"), promises to pay interest on the principal amount of this Security at the interest rate per annum shown above. The Company will pay interest semiannually on _____ and _____ of each year. Interest on the Securities of this Series will accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from _____. Interest will be computed [on the basis of a 360-day year consisting of twelve 30-day months] [as set forth in the Directors' Certificate or supplemental indenture delivered pursuant to Section 2.1].

(2)  Method of Payment. The Company will pay interest on the Securities of this Series (except Defaulted Interest) to the persons who are registered Holders of Securities of this Series at the close of business on the record date next preceding the interest payment date even though such Securities are canceled after the record date and on or before the interest payment date. Holders must surrender Securities to a Paying Agent to collect principal payments. The Company will pay principal and interest in money of the United States that at the time of payment is legal tender for payment of public and private debts. However, the Company may pay principal and interest by check payable in such money. It may mail an interest check to a Holder's registered address.

(3)  Paying Agent, Registrar. Initially, The Wilmington Trust Company, a Delaware banking corporation (the "Trustee"), will act as Paying Agent and Registrar. The Company may change any Paying Agent, Registrar or co-registrar without notice. The Company may act as Paying Agent, Registrar or co-registrar.

(4)  Indenture. The Company issued the Securities of this Series under an Indenture dated   as of _____ (the "Indenture") between the Company and the Trustee. The Securities are unsecured general obligations of the Company issued and to be issued in one or more Series under the Indenture and may be issued in an unlimited principal amount. The terms of the Securities include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code Sections  77aaa-77bbbb) (the "TIA"). Capitalized terms used herein but not defined herein are used as defined in the Indenture. The Securities are subject to all such terms, and Securityholders are referred to the Indenture and the TIA for a statement of such terms.

(5)  Redemption. [set forth redemption provision.]

(6)  Denominations; Transfer; Exchange. The Securities of this Series are in registered form without coupons in denominations of $1,000 and any integral multiple thereof [or as otherwise set forth in the Security]. The transfer of Securities may be registered and Securities may be exchanged as provided in the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and   transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. The Company shall not be required (A) to issue, register the transfer of or exchange any Securities of a Series during a period beginning at the opening of business 15 days before the day of the mailing of a notice of redemption of any such Securities selected for redemption under Section 9.3 of the Indenture and ending at the close of business on the day of

52

such mailing or (B) to register the transfer of or exchange any Security so selected for redemption in whole or in part, except the unredeemed portion of any Security being redeemed in part.

(7) Defeasance. Subject to certain conditions and unless otherwise provided in the terms of the Securities of this Series, the Company at any time may terminate some or all of its obligations under the Securities and the Indenture if the Company deposits with the Trustee money and/or U.S. Government Obligations for the payment of principal and interest on the Securities to maturity.

(8) Persons Deemed Owners. The registered Holder of a Security may be treated as its owner for all purposes, except that interest (other than Defaulted Interest) will be paid to the person that was the registered Holder on the relevant record date for such payment of interest.

(9) Amendments and Waivers. Subject to certain exceptions, (i) the Indenture or the Securities may be amended or supplemented with the consent of the Holders of a majority in principal amount of the Securities of each Series affected; and (ii) any existing default with respect to the Securities of this Series may be waived with the consent of the Holders of a majority in principal amount of the Securities of such Series. Without the consent of any Securityholder, the Indenture or the Securities may be amended or supplemented to cure any ambiguity, omission, defect or inconsistency, to provide for assumption of Company obligations to Securityholders or to provide for uncertificated Securities in addition to or in place of certificated Securities, to provide for guarantees with respect to, or security for, the Securities, or to comply with the TIA or to add additional covenants or surrender Company rights, or to make any change that does not adversely affect the rights of any Securityholder.

(10) Remedies. If an Event of Default with respect to the Securities of this Series occurs and is continuing, the Trustee or Holders of at least 25% in principal amount of the Securities of this Series may declare all the Securities of this Series to be due and payable immediately. Securityholders may not enforce the Indenture or the Securities of this Series except as provided in the Indenture. The Trustee may require an indemnity before it enforces the Indenture or the Securities. Subject to certain limitations, Holders of a majority in principal amount of the Securities of a Series may direct the Trustee in its exercise of any trust or power with respect to such Series. The Trustee may withhold from Securityholders notice of any continuing default (except a Default in payment of principal or interest) if it determines that withholding notice is in their interests. The Company must furnish an annual compliance certificate to the Trustee.

(11) Trustee Dealings with Company. Subject to the provisions of the TIA, the Trustee under the Indenture, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not Trustee. The Trustee will initially be Wilmington Trust Company.

(12) No Recourse Against Others. A director, officer, employee or stockholder, as such, of the Company shall not have any liability for any obligations of the Company under the Securities or the Indenture or for any claim based on, in respect of or by reason of such obligations or their creation. Each Securityholder by accepting a Security waives and releases all such liability. The waiver and release are part of the consideration for the issue of the Securities.

(13) Authentication. This Security shall not be valid until authenticated by the manual signature of an authorized officer of the Trustee or an authenticating agent.

53

(14) Abbreviations. Customary abbreviations may be used in the name of a Securityholder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures the Company has caused CUSIP numbers to be printed on the Securities. No representation is made as to the accuracy of such numbers as printed on the Securities and reliance may be placed only on the other identification numbers placed thereon.

THE COMPANY WILL FURNISH TO ANY SECURITYHOLDER UPON WRITTEN REQUEST AND WITHOUT CHARGE A COPY OF THE INDENTURE, WHICH HAS IN IT THE TEXT OF THIS SECURITY IN TWELVE-POINT TYPE. REQUESTS MAY BE MADE TO: SECRETARY, CALPINE CORPORATION, 50 WEST SAN FERNANDO STREET, SAN JOSE, CALIFORNIA 95113.

## ASSIGNMENT FORM

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

(Insert assignee's soc. sec or tax I.D. no.)

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____ agent to transfer this Security on the books of the Company.
The agent may substitute another to act for him.

Dated: _____          Signed:_____
                                  (Sign exactly as your name appears
                                  on the other side of this Security)

Signature Guarantee: _____

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

55

CALPINE CORPORATION

$650,000,000 PRINCIPAL AMOUNT
7.75% CONTINGENT CONVERTIBLE NOTES DUE 2015

THIRD SUPPLEMENTAL INDENTURE

Dated as of June 23, 2005

WILMINGTON TRUST COMPANY

Trustee

Table of Contents

Page

**ARTICLE I DEFINITIONS**

Section 1.01  Definitions................................................................... 1
Section 1.02  Other Definitions ........................................................ 6

**ARTICLE II THE NOTES**

Section 2.01  Form and Dating .......................................................... 7
Section 2.02  Registrar, Paying Agent and Conversion Agent ........... 8
Section 2.03  Transfer and Exchange ................................................. 8

**ARTICLE III REDEMPTION AND PREPAYMENT**

Section 3.01  Mandatory Redemption ................................................. 8
Section 3.02  Optional Redemption Upon Conversion........................ 9
Section 3.03  Purchase of Notes at Option of the Holder upon Change of Control .... 9
Section 3.04  Effect of Change of Control Purchase Notice................. 13
Section 3.05  Deposit of Change of Control Purchase Price ............... 14
Section 3.06  Notes Purchased in Part ............................................... 14
Section 3.07  Covenant to Comply With Securities Laws Upon Purchase of Notes 14
Section 3.08  Repayment to the Company............................................ 15

**ARTICLE IV COVENANTS**

Section 4.01  Compliance Certificate ................................................. 15
Section 4.02  Taxes ........................................................................... 16
Section 4.03  Stay, Extension and Usury Laws .................................. 16
Section 4.04  Corporate Existence ..................................................... 16
Section 4.05  Calculations in Respect of Notes ................................. 17

**ARTICLE V MERGER AND CONSOLIDATION OF COMPANY**

Section 5.01  Lease of Properties...................................................... 17

**ARTICLE VI DEFAULTS AND REMEDIES**

Section 6.01  Events of Default ......................................................... 17

**ARTICLE VII TRUSTEE**

Section 7.01  Rights of Trustee.......................................................... 18
Section 7.02  Reports by Trustee to Holders of the Notes................... 18
Section 7.03  Eligibility; Disqualification ......................................... 19

i

# ARTICLE VIII DEFEASANCE

Section 8.01  No Defeasance ............................................................... 19

# ARTICLE IX AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01  Without Consent of Holders of Notes ........................... 19
Section 9.02  With Consent of Holders of Notes ................................ 19

# ARTICLE X CONVERSION

Section 10.01  Conversion Privilege ...................................................... 20
Section 10.02  Conversion Procedure .................................................... 23
Section 10.03  Taxes on Conversion ...................................................... 24
Section 10.04  Company to Provide Stock ............................................. 24
Section 10.05  Adjustment of Conversion Price .................................... 24
Section 10.06  Adjustment for Certain Changes of Control ................... 28
Section 10.07  When No Adjustment Required ...................................... 29
Section 10.08  When Adjustment May Be Deferred .............................. 30
Section 10.09  Successive Adjustments ................................................. 30
Section 10.10  Notice of Adjustment ..................................................... 30
Section 10.11  Notice of Certain Transactions ...................................... 30
Section 10.12  Effect of Reclassification, Consolidation, Merger, Share Exchange or
               Sale on Conversion Privilege ......................................... 31
Section 10.13  Trustee's Disclaimer ...................................................... 32
Section 10.14  Voluntary Reduction ...................................................... 32
Section 10.15  Conversion Value of Notes Tendered ............................ 32

# ARTICLE XI SUBORDINATION

Section 11.01  Agreement to Subordinate .............................................. 34
Section 11.02  Default On Senior Debt .................................................. 34
Section 11.03  Liquidation; Dissolution; Bankruptcy ........................... 35
Section 11.04  Subrogation .................................................................... 36
Section 11.05  Trustee To Effectuate Subordination ............................. 37
Section 11.06  Notice By The Company ................................................ 37
Section 11.07  Rights Of The Trustee; Holders Of Senior Debt ........... 38
Section 11.08  Subordination May Not Be Impaired ............................. 39

# ARTICLE XII MISCELLANEOUS

Section 12.01  No Adverse Interpretation of Other Agreements ............ 40
Section 12.02  Severability ..................................................................... 40
Section 12.03  Table of Contents, Headings, etc ................................... 40
Section 12.04  Ratification Of Original Indenture ................................. 40
Section 12.05  Trustee Not Responsible for Recitals ............................. 40
Section 12.06  Performance by Trustee .................................................. 40
Section 12.07  Governing Law ............................................................... 40

ii

# EXHIBIT A
# PART 3

EXHIBITS

Exhibit A          Form of Note
Schedule A         Table of Additional Shares

THIRD SUPPLEMENTAL INDENTURE (the "Third Supplemental Indenture") dated as of June 23, 2005, between Calpine Corporation (the "Company"), a Delaware corporation, and Wilmington Trust Company (the "Trustee").

## WITNESSETH:

WHEREAS, the Company and the Trustee have entered into an Indenture, dated as of August 10, 2000, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000 (as so supplemented, the "Original Indenture" and, as further supplemented by the Second Supplemental Indenture, dated as of September 30, 2004, and this Third Supplemental Indenture, the "Indenture") which provides, among other things, for unsecured debentures, notes or other evidences of indebtedness to be issued by the Company from time to time in one or more series under the Indenture;

WHEREAS, the Original Indenture provides that the Company and the Trustee may enter into an indenture supplemental to the Original Indenture to establish the form or terms of Securities (as defined in the Original Indenture) of any series as provided by Sections 2.1 and 2.3 of the Original Indenture;

WHEREAS, the Board of Directors of the Company has duly adopted resolutions authorizing the Company to execute and deliver this Third Supplemental Indenture;

WHEREAS, pursuant to the terms of the Original Indenture, the Company desires to enter into this Third Supplemental Indenture to provide for the establishment of a new Series of its Securities to be known as its 7.75% Contingent Convertible Notes Due 2015 (the "Notes");

WHEREAS, the Company has requested that the Trustee execute and deliver this Third Supplemental Indenture and all things necessary to make (i) this Third Supplemental Indenture a valid instrument in accordance with its terms, and (ii) the Notes, when executed by the Company and authenticated and delivered by the Trustee, the valid obligations of the Company;

NOW THEREFORE, in consideration of the purchase and acceptance of the Notes by the Holders thereof, and for the purpose of setting forth, as provided in the Indenture, the form and terms of the Notes, the Company covenants and agrees with the Trustee as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Definitions.

(a)    Unless the context requires otherwise:

(i)    a term defined in the Original Indenture has the same meaning when used in this Third Supplemental Indenture unless the definition of such term is amended and supplemented pursuant to this Third Supplemental Indenture;

(ii)    a term defined anywhere in this Third Supplemental Indenture has the same meaning throughout;

(iii)    the singular includes the plural and vice versa;

(iv)    a reference to a Section or Article is to a Section or Article of this Third Supplemental Indenture; and

(v)    headings are for convenience of reference only and do not affect interpretation.

(b)    the following terms have the meanings given to them in this Section 1.01(b):

"Applicable Procedures" means, with respect to any transfer or transaction involving a Global Note or beneficial interests therein, the rules and procedures of the Depositary, for such Global Note, in each case to the extent applicable to such transaction and as in effect from time to time.

"Bid Solicitation Agent" means American Stock Transfer & Trust Company until the Company selects another bank, trust company or similar fiduciary agent, if any, to serve as Bid Solicitation Agent.

"Capital Stock" means:

(1) in the case of a corporation, corporate stock;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Change of Control" means the occurrence of any of the following:

2

(1) any Person, including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Exchange Act, acquires beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of transactions, of shares of the Company's Capital Stock entitling the Person to exercise 50% or more of the total voting power of all shares of the Company's Capital Stock that is entitled to vote generally in elections of directors, other than an acquisition by the Company, of any of its Subsidiaries or any of its employee benefit plans; or

(2) the Company merges or consolidates with or into any other Person, any merger of another Person into the Company, or the Company conveys, sells, transfers or leases all or substantially all of its assets to another Person, other than any transaction:

(a) that does not result in any reclassification, conversion, exchange or cancellation of outstanding shares of the Company's Capital Stock,

(b) pursuant to which the holders of the Company's Common Stock immediately prior to the transaction have the entitlement to exercise, directly or indirectly, 50% or more of the total voting power of all shares of Capital Stock entitled to vote generally in the election of directors of the continuing or surviving corporation immediately after the transaction, or

(c) which is effected solely to change the Company's jurisdiction of incorporation and results in a reclassification, conversion or exchange of outstanding shares of the Company's Common Stock solely into shares of Common Stock of the surviving entity.

"Common Stock" means shares of the Company's Common Stock, $0.001 par value per share, as they exist on the date of this Third Supplemental Indenture or any other shares of Capital Stock of the Company into which the Common Stock shall be reclassified or changed.

"Common Stock Price" on any date means the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such date for the Company's Common Stock as reported in composite transactions on the principal United States securities exchange on which the Company's Common Stock is traded or, if its Common Stock is not listed on a United States national or regional securities exchange, as reported by the National Association of Securities Dealers Automated Quotation System ("NASDAQ").

"Conversion Agent" means the Agent of the Company pursuant to Section 2.02 hereof.

3

"Conversion Date" shall have the meaning as specified in Section 10.02 hereof.

"Conversion Price" means $4.00 per share of Common Stock, subject to the adjustments described in Section 10.05 hereof.

"Conversion Rate" means an amount of shares of Common Stock equal to $1,000 principal amount of Notes divided by the Conversion Price, which shall be 250.0000 per $1,000 principal amount of Notes as of the date of this Third Supplemental Indenture, subject to the adjustments described in Section 10.05 hereof.

"Fair Market Value" means the value that would be paid by a willing buyer to a willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of the Company, whose determination shall be conclusive evidence of such determination (unless otherwise provided in this Indenture).

"Global Notes" means, individually and collectively, each of the Global Securities, substantially in the form of Exhibit A hereto.

"Market Price" means the average determined by the Company of the Common Stock Price of the shares for the five Trading Day period immediately preceding and including the third Trading Day prior to the applicable date fixed for the determination of stockholders entitled to receive any distribution described in Section 10.05, appropriately adjusted to take into account the occurrence, during the period commencing on the first of the Trading Days during such five Trading Day period and ending on such determination date, of any event described in Section 10.05; subject, however, to the conditions set forth in Section 10.07 and Section 10.08 hereof. If the shares of Common Stock are not listed on The New York Stock Exchange, then the Market Price shall be determined by the Company by reference to the Common Stock Price as reported by NASDAQ. In the absence of such quotations, the Company shall be entitled to determine in good faith the Market Price by reference to the Common Stock Price on any date on the basis of such quotations as it considers appropriate.

"Obligations" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness (including the Notes).

"Permitted Investments" means the following investments:

(i) any direct obligations of, or obligations fully and unconditionally guaranteed by, the United States of America, or any agency or instrumentality of the United States of America, the obligations of which are fully and unconditionally backed by the full faith and credit of the United States of America;

(ii) demand and time deposits in, certificates of deposit of, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America or any state thereof

4

and subject to supervision and examination by federal and/or state authorities, or incorporated under the laws of any other jurisdiction, so long as at the time of such investment or contractual commitment providing for such investment the unsecured commercial paper or other unsecured short-term debt obligations of such depository institution or trust company have credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(iii) repurchase obligations with respect to any security described in clauses (i) or (ii) above, in each case entered into with either (A) a depository institution or trust company (acting as principal) which in respect of its short-term unsecured debt has credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P or (B) a money market fund maintained by a broker which, in respect of its short-term unsecured debt, has credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(iv) unsecured debt securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof which have, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(v) unsecured commercial paper which has, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P; and

(vi) investments in money market funds or money market mutual funds which have, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P (including such funds for which the Trustee or any of its Affiliates is investment manager or advisor and for which the Trustee or any of its Affiliates may receive a fee).

"Prospectus Supplement" means that Prospectus Supplement dated June 20, 2005 relating to the offering of the Notes.

"S&P" means Standard & Poor's Ratings Group (or, if such entity ceases to rate the Notes for reasons outside of the control of the Company, the equivalent investment grade credit rating from any other "nationally recognized statistical rating organization" (or successor concept) within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act (or successor provision) selected by the Company as a replacement agency).

"Senior Debt" means (A) all of the existing and future secured Indebtedness of the Company; (B) all of the following series of the Company's outstanding senior unsecured Indebtedness:

1.  the Company's 10 1/2% Senior Notes due 2006,

2.  the Company's 8 3/4% Senior Notes due 2007,

3.  the Company's 7 7/8% Senior Notes due 2008,

4.  the Company's 7 5/8% Senior Notes due 2006, and

5.  the Company's 7 3/4% Senior Notes due 2009; and

(C) any deferrals, renewals or extensions of any of the foregoing.

"Subsidiary" means, as applied to any Person, any corporation, limited or general partnership, trust, association or other business entity of which an aggregate of at least 50% of the outstanding Voting Stock, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more Subsidiaries of such Person.

"Trading Day" means any regular or abbreviated trading day of The New York Stock Exchange.

"Trading Price" of the Notes on any date of determination means the average of the secondary market bid quotations per $1,000 principal amount of Notes obtained by the Bid Solicitation Agent for $5,000,000 principal amount of the Notes at approximately 3:30 p.m., New York City time, on such determination date from three independent nationally recognized securities dealers the Company selects, which may include the Underwriter; provided that if at least three such bids cannot reasonably be obtained by the Bid Solicitation Agent, but two such bids are obtained, then the average of the two bids shall be used, and if only one such bid can reasonably be obtained by the Bid Solicitation Agent, this one bid shall be used. If the Bid Solicitation Agent cannot reasonably obtain at least one such bid or, in the Company's reasonable judgment, the bid quotations are not indicative of the secondary market value of the Notes, then the Trading Price of the Notes will be determined in good faith by the Bid Solicitation Agent, taking into account in such determination such factors as it, in its sole discretion after consultation with the Company, deems appropriate.

"Underwriter" means Goldman, Sachs & Co.

"Underwriting Agreement" means the Underwriting Agreement between the Company and the Underwriter dated June 20, 2005 relating to the issuance and sale of the Notes.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

Section 1.02    Other Definitions.

| Term | Defined in Section |
|---|---|
| "Additional Shares" | 10.01 |
| "Change of Control Notice" | 3.03 |

6

| Term | Defined in Section |
|---|---|
| "Change of Control Notice Date" | 3.03 |
| "Change of Control Purchase Date" | 3.03 |
| "Change of Control Purchase Notice" | 3.03 |
| "Change of Control Purchase Price" | 3.03 |
| "Conversion Value" | 10.15 |
| "Determination Date" | 10.15 |
| "Effective Date" | 10.06 |
| "Ex-Dividend Date" | 10.01 |
| "Expiration Time" | 10.05 |
| "Five Day Average Closing Stock Price" | 10.15 |
| "Net Shares" | 10.15 |
| "Net Share Amount" | 11.02 |
| "Payment Default" | 10.15 |
| "Pre-Dividend Sale Price" | 10.15 |
| "Principal Return" | 10.01 |
| "Principal Value Conversion" | 10.05 |
| "Purchased Shares" | 10.01 |
| "Quarter" | 3.02 |
| "Redemption Date" | 3.02 |
| "Redemption Price" | 10.05 |
| "Reference Date" | 10.06 |
| "Stock Price" | |

## ARTICLE II

## THE NOTES

Section 2.01    Form and Dating.

The Notes shall be in denominations of $1,000 principal amount and integral multiples thereof.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Third Supplemental Indenture and the Company and the Trustee, by their execution and delivery of this Third Supplemental Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Third Supplemental Indenture, the provisions of this Third Supplemental Indenture shall govern and be controlling.

The Notes shall initially be issued in the form of a Global Security attached as Exhibit A hereto deposited upon issuance with the Trustee as Custodian for the Depositary and registered in the name of the Depositary or its nominee. Each Global Security shall represent such of the outstanding Notes as shall be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes

7

from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges, repurchases, redemptions or conversions. Any endorsement of a Global Security to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by the Indenture.

Section 2.02    Registrar, Paying Agent and Conversion Agent.

In addition to Section 2.4 of the Original Indenture, the Company shall maintain an office or agency where Securities may be presented for conversion ("Conversion Agent"). The term "Conversion Agent" includes any additional conversion agent.

The Company may change any Registrar, Paying Agent or Conversion Agent for the Notes without notice to any Holder. The Company shall notify the Trustee in writing of the name and address of any Conversion Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Conversion Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Conversion Agent.

The Company initially appoints the Trustee to act as the Registrar, Paying Agent and Conversion Agent with respect to the Notes.

Section 2.03    Transfer and Exchange.

In addition to Section 2.7 of the Original Indenture, beneficial interests in a Global Security held by any beneficial owner of Notes may be exchanged by the Holder for Notes in definitive form upon request, but only upon at least 20 days' prior written notice given to the Trustee by or on behalf of the Depositary in accordance with Applicable Procedures.

Neither the Company nor the Trustee will be liable for any delay by the Holder of any Global Note or the Depositary in identifying the beneficial owners of Notes and the Company and the Trustee may conclusively rely on, and will be protected in relying on, instructions from the Holder of any Global Note or the Depositary for all purposes.

ARTICLE III

REDEMPTION AND PREPAYMENT

Section 3.01    Mandatory Redemption.

The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

8

Section 3.02    Optional Redemption Upon Conversion.

The Company shall have the right to redeem, at its option, any Notes tendered for conversion pursuant to Article 10 hereof if, on the date such Notes are tendered for conversion, the Company determines, in its sole judgment, that its then outstanding Indebtedness would prevent it from paying the Principal Return or delivering the Net Shares when due upon conversion as required by Section 10.02 hereof; provided that the Company shall not so redeem any Notes pursuant to this Section 3.02 if an Event of Default shall have occurred and be continuing (other than an Event of Default that would be cured by such redemption). The Company shall notify the Holder of such Notes of the Company's election to redeem such Notes pursuant to this Section 3.02 no later than the Determination Date in respect of such Notes tendered for conversion. Upon any such notification of an optional redemption, the Company shall not be required to pay or deliver, as the case may be, the Principal Return and Net Shares or any cash in lieu of fractional shares as required by Section 10.02, and payment or delivery of such Principal Return and Net Shares or cash in lieu of fractional shares shall be governed by this Section 3.02.

The redemption price for any Notes so redeemed shall be an amount in cash equal to the Principal Return and an amount of shares of Common Stock equal to the Net Shares, together with cash in lieu of any fractional shares (collectively, the "Redemption Price"), in each case in respect of such Notes tendered for conversion as set forth in Section 10.15. The redemption date for any such redemption by the Company shall be the seventh Business Day following the Determination Date in respect of such Notes tendered for conversion (the "Redemption Date").

No later than 10:00 a.m. (local time in the City of New York) on the Redemption Date in respect of such Notes, the Company shall deposit with the Conversion Agent money and shares of Common Stock sufficient to pay the Redemption Price on all Notes to be redeemed on that date. Upon such deposit of the Redemption Price, interest will cease to accrue on such Notes, such Notes will cease to be outstanding and all other rights of the Holder of such Notes will terminate. The Conversion Agent shall promptly return to the Company any money or shares of Common Stock deposited with the Conversion Agent by the Company in excess of the amounts necessary to pay the Redemption Price of all Notes to be redeemed on such date.

Section 3.03    Purchase of Notes at Option of the Holder upon Change of Control.

(a)    If a Change of Control occurs, a Holder of Notes will have the right, at its option, to require the Company to repurchase all of its Notes, or any portion thereof at a purchase price equal to the aggregate principal amount of the Notes repurchased plus any accrued and unpaid interest to, but excluding, the date of repurchase (the "Change of Control Purchase Price"). The Company shall repurchase all such Notes on the date that is 45 days after the date of the Change of Control Notice (as defined below) delivered by the Company (the "Change of Control Purchase Date"), subject to satisfaction by or on behalf of the Holder of the requirements set forth in Section 3.03(c).

9

Notwithstanding the foregoing provisions of this Section 3.03, no Holder shall have the right to require the Company to purchase its Notes upon a Change of Control if:

(1) the Common Stock Price on The New York Stock Exchange for any five Trading Days within the period of 10 consecutive Trading Days ending immediately after the later of the Change of Control or the public announcement of such event, in the case of a Change of Control relating to an acquisition of Capital Stock, or the period of 10 consecutive Trading Days ending immediately before such event, in the case of Change of Control relating to a merger, consolidation or asset sale, equals or exceeds 105% of the Conversion Price of the Notes in effect on each of those Trading Days; or

(2) all of the consideration (excluding cash payments for fractional shares and cash payments made pursuant to dissenters' appraisal rights) in a merger or consolidation otherwise constituting a Change of Control above consists of shares of common stock traded on a national securities exchange or quoted on the Nasdaq National Market (or will be so traded or quoted immediately following the merger or consolidation) and as a result of the merger or consolidation the Notes become convertible into such common stock.

For purposes of this Section 3.03,

(x) whether a person is a "beneficial owner" shall be determined in accordance with Rule 13d-3 under the Exchange Act; and

(y) "person" includes any syndicate or group that would be deemed to be a "person" under Section 13(d)(3) of the Exchange Act.

If the shares of Common Stock are not listed on The New York Stock Exchange at the relevant time, closing prices and Trading Days shall be calculated as reported by the NASDAQ.

At least three Business Days before the Change of Control Notice Date (as defined below), the Company shall deliver an Officer's Certificate to the Trustee specifying:

(i) the information required by Section 3.03(b); and

(ii) whether the Company desires the Trustee to give the Change of Control Notice required by Section 3.03(b).

(b) No later than 30 days after the occurrence of a Change of Control, the Company shall mail a written notice of the Change of Control (the "Change of Control Notice" and the date of such mailing, the "Change of Control Notice Date") by

10

first-class mail to the Trustee and to each Holder (and to beneficial owners to the extent required by applicable law). The notice shall include a form of Change of Control Purchase Notice to be completed by the Holder that wishes to exercise rights under this Section 3.03 and shall state:

(1)     briefly, the events causing a Change of Control and the date of such Change of Control;

(2)     the date by which the Change of Control Purchase Notice pursuant to this Section 3.03 must be given, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(3)     the Change of Control Purchase Date, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(4)     the Change of Control Purchase Price, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(5)     the name and address of the Paying Agent and the Conversion Agent, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(6)     the Conversion Rate and any adjustments thereto;

(7)     that Notes must be surrendered to the Paying Agent, at any time on or prior to the 30th day after the Company delivers its Change of Control Notice, to collect payment, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(8)     that the Change of Control Purchase Price for any Note as to which a Change of Control Purchase Notice has been duly given will be paid promptly following the Change of Control Purchase Date as described in (7), if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(9)     briefly, the procedures the Holder must follow to exercise rights under this Section 3.03, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(10)    briefly, the conversion rights, if any, of the Notes;

11

(11) that, unless the Company defaults in making payment of such Change of Control Purchase Price, interest on Notes surrendered for purchase by the Company will cease to accrue on and after the Change of Control Purchase Date, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a); and

(12) the CUSIP numbers of the Notes.

Simultaneously with the delivery of the Change of Control Notice to Holders, the Company shall, or, if the Company has requested that Trustee deliver the Change of Control Notice to Holders pursuant to Section 3.03(a), shall cause the Trustee to, at the Company's expense and in the Company's name, disseminate a press release through any of Dow Jones & Company, Inc., Business Wire, Bloomberg Business News or Reuters (or if such organizations are not in existence at the time of issuance of such press release, such other news or press organization as is reasonably calculated to broadly disseminate the relevant information to the public) containing this information, and the Company shall publish the information on the Company's Web site on the World Wide Web or through such other public medium as the Company may use at that time.

(c) A Holder may exercise its rights specified in Section 3.03(a) upon delivery of an irrevocable written notice of purchase (a "Change of Control Purchase Notice") to the Paying Agent at any time on or prior to the 30th day after the Company delivers its Change of Control Notice, stating:

(1) the certificate number of the Note which the Holder will deliver to be purchased;

(2) the portion of the principal amount of the Note which the Holder will deliver to be purchased, which portion must be $1,000 principal amount or an integral multiple thereof; and

(3) that such Note shall be purchased pursuant to the terms and conditions specified in this Section 3.03.

The delivery of such Note to the Paying Agent with the Change of Control Purchase Notice (together with all necessary endorsements), at any time on or after the 30th day after the Company delivers its Change of Control Notice, at the offices of the Paying Agent shall be a condition to the receipt by the Holder of the Change of Control Purchase Price therefor; provided, however, that such Change of Control Purchase Price shall be so paid pursuant to this Section 3.03 only if the Note so delivered to the Paying Agent shall conform in all respects to the description thereof set forth in the related Change of Control Purchase Notice.

The Company shall purchase from the Holder thereof, pursuant to this Section 3.03, a portion of a Note if the principal amount of such portion is $1,000 or an integral multiple of $1,000. Provisions of this Indenture that apply to the purchase of all of a Note also apply to the purchase of such portion of such Note. Any purchase by the Company contemplated pursuant to the provisions of this Section 3.03 shall be

12

consummated by the delivery of the consideration to be received by the Holder on the Change of Control Purchase Date.

(d)   The Company shall deposit cash at the time and in the manner as provided in Section 3.05, sufficient to pay the aggregate Change of Control Purchase Price of all Notes to be purchased pursuant to this Section 3.03.

Section 3.04   Effect of Change of Control Purchase Notice.

Upon receipt by the Paying Agent of the Change of Control Purchase Notice and the Note specified in Section 3.03(c), the Holder of the Note in respect of which such Change of Control Purchase Notice was given shall thereafter be entitled to receive solely the Change of Control Purchase Price with respect to such Note. Such Change of Control Purchase Price shall be paid to such Holder, subject to receipts of funds by the Paying Agent, promptly following the Change of Control Purchase Date with respect to such Note (provided the conditions in Section 3.03(c) have been satisfied). If the Paying Agent holds money sufficient to pay the Change of Control Purchase Price of the Notes on the Business Day following the Change of Control Purchase Date, then:

(1)   the Notes will cease to be outstanding;

(2)   interest will cease to accrue; and

(3)   all other rights of the Holder of the Notes will terminate.

This will be the case whether or not book-entry transfer of the Notes is made or whether or not the Notes are delivered to the Paying Agent.

Notes in respect of which a Change of Control Purchase Notice has been given by the Holder thereof may not be converted pursuant to the provisions hereof on or after the date of the delivery of such Change of Control Purchase Notice unless, such Change of Control Purchase Notice has first been validly withdrawn as specified in the following paragraph.

A Change of Control Purchase Notice may be withdrawn by means of a written notice of withdrawal delivered to the office of the Paying Agent in accordance with the Change of Control Purchase Notice at any time prior to the close of business on the last Business Day prior to the Change of Control Purchase Date, specifying:

(1)   the certificate number, if any, of the Note in respect of which such notice of withdrawal is being submitted;

(2)   the principal amount of the Note with respect to which such notice of withdrawal is being submitted; and

13

(3)    the principal amount, if any, of such Note which remains subject to the original Purchase Notice, and which has been or will be delivered for purchase by the Company.

There shall be no purchase of any Notes pursuant to Section 3.03 if there has occurred (prior to, on or after the giving, by the Holders of such Notes, of the required Change of Control Purchase Notice) and is continuing an Event of Default (other than a default in the payment of the Change of Control Purchase Price with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Notes (x) with respect to which a Change of Control Purchase Notice has been withdrawn in compliance with this Indenture, or (y) held by it during the continuation of an Event of Default (other than a default in the payment of the Change of Control Purchase Price with respect to such Notes) in which case, upon such return, the Change of Control Purchase Notice with respect thereto shall be deemed to have been withdrawn.

Section 3.05    Deposit of Change of Control Purchase Price.

Prior to 10:00 a.m. (local time in the City of New York) on the Change of Control Purchase Date, the Company shall deposit with the Trustee or with the Paying Agent (or, if the Company or a Subsidiary or an Affiliate of either of them is acting as the Paying Agent, shall segregate and hold in trust as provided in the Indenture) an amount of cash (in immediately available funds if deposited on such Business Day) sufficient to pay the aggregate Change of Control Purchase Price of all the Notes or portions thereof which are to be purchased as of the Change of Control Purchase Date.

Section 3.06    Notes Purchased in Part.

Any certificated Note which is to be purchased only in part shall be surrendered at the office of the Paying Agent (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or such Holder's attorney duly authorized in writing) and the Company shall execute and the Trustee shall, upon receipt of a written order of the Company signed by two Officers, authenticate and deliver to the Holder of such Note, without service charge, a new Note or Notes, of any authorized denomination as requested by such Holder in aggregate principal amount equal to, and in exchange for, the portion of the principal amount of the Note so surrendered which is not purchased.

Section 3.07    Covenant to Comply With Securities Laws Upon Purchase of Notes.

When making any offers to purchase pursuant to the provisions of Section 3.03 hereof (if such offer or purchase constitutes an "issuer tender offer" for purposes of Rule 13e-4 (which term, as used herein, includes any successor provision thereto) under the Exchange Act at the time of such offer or purchase), the Company shall (i) comply with Rule 13e-4 and Rule 14e-1 (or any successor provision) under the Exchange Act, (ii) file the related Schedule TO (or any successor schedule, form or report) under the

14

Exchange Act, and (iii) otherwise comply with all Federal and state securities laws so as to permit the rights and obligations under Section 3.03 to be exercised in the time and in the manner specified in Section 3.03.

Section 3.08     Repayment to the Company.

The Trustee and the Paying Agent shall return to the Company any cash that remains unclaimed, together with interest, if any, thereon held by them for the payment of the Change of Control Purchase Price; provided, however, that to the extent that the aggregate amount of cash deposited by the Company pursuant to Section 3.05 exceeds the aggregate Change of Control Purchase Price of the Notes or portions thereof which the Company is obligated to purchase as of the Change of Control Purchase Date, then, unless otherwise agreed in writing with the Company, promptly after the Business Day following the Change of Control Purchase Date, the Trustee shall return any such excess to the Company together with interest, if any, thereon. Prior to such return, any such excess funds held by the Paying Agent shall be invested in cash or Permitted Investments as may be directed by the Company from time to time.

## ARTICLE IV

## COVENANTS

Section 4.01     Compliance Certificate.

The following shall apply in lieu of Section 3.5 of the Original Indenture with respect to the Notes:

(a)     The Company shall deliver to the Trustee, within 90 days after the end of each fiscal year, an Officer's Certificate prescribed by the TIA stating that a review of the activities of the Company and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge the Company has kept, observed, performed and fulfilled each and every covenant contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions and conditions of this Indenture (or, if a Default or Event of Default has occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of or interest, if any, on the Notes is prohibited or if such event has occurred, a description of the event and what action the Company is taking or proposes to take with respect thereto.

(b)     So long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants, the year-end financial statements delivered pursuant to Section 3.6 of the Original Indenture shall be

15

accompanied by a written statement of the Company's independent public accountants (who shall be a firm of established national reputation) that in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that the Company has violated any provisions of Article 4 hereof or Article III or IV of the Original Indenture, if any such violation has occurred, specifying the nature and period of existence thereof, it being understood that such accountants shall not be liable directly or indirectly to any Person for any failure to obtain knowledge of any such violation.

(c)     So long as any of the Notes are outstanding, the Company shall deliver to the Trustee, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

Section 4.02     Taxes.

The Company shall pay, and shall cause each of its Subsidiaries to pay, prior to delinquency, all stamp taxes and other duties, if any, which may be imposed by the United States or any political subdivision thereof or taxing authority thereof or therein with respect to the issuance of the Notes. The Company shall not be required to make any payment with respect to any other tax, assessment or governmental charge imposed by any government or any political subdivision thereof or taxing authority thereof or therein.

Section 4.03     Stay, Extension and Usury Laws.

The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.04     Corporate Existence.

Subject to Article IV of the Original Indenture and Article 5 hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect:

(1)     its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary; and

16

(2) the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; provided, however, that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

Section 4.05    Calculations in Respect of Notes.

The Company shall provide a schedule of all calculations called for under the Notes and this Indenture to the Trustee and the Conversion Agent, and each of the Trustee and Conversion Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification. The Trustee and/or the Conversion Agent shall forward the Company's calculations to any Holder of Notes upon request of that Holder.

ARTICLE V

MERGER AND CONSOLIDATION OF COMPANY

Section 5.01    Lease of Properties.

Notwithstanding anything in the Original Indenture to the contrary, the Company shall not, directly or indirectly, lease all or substantially all of its properties or assets, in one or more related transactions, to any other Person.

ARTICLE VI

DEFAULTS AND REMEDIES

Section 6.01    Events of Default.

In addition to the Events of Default set forth in the Original Indenture, each of the following shall constitute an Event of Default with respect to the Notes:

(1) default in payment of accrued interest at maturity, when the same becomes due and payable;

(2) default in payment of the Change of Control Purchase Price or Redemption Price when the same becomes due and payable;

(3) default in the payment of the Principal Return (and cash in lieu of fraction shares) or failure to deliver the Net Shares, in each case when due, unless the Notes in respect of which such Principal Return (and cash in lieu of fractional shares) and Net Shares

17

were due have been called for redemption in accordance with Section 3.02 hereof;

(4)     default by the Company in the payment of the principal of any bond, debenture, note or other evidence of the Company's Indebtedness, in each case for money borrowed, or in the payment of principal under any mortgage, indenture, agreement or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness of the Company for money borrowed, which default for payment of principal is individually or in an aggregate principal amount exceeding $50,000,000 (or its equivalent in any other currency or currencies) when such indebtedness becomes due and payable (whether at maturity, upon redemption or acceleration or otherwise), if such default shall continue unremedied or unwaived for more than 30 days after the expiration of any grace period or extension of the time for payment applicable thereto.

The Company shall deliver to the Trustee, within 30 days after the occurrence thereof, written notice of any event which with the giving of notice or the lapse of time or both would become an Event of Default under clause (e) of Section 5.1 of the Original Indenture or clause (4) of this Section 6.01. However, notwithstanding Section 5.1 of the Original Indenture, the Company need not deliver such written notice within 30 days after the occurrence thereof of any event which with the giving of notice or the lapse of time or both would become an Event of Default under clauses (e) or (f) of Section 5.1 of the Original Indenture.

## ARTICLE VII

### TRUSTEE

Section 7.01    Rights of Trustee.

(a)    Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company shall be sufficient if signed by an Officer of the Company.

(b)    In no event shall the Trustee be required to take notice of any default or breach hereof or any Event of Default hereunder, except for Events of Default specified in Section 6.01 hereof and/or Section 5.1(a) and/or 5.1(b) of the Original Indenture, unless and until the Trustee shall have received from a Holder of a Note or from the Company express written notice of the circumstances constituting the breach, default or Event of Default and stating that said circumstances constitute an Event of Default hereunder.

Section 7.02    Reports by Trustee to Holders of the Notes.

(a)    The Trustee shall transmit by mail all reports as required by TIA Section 313(c).

18

Section 7.03     Eligibility; Disqualification.

Notwithstanding Section 6.10 of the Original Indenture, the Notes shall at all times have a Trustee that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $100.0 million as set forth in its most recent published annual report of condition.

In addition to Section 6.10 of the Original Indenture, the Notes shall at all times have a Trustee who satisfies the requirements of TIA Section 310(a)(1), (2) and (5).

ARTICLE VIII

DEFEASANCE

Section 8.01     No Defeasance.

Sections 7.2, 7.3 and 7.4 of the Original Indenture shall not apply to the Notes.

ARTICLE IX

AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01     Without Consent of Holders of Notes.

In addition to the purposes set forth in Section 8.1 of the Original Indenture, the Company and the Trustee may amend this Indenture or the Notes or enter into an indenture or indentures supplement hereto (which shall conform to the provisions of the Trust Indenture Act as then in effect) without notice to or the consent of any Holder of a Note:

(1)     to provide for uncertificated Notes in place of certificated Notes or to provide for bearer Notes; or

(2)     to conform the text of the Indenture or the Notes to any provisions of the Description of the Notes section of the Prospectus Supplement to the extent that such provision of the Description of the Notes section of the Prospectus Supplement was intended to be a verbatim recitation of a provision of the Indenture or the Notes.

Section 9.02     With Consent of Holders of Notes.

In addition to clauses (a) through (f) of Section 8.2 of the Original Indenture, without the consent of each Holder affected, an amendment or supplement under Section 8.2 of the Original Indenture may not:

19

    (1)    make any change in any conversion right to the detriment of a Holder; or

    (2)    make a change in the percentage of principal amount of the Notes necessary to waive compliance with any provision of the Indenture or to make any change in Section 8.2 of the Original Indenture, as supplemented by this provision, for modification.

## ARTICLE X

## CONVERSION

Section 10.01   Conversion Privilege.

    (a)    Subject to the provisions of this Article 10, a Holder of a Note may convert such Note into cash and Common Stock equal to the Conversion Value in accordance with Section 10.15, if any of the following conditions are satisfied and only during the periods set forth in this Section 10.01:

    (1)    during any calendar quarter (the "Quarter") commencing after the date of issuance of the Notes, if the Common Stock Price for at least 20 Trading Days in the period of 30 consecutive Trading Days ending on the last Trading Day of the Quarter immediately preceding the Quarter in which the conversion occurs (appropriately adjusted to take into account the occurrence, during such 30 consecutive Trading Day period, of any event requiring adjustment of the Conversion Price under this Indenture) is more than 120% of the Conversion Price on such 30th Trading Day;

    (2)    at any time following May 31, 2014;

    (3)    (A) during the five Trading Day period immediately after a period of five consecutive Trading Days in which the Trading Price of $1,000 principal amount of Notes for each such Trading Day in such period was less than 95% of the product of (x) the Common Stock Price on such Trading Day multiplied by (y) the Conversion Rate on such Trading Day.

    (B)    Notwithstanding the foregoing, if on the date of any conversion pursuant to Section 10.01(a)(3)(A), the Common Stock Price on such date is greater than the Conversion Price on such date but less than 120% of the Conversion Price on such date, then the Conversion Value a Holder of Notes will be entitled to receive will be equal to the principal amount of the Notes held by such Holder as of the Conversion Date plus accrued and unpaid interest to the Conversion Date (such a conversion, a "Principal Value Conversion") and the

number of Net Shares (and any cash in lieu of fractional shares) to be delivered upon a Principal Value Conversion will be determined in accordance with Section 10.15; and provided further that, in place of the Five Day Average Closing Stock Price, such number of Net Shares will be calculated using an amount equal to the greater of (i) the Conversion Price on the Conversion Date and (ii) the Common Stock Price on the Conversion Date;

(4)     during the periods set forth in Section 10.01(c) upon (i) a distribution to all or substantially all holders of Common Stock of rights, warrants or options entitling them to subscribe for or purchase, for a period expiring within 60 days of the date of such distribution, shares of Common Stock at a price less than the Common Stock Price on the Trading Day immediately preceding the date of declaration of such distribution or (ii) a distribution to all or substantially all holders of Common Stock evidences of Company indebtedness, rights or warrants to purchase or subscribe for Capital Stock or other securities of the Company, or assets, which distribution has a per share value that exceeds 12.5% of the Common Stock Price on the Trading Day immediately preceding the declaration date of such distribution; provided that, the Holder shall have no right to convert any Note pursuant to Section 10.01(c) hereof if the Holder of a Note otherwise participates in the issuance or distribution described in this Section 10.01(a)(4) without conversion of such Holder's Notes; or

(5)     (A) during the period set forth in clause (B) below, if the Company is party to a consolidation, merger, share exchange, sale of all or substantially all of its assets or other similar transaction pursuant to which the Common Stock is subject to conversion into shares of stock (other than Common Stock), other securities or property (including cash) subject to Section 10.12; provided that if such conversion occurs after the effective date of such transaction, the Holder will receive on conversion the consideration determined in accordance with Section 10.12.

(B)     The Notes shall be convertible pursuant to clause (A) above at any time from and after the date that is 15 days prior to the date of the anticipated effective time (as publicly announced by the Company) of such transaction until and including the date that is 15 days after the actual effective date of such transaction.

(C)     If (i) a Holder elects to convert its Notes pursuant to this Article upon the occurrence of a transaction described clause (5)(A) above,

21

(ii) such transaction also constitutes a Change of Control (regardless of whether a Holder has the right to require the repurchase of Notes pursuant to Section 3.03) and (iii) 10% or more of the consideration for the Common Stock (valued as set forth in Section 10.06 hereof) consists of cash, other property or securities that are not traded or scheduled to be traded or scheduled to be traded immediately following such transaction on a United States national securities exchange or the Nasdaq National Market, then, for purposes of determining the Conversion Value, the Conversion Price in respect of such Notes shall be decreased such that the Conversion Rate shall be increased by an additional number of shares of Common Stock (the "Additional Shares") determined as set forth in Section 10.06.

(b)     In the case of any distribution described in Section 10.01(a)(3), the Bid Solicitation Agent shall have no obligation to determine the Trading Price of the Notes unless the Company has requested such determination in writing, and the Company shall have no obligation to make such request unless a Holder of the Notes provides the Company with reasonable evidence that the Trading Price of the Notes on any date would be less than 95% of the product of (x) the Common Stock Price on such date and (y) the Conversion Rate then in effect. Upon receipt of such reasonable evidence, the Company shall instruct the Bid Solicitation Agent in writing to determine the Trading Price beginning on the next Trading Day and on each successive Trading Day until the Trading Price of the Notes is greater than or equal to 95% of the product of the Common Stock Price and the Conversion Rate. The Company shall make the calculations described in Section 10.01(a)(3) hereof, using the Trading Price of the Notes provided by the Bid Solicitation Agent and will advise the Trustee (or Conversion Agent, as the case may be) within a reasonable time (and, in any event, no later than three Business Days prior to the Conversion Date) of any determination of the Trading Price of the Notes. In the case of the foregoing Section 10.01(a)(4)(i) and Section 10.01(a)(4)(ii), the Company shall cause a notice of such distribution to be filed with the Trustee and the Conversion Agent and to be mailed to each Holder of Notes no later than 20 days prior to the Ex-Dividend Date for such distribution. Once the Company has given such notice, Holders may surrender their Notes for conversion by delivering the Notes to the Conversion Agent at any time thereafter until the earlier of the close of business on the Business Day prior to the Ex-Dividend Date or the Company's announcement that such distribution will not take place; provided that, the Holder shall have no right to convert any Note pursuant to this Section 10.01(c) if the Holder of a Note otherwise participates in the distribution described in either Section 10.01(a)(4)(i) or Section 10.01(a)(4)(ii) without conversion of such Holder's Notes. The "Ex-Dividend Date" for any such distribution means the date immediately prior to the commencement of "ex-dividend" trading for such distribution on The New York Stock Exchange or such other national securities exchange or The Nasdaq Stock Market or similar system of automated dissemination of quotations of securities prices on which the Common Stock is then listed or quoted.

22

(c)    A Holder may convert a portion of a Note equal to $1,000 principal amount or any integral multiple thereof. Provisions of this Indenture that apply to conversion of all of a Note also apply to conversion of a portion of a Note. A Note in respect of which a Holder has delivered a Change of Control Purchase Notice pursuant to Section 3.03 may not be converted unless such Change of Control Purchase Notice is withdrawn pursuant to Section 3.04.

(d)    A Holder of Notes is not entitled to any rights of a holder of Common Stock until, and only to the extent that, such Holder has converted its Notes into Common Stock.

Section 10.02    Conversion Procedure.

(a)    To convert a Note, a Holder must satisfy the requirements of this Article 10 and (i) complete and manually sign the irrevocable conversion notice on the back of the Note and deliver such notice to the Conversion Agent, (ii) if the Notes are in certificated form, deliver the Note to the Conversion Agent, (iii) furnish appropriate endorsements and transfer documents if required by the Registrar or the Conversion Agent, (iv) pay any transfer or other tax, if required by Section 10.03 and/or (v) if the Note is held in book-entry form, complete and deliver to the Depositary appropriate instructions pursuant to the Applicable Procedures. The later of (x) the date on which the Holder satisfies all of the foregoing requirements and (y) the Determination Date is the "Conversion Date." As soon as practicable after the Conversion Date and in any event within four Business Days thereof, the Company shall deliver to the Holder through the Conversion Agent (1) cash in the amount calculated in accordance with Section 10.15 and (2) either (A) a certificate for or (B) a book-entry notation of the number of whole shares of Common Stock issuable upon the conversion and cash in lieu of any fractional shares pursuant to Section 10.15.

(b)    The Person in whose name the Note is registered shall be deemed to be a stockholder of record on the Conversion Date; provided that no surrender of a Note on any date when the stock transfer books of the Company shall be closed shall be effective to constitute the Person or Persons entitled to receive the shares of Common Stock upon such conversion as the record holder or holders of such shares of Common Stock on such date, but such surrender shall be effective to constitute the Person or Persons entitled to receive such shares of Common Stock as the record holder or holders thereof for all purposes at the close of business on the next succeeding day on which such stock transfer books are open (subject to the provisions of the next paragraph of this Section 10.02); provided that such conversion shall be at the Conversion Price in effect on the date that such Note shall have been surrendered for conversion, as if the stock transfer books of the Company had not been closed. Upon conversion of a Note, such Person shall no longer be a Holder of such Note.

(c)    No payment or adjustment will be made for accrued interest on a converted Note or for dividends or distributions on shares of Common Stock issued upon conversion of a Note, but if any Holder surrenders a Note for conversion between the record date for the payment of an installment of interest and the next interest payment

23

date, then, notwithstanding such conversion, the interest, payable on such interest payment date shall be paid to the Holder of such Note on such interest payment date. In such event, such Note, when surrendered for conversion, must be accompanied by delivery of a check payable to the Conversion Agent in an amount equal to the interest, payable on such interest payment date on the portion so converted. If such payment does not accompany such Note, the Note shall not be converted; provided that no such check shall be required if such Note is surrendered for conversion on the interest payment date. If the Company defaults in the payment of interest, payable on the interest payment date, the Conversion Agent shall repay such funds to the Holder.

(d)     Upon surrender of a Note that is converted in part, the Company shall execute, and the Trustee shall, upon receipt of a written order of the Company signed by two Officers, authenticate and deliver to the Holder, a new Note equal in principal amount to the unconverted portion of the Note surrendered.

Section 10.03     Taxes on Conversion.

If a Holder submits a Note for conversion, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issue of shares of Common Stock upon the conversion. However, the Holder shall pay any such tax which is due because the Holder requests the shares to be issued in a name other than the Holder's name. The Conversion Agent may refuse to deliver the certificates representing the shares of Common Stock being issued in a name other than the Holder's name until the Conversion Agent receives a sum sufficient to pay any tax which will be due because the shares are to be issued in a name other than the Holder's name. Nothing herein shall preclude any income tax withholding required by law or regulations.

Section 10.04     Company to Provide Stock.

The Company has reserved shares of Common Stock to permit delivery of shares of Common Stock upon conversion of the Notes up to an assumed Five Day Average Closing Stock Price, and from time to time as may be necessary shall reserve out of its authorized but unissued shares of Common Stock a sufficient number of additional shares of Common Stock to permit delivery of shares of Common Stock upon the conversion of the Notes in full.

All shares of Common Stock delivered upon conversion of the Notes shall be newly issued shares or treasury shares, shall be duly and validly issued and fully paid and nonassessable, shall be free from preemptive rights and free of any lien or adverse claim, and shall have the same rights as all of the other outstanding shares of the Company's Common Stock. The Company will endeavor promptly to comply with all federal and state securities laws regulating the offer and delivery of shares of Common Stock upon conversion of Notes, if any, and will list or cause to have quoted such shares of Common Stock on each national securities exchange or in the over-the-counter market or such other market on which the shares of Common Stock are then listed or quoted.

Section 10.05     Adjustment of Conversion Price.

24

The Conversion Price shall be adjusted (without duplication) from time to time by the Company as follows:

(a)    In case the Company shall pay a dividend or make a distribution on the Common Stock payable exclusively in Common Stock, the Conversion Price in effect at the opening of business on the day following the date fixed for the determination of stockholders entitled to receive such dividend or other distribution shall be decreased by dividing such Conversion Price by a fraction of which the denominator shall be the number of shares of Common Stock outstanding at the close of business on the date fixed for such determination and the numerator shall be the sum of (i) such number of shares and (ii) the total number of shares constituting such dividend or other distribution, such decrease to become effective immediately after the opening of business on the day following the date fixed for such determination. For the purposes of this paragraph (a), the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company. In the event that such dividend or distribution is not so paid or made, the Conversion Price shall again be adjusted to be the Conversion Price which would then be in effect if such dividend or distribution had not occurred.

(b)    In case the Company shall pay or make a dividend or other distribution on its Common Stock consisting exclusively of, or shall otherwise issue to all holders of its Common Stock, rights, warrants or options, in each case entitling the holders thereof to subscribe for or purchase shares of Common Stock at a price per share less than the Market Price per share of the Common Stock on the date fixed for the determination of stockholders entitled to receive such rights, warrants or options, the Conversion Price in effect at the opening of business on the day following the date fixed for such determination shall be decreased by dividing such Conversion Price by a fraction of which the denominator shall be the sum of (i) the number of shares of Common Stock outstanding at the close of business on the date fixed for such determination plus (ii) the number of shares of Common Stock which the aggregate of the offering price of the total number of shares of Common Stock so offered for subscription or purchase would purchase at such Market Price and the numerator shall be the sum of (i) the number of shares of Common Stock outstanding at the close of business on the date fixed for such determination plus (ii) the number of shares of Common Stock so offered for subscription or purchase, such decrease to become effective immediately after the opening of business on the day following the date fixed for such determination; provided, however, that no adjustment shall be made if Holders of the Notes may participate in the transaction on a basis and with notice that the Company's Board of Directors deems to be fair and appropriate. To the extent that rights are not so issued or shares of Common Stock are not so delivered after the expiration of such rights, warrants or options, the Conversion Price shall be readjusted to the Conversion Price which would then be in effect if such date fixed for the determination of stockholders entitled to receive such rights, warrants or options, had not been fixed. For the purposes of this paragraph (b), the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company.

25

(c)    In case the Company shall declare a cash dividend or distribution to all or substantially all of the holders of Common Stock, the Conversion Price shall be decreased so that the Conversion Price shall equal the price determined by multiplying the Conversion Price in effect immediately prior to the record date for such dividend or distribution by a fraction,

(i)    the numerator of which shall be the average of the Common Stock Prices for the three consecutive Trading Days ending on the date immediately preceding the Ex-Dividend Date for such dividend or distribution (the "Pre-Dividend Sale Price"), minus the full amount of such cash dividend or distribution, to the extent payable in cash, applicable to one share of Common Stock, and

(ii)    the denominator of which shall be the Pre-Dividend Sale Price, such adjustment to become effective immediately after the record date for such dividend or distribution; provided, that no adjustment to the Conversion Price or the ability of a Holder of a Note to convert will be made pursuant to this Section 10.05(c) if the Company provides that Holders of Notes will participate in such cash dividend or distribution on an as-converted basis without conversion; provided further, that if the numerator of the foregoing fraction is less than $1.00 (including a negative amount), then in lieu of the foregoing adjustment, adequate provision shall be made so that each Holder shall have the right to receive upon conversion, in addition to the Common Stock issuable upon such conversion (and any cash in lieu of fractional shares), the amount of cash such Holder would have received had such Holder converted its Note on the record date for such dividend or distribution at the Conversion Rate and for the Conversion Value in effect on such record date. If such dividend or distribution is not so paid or made, the Conversion Price shall be adjusted to the Conversion Price that would then be in effect if such dividend or distribution had not been declared.

(d)    Subject to the last sentence of this paragraph (d), in case the Company shall, by dividend or otherwise, distribute to all holders of its Common Stock evidences of its indebtedness, shares of any class or series of Capital Stock, cash or assets (including securities, but excluding any rights, warrants or options referred to in paragraph (b) of this Section 10.05 and any cash dividend or distribution referred to in paragraph (c) of this Section 10.05), the Conversion Price shall be decreased so that the same shall equal the price determined by dividing the Conversion Price in effect immediately prior to the effectiveness of the Conversion Price decrease contemplated by this paragraph (d) by a fraction of which the denominator shall be the Market Price per share of the Common Stock on the date fixed for the determination of stockholders entitled to receive such distribution (the "Reference Date") less the Fair Market Value, on the Reference Date, of the portion of the evidences of indebtedness, shares of capital stock, cash and/or assets so distributed applicable to one share of Common Stock and the numerator shall be such Market Price per share of the Common Stock, such decrease to become effective immediately prior to the opening of business on the day following the

26

Reference Date; provided that if the Fair Market Value of the portion of the evidences of indebtedness, shares of capital stock, cash and/or assets so distributed applicable to one share of Common Stock shall be greater than the Market Price per share of Common Stock, then in lieu of the foregoing adjustment, adequate provision shall be made so that each Holder shall have the right to receive upon conversion, in addition to the Common Stock issuable upon such conversion (and any cash in lieu of fractional shares), the amount of evidences of indebtedness, shares of capital stock, cash and/or assets so distributed that such Holder would have received had such Holder converted its Note on the record date for such dividend or distribution at the Conversion Rate and for the Conversion Value in effect on such record date; and provided, further, that no adjustment shall be made if all Holders of Notes are entitled to participate in such transactions. In the event that such dividend or distribution is not so paid or made, the Conversion Price shall again be adjusted to be the Conversion Price which would then be in effect if such dividend or distribution had not occurred. For purposes of this paragraph (d), any dividend or distribution that includes shares of Common Stock or rights, warrants or options to subscribe for or purchase shares of Common Stock shall be deemed instead to be (i) a dividend or distribution of the evidences of indebtedness, shares of Capital Stock, cash and/or assets other than such shares of Common Stock or such rights or warrants (making any Conversion Price decrease required by this paragraph (d)) immediately followed by (ii) a dividend or distribution of such shares of Common Stock or such rights, warrants or options (making any further Conversion Price decrease required by paragraph (a) or (b) of this Section 10.05), except any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding at the close of business on the date fixed for such determination" within the meaning of paragraph (a) of this Section 10.05.

(e)    In case outstanding shares of Common Stock shall be subdivided into a greater number of shares of Common Stock, the Conversion Price in effect at the opening of business on the Business Day following the day upon which such subdivision becomes effective shall be proportionately decreased and, conversely, in case outstanding shares of Common Stock shall each be combined into a smaller number of shares of Common Stock, the Conversion Price in effect at the opening of business on the day following the day upon which such combination becomes effective shall be proportionately increased, such increase or decrease, as the case may be, to become effective immediately after the opening of business on the Business Day following the day upon which such subdivision or combination becomes effective.

(f)    In case the Company pays to holders of Common Stock in respect of a tender or exchange offer, other than an odd-lot offer, by the Company or any of its Subsidiaries for Common Stock to the extent that the offer involves aggregate consideration that, together with (1) any cash and the Fair Market Value of any other consideration payable in respect of any tender offer by the Company or any of its Subsidiaries for shares of Common Stock consummated within the preceding 12 months not triggering a Conversion Price adjustment and (2) all-cash distributions to all or substantially all holders of the Company's Common Stock made within the preceding 12 months not triggering a Conversion Price adjustment, exceeds an amount equal to 12.5% of the market capitalization of Common Stock on the expiration date of the tender offer,

27

the Conversion Price shall be decreased so that the same shall equal the price determined by dividing the Conversion Price in effect immediately prior to the effectiveness of the Conversion Price decrease contemplated by this Section 10.05(f) by a fraction of which the denominator shall be the number of shares of Common Stock outstanding (including any tendered or exchanged shares) at the last time tenders of exchanges may be made pursuant to such tender or exchange offer (the "Expiration Time") multiplied by the Market Price per share of the Common Stock on the Trading Day next succeeding the Expiration Time and the numerator shall be the sum of (x) the Fair Market Value (determined as aforesaid) of the aggregate consideration payable to stockholders based on the acceptance (up to any maximum specified in the terms of the tender or exchange offer) of all shares validly tendered or exchanged and not withdrawn as of the Expiration Time (the shares deemed so accepted, up to any such maximum, being referred to as the "Purchased Shares") and (y) the product of the number of shares of Common Stock outstanding (less any Purchased Shares) at the Expiration Time and the Market Price per share of the Common Stock on the Trading Day next succeeding the Expiration Time, such decrease to become effective immediately prior to the opening of business on the Business Day following the Expiration Time.

In any case in which this Section 10.05 shall require that an adjustment be made immediately following a record date established for purposes of this Section 10.05, the Company may elect to defer (but only until five Business Days following the filing by the Company with the Trustee of the certificate described in Section 10.10) issuing to the holder of any Note converted after such record date the shares of Common Stock issuable upon such conversion over and above the shares of Common Stock issuable upon such conversion only on the basis of the Conversion Price prior to adjustment; and, in lieu of the shares the issuance of which is so deferred, the Company shall issue or cause its transfer agents to issue due bills or other appropriate evidence of the right to receive such shares.

Section 10.06    Adjustment for Certain Changes of Control.

The number of Additional Shares in connection with an adjustment of the Conversion Price as set forth in Section 10.01(a)(5)(C) shall be determined by reference to the table attached as Schedule A hereto, based on the date on which the corporate transaction becomes effective (the "Effective Date") and the stock price paid per share of Common Stock (valued as set forth in the next paragraph) in the corporate transaction (the "Stock Price"); provided that if the Stock Price is between two Stock Price amounts in the table or the Effective Date is between two Effective Dates in the table, the number of Additional Shares will be determined by a straight-line interpolation between the number of Additional Shares set forth for the higher and lower Stock Price amounts and the two dates, as applicable, based on a 365-day year.

The Stock Price per share of Common Stock shall be valued as follows:

(i)    if holders of the Common Stock receive only cash in the corporate transaction, the Stock Price shall be the cash amount paid per share of the Common Stock, and

28

(ii)   in all other cases, the Stock Price shall be the average of the Common Stock Price on the five Trading Days prior to but not including the Effective Date.

Notwithstanding the foregoing, (i) if the Stock Price is equal to or greater than $20 or less than $3.10 (subject in each case to adjustment as described below), the number of Additional Shares shall be zero and (ii) in no event may the total number of shares of Common Stock issuable upon conversion exceed approximately 322.5806 per $1,000 principal amount of Notes, subject to adjustments in the same manner as the Conversion Price as set forth in Section 10.05. The maximum amount of Additional Shares payable shall be 72.5806 per $1,000 principal amount of Notes, subject to adjustments on the same basis.

The Stock Prices set forth in the first row of the table (i.e., column headers) in Schedule A hereto and set forth in the proviso at the first sentence of the first paragraph of this Section will be adjusted as of any date on which the Conversion Price of the Notes is adjusted pursuant to Section 10.05. The adjusted Stock Prices will equal the Stock Prices applicable immediately prior to such adjustment, multiplied by a fraction, the numerator of which is the Conversion Rate immediately prior to the adjustment giving rise to the Stock Price adjustment and the denominator of which is the Conversion Rate as so adjusted. The number of Additional Shares will be adjusted in the same manner as the Conversion Price as set forth in Section 10.05.

Section 10.07   When No Adjustment Required.

No adjustment of the Conversion Price shall be made:

(a)   upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on securities of the Company and the investment of additional optional amounts in shares of Common Stock under any plan,

(b)   upon the issuance of any shares of Common Stock or options or rights to purchase those shares pursuant to any present or future employee, director or consultant benefit plan or program of the Company,

(c)   upon the issuance of any shares of Common Stock pursuant to any option, warrant, right or exercisable, exchangeable or convertible security outstanding as of the date the Notes were first issued;

(d)   upon the issuance of any rights, any distribution of separate certificates representing the rights, any exercise or redemption of any rights or any termination or invalidation of the rights, pursuant to the Company's stockholders rights plan, or

(e)   for a change in the par value or no par value of the shares of Common Stock.

29

There shall also be no adjustment of the Conversion Price in case of the issuance of any Common Stock (or securities convertible into or exchangeable for Common Stock), except as specifically described above.

### Section 10.08    When Adjustment May Be Deferred.

No adjustment in the Conversion Price need be made unless the adjustment would require an increase or decrease of at least 1% in the Conversion Price (other than an adjustment described in Section 10.05(f)). Any adjustments that are not made under this Section 10.08 shall be carried forward and taken into account in any subsequent adjustment. All calculations under this Article 10 shall be made to the nearest cent, with one-half cent rounded up, or to the nearest 1/1,000th of a share, with 1/500th of a share being rounded up, as the case may be.

### Section 10.09    Successive Adjustments.

After an adjustment to the Conversion Price under this Article 10, any subsequent event requiring an adjustment under this Article 10 shall cause an adjustment to the Conversion Price as so adjusted.

### Section 10.10    Notice of Adjustment.

Whenever the Conversion Price is adjusted, the Company shall promptly mail to Holders of Notes a notice of the adjustment and concurrently file with the Trustee and the Conversion Agent such notice and a certificate from the Company's independent public accountants briefly stating the facts requiring the adjustment and the manner of computing such adjustment. The certificate shall be conclusive evidence that such adjustment is correct. Neither the Trustee nor any Conversion Agent shall be under any duty or responsibility with respect to any such notice and certificate (or the receipt of such notice and certificate or with the knowledge of any adjustment absent such notice and certificate) except to exhibit the same to any Holder desiring inspection thereof.

### Section 10.11    Notice of Certain Transactions.

The Company shall mail to Holders of Notes and file with the Trustee and/or the Conversion Agent a notice stating the proposed record date for a dividend or distribution or the proposed effective date of a subdivision, combination, reclassification, consolidation, merger, binding share exchange, transfer, liquidation or dissolution, if any of the following occur:

        (a)    the Company takes any action that would require an adjustment in the Conversion Price pursuant to Section 10.05 (unless no adjustment is to occur pursuant to Section 10.06); or

        (b)    the Company takes any action that would require a supplemental indenture pursuant to Section 10.12; or

        (c)    there is a liquidation or dissolution of the Company.

30

The Company shall file and mail such notice at least 15 days before the applicable date of any such transaction. Failure to file or mail the notice or any defect in it shall not affect the validity of the transaction.

Section 10.12    Effect of Reclassification, Consolidation, Merger, Share Exchange or Sale on Conversion Privilege.

If any of the following shall occur: (i) any reclassification or change of outstanding shares of Common Stock (other than a change in par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination); (ii) any consolidation, combination, merger or share exchange to which the Company is a party other than a merger in which the Company is the continuing corporation and which does not result in any reclassification of, or change (other than a change in name, or par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination) in, outstanding shares of Common Stock; or (iii) any sale or conveyance of all or substantially all of the assets of the Company; then the Company, or such successor or purchasing corporation, as the case may be, shall, as a condition precedent to such reclassification, change, consolidation, merger, share exchange, sale or conveyance, execute and deliver to the Trustee a supplemental indenture providing that the Holder of each Note then outstanding shall have the right to convert such Note into the kind and amount of shares of Capital Stock and other securities and property (including cash) receivable upon such reclassification, change, consolidation, merger, share exchange, sale or conveyance by a holder of the number of shares of Common Stock deliverable upon conversion of such Note immediately prior to such reclassification, change, consolidation, merger, share exchange, sale or conveyance. Such supplemental indenture shall provide for adjustments of the Conversion Price which shall be as nearly equivalent as may be practicable to the adjustments of the Conversion Price provided for in this Article 10. If, in the case of any such consolidation, merger, share exchange, sale or conveyance, the stock or other securities and property (including cash) receivable thereupon by a holder of Common Stock includes shares of Capital Stock or other securities and property of a corporation other than the successor or purchasing corporation, as the case may be, in such consolidation, merger, share exchange, sale or conveyance, then such supplemental indenture shall also be executed by such other corporation and shall contain such additional provisions to protect the interests of the Holders of the Notes as the Board of Directors of the Company shall reasonably consider necessary by reason of the foregoing. The provision of this Section 10.12 shall similarly apply to successive consolidations, mergers, share exchanges, sales or conveyances. Notwithstanding the foregoing, a distribution by the Company to all or substantially all holders of its Common Stock for which an adjustment to the Conversion Price or provision for conversion of the Notes may be made pursuant to Section 10.05 shall not be deemed to be a sale or conveyance of all or substantially all of the assets of the Company for purposes of this Section 10.12.

In the event the Company shall execute a supplemental indenture pursuant to this Section 10.12, the Company shall promptly file with the Trustee an Opinion of Counsel stating that such supplemental indenture is authorized or permitted by this Indenture and an Officer's Certificate briefly stating (a) the reasons therefor, (b) the kind

31

or amount of shares of stock or securities or property (including cash) receivable by Holders of the Notes upon the conversion of their Notes after any such reclassification, change, consolidation, merger, share exchange, sale or conveyance, (c) any adjustment to be made with respect thereto and (d) that all conditions precedent have been complied with.

Section 10.13    Trustee's Disclaimer.

The Trustee has no duty to determine when an adjustment under this Article 10 should be made, how it should be made or what such adjustment should be made, but may accept as conclusive evidence of the correctness thereof, and shall be protected in relying upon, the Officer's Certificate with respect thereto, which the Company is obligated to file with the Trustee pursuant to Section 10.10. The Trustee shall not be accountable for and makes no representation as to the validity or value of any securities or assets issued upon conversion of Notes, and the Trustee shall not be responsible for the Company's failure to comply with any provisions of this Article 10. Each Conversion Agent (other than the Company or an Affiliate of the Company) shall have the same protection under this Section 10.13 as the Trustee.

The Trustee shall not be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture executed pursuant to Section 10.12, but may accept as conclusive evidence of the correctness thereof, and shall be protected in relying upon, the Officer's Certificate with respect thereto, which the Company is obligated to file with the Trustee pursuant to Section 10.12 of this Indenture.

Section 10.14    Voluntary Reduction.

The Company from time to time may decrease the Conversion Price by any amount at any time for at least 20 days, so long as the decrease is irrevocable during such 20-day period. Whenever the Conversion Price is decreased, the Company shall mail to Holders of Notes and file with the Trustee and the Conversion Agent a notice of the decrease. The Company shall mail the notice at least 15 days before the date the decreased Conversion Price takes effect. The notice shall state the decreased Conversion Price and the period during which it will be in effect. A voluntary decrease of the Conversion Price does not change or adjust the Conversion Price otherwise in effect for purposes of Section 10.15.

Section 10.15    Conversion Value of Notes Tendered.

(a)    Subject to certain exceptions described in Sections 10.01(a)(3) and 10.01(a)(4), Holders tendering the Notes for conversion shall be entitled to receive, upon conversion of such Notes, cash and shares of Common Stock, the value of which (the "Conversion Value") shall be equal to the product of:

(1)    (A) the aggregate principal amount of Notes to be converted divided by 1,000 multiplied by (B) the Conversion Rate (including Additional Shares, if any); and

32

(2)    the average of the Common Stock Price for the five consecutive Trading Days (appropriately adjusted to take into account the occurrence during such period of stock splits and similar events) including and immediately following the second Trading Day following the day the Notes are tendered for conversion (the "Five Day Average Closing Stock Price").

(b)    Subject to certain exceptions described below and under Sections 10.01(a)(3) and 10.01(a)(4), the Company shall deliver the Conversion Value to converting holders as follows:

(1)    an amount in cash (the "Principal Return") equal to the lesser of (a) the aggregate Conversion Value of the Notes to be converted and (b) the aggregate principal amount of Notes to be converted as of the date tendered for conversion;

(2)    subject to the exceptions described below, if the aggregate Conversion Value of the Notes to be converted is greater than the aggregate Principal Return of the Notes to be converted, an amount in shares (the "Net Shares"), determined as set forth below, equal to the difference between such aggregate Conversion Value and such aggregate Principal Return (the "Net Share Amount"); and

(3)    an amount paid in cash, determined as set forth below, for any fractional shares of Common Stock.

The number of Net Shares to be paid shall be determined by dividing the Net Share Amount by the Five Day Average Closing Stock Price. Holders of Notes will not receive a fractional share upon conversion of a Note. Instead, the Holder will receive cash for the value of the fractional share. The cash payment for fractional shares shall be based on the Five Day Average Closing Stock Price.

The Conversion Value, Principal Return, number of Net Shares and Net Share Amount shall be determined by the Company at the end of the fifth consecutive Trading Day including and immediately following the second Trading Day after the day the Notes are tendered for conversion (the "Determination Date").

(c)    The Company shall pay the Principal Return and cash for fractional shares and deliver the Net Shares, if any, as promptly as practicable after the Conversion Date, but in no event later than four Business Days thereafter, subject to Section 3.02. Delivery of the Principal Return, Net Shares and cash in lieu of fractional shares shall be deemed to satisfy the Company's obligation to pay the principal amount of the Notes, as well as accrued interest payable on the Notes, except as described below. Accrued interest shall be deemed paid in full rather than canceled, extinguished or forfeited. The Company shall not adjust the Conversion Price to account for the accrued interest. Except as described in the following sentence, upon conversion of any Notes on a date that is not an interest payment date, Holders will not be entitled to receive any

33

additional cash payment representing accrued and unpaid interest for the period from the immediately preceding interest payment date to the Conversion Date with respect to the converted Notes and such interest will be deemed paid in full. Nonetheless, if Notes are converted after a regular record date and prior to the opening of business on the next interest payment date, including the date of maturity, Holders of such Notes, at the close of business on the next regular record date shall receive the interest payable on such Notes on the corresponding interest payment date notwithstanding the conversion. Such Notes, upon surrender for conversion, must be accompanied by funds equal to the amount of interest payable on that interest payment date on the Notes so converted.

(d)    If an Event of Default as set forth in Section 5.1(e) or (f) of the Original Indenture has occurred and is continuing, the Company may not pay cash upon conversion of any Notes (other than cash in lieu of fractional shares) and instead will make payment only through the delivery of shares of Common Stock, provided that Holders shall receive an amount in cash in lieu of any fractional shares. The number of shares of Common Stock to be delivered will be equal to (A) the aggregate principal amount of Notes to be converted divided by 1,000 multiplied by (B) the Conversion Rate.

(e)    Neither the Trustee nor the Conversion Agent has any duty to determine or calculate the Conversion Value, Principal Return, number of Net Shares, the Net Share Amount of any other computation required under this Article 10, all of which shall be determined by the Company (or the Bid Solicitation Agent, as the case may be) in accordance with the provisions of this Indenture and the Trustee and Conversion Agent shall not be under any responsibility to determine the correctness of any such determinations and/or calculations and may conclusively rely on the correctness thereof.

## ARTICLE XI

## SUBORDINATION

Section 11.01    Agreement to Subordinate.

The Company covenants and agrees, and each Holder of Notes by such Holder's acceptance thereof likewise covenants and agrees, that all Notes shall be issued subject to the provisions of this Article 11; and each Holder of a Note, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provisions. The payment by the Company of the principal of, premium, if any, interest and other Obligations with respect to all Notes issued hereunder shall, to the extent and in the manner hereinafter set forth, be subordinated and junior in right of payment to the prior payment in full in cash of principal of (and premium, if any), interest and all other Obligations with respect to all Senior Debt, whether outstanding at the date of this Third Supplemental Indenture or hereafter incurred; provided, however, that no provision of this Article 11 shall prevent the occurrence of any Default or Event of Default hereunder.

Section 11.02    Default On Senior Debt.

34

In the event and during the continuation of any default by the Company in the payment of principal, premium, if any, interest on or any other Obligation relating to, any Senior Debt when the same becomes due and payable (a "Payment Default"), whether at maturity or at a date fixed for prepayment or by declaration of acceleration or otherwise, and such Payment Default continues beyond the period of grace, if any, specified in the instrument evidencing such Senior Debt, then unless and until such Payment Default shall have been cured or waived or shall have ceased to exist or all Senior Debt and all Obligations relating thereto have been paid in full in cash (and in the event that the maturity of any Senior Debt has been accelerated because of a default, the holders of all Senior Debt outstanding have been paid in full in cash), then no direct or indirect payment or distribution (in cash, property, securities, by set-off or otherwise) shall be made or agreed to be made with respect to the principal of (including redemption payments), premium, if any, or interest on, or any other Obligations relating to, the Notes or in respect of any redemption, repayment, retirement, purchase or other acquisition of any of the Notes.

In the event that, notwithstanding the foregoing, any payment shall be received by the Trustee when such payment is prohibited by the preceding paragraph of this Section 11.02, such payment shall be held in trust for the benefit of, and shall be paid over or delivered to the holders of Senior Debt, or their respective representatives, or to the trustee or trustees under any indenture pursuant to which any of such Senior Debt may have been issued, as their respective interests may appear, but only to the extent that the holders of the Senior Debt (or their representative or representatives or a trustee) notify the Trustee in writing within 180 days of such payment of the amounts then due and owing to the holders of such Senior Debt and only the amounts specified in such notice to the Trustee shall be paid to the holders of such Senior Debt.

Section 11.03   Liquidation; Dissolution; Bankruptcy.

Upon any direct or indirect payment by or on behalf of the Company or direct or indirect distribution of assets of the Company of any kind or character, whether in cash, property or securities, by set-off or otherwise, to creditors upon any dissolution or winding up or liquidation or reorganization of the Company or assignment for the benefit of creditors or marshaling of assets, whether voluntary or involuntary, or in bankruptcy, insolvency, receivership or other proceedings, all amounts (including principal, premium, if any, and interest) due or to become due upon all Senior Debt shall first be paid in full in cash, or such payment thereof provided for in money in accordance with its terms, before any payment or distribution is made on account of the principal (and premium, if any), interest or any other Obligation relating to the Notes; and upon any such dissolution or winding up or liquidation or reorganization, any direct or indirect payment by the Company, or direct or indirect payment or distribution (in cash, property, securities, by set-off or otherwise) to which the Holders of the Notes or the Trustee would be entitled, except for the provisions of this Article 11, shall be paid by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other Person making such payment or distribution, or by the Holders of the Notes or by the Trustee under this Indenture if received by them or it, directly to the holders of Senior Debt (pro rata to such holders on the basis of the respective amounts of Senior Debt held by such holders, as

35

calculated by the Company) or their representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing such Senior Debt may have been issued, as their respective interests may appear, to the extent necessary to pay such Senior Debt in full, in cash, after giving effect to any concurrent payment or distribution to or for the holders of such Senior Debt, before any such payment or distribution is made to the Holders of Notes or to the Trustee.

In the event that, notwithstanding the foregoing, any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, by set-off or otherwise, prohibited by the foregoing, shall be received by the Trustee or the Holders of the Notes before all Senior Debt is paid in full in cash, or provision is made for such payment in cash in accordance with its terms, such payment or distribution shall be held in trust for the benefit of and shall be paid over or delivered to the holders of Senior Debt or their representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing such Senior Debt may have been issued, and their respective interests may appear, as calculated by the Company, for application to the payment of all Senior Debt remaining unpaid to the extent necessary to pay such Senior Debt in full in cash in accordance with its terms, after giving effect to any concurrent payment or distribution to or for the holders of such Senior Debt.

For purposes of this Article 11, the words, "cash, property or securities" shall not be deemed to include shares of stock of the Company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment, the payment of which is subordinated at least to the extent provided in this Article 11 with respect to the Notes to the payment of all Senior Debt which may at the time be outstanding; provided that (i) such Senior Debt is assumed by the new corporation, if any, resulting from any such reorganization or readjustment, and (ii) the rights of the holders of such Senior Debt are not, without the consent of such holders, altered by such reorganization or readjustment. The consolidation of the Company with, or the merger of the Company with or into, another Person or the liquidation or dissolution of the Company following the conveyance or transfer of its properties and assets substantially as an entirety to another Person upon the terms and conditions provided for in Article IV of the Original Indenture and subject to Section 5.01 shall not be deemed a dissolution, winding up, liquidation or reorganization for the purposes of this Section 11.03 if such other Person shall, as a part of such consolidation, merger, conveyance, or transfer, comply with the conditions stated in Article IV of the Original Indenture. Nothing in Section 11.02 or this Section 11.03 shall apply to claims of, or payments to, the Trustee under or pursuant to Section 6.7 of the Original Indenture.

Section 11.04    Subrogation.

Subject to the payment in full in cash of all Senior Debt, the rights of the Holders of the Notes shall be subrogated to the rights of the holders of such Senior Debt to receive payments or distributions of cash, property or securities of the Company, as the case may be, applicable to such Senior Debt until the principal of (and premium, if any) and interest on the Notes shall be paid in full; and, for the purposes of such subrogation,

36

no payments or distributions to the holders of such Senior Debt of any cash, property or securities to which the Holders of the Notes or the Trustee would be entitled except for the provisions of this Article 11, and no payment over pursuant to the provisions of this Article 11, to or for the benefit of the holders of such Senior Debt by Holders of the Notes or the Trustee, shall, as between the Company, its creditors other than holders of Senior Debt, and the Holders of the Notes, be deemed to be a payment by the Company to or on account of such Senior Debt. It is understood that the provisions of this Article 11 are and are intended solely for the purposes of defining the relative rights of the Holders of the Notes, on the one hand, and the holders of such Senior Debt on the other hand.

Nothing contained in this Article 11 or elsewhere in this Indenture or in the Notes is intended to or shall impair, as between the Company, its creditors other than the holders of Senior Debt, and the Holders of the Notes, the obligation of the Company, which is absolute and unconditional, to pay to the Holders of the Notes the principal of (and premium, if any) and interest on the Notes as and when the same shall become due and payable in accordance with their terms, or is intended to or shall affect the relative rights of the Holders of the Notes and creditors of the Company, as the case may be, other than the holders of Senior Debt, nor shall anything herein or therein prevent the Trustee or the Holder of any Note from exercising all remedies otherwise permitted by applicable law upon default under this Indenture, subject to the rights, if any, under this Article 11 of the holders of such Senior Debt in respect of cash, property or securities of the Company, as the case may be, received upon the exercise of any such remedy.

Upon any payment or distribution of assets of the Company referred to in this Article 11, the Trustee, subject to the provisions of Section 6.2 of the Original Indenture, and the Holders of the Notes, shall be entitled to rely upon any order or decree made by any court of competent jurisdiction in which such dissolution, winding up, liquidation or reorganization proceedings are pending, or a certificate of the receiver, trustee in bankruptcy, liquidation trustee, agent or other Person making such payment or distribution, delivered to the Trustee or to the Holders of the Notes, for the purposes of ascertaining the Persons entitled to participate in such distribution, the holders of the Senior Debt and other indebtedness of the Company, as the case may be, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article 11; provided that such court, trustee, receiver, agent or other Person has been apprised of, or the order, decree or certificate makes reference to, the provisions of this Article.

Section 11.05   Trustee To Effectuate Subordination.

Each Holder of Notes by such Holder's acceptance thereof authorizes and directs the Trustee on such Holder's behalf to take such action as may be necessary or appropriate to effectuate the subordination provided in this Article 11 and appoints the Trustee as such Holder's attorney-in-fact for any and all such purposes.

Section 11.06   Notice By The Company.

37

The Company shall give prompt written notice to the Trustee of any fact known to the Company which would prohibit the making of any payment of monies to or by the Trustee in respect of the Notes pursuant to the provisions of this Article 11. Notwithstanding the provisions of this Article 11 or any other provision of this Indenture, the Trustee shall not be charged with knowledge of the existence of any facts which would prohibit the making of any payment of monies to or by the Trustee in respect of the Notes pursuant to the provisions of this Article 11, unless and until the Trustee shall have received written notice thereof at the Corporate Trust Office of the Trustee from the Company or a holder or holders of Senior Debt or from any trustee therefor or representative thereof; and before the receipt of any such written notice, the Trustee, subject to the provisions of Section 6.2 of the Original Indenture, shall be entitled in all respects to assume that no such facts exist; provided, however, that if the Trustee shall not have received the notice provided for in this Section 11.06 at least two Business Days prior to the date upon which by the terms hereof any money may become payable for any purpose (including, without limitation, the payment of the principal of (and premium, if any) or interest on any Security), then, anything herein contained to the contrary notwithstanding, the Trustee shall have full power and authority to receive such money and to apply the same to the purposes for which they were received, and shall not be affected by any notice to the contrary which may be received by it within two Business Days prior to such date.

The Trustee shall be entitled to rely on the delivery to it of a written notice by a Person representing himself to be a holder of Senior Debt (or a trustee or representative on behalf of such holder) to establish that such notice has been given by a holder of such Senior Debt or a trustee or representative on behalf of any such holder or holders. In the event that the Trustee determines in good faith that further evidence is required with respect to the right of any Person as a holder of Senior Debt to participate in any payment or distribution pursuant to this Article 11, the Trustee may request such Person to furnish evidence to the reasonable satisfaction of the Trustee as to the amount of Senior Debt held by such Person, the extent to which such Person is entitled to participate in such payment or distribution and any other facts pertinent to the right of such Person under this Article 11, and, if such evidence is not furnished, the Trustee may defer any payment to such Person pending judicial determination as to the right of such Person to receive such payment or distribution.

Section 11.07   Rights Of The Trustee; Holders Of Senior Debt.

The Trustee in its individual capacity shall be entitled to all the rights set forth in this Article 11 in respect of any Senior Debt at any time held by it, to the same extent as any other holder of Senior Debt, and nothing in this Indenture shall deprive the Trustee of any of its rights as such holder. With respect to the holders of Senior Debt of the Company, the Trustee undertakes to perform or to observe only such of its covenants and obligations as are set forth in this Article 11, and no implied covenants or obligations with respect to the holders of such Senior Debt shall be read into this Indenture against the Trustee. The Trustee shall not be deemed to owe any fiduciary duty to the holders of such Senior Debt and, subject to the provisions of Section 6.2 of the Original Indenture, the Trustee shall not be liable to any holder of such Senior Debt if it shall pay over or

deliver to Holders of Notes, the Company or any other Person money or assets to which any holder of such Senior Debt shall be entitled by virtue of this Article 11 or otherwise.

Section 11.08   Subordination May Not Be Impaired.

(a)   No right of any present or future holder of any Senior Debt to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by the Company with the terms, provisions and covenants of this Indenture, regardless of any knowledge thereof which any such holder may have or otherwise be charged with.

(b)   Without in any way limiting the generality of the foregoing paragraph, the holders of Senior Debt may, at any time and from time to time, without the consent of or notice to the Trustee or the Holders of the Notes, without incurring responsibility to the Holders of the Notes and without impairing or releasing the subordination provided in this Article 11 or the obligations hereunder of the Holders of the Notes to the holders of Senior Debt, do any one or more of the following: (i) change the manner, place or terms of payment or extend the time of payment of, or renew or alter, such Senior Debt, or otherwise amend or supplement in any manner such Senior Debt or any instrument evidencing the same or any agreement under which such Senior Debt is outstanding; (ii) sell, exchange, release or otherwise deal with any property pledged, mortgaged or otherwise securing such Senior Debt; (iii) release any Person liable in any manner for the collection of such Senior Debt; and (iv) exercise or refrain from exercising any rights against the Company and any other Person.

(c)   The subordination provisions of this Article 11 shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Senior Debt is, pursuant to applicable law, avoided, recovered, or rescinded or must otherwise be restored or returned by any holder of Senior Debt, whether as a "voidable preference," "fraudulent conveyance," "fraudulent transfer," or otherwise, all as though such payment or performance had not been made.

(d)   If, upon any proceeding referred to in Section 11.03, the Trustee does not file a claim in such proceeding prior to fifteen Business Days before the expiration of the time to file such claim, the holders of Senior Debt or their agent may file such claim on behalf of the Holders of the Notes.

(e)   The subordination provisions contained herein are solely for the benefit of the holders from time to time of Senior Debt and their representatives, assignees and beneficiaries and may not be rescinded, canceled, amended or modified in any way other than, as to any holder of Senior Debt, pursuant to an amendment or modification that is permitted by the documentation relating to the Senior Debt applicable to such holder.

39

## ARTICLE XII

## MISCELLANEOUS

Section 12.01    No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 12.02    Severability.

In case any provision in this Third Supplemental Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 12.03    Table of Contents, Headings, etc

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

Section 12.04    Ratification Of Original Indentured

The Original Indenture, as supplemented by this Third Supplemental Indenture, is in all respects ratified and confirmed, and this Third Supplemental Indenture shall be deemed part of the Original Indenture in the manner and to the extent herein and therein provided.

Section 12.05    Trustee Not Responsible for Recitals.

The recitals herein contained are made by the Company and not by the Trustee, and the Trustee assumes no responsibility for the correctness thereof. The Trustee makes no representation as to the validity or sufficiency of this Third Supplemental Indenture.

Section 12.06    Performance by Trustee.

The Trustee, for itself and its successors accepts the trusts under the Original Indenture as amended by this Third Supplemental Indenture, and agrees to perform the same, but only upon the terms and conditions set forth in the Original Indenture, including, without limitation, the terms and provisions defining and limiting the liability and responsibility of the Trustee.

Section 12.07    Governing Law.

40

This Third Supplemental Indenture and each Note shall be governed by and construed in accordance with the laws of the State of New York.

[Signatures on following page]

41

SIGNATURES

Dated as of June 23, 2005

CALPINE CORPORATION

By: _L. D. Kelly_

Name:    ROBERT D. KELLY
Title:    EXECUTIVE VICE PRESIDENT


WILMINGTON TRUST COMPANY

By: _____

Name:
Title:


[SIGNATURE PAGE TO THE THIRD SUPPLEMENTAL INDENTURE]

SIGNATURES

Dated as of June 23, 2005

CALPINE CORPORATION

By: _____
Name:
Title:


WILMINGTON TRUST COMPANY

By: _____
Name:          James J. McGinley
Title:          Authorized Signer


[SIGNATURE PAGE TO THE THIRD SUPPLEMENTAL INDENTURE]

EXHIBIT A

[Face of Note]

THIS NOTE IS ISSUED IN GLOBAL FORM AND REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC") OR A NOMINEE THEREOF. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO., OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE REGISTERED FORM IN ACCORDANCE WITH THE TERMS HEREOF AND OF THE INDENTURE (AS DEFINED BELOW), THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY DTC TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

A-1

CALPINE CORPORATION

$[ ] PRINCIPAL AMOUNT OF
7.75% CONTINGENT CONVERTIBLE NOTES DUE 2015

principal amount $_____
CUSIP: 131347BN5
ISIN: US131347BN56

No. \_\_\_\_\_

Calpine Corporation, a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal amount in Dollars on June 1, 2015.

Interest Payment Dates: June 1 and December 1.

Record Dates: May 15 and November 15.

Additional provisions of this Note are set forth on the reverse hereof.

A-2

EXHIBIT A
PART 4

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officers:

Date: June 23, 2005

CALPINE CORPORATION

By:_____
  Name:
  Title:


By:_____
  Name:
  Title:


Dated:  June 23, 2005

TRUSTEE'S CERTIFICATE OF AUTHENTICATION:

Wilmington Trust Company, as Trustee, certifies that this is one of the Notes referred to in the Indenture.

By: _____        Dated: _____
        Authorized Officer

A-3

[Back of Note]

$[ ] principal amount of 7.75% Contingent Convertible Notes due 2015

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1) INTEREST. Calpine Corporation, a Delaware corporation (such corporation and its successors and assigns under the Indenture referred to below, being herein called the "Company"), promises to pay interest on the principal amount of this Note at 7.75% per annum from June 23, 2005 until maturity. The Company shall pay interest semi-annually in arrears on June 1 and December 1 of each year, commencing December 1, 2005, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date"), except as set forth in this paragraph. Interest on the Notes shall accrue (except as set forth in this paragraph) from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date. The Company shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 1% per annum in excess of the rate then in effect; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful. Interest shall be computed on the basis of a 360-day year of twelve 30-day months.

(2) METHOD OF PAYMENT. The Company shall pay interest on the Notes (except defaulted interest) to the Persons who are registered Holders of Notes at the close of business on the May 15 or November 15 next preceding the Interest Payment Date, even if such Notes are cancelled after such record date and on or before such Interest Payment Date, except as provided in Section 2.13 of the Original Indenture with respect to defaulted interest. Holders must surrender Notes to a Paying Agent to collect principal payments. The Notes shall be payable as to principal, premium, if any, and interest at the office or agency of the Company maintained for such purpose within or without the City and State of New York, or, at the option of the Company, payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders; provided that payment by wire transfer of immediately available funds shall be required with respect to principal of and interest, premium on, all Global Notes and all other Notes the Holders of which shall have provided wire transfer instructions to the Company or the Paying Agent. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

A-4

(3) PAYING AGENT, CONVERSION AGENT AND REGISTRAR. Initially, Wilmington Trust Company, the Trustee under the Indenture, shall act as Paying Agent, Conversion Agent and Registrar. The Company may change any Paying Agent, Conversion Agent or Registrar without prior notice to any Holder. The Company or any of its Subsidiaries may act in any such capacity.

(4) INDENTURE. The Company issued the Notes under an Indenture dated as of August 10, 2000, as supplemented by the First Supplemental Indenture dated as of September 28, 2000, the Second Supplemental Indenture dated as of September 30, 2004 and the Third Supplemental Indenture dated as of June 23, 2005 (as so supplemented, the "Indenture") between the Company and the Trustee. The Notes are unsecured general obligations of the Company. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (15 U.S. Code Sections 77aaa-77bbbb). The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

(5) MANDATORY REDEMPTION. The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

(6) REPURCHASE AT OPTION OF HOLDER. If a Change of Control occurs, each Holder of Notes shall have the right to require the Company to repurchase all or any part (equal to $1,000 principal amount or an integral multiple of $1,000) of that Holder's Notes pursuant to the terms set forth in the Third Supplemental Indenture. The Company shall deliver to each holder, that has delivered to the Paying Agent an irrevocable written notice of purchase and the Notes to be repurchased, a payment in cash equal the Change of Control Purchase Price as set forth in the Third Supplemental Indenture. Within 30 days following any Change of Control, the Company shall mail a notice to each Holder as required by the Third Supplemental Indenture.

(7) CONVERSION. Upon satisfaction of the conditions set forth in Section 10.01(a) of the Third Supplemental Indenture, a Holder of a Note may convert any portion of the principal amount of any Note that is an integral multiple of $1,000 into cash and fully paid and non-assessable shares (calculated as to each conversion to the nearest 1/1,000th of a share) of Common Stock in accordance with the provisions of Section 10.15 of the Third Supplemental Indenture. Such conversion right shall commence on the initial issuance date of the Notes and expire at the close of business on the Business Day immediately preceding the date of Maturity, subject, in the case of conversion of any Global Note, to any Applicable Procedures. The Conversion Price shall, as of the date of the Third Supplemental Indenture, initially be $4.00. The Conversion Rate shall, as of the date of the Third Supplemental Indenture, initially be 250.0000 per

A-5

$1,000 principal amount of Notes. The Conversion Rate will be adjusted under the circumstances specified in the Third Supplemental Indenture.

(8) SUBORDINATION. The Notes shall be subordinated to Senior Debt to the extent and in the manner provided for in the Third Supplemental Indenture.

(9) DENOMINATIONS, TRANSFER, EXCHANGE. The Notes are in registered form without coupons in denominations of $1,000 principal amount and integral multiples of $1,000. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Company need not exchange or register the transfer of any Notes during the period between a record date and the corresponding Interest Payment Date.

(10) DEFEASANCE. The Company may not terminate some or all of its obligations under the Notes and the Indenture as it pertains to the Notes.

(11) PERSONS DEEMED OWNERS. The registered Holder of a Note may be treated as its owner for all purposes, except that interest (other than defaulted interest) will be paid to the person that was the registered Holder on the relevant record date for such payment of interest.

(12) AMENDMENT, SUPPLEMENT AND WAIVER. Subject to certain exceptions, the Indenture or the Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the then outstanding Notes voting as a single class, and any existing default or compliance with any provision of the Notes or the Indenture (with respect to the Notes) may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes voting as a single class. Without the consent of any Holder of a Note, the Indenture or the Notes may be amended or supplemented as set forth in the Indenture.

(13) DEFAULTS AND REMEDIES. Events of Default shall be as set forth in the Indenture. If any Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare all the Notes to be due and payable. Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all outstanding Notes shall become due and payable without further action or notice. Holders may not enforce the Indenture or the Notes except as provided in the Indenture.

(14) TRUSTEE DEALINGS WITH COMPANY. Subject to the provisions of the Trust Indenture Act, the Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the

A-6

Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

(15) NO RECOURSE AGAINST OTHERS. A director, officer, employee or stockholder, of the Company as such, shall not have any liability for any obligations of the Company under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes.

(16) AUTHENTICATION. This Note shall not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(17) ABBREVIATIONS. Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(18) CUSIP NUMBERS. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of repurchase as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Company shall furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to:

Calpine Corporation
50 West San Fernando Street
San Jose, California 95113
Attention: Investor Relations

A-7

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:

_____
(Insert assignee's legal name)

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Note on the books of the Company.  The agent may substitute another to
act for him.

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*: _____

_____
* Participant in a recognized Signature Guarantee Medallion Program (or other signature
guarantor acceptable to the Trustee).

A-8

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 3.03 of the Third Supplemental Indenture, state the amount you elect to have purchased:

$ _____ principal amount

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.: _____

Signature Guarantee*: _____

_____
* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-9

## FORM OF CONVERSION NOTICE

TO:    CALPINE CORPORATION
       WILMINGTON TRUST COMPANY

The undersigned registered owner of the attached Note hereby irrevocably exercises the option to convert the attached Note, or the portion thereof below designated, into the Conversion Value in accordance with the terms of the Third Supplemental Indenture referred to in the attached Note. Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Third Supplemental Indenture.

PLEASE NOTE: You may only convert the attached Note upon satisfaction of one of the conditions set forth in Section 10.01 of the Third Supplemental Indenture. If you are converting the attached Note upon satisfaction of the condition set forth in Section 10.01(a)(3), please provide, with this Conversion Notice, reasonable evidence that the Trading Price of the Note is less than 95% of the product of (x) the Common Stock Price and (y) the Conversion Rate in effect.

Upon conversion of your Note, you will receive the Conversion Value in cash and Common Stock of the Company in accordance with Article 10 of the Third Supplemental Indenture.

To convert only part of the attached Note, state the principal amount to be converted (which must be $1,000 or an integral multiple of $1,000):

$ _____

If you want the stock certificate (if any) made out in another person's name, fill in the form below:

_____

_____
(Insert other person's social security or tax I.D. no.)

_____

_____

_____
(Print or type other person's name, address and zip code)

Date: _____    Signed: _____

(Sign exactly as your name appears on the other side of this Security. The Signature(s) must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Note registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Note registrar in

A-10

addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended)

Signature Guarantee: _____

A-11

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | principal amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
| --- | --- | --- | --- | --- |

_____
* This schedule should be included only if the Note is issued in global form.

A-12

Schedule A

Table of Additional Shares

| Effective Date | Stock Price ($) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3.10 | 3.50 | 4.00 | 4.50 | 5.00 | 5.50 | 6.00 | 6.50 | 7.00 | 7.50 | 10.00 | 15.00 | 20.00 |
| June 23, 2005 | 72.58 | 63.00 | 53.82 | 46.74 | 41.12 | 36.57 | 32.80 | 29.64 | 26.96 | 24.64 | 16.71 | 9.15 | 5.63 |
| June 1, 2006 | 72.00 | 62.44 | 53.27 | 46.23 | 40.65 | 36.12 | 32.40 | 29.26 | 26.59 | 24.31 | 16.46 | 9.00 | 5.53 |
| June 1, 2007 | 71.58 | 61.97 | 52.79 | 45.74 | 40.19 | 35.69 | 31.97 | 28.88 | 26.24 | 23.96 | 16.22 | 8.86 | 5.44 |
| June 1, 2008 | 71.11 | 61.35 | 52.15 | 45.10 | 39.55 | 35.08 | 31.41 | 28.32 | 25.73 | 23.50 | 15.86 | 8.66 | 5.32 |
| June 1, 2009 | 70.47 | 60.61 | 51.24 | 44.20 | 38.66 | 34.23 | 30.58 | 27.56 | 24.99 | 22.80 | 15.37 | 8.38 | 5.14 |
| June 1, 2010 | 69.67 | 59.56 | 50.05 | 42.87 | 37.38 | 32.95 | 29.39 | 26.39 | 23.92 | 21.78 | 14.62 | 7.96 | 4.89 |
| June 1, 2011 | 68.78 | 58.10 | 48.28 | 41.01 | 35.40 | 31.09 | 27.56 | 24.70 | 22.27 | 20.26 | 13.51 | 7.35 | 4.52 |
| June 1, 2012 | 67.70 | 56.09 | 45.63 | 38.13 | 32.51 | 28.15 | 24.79 | 22.03 | 19.79 | 17.90 | 11.81 | 6.42 | 3.97 |
| June 1, 2013 | 66.59 | 53.12 | 41.47 | 33.47 | 27.76 | 23.53 | 20.30 | 17.78 | 15.81 | 14.17 | 9.19 | 5.02 | 3.15 |
| June 1, 2014 | 65.05 | 47.84 | 33.91 | 25.03 | 19.24 | 15.38 | 12.68 | 10.74 | 9.30 | 8.20 | 5.24 | 2.96 | 1.90 |
| June 1, 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

A-13

Hearing Date: October 10, 2007 at 10:00 a.m. (EST)
Objection Deadline: October 1, 2007 at 12:00 p.m. (EST)

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| Calpine Corporation, et al., | ) | |
| | ) | Case No. 05-60200 (BRL) |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

**NOTICE OF DEBTORS' MOTION FOR APPROVAL OF STIPULATION WITH**
**CALPINE UNSECURED NOTEHOLDERS AND HSBC BANK USA, N.A., AS**
**INDENTURE TRUSTEE**

---

PLEASE TAKE NOTICE that at **10:00 a.m. (EST)** on **October 10, 2007**, the

Debtors in the above-captioned chapter 11 cases, by their respective counsel, shall appear before

the Honorable Judge Burton R. Lifland, at the United States Bankruptcy Court for the Southern

District of New York, Alexander Hamilton Custom House, One Bowling Green, New York,

New York 10004-1408, Room 623, or soon thereafter as counsel may be heard, and present

Debtors' Motion for Approval of Stipulation with the Calpine Unsecured Noteholders and HSBC

Bank USA, N.A., as Indenture Trustee.

PLEASE TAKE FURTHER NOTICE that the Hearing may be adjourned thereafter from

time to time without further notice.

PLEASE TAKE FURTHER NOTICE that objections to the Motion, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court and shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (in either case, with a hard copy delivered directly to Chambers) and shall be served upon: (a) counsel to the Debtors, Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022, Attn.: Edward O. Sassower, Esq.; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn.: Paul Schwartzberg, Esq., (c) counsel to the Unofficial Committee of Second Lien Debtholders, Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064, Attn.: Alan W. Kornberg, Andrew N. Rosenberg and Elizabeth R. McColm; (d) counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, Attn.: Michael S. Stamer, Philip C. Dublin and Alexis Freeman; (e) counsel to the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, Attn.: Gary Kaplan; (f) counsel for the CWT Noteholders, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281, Attn.: George A. Davis, and (g) counsel for HSBC Bank USA, N.A., as successor Indenture Trustee, Kelley, Drye & Warren LLP, 101 Park Avenue, New York, New York 10178, Attn.: David E. Retter; so as to be received no later than **October 1, 2007 at 12:00 p.m. (EST)**.

2

Dated: September 19, 2007      Respectfully submitted,
      New York, New York

        /s/ Edward O. Sassower
      Richard M. Cieri (RC 6062)
      Marc Kieselstein (admitted *pro hac vice*)
      David R. Seligman (admitted *pro hac vice*)
      Edward O. Sassower (ES 5823)
      KIRKLAND & ELLIS LLP
      Citigroup Center
      153 East 53rd Street
      New York, New York 10022-4611
      Telephone: (212) 446-4800
      Facsimile: (212) 446-4900

      Counsel for the Debtors

Hearing Date: October 10, 2007 at 10:00 a.m. (EST)
Objection Deadline: October 1, 2007 at 12:00 p.m. (EST)

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Calpine Corporation, et al., | ) |
| | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
| | ) |

**DEBTORS' MOTION FOR APPROVAL OF STIPULATION WITH**
**CALPINE UNSECURED NOTEHOLDERS AND HSBC BANK USA, N.A.,**
**AS INDENTURE TRUSTEE**

Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (the "Debtors") file this motion (the "Motion") seeking entry of an order, in substantially the form attached hereto as **Exhibit A**, approving the Debtors' entry into a stipulation (the "Unsecured Settlement Stipulation") with certain holders of the 7.875% Senior Notes due 2008, 7.75% Senior Notes due 2009, 8.625% Senior Notes due 2010, and 8.5% Senior Notes due 2011 (the "Calpine Unsecured Notes" and the referenced holders thereof, the "CWT Noteholders") and HSBC Bank USA, National Association, as successor indenture trustee on behalf of the holders of the Calpine Unsecured Notes ("HSBC"). In support of this Motion, the Debtors respectfully state as follows.

## INTRODUCTION

A critical focus of the Debtors at this stage of the Chapter 11 Cases is the timely and efficient resolution of disputed claims. These resolutions are important to the Debtors' reorganization efforts as they minimize the need to reserve equity or liquidity and assist the Debtors' continuing efforts to achieve a consensual plan of reorganization. To that end, the Debtors recently obtained the Court's approval of a stipulation resolving makewhole premium and damages claims asserted on behalf of the holders of the Second Lien Notes (as defined below).[1] Although confident that their objections to these claims would ultimately prevail, the Debtors determined that a settlement was in the best interests of the estates because of the risk and expense associated with resolving claims in litigation. This Court agreed with the Debtors' assessment and noted that that an adjudication of makewhole claims involved "severe risk." 8/8/07 Tr. at 37.

By this motion, the Debtors likewise seek approval of a Stipulation that resolves the makewhole premium and damages claims asserted by the holders of the Calpine Unsecured Notes and HSBC (the "Unsecured Makewhole Claims"). The Debtors have determined, in their business judgment, that the Unsecured Settlement Stipulation provides greater certainty with respect to their claims pool and is a necessary step towards confirmation of their plan of reorganization. Furthermore, absent the Unsecured Settlement Stipulation, the Debtors will likely become embroiled in protracted litigation with the holders of the Calpine Unsecured Notes and HSBC at great expense to the estates. Accordingly, and as set forth more fully below, the

---

[1] See Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 9019 Approving Amended Stipulation By and Among the Debtors and Debtors in Possession, the Unofficial Committee of Second Lien Debtholders and Wilmington Trust, and Indenture Trustee for the Second Lien Fixed Rate Notes, entered on August 8, 2007 [Docket No. 5567] (the "Second Lien Settlement Order").

Debtors submit that the Unsecured Settlement Stipulation is in the best interests of the Debtors' estates, is well above the lowest point in the range of reasonableness, and should be approved.

## JURISDICTION

This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

1.    **Calpine Unsecured Debt**

From 1996 to 2005, Calpine issued more than $5.0 billion of unsecured debt through a series of financings with various maturity dates and interest rates. Of that principal amount, approximately $3.8 billion is outstanding. More specifically, Calpine's non-convertible unsecured debt is comprised of seven tranches. Three of the tranches—the 10.5% Senior Notes due 2006, the 8.75% Senior Notes due 2007, and the 7.625% Senior Notes due 2006 (collectively, the "Unsecured Matured Notes")—matured during the pendency of the Chapter 11 Cases. Since lenders are not entitled to makewhole premiums or damages upon repayment of matured debt, the holders of the Unsecured Matured Notes will not receive claims under the Stipulation.[2] Unsecured Settlement Stipulation ¶ 2.

2.    **Calpine Unsecured Noteholders' Proofs of Claim**

On July 27, 2006, HSBC filed proofs of claim against Calpine, as successor indenture trustee for the 7.875% Senior Notes due 2008 ("Claim 2820"), the 7.75% Senior Notes

---

[2]    However, in settlement of the objection filed by U.S. Bank National Association ("U.S. Bank") as Indenture Trustee for the $180,000,000 10.5% Senior Notes due 2006 (the "10.5% Senior Notes"), the Debtors shall pay the reasonable fees and expenses incurred by U.S. Bank as indenture trustee for the 10.5% Senior Notes through and including the date of entry of an order approving this Stipulation. Stipulation ¶ 5.

3

due 2009 ("Claim 2824"), the 8.625% Senior Notes due 2010 and the 8.5% Senior Notes due 2011 ("Claim 2821"). Each proof of claim includes a claim for unliquidated amounts for "interest, liquidated damages, optional or mandatory redemptions, redemption premiums, redemption prices, expenses, indemnities, compensatory, secondary and/or punitive damages, and all compensation obligations," among other things. Attachment to Claims 2825, 2822, 2820, 2824 and 2821 ¶ 2.

### 3. Debtors' Makewhole Motion and the HSBC Objection

On June 8, 2007, the Debtors filed a motion[3] seeking an order allowing their limited objection to certain claims as a necessary predicate to the repayment of these claims in connection with the Debtors' proposed plan.[4] Specifically, the Debtors objected to the claims filed on behalf of the holders of the Calpine Unsecured Notes (the "Calpine Unsecured Noteholders") and the Second Lien Debt Claims (as defined in the Makewhole Motion) to the extent such claims include demands for makewhole premiums and/or contract damages upon the Debtors' repayment of this debt. Makewhole Motion at 2.

On June 29, 2007, HSBC filed an objection to the Debtors' Makewhole Motion[5] asserting that the holders of the 7.875% Senior Notes due 2008 (the "2008 Notes") and the

---

[3] See Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims, filed on June 8, 2007 [Docket No. 4880] (the "Makewhole Motion").

[4] See Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, filed on June 20, 2007 [Docket No. 5015], as amended by the Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, filed on August 27, 2007 [Docket No. 5704] (the "Plan"); Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, filed on June 20, 2007 [Docket No. 5016], as amended by the First Amended Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, filed on August 27, 2007 [Docket No. 5702] (the "Disclosure Statement").

[5] See Objection of HSBC Bank USA, N.A., as Indenture Trustee to Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims [Docket No. 5137] (the "HSBC Objection").

4

7.75% Senior Notes due 2009 (the "2009 Notes") are entitled to contract damages in connection with the Debtors' proposed repayment of such Notes. In addition, HSBC argued that the holders of the 8.625% Senior Notes due 2010 (the "2010 Notes") and the 8.5% Senior Notes due 2011 (the "2011 Notes") are entitled to makewhole premiums upon the Debtors' repayment pursuant to the terms of the governing indenture.[6] On July 10, 2007, the Debtors and HSBC, as successor indenture trustee for the Calpine Unsecured Notes, entered into a stipulation pursuant to which the parties agreed that if the Court were to hold that the Calpine Unsecured Noteholders are entitled to claims for damages and/or makewhole premiums, such claims would total approximately $109 million.[7] More specifically, the Unsecured Makewhole Claims asserted by the Calpine Unsecured Noteholders are as follows:

| Notes | Asserted Damages Claim | Asserted Premium Claim |
|---|---|---|
| 7.875% Senior Notes due 2008 | $1,400,000 | — |
| 7.75% Senior Notes due 2009 | $5,900,000 | — |
| 8.625% Senior Notes due 2010 | — | $36,500,000 |
| 8.5% Senior Notes due 2011 | — | $64,900,000 |

### 4.    The Settlement of the Second Lien Makewhole Claims

Prior to the scheduled hearing on the Makewhole Motion, the Debtors were able to reach a settlement of the makewhole premium and/or damages claims ranging from approximately $163 million to $288 million that were asserted by the holders of the Second Lien

---

[6]    HSBC submitted with its objection the expert affidavit of Bruce Kaufman, a Principal of Compass Advisors LLP, in which Mr. Kaufman calculated the makewhole premiums due to the Calpine Unsecured Noteholders, and subsequently submitted a supplemental expert affidavit on July 10, 2007 in which Mr. Kaufman amended his calculations. See Supplemental Affidavit of Bruce Kaufman in Support of the Objection of HSBC Bank USA, N.A., as Indenture Trustee to Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims [Docket No. 5232].

[7]    See Stipulation Regarding Certain Calculations Under the Indentures and Related Documents to the Unsecured Debt [Docket No. 5240].

Notes[8] (the "Second Lien Makewhole Claims"). Pursuant to the terms of this settlement, certain holders of the Second Lien Notes received (a) an allowed secured claim in the aggregate amount of $60 million, and (b) an allowed general unsecured claim in the aggregate amount of $40 million.[9] Second Lien Settlement Stipulation ¶ 1. On August 8, 2007, the Court overruled an objection from the Official Committee of Equity Security Holders and authorized the Debtors to enter into the Second Lien Settlement Stipulation. Specifically, the Court found that the settlement of the Second Lien Makewhole Claims was "fair and equitable, falls well within the range of reasonableness and is in the best interest of the debtors and their estates." 8/8/07 Tr. at 39-40.

5.    **The Unsecured Settlement Stipulation**

The Debtors subsequently entered into negotiations with HSBC and the CWT Noteholders in an attempt to resolve the Unsecured Makewhole Claims. The results of these negotiations are embodied in the terms and conditions of the Unsecured Settlement Stipulation, attached hereto as **Exhibit B**. Under the Unsecured Settlement Stipulation, in full satisfaction of the Unsecured Makewhole Claims, HSBC, as successor indenture trustee for the Calpine Unsecured Noteholders, shall receive allowed general unsecured claims in the aggregate amount

---

[8]   The Second Lien Notes are comprised of the (a) $500,000,000 Second Priority Senior Secured Floating Rate Notes Due 2007, issued by Calpine pursuant to a certain Indenture, dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as trustee, (b) $1,150,000,000 8.50% Second Priority Senior Secured Notes Due 2010, issued by Calpine pursuant to a certain Indenture, dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as trustee, (c) $900,000,000 Second Priority 8.75% Senior Secured Notes due 2013, issued by Calpine pursuant to a certain Indenture, dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as trustee, and (d) $400,000,000 9.875% Second Priority Senior Secured Notes due 2011, issued by Calpine pursuant to a certain Indenture, dated as of November 18, 2003, between Calpine and Wilmington Trust Company, as trustee.

[9]   See Exhibit A to the Second Lien Settlement Order (the "Second Lien Settlement Stipulation").

6

of $54,350,000 (the "Allowed Unsecured Claims").[10]  Unsecured Settlement Stipulation ¶ 1.  In addition, the Debtors shall pay the reasonable professional fees and expenses of Cadwalader, Wickersham & Taft LLP, as counsel to the CWT Noteholders through and including the date of entry of an order approving the Unsecured Settlement Stipulation.  The Debtors shall also pay the reasonable fees and expenses of HSBC, as successor indenture trustee for the Calpine Unsecured Notes, and the reasonable professional fees and expenses incurred by HSBC, as successor indenture trustee for the Calpine Unsecured Notes, in connection with the Debtors' Makewhole Motion through and including the date of entry of an order approving the Unsecured Settlement Stipulation.

### RELIEF REQUESTED

The Debtors respectfully request that this Court enter an order approving the Debtors' entry into the Stipulation with the Calpine Unsecured Noteholders and HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Noteholders, pursuant to section 105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure.

### BASIS FOR RELIEF

I.    **The Stipulation Is A Fair And Reasonable Compromise Under Bankruptcy Rule 9019.**

The Stipulation between the Debtors, the Calpine Unsecured Noteholders, and HSBC represents a settlement of the Unsecured Makewhole Claims and is, therefore, subject to approval by the Court under Bankruptcy Rule 9019(a).  Compromises and settlements are "a normal part of the process of reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. Los Angeles

---

[10]  The allocation of the Allowed Unsecured Claim is specified in paragraph 2 of the Unsecured Settlement
(Continued...)

7

Lumber Prods. Co., 308 U.S. 106, 130 (1939)).  The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 122-23 (S.D.N.Y. 1994).  In exercising its discretion, the bankruptcy court must make an independent determination that the settlement is fair and reasonable.  Id. at 122.  The court may consider the opinions of the debtor in possession and its counsel that the settlement is fair and reasonable.  Id.; see also In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993).  This discretion should be exercised by the bankruptcy court "in light of the general public policy favoring settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); Shugrue, 165 B.R. at 123 ("the general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above").

To approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983) (citing Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972)); see also Purofied Down Prods., 150 B.R. at 522 ("the court need not conduct a 'mini-trial' to determine the merits of the underlying [dispute]").  In deciding whether a particular settlement falls within the "range of reasonableness," courts consider the following "Iridium" factors:

| | |
|---|---|
| (A) | the balance between the litigation's possibility of success and the settlement's future benefits; |
| (B) | the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay;" |

---

Stipulation.

8

| (C) | the paramount interests of creditors; |
| (D) | whether other parties in interest support the settlement; |
| (E) | the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing; |
| (F) | "the extent to which the settlement is the product of arm's length bargaining." |

Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2002) (quoting In re Worldcom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).[11]

The Debtors submit that the Unsecured Settlement Stipulation represents a fair and equitable settlement that falls well within the range of reasonableness. Moreover, the Unsecured Settlement Stipulation will enable the Debtors to resolve claims in this case without the need for protracted litigation. Because the proposed Stipulation satisfies the Second Circuit's standard for approval of a compromise, the Debtors should be authorized to enter into the Unsecured Settlement Stipulation pursuant to Bankruptcy Rule 9019.

A.    The Probability of Success in the Litigation

The Debtors continue to believe that their objection to the Unsecured Makewhole Claims is correct as a matter of law and thus would be allowed. But the Debtors also recognize that resolving disputes through litigation always involves some measure of uncertainty and expense---and this likewise holds true in the present circumstances.

---

[11] One additional factor enumerated by the Second Circuit is "the nature and breadth of releases to be obtained by officers and directors." In re Iridium Operating LLC, 478 F.3d at 462. But this factor is not applicable here because the Unsecured Settlement Stipulation is silent as to releases.

9

The Debtors have objected to the Unsecured Makewhole Claims to the extent they include demands for contract damages or prepayment premiums. Makewhole Motion at 2. As an initial matter, the Debtors argue that the commencement of their Chapter 11 Cases accelerated the Calpine Unsecured Notes—pursuant to the terms of the governing indentures and the Bankruptcy Code—thus making the Notes due and payable immediately. Id. at 22. Second, the operative acceleration clauses in these same governing indentures do not provide for a prepayment premium upon acceleration, and thus the Bankruptcy Code plainly precludes the Calpine Unsecured Noteholders from recovering a makewhole premium. Id. Third, because the Debtors propose to repay the accelerated Calpine Unsecured Notes precisely according to the terms of the indentures, the Noteholders cannot credibly allege any "breach" of the parties' contracts that gives rise to damages under federal or state law. Id. at 24.

Further, the Debtors assert there is only one circumstance where the Calpine Unsecured Noteholders are entitled to a makewhole premium—and that is an "optional" or "voluntary" prepayment of unaccelerated debt. Makewhole Motion at 24. This circumstance does not apply here because the Debtors' repayment of the accelerated Notes is not optional, but required under the Bankruptcy Code as part of the Debtors' plan of reorganization. Moreover, the Debtors contend that as a matter of law, unsecured creditors are not entitled to makewhole premiums under the Bankruptcy Code. Id. at 20-21. A makewhole premium is considered a "charge" and under section 506(b), a creditor can only recover "fees, costs and charges" to the extent that creditor is oversecured. By definition, unsecured creditors are not oversecured and thus, cannot recover "charges" in the form of a makewhole premium. Id.

In response, HSBC asserts that the Calpine Unsecured Noteholders are entitled to contract damages and makewhole premiums upon the Debtors' proposed repayment of their

10

prepetition debt. HSBC Objection ¶ 2. More specifically, HSBC analogizes its claims to the CalGen Repayment Opinion,[12] where the Court awarded unsecured damages claims to the CalGen Secured Lenders for their "dashed expectations" upon the Debtors' repayment of debt that was subject to a no-call provision—a prepayment prohibition that purports to bar repayment. Id. ¶ 17-21. Because the 2008 and 2009 Notes contain similar no-call provisions, HSBC argues that the Calpine Unsecured Noteholders are entitled to damages claims under the CalGen Repayment Opinion. Id. ¶ 20.

As for the 2010 and 2011 Notes, HSBC asserts that the Calpine Unsecured Noteholders are entitled to a prepayment premium upon repayment of these Notes pursuant to the terms of the governing indentures. Id. ¶ 2. HSBC argues that even if the debt were held to have been accelerated, "the automatic acceleration of a debt upon the filing of a bankruptcy case is not the kind of acceleration that eliminates the right to a prepayment premium." Id. ¶ 24 (citing In re Skyler Ridge, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987)). Therefore, HSBC contends that its Noteholders are entitled to recover makewhole premiums because "the creditor's expectation was to the date of maturity of their notes." Id. Furthermore, HSBC contends that section 502—not section 506(b)—governs the allowance of claims. Specifically, HSBC argues that Section 506(b) governs the treatment of fees, costs and other charges for oversecured creditors and has nothing to do with the allowance of unsecured claims for unsecured creditors. Thus, section 506(b) does not bar the Calpine Unsecured Noteholders' makewhole claims.

---

[12] See Memorandum Decision and Order Granting, in Part, Debtors' Motion for Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims, entered March 5, 2007 [Docket No. 3875] (the "CalGen Repayment Opinion").

Given the multitude of arguments by both sides, many of which are based on conflicting readings of the CalGen Repayment Opinion's damages award,[13] the Debtors recognize there is a risk their Objection may not defeat the Unsecured Makewhole Claims. See Hibbard Brown, 217 B.R. at 46 (approving settlement after finding that the multiple legal issues presented were "complex" and carried "no guarantee of success"). Indeed, because the Court's CalGen Opinion is subject to appeal, the Debtors' ability to predict the probability of success in this litigation is even further diminished. Accordingly, the Debtors submit that settlement in these circumstances is appropriate.

B.     The Likelihood of Complex and Protracted Litigation

The Debtors are currently embroiled in two other disputes regarding makewhole claims (on appeal with the CalGen Lenders and in an adversary proceeding with the First Lien Trustee) that have lasted several months and could continue for several years. Therefore, it is likely that this litigation could also span for several months (or years), requiring significant time and resources of the Debtors. Given that the Debtors have already participated in several depositions and produced a sizable volume of documents in connection with the Makewhole Motion, the proposed Stipulation is a timely, cost-effective resolution of this dispute.

Moreover, if the Debtors did not prevail, the consequences could be approximately $109 million in makewhole premium and damages claims. These claims would increase the Debtors' payment under the Plan and potentially have an impact on distributions to stakeholders, particularly equity holders. Pursuant to the Unsecured Settlement Stipulation,

---

13    The Debtors maintain that the no-call provisions in the CalGen Indentures were unenforceable and thus, did not give rise to damages for breach of contract upon repayment of the CalGen Secured Debt. Accordingly, this issue is currently on appeal.

however, the Debtors will replace these claims with an unsecured claim for $54,350,000. Because of the risks associated with litigation regarding the Unsecured Makewhole Claims and the potential for $109 million in claims, the Debtors believe a settlement of the Unsecured Makewhole Claims is in the best interests of the estates.

      C.      **The Paramount Interests of Creditors**

      The settlement of the Unsecured Makewhole Claims is beneficial to the Debtors' creditors for several reasons. First, the Unsecured Settlement Stipulation will provide greater clarity with respect to the Debtors' claims pool and expedite distributions to holders of allowed claims. Second, a resolution of the Unsecured Makewhole Claims will assist the Debtors' efforts to realize a consensual plan of reorganization. A consensual plan is important to the creditors in this case because it will expedite the Debtors' emergence from Chapter 11. Lastly, the Debtors' creditors necessarily would incur some of the negative consequences of any ongoing litigation with HSBC and the Calpine Unsecured Noteholders, including shouldering their share of the burdensome costs and expenses to the estates. The proposed Stipulation is therefore in the best interests of the Debtors' creditors.

**D.**      **The Support of Other Parties**

      The Debtors believe the paramount interests of all parties in the Chapter 11 Cases are best served by approval of the Unsecured Settlement Stipulation. The Official Committee of Unsecured Creditors has already indicated that it does not oppose the proposed settlement. In addition, the Debtors expect other parties in interest will support after reviewing the Unsecured Settlement Stipulation. As for the last two _Iridium_ factors, the Debtors assert that the settlement of the Unsecured Makewhole Claims was negotiated and proposed by the parties without collusion, in good faith and from arms' length bargaining positions. Moreover, this Court has a

13

wealth of experience and knowledge with regard to the issued presented in this Motion and indeed, recently approved a similar Stipulation involving the same types of claims.

In sum, the Debtors have determined, exercising their sound business judgment, that the Unsecured Settlement Stipulation resolving the HSBC Objection is fair, equitable and eminently reasonable. Moreover, the timely resolution of the Unsecured Makewhole Claims is in the best interests of the Debtors' estates and its creditors. The Debtors therefore submit that the Stipulation falls well above the lowest point in the range of reasonableness. Accordingly, the Debtors respectfully request that the Court approve the Unsecured Settlement Stipulation pursuant to Bankruptcy Rule 9019.

## MEMORANDUM OF LAW

This Motion includes citations to the applicable authorities and a discussion of their application to this Motion. Accordingly, the Debtors respectfully submit that such citations and discussion satisfy the requirement that the Debtors submit a separate memorandum of law in support of this Motion pursuant to Rule 9013-1 of the Local Rules.

## NOTICE

Notice of this Motion has been provided to: (a) the United States Trustee for the Southern District of New York; (b) counsel to the Creditors' Committee; (c) counsel to the administrative agents for the Debtors' prepetition secured lenders; (d) counsel to the ad hoc committees; (e) the indenture trustees pursuant to the Debtors' secured indentures; (f) counsel to the Debtors' postpetition lenders; (g) the Securities and Exchange Commission; (h) the Internal Revenue Service; (i) the United States Department of Justice; (j) counsel to the Equity Committee; and (k) all parties entitled who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or

14

further notice is required. A copy of the Motion is also available on the website of the Debtors'

notice and claims agent, Kurtzman Carson Consultants, at http://www.kccllc.net/calpine.

Except as otherwise noted herein, no prior application for the relief requested

herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request an entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: September 19, 2007            Respectfully submitted,
       New York, New York

                                     /s/ Edward O. Sassower

                                 Richard M. Cieri (RC 6062)
                                 Marc Kieselstein (admitted *pro hac vice*)
                                 David R. Seligman (admitted *pro hac vice*)
                                 Edward O. Sassower (ES 5823)
                                 KIRKLAND & ELLIS LLP
                                 Citigroup Center
                                 153 East 53rd Street
                                 New York, New York  10022-4611
                                 Telephone:  (212) 446-4800
                                 Facsimile:  (212) 446-4900

                                 Counsel for the Debtors

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Calpine Corporation, et al., | ) |
| | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
| | ) |

**ORDER PURSUANT TO 11 U.S.C. § 105(a) AND BANKRUPTCY RULE 9019
APPROVING STIPULATION RESOLVING OBJECTIONS BY INDENTURE TRUSTEE
FOR THE CALPINE UNSECURED NOTES AND CALPINE UNSECURED
NOTEHOLDERS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER ALLOWING
LIMITED OBJECTION TO CLAIMS AND DETERMINING VALUE OF CLAIMS**

This matter is before the Court upon the motion (the "9019 Motion"), [1] dated

September 19, 2007 of Calpine Corporation ("Calpine") and its affiliated Debtors and Debtors in

Possession (collectively, including Calpine, the "Debtors") in the above-captioned chapter 11

cases (the "Chapter 11 Cases") for entry of an order pursuant to 11 U.S.C. §§ 105(a) and 363 and

Bankruptcy Rule 9019 authorizing and approving the Stipulation Resolving Objections by the

Indenture Trustee for the Calpine Unsecured Notes and the Calpine Unsecured Noteholders to

Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining

Value of Claims, dated as of September 19, 2007, by and among (i) the Debtors, (ii) the CWT

Noteholders, and (iii) HSBC, as successor indenture trustee for the Calpine Unsecured Notes (the

"Stipulation"), a copy of which is attached hereto as **Exhibit A**; and the Court having reviewed

and considered the 9019 Motion, the settlement contained in the Stipulation (the "Settlement"),

and the arguments of counsel made, and the evidence proffered or adduced at the hearing on the

9019 Motion held on October 10, 2007 (the "Hearing"), and upon all the proceedings heretofore

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the 9019 Motion.

held in the Chapter 11 Cases; and it appearing that the relief requested in the 9019 Motion is in the best interests of the Debtors, their estates and creditors and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction over the 9019 Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).  Venue of the Chapter 11 Cases and the 9019 Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the 9019 Motion are section 105(a) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.    As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the hearing on the 9019 Motion, (i) proper, timely, adequate and sufficient notice of the 9019 Motion and the Hearing has been provided in accordance with section 102(l) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9014 and 9019, (ii) such notice was good and sufficient, and appropriate under the circumstances of these cases, and (iii) no other or further notice of the 9019 Motion is or shall be required.

D.    A reasonable opportunity to object or be heard with respect to the 9019 Motion and the relief requested therein has been afforded to all interested persons and entities, including: (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel to

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052, as made applicable herein by Fed. R. Bankr. P. 9014.

the CWT Noteholders, (iii) counsel to HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Notes, (iv) counsel to U.S. Bank, as indenture trustee on behalf of the 10.5% Senior Notes, (v) counsel to the Official Committee of Unsecured Creditors, and (vi) counsel to the Official Committee of Equity Security Holders.

E.    The Settlement represents a fair, prudent and reasonable compromise of the controversies resolved by the Stipulation and is in the best interests of the Debtors, their estates and creditors taking into account, among other things, (a) the probability of success on the claims being released as part of the Settlement, (b) the complexity of the litigation involved with respect to the claims being released as part of the Settlement and (c) the paramount interest of the creditors and a proper deference to their views in respect of the Settlement.

F.    The Debtors have demonstrated both (i) good, sufficient, and sound business purpose and justification, and (ii) compelling circumstances for entering into the Stipulation prior to, and outside of, a plan of reorganization, and the Stipulation pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 is the best alternative for the Debtors, their respective estates and creditors.

G.    The Stipulation was negotiated, proposed and entered into by the parties without collusion, in good faith and from arms' length bargaining positions.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    The 9019 Motion is granted in all respects.

2.    In the event of any inconsistency between the 9019 Motion or this Order and the Stipulation, the Stipulation shall control.

3.     All objections, including without limitation any objection of any Calpine Unsecured Noteholder to the Stipulation, or any portion thereof, including the entry of HSBC, as successor indenture trustee for the Calpine Unsecured Notes, into the Stipulation, that have not been withdrawn, waived, settled, or specifically addressed in this Order and all reservations of rights included in such objections, are hereby overruled on the merits. Accordingly, HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Notes, is authorized to settle the claims on behalf of the Calpine Unsecured Noteholders as provided in the Stipulation and shall have no liability to any Calpine Unsecured Noteholder as a result of its entry into the Stipulation or settlement of the claims thereunder.

4.     The Calpine Unsecured Noteholders and HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Notes, retain any and all rights that they now have or may hereafter have against other parties or property under or with respect to subordination provisions, including, but not limited to, those contained in the 7.750% Contingent Senior Convertible Notes due June 1, 2015 issued by Calpine other than with respect to the Unsecured Makewhole Claims. Nothing in this Order shall in any way prejudice or preclude the Debtors or the Official Committee of Unsecured Creditors (the "Creditors' Committee") from supporting or opposing the collection of additional amounts from other parties.

5.     The Debtors' entry into the Stipulation is authorized and ratified pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019, and the Debtors are hereby authorized, empowered and directed to enter into and perform, and consummate the transactions, under the Stipulation. All the terms of the Stipulation, including, but not limited to, the allocation and distribution of the Allowed Unsecured Claims are hereby approved and are binding in all respects on all parties in interest in these cases as if set forth herein, including the

4

Debtors, the Creditors' Committee, the Calpine Unsecured Noteholders and HSBC, as successor indenture trustee for the Calpine Unsecured Notes.

6.    The Debtors are authorized, empowered and directed to take any and all actions and execute any and all documents and instruments that are reasonably necessary or appropriate to implement and effectuate the Stipulation.

7.    In furtherance of this Order, the Stipulation and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court; provided such modification, amendment or supplement is not material.

8.    As provided by Bankruptcy Rule 6004(g), and notwithstanding Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately upon entry.

9.    This Stipulation may be executed by facsimile or pdf in one or more counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same document.

10.    Notwithstanding section 502(j) of the Bankruptcy Code, no order of this Court and nothing contained in any chapter 11 plan confirmed in these cases or any order of this Court confirming such plan or otherwise shall conflict with or derogate from the provisions of the Stipulation, including without limitation, allowance of the Allowed Unsecured Claims in the amounts and on the terms set forth therein. In addition, the Stipulation shall be binding upon any trustee appointed in these cases or in a subsequent chapter 7 case(s).

11.    This Court retains jurisdiction to interpret, enforce and implement the Settlement, including the Stipulation, and all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to resolve any disputes, controversy or claims arising under or related to the Stipulation, and interpret, implement, and enforce the provisions of this Order.

New York, New York
Dated: ___ ___ ___, 2007

_____
United States Bankruptcy Judge

6

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| Calpine Corporation, et al., | ) Chapter 11 |
|  | ) |
| Debtors. | ) Case No. 05-60200 (BRL) |
|  | ) Jointly Administered |
|  | ) |

STIPULATION RESOLVING OBJECTIONS BY
THE INDENTURE TRUSTEE FOR THE CALPINE UNSECURED NOTES AND
CALPINE UNSECURED NOTEHOLDERS TO DEBTORS' MOTION FOR ENTRY OF
AN ORDER ALLOWING LIMITED OBJECTION TO CLAIMS AND DETERMINING
VALUE OF CLAIMS

Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively, including Calpine, the "Debtors"), HSBC Bank USA, National Association ("HSBC"), as successor indenture trustee for the holders of the 7.875% Senior Notes due 2008, 7.75% Senior Notes due 2009, 8.625% Senior Notes due 2010 and 8.5% Senior Notes due 2011 (the "Calpine Unsecured Notes" and the referenced holders thereof, the "Calpine Unsecured Noteholders") and certain holders of the 7.875% Senior Notes due 2008 (the "CWT Noteholders"), by and through their respective attorneys, have agreed upon this stipulation (the "Stipulation") resolving the Objection of HSBC to the Debtors' Motion For Entry Of An Order Allowing Limited Objection To Claims And Determining Value Of Claims (the "Objection"). The Stipulation states as follows:

## RECITALS

WHEREAS, beginning on or about December 20, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, on July 27, 2006, HSBC filed proofs of claim against Calpine as successor indenture trustee for the Calpine Unsecured Notes for approximately $1.8 billion (the "Unsecured Claims"). Each proof of claim asserts a claim for unliquidated amounts for interest, liquidated damages, redemption premiums, expenses, indemnities, compensatory, secondary and punitive damages, and all compensation obligations, among other things. See Addendum to Proofs of Claim 2825, 2822, 2820 and 2821 ¶ 2;

WHEREAS, on January 30, 2007, the Debtors and HSBC entered into a Stipulation and Order Resolving Claim Numbers 2820, 2821, 2822, 2823, 2824 and 2825 (Docket No. 3501) (the "January Claims Stipulation"), pursuant to which the parties stipulated to certain amounts for the outstanding principal and prepetition interest of the claims asserted by HSBC on behalf of certain creditors, including the holders of the Calpine Unsecured Notes (the "Calpine Unsecured Noteholders").

WHEREAS, on June 8, 2007, the Debtors filed a Motion seeking Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims (Docket No. 4880) (the "Makewhole Motion")[1] objecting to, among other things, the Unsecured Claims to the extent they seek amounts in excess of principal and accrued interest, including, specifically, the makewhole premium and damages claims asserted by HSBC on behalf of the Calpine Unsecured Noteholders;

WHEREAS, on June 29, 2007, HSBC filed its Objection (Docket No. 5137) and submitted therewith the expert affidavit of Bruce Kaufman, a Principal of Compass Advisors LLP, in which Mr. Kaufman calculated the makewhole premiums due to the Calpine Unsecured

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meaning set forth for such terms in the Makewhole Motion.

Noteholders, and subsequently submitted a supplemental expert affidavit on July 10, 2007 in which Mr. Kaufman amended his calculations (Docket No. 5232);

WHEREAS, on July 9, 2007, the Debtors filed the Debtors' Consolidated Reply to Objections to Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims (Docket No. 5222);

WHEREAS, on July 10, 2007, the Debtors and HSBC entered into a Stipulation Regarding Certain Calculations Under the Indentures and Related Documents to the Unsecured Debt (Docket No. 5240), pursuant to which the parties agreed that if the Court were to hold that the Calpine Unsecured Noteholders are entitled to claims for damages and/or makewhole premiums and any and all claims related to makewhole provisions, prepayment provisions or claim for contract damages allegedly incurred as a result of payment prior to the original scheduled maturity date (collectively, the "Makewhole Claims"), then such Makewhole Claims would total approximately $109 million; and

WHEREAS, the Debtors, HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Noteholders, and the CWT Noteholders entered into negotiations and have reached a settlement in respect of the Makewhole Claims.

## STIPULATION

IT IS THEREFORE AGREED, AND UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED AS FOLLOWS:

1.    In full settlement and satisfaction against the Debtors and their affiliates of the Makewhole Claims, HSBC, as indenture trustee for the Calpine Unsecured Notes, is hereby granted allowed general unsecured claims against Calpine in the aggregate amount of $54,350,000 (the "Allowed Unsecured Claims").

2.    The Allowed Unsecured Claims shall be allocated as follows:

3

| Note | Allowed Unsecured Claim |
|---|---|
| 7.875% Senior Notes due 2008 | $700,000 |
| 7.75% Senior Notes due 2009 | $2,950,000 |
| 8.625% Senior Notes due 2010 | $18,250,000 |
| 8.5% Senior Notes due 2011 | $32,450,000 |

3.    In addition, the Debtors shall pay the reasonable fees and expenses of HSBC, as successor indenture trustee for the Calpine Unsecured Notes, and the professional fees and expenses incurred by HSBC, as successor indenture trustee for the Calpine Unsecured Notes, in connection with the Makewhole Motion through and including the date of entry of an order approving this Stipulation.

4.    The Debtors shall also pay the reasonable professional fees and expenses of Cadwalader, Wickersham & Taft LLP, as counsel to the CWT Noteholders from June 2007 through and including the date of entry of an order approving this Stipulation.

5.    In settlement of the objection to the Makewhole Motion filed by U.S. Bank National Association ("U.S. Bank") as Indenture Trustee for that portion of the Unsecured Debt constituting the $180,000,000 10.5% Senior Notes due 2006 (the "10.5% Senior Notes"),[2] the Debtors shall pay the reasonable fees and expenses incurred by U.S. Bank as indenture trustee for the 10.5% Senior Notes through and including the date of entry of an order approving this Stipulation.  U.S. Bank and the Debtors reserve their rights with respect to fees and expenses

---

[2]   See Limited Response of U.S. Bank National Association, as Indenture Trustee for the Calpine Corporation 10.5% Senior Notes, to the Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims, filed on June 28, 2007 [Docket No. 5132].

4

arising subsequent thereto. The Debtors also acknowledge that the aggregate principal amount outstanding on the 10.5% Senior Notes is $149,210,000.

6.    The Calpine Unsecured Noteholders shall not be entitled to receive any interest on account of the Allowed Unsecured Claims unless the Debtors agree or are required to pay interest on any potential allowed makewhole claims in a chapter 11 plan or otherwise in favor of the holders of any unsecured notes issued by Calpine (the "Reference Unsecured Notes"). In the event, the Debtors agree or are required to pay such interest, the percent of interest paid on the Allowed Unsecured Claims (calculated as a percentage of contract interest) shall be equal to the weighted average percent of interest paid on the allowed makewhole claims in respect of the Reference Unsecured Notes for which interest is agreed or required to be paid (calculated in the same manner). By way of example, if the Debtors agree or are required to pay interest on allowed makewhole claims in respect of the Reference Unsecured Notes at the contractual rate under the Indenture governing the applicable Reference Unsecured Notes (or a specified percentage thereof), then the holders of the Calpine Unsecured Notes shall be entitled to receive interest at the contractual rate under the Indenture governing the applicable Calpine Unsecured Notes (or same specified percentage thereof) accruing from the Petition Date on the Allowed Unsecured Claims.

7    Notwithstanding section 502(j) of the Bankruptcy Code, no order of this Court and nothing contained in any chapter 11 plan confirmed in these cases or any order of this Court confirming such plan or otherwise shall conflict with or derogate from the provisions of this Stipulation, including without limitation, allowance of the Allowed Unsecured Claims in the amounts and on the terms set forth herein. In addition, this Stipulation shall be binding upon any trustee appointed in these cases or in a subsequent chapter 7 case(s).

5

EXHIBIT A
PART 5

8.    This Stipulation is a settlement between the Debtors, the CWT Noteholders and HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Noteholders. The Calpine Unsecured Noteholders retain any and all rights that they now have or may hereafter have against other parties or property under or with respect to the subordination provisions, including, without limitation, those contained in the 7.750% Contingent Senior Convertible Notes due June 1, 2015 issued by Calpine other than with respect to the Makewhole Claims. Nothing in this Order shall in any way prejudice or preclude the Debtors or the Official Committee of Unsecured Creditors from supporting or opposing the collection of additional amounts from other parties.

9.    Upon the effectiveness of this Stipulation, the Debtors' Makewhole Motion shall be deemed withdrawn with prejudice.

10.    This Stipulation is solely in settlement of the Makewhole Claims that are the subject of the Debtors' Makewhole Motion and the Objections of HSBC and U.S. Bank to the Makewhole Motion. Except as explicitly set forth in paragraph 6 above with respect to interest on the Allowed Unsecured Claims, this Stipulation shall not affect any rights, claims or remedies of (i) the holders of the Unsecured Debt including, without limitation, any rights with respect to default interest, simple interest, compound interest, or adequate protection or fees or costs permissible under the underlying agreements, or (ii) the Debtors, including without limitation, any right to oppose claims for default interest, simple interest, compound interest, adequate protection, or fees or costs permissible under the underlying agreements. Likewise, the Stipulation shall not affect the claims as set forth in the January Claims Stipulation.

11.    This Stipulation is the entire agreement between the parties in respect of the subject matter hereof and shall not be modified, altered, amended, or vacated without the Court's

6

approval. No statement made or action taken in the negotiation of the Stipulation may be used by any party for any purpose whatsoever.

12.    The provisions of this Stipulation are nonseverable and mutually dependent.

13.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Stipulation.

14.    This Stipulation shall only be effective upon entry of an order substantially in the form of the proposed order, attached as **Exhibit A** to the Debtors' motion to approve this Stipulation.

Dated  September 19, 2007
       New York, New York

| | |
|---|---|
| ___/s/ Edward O. Sassower___ | ___/s/ Sarah L. Reid___ |
| Richard M. Cieri (RC 6062) | Sarah L. Reid (SR-4603) |
| Marc Kieselstein (admitted *pro hac vice*) | David E. Retter (DR-4014) |
| David R. Seligman (admitted pro hac vice) | Jennifer Christian (JC-7305) |
| Edward O. Sassower (ES 5823) | Damon W. Suden (DS-8384) |
| Stephen E. Hessler (admitted *pro hac vice*) | KELLEY DRYE & WARREN LLP |
| KIRKLAND & ELLIS LLP | 101 Park Avenue |
| 153 East 53rd Street | New York, New York 10178 |
| New York, New York  10022-4611 | Telephone: (212) 808-7800 |
| Telephone:  (212) 446-4800 | Facsimile: (212) 808-7897 |
| Facsimile:  (212) 446-4900 | |
| | |
| Attorneys for the Debtors and Debtors in Possession | Counsel to HSBC Bank USA, N.A., as Successor Indenture Trustee for the Calpine Unsecured Noteholders |

 

___/s/ George A. Davis___
George A. Davis (GD 2761)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Counsel for the CWT Noteholders

8

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Calpine Corporation, et al., | Case No. 05-60200 (BRL) |
| Debtors. | Jointly Administered |

## STIPULATION RESOLVING OBJECTIONS BY THE INDENTURE TRUSTEE FOR THE CALPINE UNSECURED NOTES AND CALPINE UNSECURED NOTEHOLDERS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER ALLOWING LIMITED OBJECTION TO CLAIMS AND DETERMINING VALUE OF CLAIMS

Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively, including Calpine, the "Debtors"), HSBC Bank USA, National Association ("HSBC"), as successor indenture trustee for the holders of the 7.875% Senior Notes due 2008, 7.75% Senior Notes due 2009, 8.625% Senior Notes due 2010 and 8.5% Senior Notes due 2011 (the "Calpine Unsecured Notes" and the referenced holders thereof, the "Calpine Unsecured Noteholders") and certain holders of the 7.875% Senior Notes due 2008 (the "CWT Noteholders"), by and through their respective attorneys, have agreed upon this stipulation (the "Stipulation") resolving the Objection of HSBC to the Debtors' Motion For Entry Of An Order Allowing Limited Objection To Claims And Determining Value Of Claims (the "Objection"). The Stipulation states as follows:

### RECITALS

WHEREAS, beginning on or about December 20, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, on July 27, 2006, HSBC filed proofs of claim against Calpine as successor indenture trustee for the Calpine Unsecured Notes for approximately $1.8 billion (the "Unsecured Claims"). Each proof of claim asserts a claim for unliquidated amounts for interest, liquidated damages, redemption premiums, expenses, indemnities, compensatory, secondary and punitive damages, and all compensation obligations, among other things. See Addendum to Proofs of Claim 2825, 2822, 2820 and 2821 ¶ 2;

WHEREAS, on January 30, 2007, the Debtors and HSBC entered into a Stipulation and Order Resolving Claim Numbers 2820, 2821, 2822, 2823, 2824 and 2825 (Docket No. 3501) (the "January Claims Stipulation"), pursuant to which the parties stipulated to certain amounts for the outstanding principal and prepetition interest of the claims asserted by HSBC on behalf of certain creditors, including the holders of the Calpine Unsecured Notes (the "Calpine Unsecured Noteholders").

WHEREAS, on June 8, 2007, the Debtors filed a Motion seeking Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims (Docket No. 4880) (the "Makewhole Motion")[1] objecting to, among other things, the Unsecured Claims to the extent they seek amounts in excess of principal and accrued interest, including, specifically, the makewhole premium and damages claims asserted by HSBC on behalf of the Calpine Unsecured Noteholders;

WHEREAS, on June 29, 2007, HSBC filed its Objection (Docket No. 5137) and submitted therewith the expert affidavit of Bruce Kaufman, a Principal of Compass Advisors LLP, in which Mr. Kaufman calculated the makewhole premiums due to the Calpine Unsecured

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meaning set forth for such terms in the Makewhole Motion.

2

Noteholders, and subsequently submitted a supplemental expert affidavit on July 10, 2007 in which Mr. Kaufman amended his calculations (Docket No. 5232);

WHEREAS, on July 9, 2007, the Debtors filed the Debtors' Consolidated Reply to Objections to Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims (Docket No. 5222);

WHEREAS, on July 10, 2007, the Debtors and HSBC entered into a Stipulation Regarding Certain Calculations Under the Indentures and Related Documents to the Unsecured Debt (Docket No. 5240), pursuant to which the parties agreed that if the Court were to hold that the Calpine Unsecured Noteholders are entitled to claims for damages and/or makewhole premiums and any and all claims related to makewhole provisions, prepayment provisions or claim for contract damages allegedly incurred as a result of payment prior to the original scheduled maturity date (collectively, the "Makewhole Claims"), then such Makewhole Claims would total approximately $109 million; and

WHEREAS, the Debtors, HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Noteholders, and the CWT Noteholders entered into negotiations and have reached a settlement in respect of the Makewhole Claims.

## **STIPULATION**

IT IS THEREFORE AGREED, AND UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED AS FOLLOWS:

1.      In full settlement and satisfaction against the Debtors and their affiliates of the Makewhole Claims, HSBC, as indenture trustee for the Calpine Unsecured Notes, is hereby granted allowed general unsecured claims against Calpine in the aggregate amount of $54,350,000 (the "Allowed Unsecured Claims").

2.      The Allowed Unsecured Claims shall be allocated as follows:

3

| Note | Allowed Unsecured Claim |
|---|---|
| 7.875% Senior Notes due 2008 | $700,000 |
| 7.75% Senior Notes due 2009 | $2,950,000 |
| 8.625% Senior Notes due 2010 | $18,250,000 |
| 8.5% Senior Notes due 2011 | $32,450,000 |

3.     In addition, the Debtors shall pay the reasonable fees and expenses of HSBC, as successor indenture trustee for the Calpine Unsecured Notes, and the professional fees and expenses incurred by HSBC, as successor indenture trustee for the Calpine Unsecured Notes, in connection with the Makewhole Motion through and including the date of entry of an order approving this Stipulation.

4.     The Debtors shall also pay the reasonable professional fees and expenses of Cadwalader, Wickersham & Taft LLP, as counsel to the CWT Noteholders from June 2007 through and including the date of entry of an order approving this Stipulation.

5.     In settlement of the objection to the Makewhole Motion filed by U.S. Bank National Association ("U.S. Bank") as Indenture Trustee for that portion of the Unsecured Debt constituting the $180,000,000 10.5% Senior Notes due 2006 (the "10.5% Senior Notes"),[2] the Debtors shall pay the reasonable fees and expenses incurred by U.S. Bank as indenture trustee for the 10.5% Senior Notes through and including the date of entry of an order approving this Stipulation.  U.S. Bank and the Debtors reserve their rights with respect to fees and expenses

---

[2]     See Limited Response of U.S. Bank National Association, as Indenture Trustee for the Calpine Corporation 10.5% Senior Notes, to the Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims, filed on June 28, 2007 [Docket No. 5132].

4

arising subsequent thereto. The Debtors also acknowledge that the aggregate principal amount outstanding on the 10.5% Senior Notes is $149,210,000.

6.    The Calpine Unsecured Noteholders shall not be entitled to receive any interest on account of the Allowed Unsecured Claims unless the Debtors agree or are required to pay interest on any potential allowed makewhole claims in a chapter 11 plan or otherwise in favor of the holders of any unsecured notes issued by Calpine (the "Reference Unsecured Notes"). In the event, the Debtors agree or are required to pay such interest, the percent of interest paid on the Allowed Unsecured Claims (calculated as a percentage of contract interest) shall be equal to the weighted average percent of interest paid on the allowed makewhole claims in respect of the Reference Unsecured Notes for which interest is agreed or required to be paid (calculated in the same manner). By way of example, if the Debtors agree or are required to pay interest on allowed makewhole claims in respect of the Reference Unsecured Notes at the contractual rate under the Indenture governing the applicable Reference Unsecured Notes (or a specified percentage thereof), then the holders of the Calpine Unsecured Notes shall be entitled to receive interest at the contractual rate under the Indenture governing the applicable Calpine Unsecured Notes (or same specified percentage thereof) accruing from the Petition Date on the Allowed Unsecured Claims.

7.    Notwithstanding section 502(j) of the Bankruptcy Code, no order of this Court and nothing contained in any chapter 11 plan confirmed in these cases or any order of this Court confirming such plan or otherwise shall conflict with or derogate from the provisions of this Stipulation, including without limitation, allowance of the Allowed Unsecured Claims in the amounts and on the terms set forth herein. In addition, this Stipulation shall be binding upon any trustee appointed in these cases or in a subsequent chapter 7 case(s).

8.    This Stipulation is a settlement between the Debtors, the CWT Noteholders and HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Noteholders. The Calpine Unsecured Noteholders retain any and all rights that they now have or may hereafter have against other parties or property under or with respect to the subordination provisions, including, without limitation, those contained in the 7.750% Contingent Senior Convertible Notes due June 1, 2015 issued by Calpine other than with respect to the Makewhole Claims. Nothing in this Order shall in any way prejudice or preclude the Debtors or the Official Committee of Unsecured Creditors from supporting or opposing the collection of additional amounts from other parties.

9.    Upon the effectiveness of this Stipulation, the Debtors' Makewhole Motion shall be deemed withdrawn with prejudice.

10.    This Stipulation is solely in settlement of the Makewhole Claims that are the subject of the Debtors' Makewhole Motion and the Objections of HSBC and U.S. Bank to the Makewhole Motion. Except as explicitly set forth in paragraph 6 above with respect to interest on the Allowed Unsecured Claims, this Stipulation shall not affect any rights, claims or remedies of (i) the holders of the Unsecured Debt including, without limitation, any rights with respect to default interest, simple interest, compound interest, or adequate protection or fees or costs permissible under the underlying agreements, or (ii) the Debtors, including without limitation, any right to oppose claims for default interest, simple interest, compound interest, adequate protection, or fees or costs permissible under the underlying agreements. Likewise, the Stipulation shall not affect the claims as set forth in the January Claims Stipulation.

11.    This Stipulation is the entire agreement between the parties in respect of the subject matter hereof and shall not be modified, altered, amended, or vacated without the Court's

approval. No statement made or action taken in the negotiation of the Stipulation may be used by any party for any purpose whatsoever.

     12.    The provisions of this Stipulation are nonseverable and mutually dependent.

     13.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Stipulation.

14    This Stipulation shall only be effective upon entry of an order substantially in the form of the proposed order, attached as **Exhibit A** to the Debtors' motion to approve this Stipulation.

Dated  September 19, 2007
      New York, New York

| | |
|---|---|
|    /s/ Edward O. Sassower    |    /s/ Sarah L. Reid    |
| Richard M. Cieri (RC 6062) | Sarah L. Reid (SR-4603) |
| Marc Kieselstein (admitted *pro hac vice*) | David E. Retter (DR-4014) |
| David R. Seligman (admitted *pro hac vice*) | Jennifer Christian (JC-7305) |
| Edward O. Sassower (ES 5823) | Damon W. Suden (DS-8384) |
| Stephen E. Hessler (admitted *pro hac vice*) | KELLEY DRYE & WARREN LLP |
| KIRKLAND & ELLIS LLP | 101 Park Avenue |
| 153 East 53rd Street | New York, New York 10178 |
| New York, New York 10022-4611 | Telephone: (212) 808-7800 |
| Telephone: (212) 446-4800 | Facsimile: (212) 808-7897 |
| Facsimile: (212) 446-4900 | |

Attorneys for the Debtors and Debtors in Possession

Counsel to HSBC Bank USA, N.A., as Successor Indenture Trustee for the Calpine Unsecured Noteholders

   /s/ George A. Davis   
George A. Davis (GD 2761)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Counsel for the CWT Noteholders

8

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | ) Chapter 11 |
| Calpine Corporation, <u>et al.</u>, | ) |
|  | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
|  | ) |

ORDER PURSUANT TO 11 U.S.C. § 105(a) AND BANKRUPTCY RULE 9019
APPROVING STIPULATION RESOLVING OBJECTIONS BY
INDENTURE TRUSTEE FOR THE CALPINE UNSECURED NOTES AND
CALPINE UNSECURED NOTEHOLDERS TO DEBTORS' MOTION FOR
ENTRY OF AN ORDER ALLOWING LIMITED OBJECTION TO CLAIMS
<u>AND DETERMINING VALUE OF CLAIMS</u>

This matter is before the Court upon the motion (the "<u>9019 Motion</u>"), [1]

dated September 19, 2007 of Calpine Corporation ("<u>Calpine</u>") and its affiliated Debtors

and Debtors in Possession (collectively, including Calpine, the "<u>Debtors</u>") in the above-

captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>") for entry of an order pursuant to

11 U.S.C. §§ 105(a) and 363 and Bankruptcy Rule 9019 authorizing and approving the

Stipulation Resolving Objections by the Indenture Trustee for the Calpine Unsecured

Notes and the Calpine Unsecured Noteholders to Debtors' Motion for Entry of an

Order Allowing Limited Objection to Claims and Determining Value of Claims, dated

as of September 19, 2007, by and among (i) the Debtors, (ii) the CWT Noteholders, and

(iii) HSBC, as successor indenture trustee for the Calpine Unsecured Notes (the

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the 9019 Motion.

"Stipulation"), a copy of which is attached hereto as **Exhibit A**; and the Court having reviewed and considered the 9019 Motion, the settlement contained in the Stipulation (the "Settlement"), and the arguments of counsel made, and the evidence proffered or adduced at the hearing on the 9019 Motion held on October 10, 2007 (the "Hearing"), and upon all the proceedings heretofore held in the Chapter 11 Cases; and it appearing that the relief requested in the 9019 Motion is in the best interests of the Debtors, their estates and creditors and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction over the 9019 Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue of the Chapter 11 Cases and the 9019 Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the 9019 Motion are section 105(a) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.    As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the hearing on the 9019 Motion, (i)

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052, as made applicable herein by Fed. R. Bankr. P. 9014.

2

proper, timely, adequate and sufficient notice of the 9019 Motion and the Hearing has been provided in accordance with section 102(l) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9014 and 9019, (ii) such notice was good and sufficient, and appropriate under the circumstances of these cases, and (iii) no other or further notice of the 9019 Motion is or shall be required.

D.     A reasonable opportunity to object or be heard with respect to the 9019 Motion and the relief requested therein has been afforded to all interested persons and entities, including: (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel to the CWT Noteholders, (iii) counsel to HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Notes, (iv) counsel to U.S. Bank, as indenture trustee on behalf of the 10.5% Senior Notes, (v) counsel to the Official Committee of Unsecured Creditors, and (vi) counsel to the Official Committee of Equity Security Holders.

E.     The Settlement represents a fair, prudent and reasonable compromise of the controversies resolved by the Stipulation and is in the best interests of the Debtors, their estates and creditors taking into account, among other things, (a) the probability of success on the claims being released as part of the Settlement, (b) the complexity of the litigation involved with respect to the claims being released as part of the Settlement and (c) the paramount interest of the creditors and a proper deference to their views in respect of the Settlement.

F.     The Debtors have demonstrated both (i) good, sufficient, and sound business purpose and justification, and (ii) compelling circumstances for entering into

the Stipulation prior to, and outside of, a plan of reorganization, and the Stipulation pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 is the best alternative for the Debtors, their respective estates and creditors.

G.    The Stipulation was negotiated, proposed and entered into by the parties without collusion, in good faith and from arms' length bargaining positions.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    The 9019 Motion is granted in all respects.

2.    In the event of any inconsistency between the 9019 Motion or this Order and the Stipulation, the Stipulation shall control.

3.    All objections, including without limitation any objection of any Calpine Unsecured Noteholder to the Stipulation, or any portion thereof, including the entry of HSBC, as successor indenture trustee for the Calpine Unsecured Notes, into the Stipulation, that have not been withdrawn, waived, settled, or specifically addressed in this Order and all reservations of rights included in such objections, are hereby overruled on the merits. Accordingly, HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Notes, is authorized to settle the claims on behalf of the Calpine Unsecured Noteholders as provided in the Stipulation and shall have no liability to any Calpine Unsecured Noteholder as a result of its entry into the Stipulation or settlement of the claims thereunder.

4.    The Calpine Unsecured Noteholders and HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Notes, retain any and all rights

4

that they now have or may hereafter have against other parties or property under or with respect to subordination provisions, including, but not limited to, those contained in the 7.750% Contingent Senior Convertible Notes due June 1, 2015 issued by Calpine other than with respect to the Unsecured Makewhole Claims. Nothing in this Order shall in any way prejudice or preclude the Debtors or the Official Committee of Unsecured Creditors (the "Creditors' Committee") from supporting or opposing the collection of additional amounts from other parties.

5.    The Debtors' entry into the Stipulation is authorized and ratified pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019, and the Debtors are hereby authorized, empowered and directed to enter into and perform, and consummate the transactions, under the Stipulation. All the terms of the Stipulation, including, but not limited to, the allocation and distribution of the Allowed Unsecured Claims are hereby approved and are binding in all respects on all parties in interest in these cases as if set forth herein, including the Debtors, the Creditors' Committee, the Calpine Unsecured Noteholders and HSBC, as successor indenture trustee for the Calpine Unsecured Notes.

6.    The Debtors are authorized, empowered and directed to take any and all actions and execute any and all documents and instruments that are reasonably necessary or appropriate to implement and effectuate the Stipulation.

7.    In furtherance of this Order, the Stipulation and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in a writing signed by such parties, and in

accordance with the terms thereof, without further order of the Court; <u>provided</u> such modification, amendment or supplement is not material.

8.    As provided by Bankruptcy Rule 6004(g), and notwithstanding Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately upon entry.

9.    This Stipulation may be executed by facsimile or pdf in one or more counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same document.

10.    Notwithstanding section 502(j) of the Bankruptcy Code, no order of this Court and nothing contained in any chapter 11 plan confirmed in these cases or any order of this Court confirming such plan or otherwise shall conflict with or derogate from the provisions of the Stipulation, including without limitation, allowance of the Allowed Unsecured Claims in the amounts and on the terms set forth therein. In addition, the Stipulation shall be binding upon any trustee appointed in these cases or in a subsequent chapter 7 case(s).

11.     This Court retains jurisdiction to interpret, enforce and implement the Settlement, including the Stipulation, and all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to resolve any disputes, controversy or claims arising under or related to the Stipulation, and interpret, implement, and enforce the provisions of this Order.

Dated: New York, NY
       October 10, 2007

                          /s/Burton R. Lifland
                          UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Calpine Corporation, et al., | ) |
| | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
| | ) |

**STIPULATION RESOLVING OBJECTIONS BY
THE INDENTURE TRUSTEE FOR THE CALPINE UNSECURED NOTES AND
CALPINE UNSECURED NOTEHOLDERS TO DEBTORS' MOTION FOR ENTRY OF
AN ORDER ALLOWING LIMITED OBJECTION TO CLAIMS AND DETERMINING
VALUE OF CLAIMS**

Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively, including Calpine, the "Debtors"), HSBC Bank USA, National Association ("HSBC"), as successor indenture trustee for the holders of the 7.875% Senior Notes due 2008, 7.75% Senior Notes due 2009, 8.625% Senior Notes due 2010 and 8.5% Senior Notes due 2011 (the "Calpine Unsecured Notes" and the referenced holders thereof, the "Calpine Unsecured Noteholders") and certain holders of the 7.875% Senior Notes due 2008 (the "CWT Noteholders"), by and through their respective attorneys, have agreed upon this stipulation (the "Stipulation") resolving the Objection of HSBC to the Debtors' Motion For Entry Of An Order Allowing Limited Objection To Claims And Determining Value Of Claims (the "Objection"). The Stipulation states as follows:

**RECITALS**

WHEREAS, beginning on or about December 20, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, on July 27, 2006, HSBC filed proofs of claim against Calpine as successor indenture trustee for the Calpine Unsecured Notes for approximately $1.8 billion (the "Unsecured Claims"). Each proof of claim asserts a claim for unliquidated amounts for interest, liquidated damages, redemption premiums, expenses, indemnities, compensatory, secondary and punitive damages, and all compensation obligations, among other things. See Addendum to Proofs of Claim 2825, 2822, 2820 and 2821 ¶ 2;

WHEREAS, on January 30, 2007, the Debtors and HSBC entered into a Stipulation and Order Resolving Claim Numbers 2820, 2821, 2822, 2823, 2824 and 2825 (Docket No. 3501) (the "January Claims Stipulation"), pursuant to which the parties stipulated to certain amounts for the outstanding principal and prepetition interest of the claims asserted by HSBC on behalf of certain creditors, including the holders of the Calpine Unsecured Notes (the "Calpine Unsecured Noteholders").

WHEREAS, on June 8, 2007, the Debtors filed a Motion seeking Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims (Docket No. 4880) (the "Makewhole Motion")[1] objecting to, among other things, the Unsecured Claims to the extent they seek amounts in excess of principal and accrued interest, including, specifically, the makewhole premium and damages claims asserted by HSBC on behalf of the Calpine Unsecured Noteholders;

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meaning set forth for such terms in the Makewhole Motion.

WHEREAS, on June 29, 2007, HSBC filed its Objection (Docket No. 5137) and submitted therewith the expert affidavit of Bruce Kaufman, a Principal of Compass Advisors LLP, in which Mr. Kaufman calculated the makewhole premiums due to the Calpine Unsecured Noteholders, and subsequently submitted a supplemental expert affidavit on July 10, 2007 in which Mr. Kaufman amended his calculations (Docket No. 5232);

WHEREAS, on July 9, 2007, the Debtors filed the Debtors' Consolidated Reply to Objections to Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims (Docket No. 5222);

WHEREAS, on July 10, 2007, the Debtors and HSBC entered into a Stipulation Regarding Certain Calculations Under the Indentures and Related Documents to the Unsecured Debt (Docket No. 5240), pursuant to which the parties agreed that if the Court were to hold that the Calpine Unsecured Noteholders are entitled to claims for damages and/or makewhole premiums and any and all claims related to makewhole provisions, prepayment provisions or claim for contract damages allegedly incurred as a result of payment prior to the original scheduled maturity date (collectively, the "Makewhole Claims"), then such Makewhole Claims would total approximately $109 million; and

WHEREAS, the Debtors, HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Noteholders, and the CWT Noteholders entered into negotiations and have reached a settlement in respect of the Makewhole Claims.

## STIPULATION

IT IS THEREFORE AGREED, AND UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED AS FOLLOWS:

1.     In full settlement and satisfaction against the Debtors and their affiliates of the Makewhole Claims, HSBC, as indenture trustee for the Calpine Unsecured Notes, is hereby

3

granted allowed general unsecured claims against Calpine in the aggregate amount of $54,350,000 (the "Allowed Unsecured Claims").

2.    The Allowed Unsecured Claims shall be allocated as follows:

| Note | Allowed Unsecured Claim |
|---|---|
| 7.875% Senior Notes due 2008 | $700,000 |
| 7.75% Senior Notes due 2009 | $2,950,000 |
| 8.625% Senior Notes due 2010 | $18,250,000 |
| 8.5% Senior Notes due 2011 | $32,450,000 |

3.    In addition, the Debtors shall pay the reasonable fees and expenses of HSBC, as successor indenture trustee for the Calpine Unsecured Notes, and the professional fees and expenses incurred by HSBC, as successor indenture trustee for the Calpine Unsecured Notes, in connection with the Makewhole Motion through and including the date of entry of an order approving this Stipulation.

4.    The Debtors shall also pay the reasonable professional fees and expenses of Cadwalader, Wickersham & Taft LLP, as counsel to the CWT Noteholders from June 2007 through and including the date of entry of an order approving this Stipulation.

5.    In settlement of the objection to the Makewhole Motion filed by U.S. Bank National Association ("U.S. Bank") as Indenture Trustee for that portion of the Unsecured Debt constituting the $180,000,000 10.5% Senior Notes due 2006 (the "10.5% Senior Notes"),[2] the Debtors shall pay the reasonable fees and expenses incurred by U.S. Bank as indenture trustee

---

[2]    See Limited Response of U.S. Bank National Association, as Indenture Trustee for the Calpine Corporation 10.5% Senior Notes, to the Debtors' Motion for Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims, filed on June 28, 2007 [Docket No. 5132].

4

for the 10.5% Senior Notes through and including the date of entry of an order approving this Stipulation. U.S. Bank and the Debtors reserve their rights with respect to fees and expenses arising subsequent thereto. The Debtors also acknowledge that the aggregate principal amount outstanding on the 10.5% Senior Notes is $149,210,000.

6. The Calpine Unsecured Noteholders shall not be entitled to receive any interest on account of the Allowed Unsecured Claims unless the Debtors agree or are required to pay interest on any potential allowed makewhole claims in a chapter 11 plan or otherwise in favor of the holders of any unsecured notes issued by Calpine (the "Reference Unsecured Notes"). In the event, the Debtors agree or are required to pay such interest, the percent of interest paid on the Allowed Unsecured Claims (calculated as a percentage of contract interest) shall be equal to the weighted average percent of interest paid on the allowed makewhole claims in respect of the Reference Unsecured Notes for which interest is agreed or required to be paid (calculated in the same manner). By way of example, if the Debtors agree or are required to pay interest on allowed makewhole claims in respect of the Reference Unsecured Notes at the contractual rate under the Indenture governing the applicable Reference Unsecured Notes (or a specified percentage thereof), then the holders of the Calpine Unsecured Notes shall be entitled to receive interest at the contractual rate under the Indenture governing the applicable Calpine Unsecured Notes (or same specified percentage thereof) accruing from the Petition Date on the Allowed Unsecured Claims.

7. Notwithstanding section 502(j) of the Bankruptcy Code, no order of this Court and nothing contained in any chapter 11 plan confirmed in these cases or any order of this Court confirming such plan or otherwise shall conflict with or derogate from the provisions of this Stipulation, including without limitation, allowance of the Allowed Unsecured Claims in the

5

amounts and on the terms set forth herein.  In addition, this Stipulation shall be binding upon any trustee appointed in these cases or in a subsequent chapter 7 case(s).

8.    This Stipulation is a settlement between the Debtors, the CWT Noteholders and HSBC, as successor indenture trustee on behalf of the Calpine Unsecured Noteholders.  The Calpine Unsecured Noteholders retain any and all rights that they now have or may hereafter have against other parties or property under or with respect to the subordination provisions, including, without limitation, those contained in the 7.750% Contingent Senior Convertible Notes due June 1, 2015 issued by Calpine other than with respect to the Makewhole Claims. Nothing in this Order shall in any way prejudice or preclude the Debtors or the Official Committee of Unsecured Creditors from supporting or opposing the collection of additional amounts from other parties.

9.    Upon the effectiveness of this Stipulation, the Debtors' Makewhole Motion shall be deemed withdrawn with prejudice.

10.    This Stipulation is solely in settlement of the Makewhole Claims that are the subject of the Debtors' Makewhole Motion and the Objections of HSBC and U.S. Bank to the Makewhole Motion.  Except as explicitly set forth in paragraph 6 above with respect to interest on the Allowed Unsecured Claims, this Stipulation shall not affect any rights, claims or remedies of (i) the holders of the Unsecured Debt including, without limitation, any rights with respect to default interest, simple interest, compound interest, or adequate protection or fees or costs permissible under the underlying agreements, or (ii) the Debtors, including without limitation, any right to oppose claims for default interest, simple interest, compound interest, adequate protection, or fees or costs permissible under the underlying agreements.  Likewise, the Stipulation shall not affect the claims as set forth in the January Claims Stipulation.

6

11.     This Stipulation is the entire agreement between the parties in respect of the subject matter hereof and shall not be modified, altered, amended, or vacated without the Court's approval. No statement made or action taken in the negotiation of the Stipulation may be used by any party for any purpose whatsoever.

12.     The provisions of this Stipulation are nonseverable and mutually dependent.

13.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Stipulation.

14.    This Stipulation shall only be effective upon entry of an order substantially in the form of the proposed order, attached as **Exhibit A** to the Debtors' motion to approve this Stipulation.

Dated  September 19, 2007
       New York, New York

   /s/ Edward O. Sassower
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Stephen E. Hessler (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for the Debtors and Debtors in Possession

   /s/ Sarah L. Reid
Sarah L. Reid (SR-4603)
David E. Retter (DR-4014)
Jennifer Christian (JC-7305)
Damon W. Suden (DS-8384)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

Counsel to HSBC Bank USA, N.A., as Successor Indenture Trustee for the Calpine Unsecured Noteholders

   /s/ George A. Davis
George A. Davis (GD 2761)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Counsel for the CWT Noteholders

8

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)
James J. Mazza, Jr. (admitted pro hac vice)
Chad J. Husnick (admitted pro hac vice)

Counsel for the Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | ) CHAPTER 11 |
| | ) |
| CALPINE CORPORATION, ET AL., | ) CASE NO. 05-60200 (BRL) |
| | ) JOINTLY ADMINISTERED |
| DEBTORS. | ) |
| | ) |

## DEBTORS' SIXTH AMENDED JOINT PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

Dated: December 19, 2007

K&E 12300541.14

## TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................................1

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW** ...........................................1
    A.    Defined Terms ........................................................................................1
    B.    Rules of Interpretation and Computation of Time:............................31
    C.    Reference to Monetary Figures..........................................................32
    D.    Reference to the Debtors or Reorganized Debtors ............................32

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS**...........................................32
    A.    DIP Facility Claims..............................................................................32
    B.    Administrative Claims ........................................................................32
    C.    Priority Tax Claims.............................................................................32

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND**
**INTERESTS** ................................................................................................32
    A.    Classification of Claims and Interests................................................32
    B.    Treatment of Classes of Claims and Interests....................................33
    C.    Class Voting Rights ............................................................................42
    D.    Acceptance or Rejection of the Plan...................................................43

**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN** .......................44
    A.    Substantive Consolidation...................................................................44
    B.    Sources of Consideration for Plan Distributions ...............................45
    C.    Section 1145 Exemption......................................................................45
    D.    Listing Rights......................................................................................46
    E.    Restrictions on Resale of Securities to Protect Net Operating Losses.................46
    F.    Issuance and Distribution of the New Calpine Plan Securities...........................46
    G.    Corporate Existence ............................................................................46
    H.    Vesting of Assets in the Reorganized Debtors ...................................46
    I.    Cancellation of Debt and Equity Securities and Related Obligations ....................47
    J.    Restructuring Transactions .................................................................48
    K.    Post-Confirmation Property Sales........................................................48
    L.    Corporate Action.................................................................................49
    M.    Certificate of Incorporation and Bylaws............................................49
    N.    Effectuating Documents, Further Transactions ..................................49
    O.    Exemption from Certain Transfer Taxes and Recording Fees............................50
    P.    Directors and Officers of Reorganized Calpine...................................50
    Q.    Directors and Officers of Reorganized Debtors Other Than Calpine ................50
    R.    Employee and Retiree Benefits...........................................................51
    S.    Management and Director Equity Incentive Plan................................51
    T.    Creation of Professional Fee Escrow Account ...................................52
    U.    Preservation of Rights of Action.........................................................52

i

<u>TABLE OF CONTENTS (cont'd)</u>

V.      Rights of Action Against Pipelines................................................................53

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................................................................................**53**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ..........53

B.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases........56

C.      Executory Contracts and Unexpired Leases Relating to Projects to be Sold or Surrendered................................................................................................57

D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases............................................................................................58

E.      Claims Based on Rejection or Repudiation of Executory Contracts and Unexpired Leases............................................................................................58

F.      Intercompany Contracts, Contracts, and Leases Entered Into After the Petition Date....................................................................................................58

G.      Guarantees Issued or Reinstated After the Petition Date......................................59

H.      Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions........................................................................59

I.      Modifications, Amendments, Supplements, Restatements, or Other Agreements ....................................................................................................59

J.      Reservation of Rights..........................................................................................59

K.      Nonoccurrence of Effective Date.........................................................................60

**ARTICLE VI. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS** ..........................................................................................**60**

A.      Allowance of Claims and Interests .....................................................................60

B.      Claims and Interests Administration Responsibilities ............................................60

C.      Estimation of Claims and Interests ......................................................................60

D.      Adjustment to Claims and Interests Without Objection .....................................61

E.      Time to File Objections to Claims ......................................................................61

F.      Disallowance of Claims or Interests .....................................................................61

G.      Offer of Judgment...............................................................................................62

H.      Amendments to Claims.......................................................................................63

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS** ...............................**63**

A.      Total Enterprise Value for Purposes of Distributions Under the Plan and the New Calpine Stock Reserve.......................................................................63

B.      Distributions on Account of Claims and Interests Allowed as of the Effective Date ................................................................................................63

C.      Distributions on Account of Claims Allowed After the Effective Date ...............63

D.      Delivery of Distributions ....................................................................................66

E.      Claims Paid or Payable by Third Parties .............................................................70

F.      Treatment of Interests ........................................................................................71

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN**.....................................**71**

A.      Discharge of Claims and Termination of Interests ..............................................71

B.      Subordinated Claims...........................................................................................72

K&E 12303541.14

<u>TABLE OF CONTENTS (cont'd)</u>

C.   Compromise and Settlement of Claims and Controversies ...................................72
D.   Releases by the Debtors ...................................72
E.   Exculpation...................................73
F.   Releases by Holders of Claims and Interests...................................73
G.   Injunction...................................74
H.   Protection Against Discriminatory Treatment...................................75
I.   Setoffs...................................75
J.   Recoupment...................................76
K.   Release of Liens...................................76
L.   Document Retention...................................77
M.   Reimbursement or Contribution ...................................77

ARTICLE IX. ALLOWANCE AND PAYMENT OF CERTAIN
ADMINISTRATIVE CLAIMS...................................77
A.   Professional Claims ...................................77
B.   Other Administrative Claims ...................................79

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN...................................80
A.   Conditions to Confirmation ...................................80
B.   Conditions Precedent to Consummation...................................80
C.   Waiver of Conditions Precedent ...................................81
D.   Effect of Non-Occurrence of Conditions to Consummation ...................................81
E.   Satisfaction of Conditions Precedent to Confirmation ...................................81

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE
PLAN...................................81
A.   Modification and Amendments...................................82
B.   Effect of Confirmation on Modifications ...................................82
C.   Revocation or Withdrawal of Plan...................................82

ARTICLE XII. RETENTION OF JURISDICTION...................................82

ARTICLE XIII. MISCELLANEOUS PROVISIONS...................................84
A.   Immediate Binding Effect...................................85
B.   Additional Documents ...................................85
C.   Payment of Statutory Fees ...................................85
D.   Dissolution of Committees ...................................85
E.   Reservation of Rights...................................86
F.   Successors and Assigns...................................86
G.   Service of Documents...................................87
H.   Term of Injunctions or Stays...................................87
I.   Entire Agreement ...................................87
J.   Governing Law ...................................88
K.   Exhibits ...................................88
L.   Nonseverability of Plan Provisions...................................88

iii

## TABLE OF CONTENTS (cont'd)

M.    Closing of Chapter 11 Cases.................................................................................88
N.    **Waiver or Estoppel** ...........................................................................................88
O.    Conflicts...............................................................................................................89

iv

## INTRODUCTION

Calpine Corporation and the other debtors in the above-captioned chapter 11 cases (collectively, the "Debtors") propose the following sixth amended joint plan of reorganization (the "Plan") for the resolution of outstanding creditor claims against, and equity interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101–1532. Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in ARTICLE I.A of the Plan. Reference is made to the Disclosure Statement, Filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN PROVIDES FOR SUBSTANTIVE CONSOLIDATION OF ALL OF THE ESTATES FOR ALL PURPOSES ASSOCIATED WITH CONFIRMATION AND CONSUMMATION.

## ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.    Defined Terms:  As used in the Plan, the capitalized terms below have the following meanings, except as expressly provided or unless the context otherwise requires. Any term used but not defined in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.    4.0% Convertible Senior Notes Due 2006:  The $1,200,000,000 4.0% Convertible Senior Notes due December 26, 2006, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000.

2.    4.75% Convertible Senior Notes Due 2023:  The $900,000,000 4.75% Convertible Senior Notes due November 15, 2023, issued by Calpine pursuant to that certain Amended and Restated Indenture, dated as of March 12, 2004, between Calpine and Wilmington Trust Company, as trustee.

3.    6.00% Contingent Convertible Notes Due 2014:  The $736,000,000 6.00% Contingent Convertible Notes due September 30, 2014, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the Second Supplemental Indenture, dated as of September 30, 2004.

4.    7.625% Senior Notes Due 2006:  The $250,000,000 7.625% Senior Notes due April 15, 2006, issued by Calpine pursuant to that certain Indenture, dated as of March 29, 1999, between Calpine and The Bank of New York, as trustee, as supplemented by the First

Supplemental Indenture, dated as of July 31, 2000, and the Second Supplemental Indenture, dated as of April 26, 2004.

5.     <u>7.75% Contingent Convertible Notes Due 2015</u>:  The $650,000,000 7.75% Contingent Convertible Notes Due June 1, 2015, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the Third Supplemental Indenture, dated as of June 23, 2005.

6.     <u>7.75% Senior Notes Due 2009</u>:  The $350,000,000 7.75% Senior Notes due April 15, 2009, issued by Calpine pursuant to that certain Indenture, dated as of March 29, 1999, between Calpine and The Bank of New York, as trustee, as supplemented by the First Supplemental Indenture, dated as of July 31, 2000, and the Second Supplemental Indenture, dated as of April 26, 2004.

7.     <u>7.875% Senior Notes Due 2008</u>:  The $400,000,000 7.875% Senior Notes due April 1, 2008, issued by Calpine pursuant to that certain Indenture, dated as of March 31, 1998, between Calpine and The Bank of New York, as trustee, as supplemented by the First Supplemental Indenture, dated as of July 24, 1998, the Second Supplemental Indenture, dated as of July 31, 2000, and the Third Supplemental Indenture, dated as of April 26, 2004.

8.     <u>8.5% Second Priority Senior Secured Notes Due 2010</u>:  The $1,150,000,000 8.5% Second Priority Senior Secured Notes due July 15, 2010, issued by Calpine pursuant to that certain Indenture dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as trustee.

9.     <u>8.5% Senior Notes Due 2011</u>:  The $850,000,000 8.5% Senior Notes due February 15, 2011, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000.

10.     <u>8.625% Senior Notes Due 2010</u>:  The $750,000,000 8.625% Senior Notes due August 15, 2010, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee.

11.     <u>8.75% Second Priority Senior Secured Notes Due 2013</u>:  The $900,000,000 Second Priority 8.75% Senior Secured Notes due July 15, 2013, issued by Calpine pursuant to that certain Indenture dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as trustee.

12.     <u>8.75% Senior Notes Due 2007</u>:  The $275,000,000 8.75% Senior Notes due July 15, 2007, issued by Calpine pursuant to that certain Indenture, dated as of July 8, 1997, between Calpine and The Bank of New York, as trustee, as supplemented by the First Supplemental Indenture, dated as of September 10, 1997, the Second Supplemental Indenture, dated as of July 31, 2000, and the Third Supplemental Indenture, dated as of April 26, 2004.

13.     <u>9.625% First Priority Senior Secured Notes Due 2014</u>:  The $785,000,000 9.625% First Priority Senior Secured Notes due September 30, 2014, issued by Calpine pursuant to that

2

certain Indenture, dated as of September 30, 2004, between Calpine and Wilmington Trust Company, as trustee.

14.    9.875% Second Priority Senior Secured Notes Due 2011:  The $400,000,000 9.875% Second Priority Senior Secured Notes due December 1, 2011, issued by Calpine pursuant to that certain Indenture, dated as of November 18, 2003, between Calpine and Wilmington Trust Company, as trustee.

15.    10.5% Senior Notes Due 2006:  The $180,000,000 10.5% Senior Notes due May 15, 2006, issued by Calpine pursuant to that certain Indenture, dated as of May 16, 1996, between Calpine and U.S. Bank National Association, as successor trustee, as supplemented by the First Supplemental Indenture, dated as of August 1, 2000 and the Second Supplemental Indenture, dated as of April 26, 2004.

16.    Accrued Professional Compensation:  At any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

17.    Ad Hoc Committee Of 6.0% Convertible Noteholders:  That certain ad hoc committee of Holders of 6.00% Contingent Convertible Notes Due 2014 whose members are Aristeia Capital, L.L.C., Aurelius Capital Management, LP, Drawbridge Special Opportunities Advisors LLC, Harbinger Capital Partners, Luminus Management, LLC, Ore Hill Hub Fund Ltd., Nisswa Master Fund Ltd., Pines Edge Value Investors Ltd., Pines Edge Value Investors L.P., Silver Sands Fund LLC, Stark Master Fund Ltd. and 3V Capital Management, LLC.

18.    Ad Hoc Committee Of 7.75% Convertible Noteholders:  That certain ad hoc committee of Holders of 7.75% Contingent Convertible Notes Due 2015 whose members are Harbinger Capital Partners Master Fund I, Ltd. Harbinger Capital Partners Special Situations Fund L.P., Dillon Read U.S. Finance L.P., Dillon Read Financial Products Trading Ltd., and R6 Capital Management, L.P.

19.    Administrative Agents:  In their capacity as such, the administrative agent and its predecessors for the Second Priority Senior Secured Term Loan Due 2007.

20.    Administrative Claim:  A Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a

3

substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

21.     Administrative Claim Bar Date: The deadline for filing requests for payment of Administrative Claims, which shall be thirty days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, except with respect to Professional Claims, which shall be subject to the provisions of ARTICLE IX; provided, however, that pursuant to section 503(b)(1)(D) of the Bankruptcy Code, to be considered timely filed for the purposes of the Administrative Claim Bar Date, the Texas Taxing Authority and the Louisiana Department of Revenue need not File a Claim or request payment to have an Allowed Administrative Claim for certain taxes, fines, penalties, and reductions in credit described in section 503(b)(1)(B) and (C) of the Bankruptcy Code.

22.     Affidavit of Publication: An affidavit of a representative or agent of a publisher of a periodical certifying that notice has been served through publication in the publisher's periodical.

23.     Affiliate: Excluding any Canadian Debtor: (a) an Entity that directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of any of the Debtors, other than an Entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities or (ii) solely to secure a debt, if such Entity has not in fact exercised such power to vote; (b) a corporation twenty percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by any of the Debtors, or by an Entity that directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of any of the Debtors, other than an Entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities or (ii) solely to secure a debt, if such Entity has not in fact exercised such power to vote; (c) an Entity whose business is operated under a lease or operating agreement by any of the Debtors, or an Entity substantially all of whose property is operated under an operating agreement with any of the Debtors; (d) an Entity that operates the business or substantially all of the property of any of the Debtors under a lease or operating agreement; or (e) the Debtors' domestic and non-domestic, wholly-owned, direct and indirect subsidiaries that have not commenced cases under chapter 11 of the Bankruptcy Code.

24.     Agnews Project: That certain leased 28.5 megawatt combined cycle cogeneration facility, along with certain related equipment, located in Santa Clara County, California.

25.     Allowed: With respect to Claims and Interests: (a) any Claim or Interest, proof of which is timely Filed by the applicable Bar Date (or that by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim or Interest that is listed in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, and for which no Proof of Claim or Interest has been timely Filed; or (c) any Claim Allowed pursuant to the Plan; provided, however, that with respect to any Claim or Interest described in clauses (a) or (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that (x) with respect to any Unsecured Convenience Class Claim, no objection to Allowance thereof has been interposed on or prior to the Effective Date, (y) with respect to any Claim or Interest

4

that is not an Unsecured Convenience Class Claim, no objection to the Allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (z) such an objection is so interposed and the Claim or Interest shall have been Allowed for distribution purposes only by a Final Order; provided further, however, that the Claims and Interests described in clauses (a) and (b) above shall not include any (i) Claim or Interest on account of an option, warrant, or contractual rights to purchase or acquire an Equity Security (the term "option" in this clause (i) does not include a right to convert a debt Security into an Equity Security) that is not exercised by the Voting Deadline and (ii) Interest held by or for the benefit of Calpine, including those Interests held pursuant to the DB Share Lending Agreement. Except as otherwise specified in the Plan or a Bankruptcy Court order, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim or Interest that has been or is hereafter listed in the Schedules as disputed, contingent, or unliquidated, and for which no Proof of Claim or Interest has been timely Filed, is not considered Allowed and shall be expunged without further action by the Reorganized Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court.

26.    ASM, Hain, And Sierra Group Claims:   Those certain claims of ASM Capital, Hain Capital Group, L.L.C., and Sierra Liquidity Fund L.L.C. that are identified in Exhibits A, B, and C to the motion, dated November 28, 2007, entitled *Motion of Hain Capital, L.L.C., Sierra Liquidity Fund, LLC, and ASM Capital Pursuant to Article III.B.12.c of the Debtors' Fourth Amended Joint Plan of Reorganization for Contract or State Law Interest* [Docket No. 6746].

27.    Assumed July 1 California Energy Commission Agreement:   That certain Grant Agreement (GEO-04-005) between Calpine Corporation and the California Energy Commission, dated July 1, 2004.

28.    Assumed July 14 California Energy Commission Agreement:   That certain Grant Agreement (GEO-04-003) between Calpine Corporation and the California Energy Commission, dated July 14, 2004.

29.    Ballot or Ballots:   The ballots upon which Holders of Impaired Claims or Interests entitled to vote shall cast their vote to accept or reject the Plan.

30.    Bankruptcy Code:   Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases.

31.    Bankruptcy Court:   The United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Chapter 11 Cases.

32.    Bankruptcy Rules:   The Federal Rules of Bankruptcy Procedure as applicable to the Chapter 11 Cases, promulgated pursuant to section 2075 of the Judicial Code and the general, local, and chambers rules and orders of the Bankruptcy Court.

33.    Bar Date:    August 1, 2006, except as otherwise provided in the Plan or by Bankruptcy Court order.

34.    Beneficial Holder:    The Entity holding the beneficial interest in a Claim or Interest.

35.    Bethpage Claims:    Claims under the Bethpage Notes and the First Lien Financing Agreements (as such term is defined in the Bethpage First Lien Credit Agreement) and the Second Lien Financing Agreements (as such term is defined in the Bethpage Second Lien Credit Agreement), including the Bethpage Credit Agreements.

36.    Bethpage Credit Agreements:    The Bethpage First Lien Credit Agreement and the Bethpage Second Lien Credit Agreement.

37.    Bethpage First Lien Credit Agreement:    The First Lien Credit Agreement, dated as of June 30, 2005, by and among Bethpage Energy Center 3, LLC, the lenders referred to therein, Calyon New York Branch, the lenders for the letters of credit, and Wilmington Trust Company, as First Lien Collateral Agent and Administrative Agent (as amended, modified or supplemented from time to time).

38.    Bethpage Notes:    The First Lien Notes and First Lien Related Expenses Notes (as such terms are defined in the Bethpage First Lien Credit Agreement), and the Second Lien Notes and Second Lien Related Expenses Notes (as such terms are defined in the Bethpage Second Lien Credit Agreement).

39.    Bethpage Second Lien Credit Agreement:    Second Lien Credit Agreement, dated as of June 30, 2005, by and among Bethpage Energy Center 3, LLC, the lenders referred to therein, and Wilmington Trust Company, as Second Lien Collateral Agent and Administrative Agent (as amended modified, or supplemented from time to time).

40.    BIT Holdings Claim:    That certain Allowed Claim of BIT Holdings 56, Inc. against Calpine as provided for in the order, dated August 8, 2007, entitled *Second Supplemental Order Granting Debtors' Sixteenth Omnibus Objection to Proofs of Claim (Claims to Be Adjusted, Wrong Debtor Claims to Be Adjusted, Duplicative Claims, Anticipatory Claims, No Liability Claims, Amended/Replaced Claims, Unliquidated Claims and Assumed Contract Claims) as Set Forth Herein* [Docket No. 5581], which Claim is classified in Class C-7.

41.    Board Selection Term Sheet:    That certain Term Sheet Regarding Selection of Post-Emergence Board of Directors of Reorganized Calpine Corporation, dated as of June 27, 2007, by and among the Debtors and the Creditors' Committee.

42.    Business Day:    Any day, other than a Saturday, Sunday, or Legal Holiday.

43.    CalGen:    Calpine Generating Company, LLC, a Delaware limited liability company.

44.    CalGen 11.5% Third Priority Secured Notes Due 2011:    The $150,000,000 11.5% Third Priority Secured Notes due April 4, 2011, issued by CalGen and CalGen Finance pursuant

to that certain Third Priority Indenture, dated as of March 23, 2004, among CalGen, CalGen Finance, and Wilmington Trust Company FSB, as third priority trustee.

45.   CalGen Amended and Restated Credit Agreement:  The $200,000,000 Amended and Restated Credit Agreement, dated as of March 23, 2004, among CalGen, the guarantors party thereto, the lenders party thereto, The Bank of Nova Scotia, as administrative agent, L/C bank, as lead arranger and sole bookrunner, Bayerische Landesbank, Cayman Islands Branch, as arranger and co-syndication agent, Credit Lyonnais, New York Branch, as arranger and co-syndication agent, ING Capital LLC, as arranger and co-syndication agent, Toronto Dominion (Texas) Inc., as arranger and co-syndication agent, and Union Bank of California, N.A., as arranger and co-syndication agent.

46.   CalGen Collateral Agent:  Wilmington Trust Company, solely in its capacity as collateral agent under that certain Collateral Trust and Intercreditor Agreement, dated March 23, 2004.

47.   CalGen Debt Repayment Order:  That certain Bankruptcy Court order entitled *Order Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e)* [Docket No. 3972].

48.   CalGen Finance:  CalGen Finance Corporation, a Delaware corporation.

49.   CalGen First Priority Secured Floating Rate Notes Due 2009:  The $235,000,000 First Priority Secured Floating Rate Notes due April 1, 2009, issued by CalGen and CalGen Finance pursuant to that certain First Priority Indenture, dated as of March 23, 2004, between CalGen, CalGen Finance, and Wilmington Trust Company FSB, as first priority trustee.

50.   CalGen First Priority Secured Institutional Term Loans Due 2009:   The $600,000,000 First Priority Secured Institutional Term Loans due April 1, 2009, issued by CalGen pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004, between CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger, and sole bookrunner, and the various lenders named therein.

51.   CalGen Lenders:  The holders of the CalGen Secured Debt.

52.   CalGen Makewhole Claim:  Any Makewhole Claim on account of the CalGen Second Priority Secured Floating Rate Notes Due 2010, the CalGen Second Priority Secured Term Loans Due 2010, the CalGen 11.5% Third Priority Secured Notes Due 2011, and the CalGen Third Priority Secured Floating Rate Notes Due 2011 (which may include (a) Allowed Claims for prepayment damages or premiums, (b) Allowed Claims for fees and expenses, (c) Allowed Claims for postpetition interest at the default contract rate, including interest on interest, and (d) the CalGen Third Priority Indenture Trustee's Allowed Claims against the Debtors under section 12.02 of the CalGen Third Priority Indenture, for amounts, if any, the CalGen Third Priority Indenture Trustee is required to remit to Holders of CalGen Secured Debt (other than Holders of CalGen Third Priority Secured Floating Rate Notes Due 2011) as a result of alleged intercreditor obligations).

7

53.    CalGen Second Priority Secured Floating Rate Notes Due 2010:    The $640,000,000 Second Priority Secured Floating Rate Notes due April 1, 2010, issued by CalGen and CalGen Finance pursuant to that certain Second Priority Indenture, dated as of March 23, 2004, between CalGen, CalGen Finance, and Wilmington Trust Company FSB, as second priority trustee.

54.    CalGen Second Priority Secured Term Loans Due 2010:    The $100,000,000 Second Priority Second Term Loans due April 1, 2010, issued by CalGen pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004, among CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger, and sole bookrunner, and the various lenders named therein.

55.    CalGen Secured Debt:    The series of first, second, and third lien financings, and a revolving loan consisting of: the CalGen First Priority Secured Floating Rate Notes Due 2009, the CalGen First Priority Secured Institutional Term Loans Due 2009, the CalGen Second Priority Secured Floating Rate Notes Due 2010, the CalGen Second Priority Secured Term Loans Due 2010, the CalGen Third Priority Secured Floating Rate Notes Due 2011, and the CalGen 11 1/2% Third Priority Secured Notes Due 2011.

56.    CalGen Third Priority Indenture:    That certain Third Priority Indenture, dated as of March 23, 2004, among CalGen, CalGen Finance, and Wilmington Trust Company FSB, as third priority trustee.

57.    CalGen Third Priority Indenture Trustee:    Manufacturers and Traders Trust Company, as successor indenture trustee under the CalGen Third Priority Indenture.

58.    CalGen Third Priority Secured Floating Rate Notes Due 2011:    The $680,000,000 Third Priority Secured Floating Rate Notes due April 1, 2011, issued by CalGen and CalGen Finance pursuant to the CalGen Third Priority Indenture.

59.    CalGen Unsecured Makewhole Claim:    Any Makewhole Claim on account of the CalGen Amended and Restated Credit Agreement, the CalGen First Priority Secured Floating Rate Notes Due 2009, and the CalGen First Priority Secured Institutional Term Loans Due 2009.

60.    Calpine:    Calpine Corporation, a Delaware corporation.

61.    Canadian Bar Date:    August 1, 2006, unless otherwise set in the CCAA Proceedings.

62.    Canadian Court:    The Court of Queen's Bench in Calgary, Alberta, Canada.

63.    Canadian Debtor:    Any CCAA Applicant or CCAA Party.

64.    Canadian Guarantee Claim:    Any Claim (except ULC1 Settlement Claims and Subordinated Debt Securities Claims) based on a Debtor's guarantee of a Canadian Debtor's debt that is not satisfied in full in the CCAA Proceedings, including the Canadian Re-Toll Claim.

65.   Canadian Intercompany Claim:  A Claim by a Canadian Debtor or a Canadian affiliate of the Debtors.

66.   Canadian Re-Toll Claim:   The Claim of Calpine Power LP based on the repudiation of that certain tolling agreement between Calpine Energy Services Canada Partnership and Calgary Energy Centre Limited Partnership, dated August 29, 2002, that is the subject of: (a) Proof of Claim number 5390 in the Chapter 11 Cases; (b) claim numbers 5-031, 7-009 and 8-011 in the CCAA Proceedings; and (c) an action in the Canadian Court entitled *In the Matter of Calpine Canada Energy Limited, Calpine Canada Power Ltd., Calpine Canada Energy Finance ULC, Calpine Energy Services Canada Ltd., Calpine Canada Resources Company, Calpine Canada Power Services Ltd., Calpine Canada Energy Finance II ULC, Calpine Natural Gas Services Limited and 3094479 Nova Scotia Company*, Action No. 0501-17864.

67.   Cash:  Cash and cash equivalents.

68.   Cash Collateral Order:  The Bankruptcy Court order entitled, *Second Amended Order Authorizing Use of Cash Collateral and Granting Adequate Protection*, entered in the Chapter 11 Cases on February 24, 2006 [Docket No. 881].

69.   Cause of Action:  Any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action also includes: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; (f) any claim or cause of action of any kind against any Released or Exculpated Party based in whole or in part upon acts or omissions occurring prior to or after the Petition Date; and (g) any claim listed in the Plan Supplement.

70.   CBA:  Any collective bargaining agreement as defined under section 1113 of the Bankruptcy Code to which one or more of the Debtors is a party.

71.   CCAA:  Companies' Creditors Arrangement Act (Canada).

72.   CCAA Applicant:  Each of Calpine Canada Energy Limited, Calpine Canada Power Ltd., Calpine Canada Energy Finance ULC, Calpine Energy Services Canada Ltd., Calpine Canada Resources Company, Calpine Canada Power Services Ltd., Calpine Canada Energy Finance II ULC, Calpine Natural Gas Services Limited, and 3094479 Nova Scotia Company.

9

73.    CCAA Party:  Each of Calpine Energy Services Canada Partnership, Calpine Canada Natural Gas Partnership, and Calpine Canadian Saltend Limited Partnership.

74.    CCAA Proceedings:  The proceedings initiated by the Canadian Debtors in the Canadian Court pursuant to the provisions of the CCAA, with action number 0501-17964, filed on December 20, 2005.

75.    CCAA Settlement:  That certain Settlement Agreement, which is incorporated by reference as though fully set forth herein, dated as of July 24, 2007, among Calpine, the Canadian Debtors, and the ULC1 Indenture Trustee, as approved by the Bankruptcy Court pursuant to that certain *Order Granting Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Bankruptcy Rule 9019(a) to Approve a Settlement with the Calpine Canadian Debtors*, entered in the Chapter 11 Cases on July 27, 2007 [Docket No. 5422], and by the Canadian Court pursuant to that certain *Order (Canada/U.S. Global Settlement Order)*, entered in the CCAA Proceedings on July 27, 2007.

76.    Certificate:  Any instrument evidencing a Claim or an Interest.

77.    Chapter 11 Cases:  The chapter 11 bankruptcy cases Filed by the Debtors on the Petition Date in the Bankruptcy Court, with case numbers 05-06199 through 05-60218, 05-60221 through 05-60278, 05-60281 through 05-60363, 05-60365 through 05-60401, 05-60403 through 05-60441, 05-60443 through 05-60456, 05-60458 through 05-60460, 05-60463 through 05-60468, 05-60476, 05-60477, 06-10026 through 06-10032, 06-10034, 06-10039, 06-10197, 06-10198, 06-10939, and 07-12967.

78.    Claim:  Any: (a) claim as defined in section 101(5) of the Bankruptcy Code against a Debtor and (b) with respect to ARTICLES VIII.D, E, F, and G, any claim as defined in section 101(5) of the Bankruptcy Code against the applicable Entities referenced therein.

79.    Claims and Solicitation Agent:  Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, (888) 249-2792, retained as the Debtors' claims and solicitation agent by order dated December 22, 2005, entitled *Order Pursuant to 28 U.S.C. § 155(c) and Local Rule 5075-1 of the Local Rules for the Southern District of New York, Authorizing and Approving the Retention of Kurtzman Carson Consultants LLC as Notices, Claims and Balloting Agent to the Debtors* [Docket No. 59].

80.    Claims Register:  The official register of Claims and Interests maintained by the Claims and Solicitation Agent.

81.    Class:  A class of Holders of Claims or Interests as set forth in the Plan.

82.    CM/ECF:  The Bankruptcy Court's Case Management and Electronic Case Filing system, which can be accessed at https://ecf.nysb.uscourts.gov/cgi-bin/login.pl.

83.    Collateral Trust Agreement:  The Collateral Trust Agreement dated as of July 16, 2003 among Calpine, Quintana Minerals (USA), Inc., JOQ Canada, Inc., QCH, The Bank of Nova Scotia, as Agent under the Credit Agreement, Wilmington Trust Company, as Trustee under the 2007 Indenture, Wilmington Trust Company, as Trustee under the 2010 Indenture,

10

Wilmington Trust Company, as Trustee under the 2013 Indenture, Goldman Sachs Credit Partners L.P., as Administrative Agent under the Term Loan Agreement and The Bank of New York, as Collateral Trustee, as amended or supplemented.

84.    Collateral Trustee:    In its capacity as such, the collateral trustee and its predecessors under the Collateral Trust Agreement.

85.    Confirmation:    The entry of the Confirmation Order, subject to all conditions specified in ARTICLE X having been satisfied or waived pursuant to ARTICLE X.

86.    Confirmation Date:    The date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

87.    Confirmation Hearing:    The hearing at which the Confirmation Order is first considered by the Bankruptcy Court.

88.    Confirmation Hearing Notice:    The notice approved in the Solicitation Procedures Order that sets forth in detail the voting and objection deadlines with respect to the Plan.

89.    Confirmation Order:    The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

90.    Consummation:    The occurrence of the Effective Date.

91.    Creditor:    A Holder of a Claim.

92.    Creditors' Committee:    The Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

93.    Credit Suisse Claim:    That certain claim of Credit Suisse Cayman Islands Branch, formerly known as Credit Suisse First Boston, Allowed by the order, dated July 11, 2007, entitled *Fourth Supplemental Order Granting the Debtors' Tenth Omnibus Objection to Proofs of Claim (No Liability Claims, Claims to Be Adjusted, Wrong Debtor Claims to Be Adjusted, Assumed Contract Claims, Anticipatory Claims, Amended/Replaced Claims and Insufficient Support Claims) as Set Forth Herein* [Docket No. 5251], which Claim is classified in Class C-8.

94.    Cure:    The distribution in the ordinary course of business following the Effective Date of Cash, or such other property as may be ordered by the Bankruptcy Court or agreed upon by the parties (which shall include the Creditors' Committee), in an amount equal to all unpaid monetary obligations under applicable law (including, to the extent provided for under the applicable assumed contract or unexpired lease, postpetition interest at the contract rate as agreed between the parties (which shall include the Creditors' Committee) or determined by the Bankruptcy Court) or such lesser amount as may be agreed upon by the parties, under an executory contract or unexpired lease assumed pursuant to section 365 of the Bankruptcy Code, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

K&E 12360541.14

EXHIBIT A
PART 6

95.    Cure Bar Date: The deadline for filing requests for payment of Cure, which shall be the later of: (a) thirty days after the Effective Date or (b) thirty days after the assumption of the applicable executory contract or unexpired lease, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable executory contract or unexpired lease.

96.    DB Share Lending Agreement: That certain Share Lending Agreement, dated as of September 28, 2004, by and among, Calpine Corporation, Deutsche Bank AG London, and Deutsche Bank Securities Inc.

97.    Debtor: Each of the following Entities: Calpine Corporation; Amelia Energy Center, LP; Anacapa Land Company, LLC; Anderson Springs Energy Company; Androscoggin Energy, Inc.; Auburndale Peaker Energy Center, LLC; Augusta Development Company, LLC; Aviation Funding Corp.; Baytown Energy Center, LP; Baytown Power GP, LLC; Baytown Power, LP; Bellingham Cogen, Inc.; Bethpage Energy Center 3, LLC; Bethpage Fuel Management Inc.; Blue Heron Energy Center LLC; Blue Spruce Holdings, LLC; Broad River Energy LLC; Broad River Holding, LLC; CalGen Equipment Finance Company, LLC; CalGen Equipment Finance Holdings, LLC; CalGen Expansion Company, LLC; CalGen Finance Corp.; CalGen Project Equipment Finance Company One, LLC; CalGen Project Equipment Finance Company Three, LLC; CalGen Project Equipment Finance Company Two, LLC; Calpine Acadia Holdings, LLC; Calpine Administrative Services Company, Inc.; Calpine Agnews, Inc.; Calpine Amelia Energy Center GP, LLC; Calpine Amelia Energy Center LP, LLC; Calpine Auburndale Holdings, LLC; Calpine Baytown Energy Center GP, LLC; Calpine Baytown Energy Center LP, LLC; Calpine Bethpage 3 Pipeline Construction Company, Inc.; Calpine Bethpage 3, LLC; Calpine c* Power, Inc.; Calpine CalGen Holdings, Inc.; Calpine California Development Company, LLC; Calpine California Energy Finance, LLC; Calpine California Equipment Finance Company, LLC; Calpine Calistoga Holdings, LLC; Calpine Capital Trust; Calpine Capital Trust II; Calpine Capital Trust III; Calpine Capital Trust IV; Calpine Capital Trust V; Calpine Central Texas GP, Inc.; Calpine Central, Inc.; Calpine Central, LP; Calpine Central-Texas, Inc.; Calpine Channel Energy Center GP, LLC; Calpine Channel Energy Center LP, LLC; Calpine Clear Lake Energy GP, LLC; Calpine Clear Lake Energy, LP; Calpine Cogeneration Corporation; Calpine Construction Management Company, Inc.; Calpine Corpus Christi Energy GP, LLC; Calpine Corpus Christi Energy LP; Calpine Decatur Pipeline Inc.; Calpine Decatur Pipeline, L.P.; Calpine Dighton, Inc.; Calpine East Fuels, Inc.; Calpine East Fuels, LLC; Calpine Eastern Corporation; Calpine Energy Holdings, Inc.; Calpine Energy Services Holdings, Inc.; Calpine Energy Services, LP; Calpine Finance Company; Calpine Freestone Energy GP, LLC; Calpine Freestone Energy, LP; Calpine Freestone, LLC; Calpine Fuels Corporation; Calpine Gas Holdings LLC; Calpine Generating Company, LLC; Calpine Geysers Company, LP; Calpine Gilroy 1, Inc.; Calpine Gilroy 2, Inc.; Calpine Gilroy Cogen, L.P.; Calpine Global Services Company, Inc.; Calpine Gordonsville GP Holdings, LLC; Calpine Gordonsville LP Holdings, LLC; Calpine Gordonsville, LLC; Calpine Greenleaf Holdings, Inc.; Calpine Greenleaf, Inc.; Calpine Hidalgo Design, L.P.; Calpine Hidalgo Energy Center, L.P.; Calpine Hidalgo Holdings, Inc.; Calpine Hidalgo Power GP, LLC; Calpine Hidalgo Power, LP; Calpine Hidalgo, Inc.; Calpine International Holdings, Inc.; Calpine International, LLC; Calpine Investment Holdings, LLC; Calpine Kennedy Airport, Inc.; Calpine Kennedy Operators, Inc.; Calpine KIA, Inc.; Calpine Leasing, Inc.; Calpine Long Island, Inc.; Calpine Lost Pines Operations, Inc.; Calpine Louisiana Pipeline Company; Calpine Magic Valley Pipeline, Inc.; Calpine Monterey

12

Cogeneration, Inc.; Calpine MVP, Inc.; Calpine NCTP GP, LLC; Calpine NCTP, LP; Calpine Northbrook Corporation of Maine, Inc.; Calpine Northbrook Energy Holdings, LLC; Calpine Northbrook Energy, LLC; Calpine Northbrook Holdings Corporation; Calpine Northbrook Investors, LLC; Calpine Northbrook Project Holdings, LLC; Calpine Northbrook Services LLC; Calpine Northbrook Southcoast Investors, LLC; Calpine NTC, LP; Calpine Oneta Power I, LLC; Calpine Oneta Power II, LLC; Calpine Oneta Power, LP; Calpine Operating Services Company, Inc.; Calpine Operations Management Company, Inc.; Calpine Pastoria Holdings, LLC; Calpine Philadelphia, Inc.; Calpine Pittsburg, LLC; Calpine Power Company; Calpine Power Equipment, LP; Calpine Power Inc.; Calpine Power Management, Inc.; Calpine Power Management, LP; Calpine Power Services, Inc.; Calpine PowerAmerica - CA, LLC; Calpine PowerAmerica - CT, LLC; Calpine PowerAmerica - MA, LLC; Calpine PowerAmerica - ME, LLC; Calpine PowerAmerica, LLC; Calpine PowerAmerica, LP; Calpine PowerAmerica-NH, LLC; Calpine PowerAmerica-NY, LLC; Calpine PowerAmerica-OR, LLC; Calpine Producer Services, LP; Calpine Project Holdings, Inc.; Calpine Pryor, Inc.; Calpine Rumford I, Inc.; Calpine Rumford, Inc.; Calpine Schuylkill, Inc.; Calpine Siskiyou Geothermal Partners, L.P.; Calpine Sonoran Pipeline, LLC; Calpine Stony Brook Operators, Inc.; Calpine Stony Brook Power Marketing, LLC; Calpine Stony Brook, Inc.; Calpine Sumas, Inc.; Calpine TCCL Holdings, Inc.; Calpine Texas Pipeline GP, Inc.; Calpine Texas Pipeline LP, Inc.; Calpine Texas Pipeline, L.P.; Calpine Tiverton I, Inc.; Calpine Tiverton, Inc.; Calpine ULC I Holding, LLC; Calpine University Power, Inc.; Calpine Unrestricted Funding, LLC; Calpine Unrestricted Holdings, LLC; Calpine Vapor, Inc.; Carville Energy LLC; CCFC Development Company, LLC; CCFC Equipment Finance Company, LLC; CCFC Project Equipment Finance Company One, LLC; Celtic Power Corporation; CES GP, LLC; CGC Dighton, LLC; Channel Energy Center, LP; Channel Power GP, LLC; Channel Power LP; Clear Lake Cogeneration Limited Partnership; Cogenamerica Asia, Inc.; Cogenamerica Parlin Supply Corporation; Columbia Energy LLC; Corpus Christi Cogeneration, LP; CPN 3rd Turbine, Inc.; CPN Acadia, Inc.; CPN Berks Generation, Inc.; CPN Berks LLC; CPN Bethpage 3rd Turbine Inc.; CPN Cascade, Inc.; CPN Clear Lake, Inc.; CPN Decatur Pipeline, Inc.; CPN Energy Services GP, Inc.; CPN Energy Services LP, Inc.; CPN Freestone, LLC; CPN Funding, Inc.; CPN Morris, Inc.; CPN Oxford, Inc.; CPN Pipeline Company; CPN Pleasant Hill Operating, LLC; CPN Pleasant Hill, LLC; CPN Power Services GP, LLC; CPN Power Services, LP; CPN Pryor Funding Corporation; CPN Telephone Flat, Inc.; Decatur Energy Center, LLC; Deer Park Power GP, LLC; Deer Park Power, LP; Delta Energy Center, LLC; Dighton Power Associates, LP; East Altamont Energy Center, LLC; Fond Du Lac Energy Center, LLC; Fontana Energy Center, LLC; Freestone Power Generation, LP; GEC Bethpage Inc.; Geothermal Energy Partners, LLC; Geysers Power Company II LLC; Geysers Power Company, LLC; Geysers Power I Company; Goldendale Energy Center, LLC; Hammond Energy LLC; Hillabee Energy Center, LLC; Idlewild Fuel Management Corp; JMC Bethpage, Inc.; KIAC Partners; Lake Wales Energy Center, LLC; Lawrence Energy Center, LLC; Lone Oak Energy Center, LLC; Los Esteros Critical Energy Facility, LLC; Los Medanos Energy Center, LLC; Magic Valley Gas Pipeline GP, LLC; Magic Valley Gas Pipeline LP; Magic Valley Pipeline, LP; MEP Pleasant Hill, LLC; MOAPA Energy Center, LLC; Mobile Energy LLC; Modoc Power, Inc.; Morgan Energy Center, LLC; Mount Hoffman Geothermal Company, LP; Mt. Vernon Energy LLC; Newsouth Energy LLC; Nissequogue Cogen Partners; Northwest Cogeneration, Inc.; NTC Five, Inc.; NTC GP, LLC; Nueces Bay Energy, LLC; O.L.S. Energy-Agnews, Inc.; Odyssey Land Acquisition Company; Pajaro Energy Center, LLC; Pastoria Energy Center, LLC; Pastoria Energy Facility, LLC; Philadelphia Biogas Supply Inc.; Phipps

13

Bend Energy Center, LLC; Pine Bluff Energy, LLC; Power Investors, LLC; Power Systems Mfg. LLC; Quintana Canada Holdings, LLC; Rockgen Energy LLC; Rumford Power Associates, LP; Russell City Energy Center, LLC; San Joaquin Valley Energy Center, LLC; Santa Rosa Energy Center, LLC; Silverado Geothermal Resources, Inc.; Skipanon Natural Gas, LLC; South Point Energy Center, LLC; South Point Holdings, LLC; Stony Brook Cogeneration, Inc.; Stony Brook Fuel Management Corp.; Sutter Dryers, Inc.; TBG Cogen Partners; Texas City Cogeneration, LP; Texas Cogeneration Company; Texas Cogeneration Five, Inc.; Texas Cogeneration One Company; Thermal Power Company; Thomassen Turbine Systems America, Inc.; Tiverton Power Associates, LP; VEC Holdings, LLC; Venture Acquisition Company; Vineyard Energy Center, LLC; Wawayanda Energy Center, LLC; Whatcom Cogeneration Partners, LP; and Zion Energy LLC.

98    Debtors in Possession:  The Debtors, as debtors in possession in the Chapter 11 Cases, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

99.    DIP Facility:  That certain Credit Agreement, by and among the Debtors and the DIP Lenders, dated as of March 29, 2007, and approved by the Bankruptcy Court in an order entitled, *Final Order Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e)* [Docket No. 635].

100.    DIP Facility Claim:  Any Claim on account of the DIP Facility.

101.    DIP Lenders:  General Electric Capital Corporation (including its successors), as sub-agent for the revolving lenders under the DIP Facility (in such capacity and including any successors); Credit Suisse, Goldman Sachs Credit Partners L.P., and JPMorgan Chase Bank, N.A., as co-documentation agents and as co-syndication agents; Credit Suisse, as administrative agent (in such capacity and including any successors) and as collateral agent (in such capacity and including any successors); and each of the financial institutions from time to time party to the DIP Agreement.

102.    Disclosure Statement:  The Fourth Amended Disclosure Statement for the Plan describing the Plan, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

103.    Disputed:  With respect to any Claim or Interest, any Claim or Interest on the Claims Register that is not yet Allowed.

104.    Disputed Second Lien Debt Claim:  That portion of the Second Lien Debt Claim consisting of default and compound interest that has not been waived pursuant to the Cash Collateral Order and subsequent amendments to the Cash Collateral Order accruing from and after the Petition Date through and including the Interest Accrual Limitation Date plus any fees and costs (including attorneys' fees) incurred in connection with any litigation over such Disputed Second Lien Debt Claim plus the Second Lien Ad Hoc Committee Transaction Fee.

105.    Distribution Agent:  The Reorganized Debtors, or the Entity or Entities chosen by the Reorganized Debtors, with the consent of the Creditors' Committee, to make or to facilitate distributions pursuant to the Plan.

14

106.    Distribution Date:  The date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence, but not later than ten days after the Effective Date, without further Bankruptcy Court order.

107.    Distribution Record Date:  The date for determining which Holders of Allowed Claims and Interests, except Holders of publicly traded Certificates, are eligible to receive distributions pursuant to the Plan, which shall be the Confirmation Date or such other date as designated in the Plan or a Bankruptcy Court order.

108.    District Court:  The United States District Court for the Southern District of New York.

109.    Effective Date:  The date selected by the Debtors (in consultation with the Creditors' Committee) that is a Business Day after the Confirmation Date on which the conditions as specified in the Plan have been satisfied or waived.  Unless otherwise specifically provided in the Plan, anything required to be done by the Debtors on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

110.    Entity:  As defined in section 101(15) of the Bankruptcy Code.

111.    Equity Committee:  The Official Committee of Equity Security Holders appointed in the Chapter 11 Cases.

112.    Equity Security:  Any equity security as defined in section 101(16) of the Bankruptcy Code in a Debtor.

113.    Equity Security Holder:  A Holder of an Interest.

114.    Estate:  The bankruptcy estate of any Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

115.    Exculpated Claim:  Any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in or out of court restructuring, the Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other agreement.

116.    Exculpated Party:  Each of: (a) the Debtors, the Reorganized Debtors, and their Affiliates; (b) the DIP Lenders in their capacities as such; (c) the New Credit Facility Lenders in their capacity as such, along with their respective affiliates; (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' successors and assigns; (e) any statutory committee and the members thereof in their capacity as such; (f) the Second Lien Ad Hoc Committee and the members thereof in their capacity as such; (g) the ULC1 Noteholders Ad Hoc Committee and the members thereof in their capacity as such; (h) the Indenture Trustees; (i) the Administrative Agents; (j) the Collateral Trustee; (k) Manufacturers & Traders Trust Company, solely in its capacity as indenture trustee for the 7.75% Contingent Convertible Notes

Due 2015; (l) the Ad Hoc Committee Of 6.0% Convertible Noteholders and the members thereof, solely in their capacities as such; (m) the Ad Hoc Committee Of 7.75% Convertible Noteholders and the members thereof, solely in their capacities as such; and (n) with respect to each of the foregoing Entities in clauses (a) through (m), such Entities' subsidiaries, affiliates, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, in each case in their capacity as such; provided, however, that clause (n) shall not include officers, directors, or employees of the Debtors who were no longer acting in such capacity on or after the Petition Date.

117.    Federal Judgment Rate:  The federal judgment rate of 4.34%, which was in effect as of the Petition Date.

118.    FERC:  Federal Energy Regulatory Commission.

119.    FERC Jurisdictional Contract:  Any contract to which one or more of the Debtors is a party containing rates, terms, or conditions subject to the jurisdiction of the FERC pursuant to the Federal Power Act, 16 U.S.C. §§ 824–824n, or the Natural Gas Act, 15 U.S.C. §§ 717–717z.

120.    File:  To file with the Bankruptcy Court in the Chapter 11 Cases, or in the case of Proofs of Claim or Interest, to file with the Claims and Solicitation Agent.

121.    Final Decree:  The decree contemplated under Bankruptcy Rule 3022.

122.    Final Order:  As applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the  relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the Debtors or Reorganized Debtors, as applicable, reserve the right to waive any such appeal or similar conditions of a Final Order in consultation with the Creditors' Committee, and with the consent of the Creditors' Committee with respect to Final Orders entered in any pending litigation or contested matter to which the Creditors' Committee is a party, any appeals Filed regarding Confirmation, the resolution of any substantial contribution applications, and the resolution of applications for Professionals' Claims.

123.    First Lien Debt Claim:  Any Claim (not including any First Lien Unsecured Makewhole Claims) on account of the 9.625% First Priority Senior Secured Notes Due 2014.

124.    First Lien Makewhole Claim:  Any Makewhole Claim on account of the 9.625% First Priority Senior Secured Notes Due 2014.

125.    First Lien Repayment Order:  The Bankruptcy Court order entitled, *Order Authorizing Repayment of Principal of First Lien Debt*, entered in the Chapter 11 Cases on May 10, 2006 [Docket No. 1542].

126.    First Lien Secured Makewhole Claim:    Any First Lien Makewhole Claim determined by Bankruptcy Court order to be Secured.

127.    First Lien Unsecured Makewhole Claim:    Any First Lien Makewhole Claim determined by Bankruptcy Court order not to be Secured.

128.    General Note Claim:    Any Claim (including any General Note Makewhole Claims, but not including any Subordinated Debt Securities Claims) on account of the: (a) 4.0% Convertible Senior Notes Due 2006; (b) 4.75% Convertible Senior Notes Due 2023; (c) 6.00% Contingent Convertible Notes Due 2014; (d) 8.5% Senior Notes Due 2011; and (e) 8.625% Senior Notes Due 2010.

129.    General Note Makewhole Claim:    Any Makewhole Claim on account of the: (a) 4.0% Convertible Senior Notes Due 2006; (b) 4.75% Convertible Senior Notes Due 2023; (c) 6.00% Contingent Convertible Notes Due 2014; (d) 8.5% Senior Notes Due 2011; and (e) 8.625% Senior Notes Due 2010.

130.    General Unsecured Claim:    Any Claim against any of the Debtors that is not a/an: (a) DIP Facility Claim; (b) Administrative Claim; (c) Priority Tax Claim; (d) First Lien Debt Claim; (e) Second Lien Debt Claim; (f) Other Secured Claim; (g) Other Priority Claim; (h) Senior Note Claim; (i) General Note Claim; (j) Subordinated Note Claim; (k) ULC1 Settlement Claim; (l) Canadian Guarantee Claim; (m) Canadian Intercompany Claim; (n) Rejection Damages Claim; (o) Unsecured Makewhole Claim; (p) Unsecured Convenience Class Claim; (q) Intercompany Claim; (r) Subordinated Equity Securities Claim; or (s) Subordinated Debt Securities Claim.

131.    Governmental Unit:    As defined in section 101(27) of the Bankruptcy Code.

132.    Government Bar Date:    August 1, 2006.

133.    Greenleaf Project:    Those certain leased cogeneration projects of 49.2 megawatts and 49.5 megawatts, respectively, along with certain related equipment, located in Sutter County, California.

134.    GTN/PNGTS Contracts:    Those FERC Jurisdictional Contracts subject to the *Debtors' Motion to Reject Certain Natural Gas Pipeline Transportation Contracts* [Docket No. 6562].

135.    GTN Net Allowed Claim:    The GTN Net Allowed Claim as defined in the Stipulation and Agreed Order Between and Among the Debtors, Portland Natural Gas Transmission System, TransCanada PipeLines Limited, and NOVA Gas Transmission Resolving and Allowing Claims and Terminating Agreements, dated December 18, 2007.

136.    Hawaii Plaintiffs:    Hawaii Structural Ironworkers Pension Trust Fund, on behalf of itself and the court-appointed representative of the class of others similarly situated, as plaintiffs in Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp., et al, Case No. 1-04-CV-021465 (Cal. Sup. Ct.).

17

K&E 12306341.4

137.  Hess Adversary Proceeding:  Adversary Proceeding No. 07-03198 in the Bankruptcy Court.

138.  Hess Agreement:  That certain Amended and Restated Gas Sales Agreement, dated as of June 1, 1996 between Amerada Hess Corporation (n/k/a Hess Corporation) and KIAC Partners.

139.  Hidalgo Facility:  That certain 485 megawatt natural gas-fired cogeneration power plant located in Edinburg, Texas.

140.  Hidalgo Indenture Trustee:  The Bank of New York Trust Company, N.A., as successor Indenture Trustee to JPMorgan Chase Bank, N.A., f/k/a Chase Bank of Texas, National Association.

141.  Hidalgo Lease:  That certain Electric Generation Equipment Lease Agreement, dated as of May 1, 1999, between the Industrial Development Corporation of the City of Edinburg, Texas, as lessor, and Calpine Hidalgo Energy Center, L.P., f/k/a Duke Hidalgo, as lessee.

142.  Hidalgo Leasehold Interest:  That certain leasehold interest granted to Calpine Hidalgo Energy Center, L.P., f/k/a Duke Hidalgo, pursuant to the Hidalgo Lease.

143.  Holder:  An Entity holding a Claim or Interest, as applicable.

144.  Impaired:  With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

145.  Indemnification Obligation:  A Debtor's obligation under an executory contract or otherwise to indemnify directors, officers, or employees of the Debtors who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtors' respective articles of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

146.  Indenture Trustees:  In their capacity as such, the indenture trustees and their predecessors for the: (a) 4.0% Convertible Senior Notes Due 2006; (b) 4.75% Convertible Senior Notes Due 2023; (c) 6.00% Contingent Convertible Notes Due 2014; (d) 7.625% Senior Notes Due 2006; (e) 7.75% Senior Notes Due 2009; (f) 7.875% Senior Notes Due 2008; (g) 8.5% Second Priority Senior Secured Notes Due 2010; (h) 8.5% Senior Notes Due 2011; (i) 8.625% Senior Notes Due 2010; (j) 8.75% Second Priority Senior Secured Notes Due 2013; (k) 8.75% Senior Notes Due 2007; (l) 9.875% Second Priority Senior Secured Notes Due 2011; (m) Second Priority Senior Secured Floating Rate Notes Due 2007; (n) ULC1 8.5% Senior Notes Due 2008; and (o) ULC1 8.75% Senior Notes Due 2007.

147.  Insider:  As defined in section 101(31) of the Bankruptcy Code.

148.  Intercompany Claim:  A Claim (other than a ULC1 Settlement Claim) held by a Debtor or an Affiliate.

149.  Intercompany Contract:  A contract between two or more Debtors or a contract between one or more Affiliates and one or more Debtors.

150.  Intercompany Interest:  An Interest held by a Debtor or an Affiliate.

151.  Intercreditor Escrow:  Any portion of the distribution to Holders of Allowed Subordinated Note Claims subject to the Intercreditor Subordination Dispute.

152.  Intercreditor Subordination Dispute:  That certain dispute regarding whether the Holders of Allowed Subordinated Note Claims have consented to, or are obligated to consent to, the distribution of any portion of their distribution under the Plan to Holders of Allowed Senior Note Claims to satisfy any Allowed Claims of the Holders of Allowed Senior Note Claims for amounts other than principal and interest accrued as of the Petition Date.

153.  Intercreditor Subordination Dispute Escrow Account:  That certain escrow account established for the benefit of the Holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims pending resolution of the Intercreditor Subordination Dispute by Final Order.

154.  Interest:  Any: (a) Equity Security, including all issued, unissued, authorized, or outstanding shares of stock together with any warrants, options, or contractual rights to purchase or acquire such Equity Securities at any time and all rights arising with respect thereto and (b) partnership, limited liability company, or similar interest in a Debtor.

155.  Interest Accrual Limitation Date:  The date on which the applicable Claim is satisfied in full.

156.  Interim Compensation Order:  The order, entitled *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, entered by the Bankruptcy Court on January 25, 2006 [Docket No. 617], allowing Estate Professionals to seek interim compensation in accordance with the compensation procedures approved therein, as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

157.  Internal Revenue Code:  Title 26 of the United States Code, 26 U.S.C. §§ 1–9833.

158.  Judicial Code:  Title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

159.  KIAC And Nissequogue Facilities:  That certain 110 megawatt natural gas-fired cogeneration power plant located at John F. Kennedy International Airport in Queens, New York and that certain 40 megawatt natural gas-fired cogeneration power plant located on the campus of the State University of New York at Stony Brook.

160.  KIAC And Nissequogue Leasehold Interests:  That certain leasehold interest granted to KIAC Partners pursuant to that certain Agreement of Lease, dated as of April 28, 1993, by and between KIAC Partners and the Port Authority of New York and New Jersey, and that certain leasehold interest granted to Nissequogue Cogen Partners pursuant to that certain Amended and Restated Lease Agreement, dated as of November 1, 1998, by and between Nissequogue Cogen Partners and the Suffolk County Industrial Development Agency.

19

161.  Legal Holiday: As defined in Bankruptcy Rule 9006(a).

162.  Lien: As defined in section 101(37) of the Bankruptcy Code.

163.  Liquidity Solutions Claims: Those certain claims of Liquidity Solutions, Inc. d/b/a Revenue Management, comprised of claim number 5248 and claim number 870.

164.  LS Entities: Farrington Capital, LP or LSP Cal Holdings I LLC.

165.  LSP Shares: Any Shares of New Calpine Common Stock distributable to the LS Entities or the Luminus Entities on account of their respective Allowed Claims.

166.  Luminus Entities: Luminus Asset Partners LP or Luminus Energy Partners Master Fund Ltd.

167.  Makewhole Claim: Any Claim for any makewhole amount, prepayment premium, early termination fee, or other similar amount asserted on account of any notes, indentures, or other instruments issued by the Debtors prior to the Petition Date, including with respect to the: (a) 9.625% First Priority Senior Secured Notes Due 2014; (b) CalGen First Priority Secured Floating Rate Notes Due 2009; (c) CalGen First Priority Secured Institutional Term Loans Due 2009; (d) CalGen Second Priority Secured Floating Rate Notes Due 2010; (e) CalGen Second Priority Secured Term Loans Due 2010; (f) CalGen 11.5% Third Priority Secured Notes Due 2011; (g) CalGen Third Priority Secured Floating Rate Notes Due 2011; (h) 8.5% Second Priority Senior Secured Notes Due 2010; (i) 8.75% Second Priority Senior Secured Notes Due 2013; (j) 9.875% Second Priority Senior Secured Notes Due 2011; (k) 8.625% Senior Notes Due 2010; (l) 8.5% Senior Notes Due 2011; (m) 4.0% Convertible Senior Notes Due 2006; (n) 4.75% Convertible Senior Notes Due 2023; (o) 6.00% Contingent Convertible Notes Due 2014; (p) 7.75% Contingent Convertible Notes Due 2015; (q) 8.75% Senior Notes Due 2007; (r) 7.875% Senior Notes Due 2008; (s) 7.625% Senior Notes Due 2006; (t) 7.75% Senior Notes Due 2009; and (u) 8.625% Senior Notes Due 2010.

168.  Management and Director Equity Incentive Plan: A post-Effective Date management and director compensation incentive plan intended for certain management, employees, and directors of certain of the Reorganized Debtors.

169.  Master Ballots: The master ballots upon which the applicable Nominee or other holder of record shall submit on behalf of the Beneficial Holders it represents the votes cast by such Beneficial Holders to accept or reject the Plan.

170.  Named Executive Officers: As defined in Regulation S-K, Item 402(a)(3), 17 C.F.R. § 229.402(a)(3).

171.  Nevada Power Stipulation And Agreed Order: That certain Stipulation and Agreed Order, which is incorporated herein by reference as though fully set forth herein, by and between Calpine and Nevada Power Company, Sierra Pacific Power Company, and Fireman's Fund, entered by the Bankruptcy Court on October 10, 2007 [Docket No. 6248]. The Nevada Power Stipulation and Agreed Order shall survive confirmation of the Plan and remain in full force and effect, and be binding on Reorganized Calpine and Reorganized Debtors.

20

172.   New Calpine Common Stock:   1,500,000,000 shares of common stock in Reorganized Calpine, par value $0.001 per share, to be authorized pursuant to the Reorganized Calpine Charter, of which up to 500,000,000 shares shall be initially issued and outstanding pursuant to the Plan as of the Effective Date.

173.   New Calpine Common Stock Pool For Creditors:   All New Calpine Common Stock to be issued under the Plan, net of any shares reserved for issuance under the Management and Director Equity Incentive Plan.

174.   New Calpine Common Stock Pool For Subordinated Debt Securities Claimants: All New Calpine Common Stock to be issued under the Plan remaining in the New Calpine Common Stock Pool For Creditors after all Holders of Allowed Claims (other than Subordinated Debt Securities Claims and Subordinated Equity Securities Claims) have been paid in full.

175.   New Calpine Warrants:   Those warrants referenced in that certain "Calpine Term Sheet Regarding Warrants to be Issued to Holders of Interests Under Calpine Plan of Reorganization," dated December 18, 2007, contained in the Plan Supplement.

176.   New Calpine Plan Securities:   The New Calpine Common Stock and New Calpine Warrants.

177.   New Calpine Stock Reserve:   The New Calpine Common Stock held in reserve pursuant to ARTICLE VII.C.3.

178.   New Calpine Total Enterprise Value:   $18.95 billion.

179.   New Calpine Trading Restrictions Term Sheet:   That certain Term Sheet for Proposed Trading Restrictions on Reorganized Calpine Common Stock by and among the Debtors and the Creditors' Committee.

180.   New Credit Facility:   That certain secured financing facility in the maximum amount of $7.6 billion, comprised of an up to $6.3 billion first lien secured term facility, a $1.0 billion first lien secured revolving credit facility, and a $300 million first lien secured bridge facility, by and among Reorganized Calpine, as borrower, and Goldman Sachs Credit Partners L.P., as well as other entities, as joint lead arrangers, book runners, and administrative agents, and a syndicate of banks, financial institutions, and other entities, as lenders, and all other documents entered into in connection therewith or contemplated thereby, substantially in the form of that facility referenced in, and subject to the modifications contained in, the Amended and Restated Commitment Papers, as such term is defined in the *Order Authorizing Amendments to Exit Financing Facility* [Docket No. 7161] entered by the Bankruptcy Court on December 17, 2007.

181.   New Credit Facility Lenders:   Goldman Sachs Credit Partners L.P. (including its successors), as administrative agent (in such capacity and including any successors) under the New Credit Facility, Credit Suisse (including its successors), as administrative agent and as collateral agent (in such capacity and including any successors) under the New Credit Facility, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Deutsche Bank Trust Company Americas, and Morgan Stanley Senior Funding (including their respective successors),

K&E 12302541 14

as co-syndication agents and co-documentation agents under the New Credit Facility (in such capacity and including any successors), and each of the financial institutions from time to time party to the New Credit Facility.

182.    Nominee:  Any broker, dealer, commercial bank, trust company, savings and loan, financial institution, or other party in whose name securities are registered or held of record on behalf of a Beneficial Holder.

183.    Notice of Confirmation:  That certain notice pursuant to Bankruptcy Rule 3020(c)(2) notifying Holders of Claims and Interests and parties in interest that the Bankruptcy Court has confirmed the Plan.

184.    NOVA Gas Transmission Ltd. Claims:  Those certain Claims as evidenced in the Proof of Claims or amended Proof of Claims filed by NOVA Gas Transmission Ltd.

185.    Oil and Gas Contracts:  All executory contracts or unexpired leases and any other agreements of the Debtors (a) with Petersen Production Company; or (b) related to the operation or development of the Debtors' oil and gas business.

186.    Old Calpine Common Stock:  All of the authorized, issued, and outstanding shares of common stock of Calpine as of immediately prior to the Effective Date.

187.    Other Priority Claim:  Any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

188.    Other Secured Claim:  Any Secured Claim, other than a: (a) DIP Facility Claim; (b) First Lien Debt Claim; or (c) Second Lien Debt Claim.

189.    Periodic Distribution Date:  The first Business Day that is as soon as reasonably practicable occurring approximately ninety days after the Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring approximately ninety days after the immediately preceding Periodic Distribution Date.

190.    Person:  As defined in section 101(41) of the Bankruptcy Code.

191.    Petersen:  Petersen Production Company LLC.

192.    Petition Date:  December 20, 2005 for case numbers 05-60199 through 05-60211; December 21, 2005 for case numbers 05-60212 through 05-60218, 05-60221 through 05-60278, 05-60281 through 05-60363, 05-60365 through 05-60401, 05-60403 through 05-60441, 05-60443 through 05-60456, 05-60458 through 05-60460, and 05-40463; December 27, 2005 for case numbers 05-60464 through 05-60468; December 29, 2005 for case numbers 05-60476 and 05-60477; January 8, 2006 for case numbers 06-10026 through 06-10032; January 9, 2006 for case numbers 06-10034 and 06-10039; February 3, 2006 for case numbers 06-10197 and 06-10198; May 2, 2006 for case number 06-10939; and September 20, 2007 for case number 07-12967; provided, however, for purposes of the Plan, unless otherwise provided, the Petition Date shall be deemed to be December 20, 2005 for all Debtors.

193. Phelps Plaintiffs: James Phelps, on behalf of himself, the Calpine Corporation Retirement Savings Plan, and a proposed class of others similarly situated, as plaintiffs in ERISA Litigation, Master File No. C 03-CV-1685 (SDA) (C.D. Cal.).

194. Pipelines: Gas Transmission Northwest Corporation, Portland Natural Gas Transmission System, TransCanada PipeLines Limited, and NOVA Gas Transmission Ltd.

195. Pipelines' Claims: Claims of Gas Transmission Northwest Corporation, Portland Natural Gas Transmission System, TransCanada PipeLines Limited, NOVA Gas Transmission Ltd. identified in the Proofs of Claim or amended Proofs of Claim filed by each of them.

196. PLA: Any pre-hire project labor agreement to which one or more of the Debtors, is a party.

197. Plan: This Sixth Amended Joint Plan of Reorganization for each of the Debtors pursuant to chapter 11 of the Bankruptcy Code, together with the Plan Supplement, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms of the Plan, the Bankruptcy Code, and the Bankruptcy Rules.

198. Plan Supplement: The compilation of documents and forms of documents, schedules, and exhibits to the Plan.

199. Plan Supplement Filing Date: The date that is no later than fourteen days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest.

200. PNGTS Net Allowed Claim: The PNGTS Net Allowed Claim as defined in the Stipulation and Agreed Order Between and Among the Debtors, Portland Natural Gas Transmission System, TransCanada PipeLines Limited, and NOVA Gas Transmission Resolving and Allowing Claims and Terminating Agreements, dated December 18, 2007.

201. PPA Litigation: That certain matter currently styled as In re Calpine Corp.; Calpine Corp., et al. v. California Dept. of Water Resources, et al.; Docket Nos. 06-0480-BK; 06-0676-BK; 06-0683-BK; 06-0691-BK; 06-0717-BK; and 06-0723-BK.

202. Priority Tax Claim: Any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

203. Professional: An Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

204. Professional Fee Escrow Account: An interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Professionals in the Chapter 11 Cases.

205.   Professional Fee Reserve Amount:  Accrued Professional Compensation through the Effective Date as estimated by the Professionals in accordance with ARTICLE IX.A.4.

206.   Projects to Be Sold or Surrendered:  A power plant facility owned by one or more of the Debtors to be sold or surrendered pursuant to the Plan on or after the Effective Date.

207.   Proof of Claim:  A proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

208.   Proof of Interest:  A proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

209.   QCH:  Quintana Canada Holdings, LLC, a Delaware corporation.

210.   Quadrangle And JP Morgan Claims:  Those certain claims of Quadrangle Master Funding Ltd and JPMorgan Chase Bank, N.A. Allowed by the order, dated May 9, 2007, entitled *Order Approving (I) the Claims Settlement Agreement and the Release Agreement Regarding the Settlement and Release of Certain Claims Relating to the Acadia Power Plant, and (II) an $85 Million Payment to the Stalking Horse Purchaser in Consideration for the Waiver of Priority Distributions and Other Consideration* [Docket No. 4603], which Claims are classified in Class C-8.

211.   Record Date: September 27, 2007.

212.   Reinstated:  (a) Leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Interest so as to leave such Claim Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder.

213.   Rejected California Energy Commission Agreements:  The following agreements: (a) that certain Grant Agreement (GEO-02-004) between Calpine Corporation and the California Energy Commission, dated October 9, 2002; (b) that certain Grant Agreement (GEO-04-004) between Calpine Corporation and the California Energy Commission, dated July 1, 2004; (c) that certain Grant Agreement (GEO-04-001) between Calpine Corporation and the California Energy Commission, dated July 14, 2004; (d) that certain Funding Award Agreement (REN-98-017) between Calpine Siskiyou Geothermal Partners, L.P. and the California Energy Commission,

24

dated April 2, 1999; (c) that certain Funding Award Agreement (REN-98-018) between CPN Telephone Flat, Inc. and the California Energy Commission, dated November 20, 2001.

214.    Rejected Employment Agreement:  An agreement, other than a CBA or PLA, between or among any of the Debtors and any directors, officers, or employees of any of the Debtors for such Person to serve in such capacity that has been rejected, expired on its own terms, or otherwise terminated by the Debtors on or before the Effective Date.

215.    Rejection Damages Claim:  Any Claim on account of the rejection of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

216.    Released Party:  Each of: (a) the DIP Lenders in their capacities as such; (b) the New Credit Facility Lenders in their capacities as such, along with their respective affiliates; (c) with respect to each of the foregoing Entities in clauses (a) and (b), such Entities' successors and assigns; (d) any statutory committee and the members thereof in their capacity as such; (e) the Second Lien Ad Hoc Committee and the members thereof in their capacity as such; (f) the ULC1 Noteholders Ad Hoc Committee and the members thereof in their capacity as such; (g) the Indenture Trustees; (h) the Administrative Agents; (i) the Collateral Trustee; (j) Manufacturers & Traders Trust Company, solely in its capacity as indenture trustee for the 7.75% Contingent Convertible Notes Due 2015 (solely for purposes of ARTICLE VIII.D); (k) the Ad Hoc Committee Of 6.0% Convertible Noteholders and the members thereof, solely in their capacities as such (solely for purposes of ARTICLE VIII.D); (l) the Ad Hoc Committee Of 7.75% Convertible Noteholders and the members thereof, solely in their capacities as such (solely for purposes of ARTICLE VIII.D); (m) with respect to each of the foregoing Entities in clauses (a) through (l), such Entities' affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, in each case in their capacity as such, and only if serving in such capacity; and (n) the Debtors' and Reorganized Debtors' officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, in each case in their capacity as such, and only if serving in such capacity.

217.    Reorganized Calpine:  Calpine, as reorganized under and pursuant to the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

218.    Reorganized Calpine Bylaws:  The bylaws of Reorganized Calpine, which shall be in form and substance acceptable to the Debtors and the Creditors' Committee, substantially in the form contained in the Plan Supplement to be in effect upon the Effective Date.

219.    Reorganized Calpine Charter:  The amended and restated certificate of incorporation of Reorganized Calpine, which shall be in form and substance acceptable to the Debtors and the Creditors' Committee, substantially in the form contained in the Plan Supplement to be in effect upon the Effective Date.

25

220.    Reorganized Debtors:  The Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

221.    Roll-Up Transaction:  A dissolution or winding up of the corporate existence of a Reorganized Debtor under applicable state law or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized Debtor merges with or transfers substantially all of its assets and liabilities to another Reorganized Debtor or one or more of their Affiliates, on or after the Effective Date.

222.    Rosetta:  Rosetta Resources, Inc. and any of its affiliates or subsidiaries.

223.    Rosetta Adversary Proceeding:  That certain adversary proceeding styled *Calpine Corporation v. Rosetta, Inc. (In re Calpine Corporation, et al.)*, Adv. No. 07-01760(BRL).

224.    Rosetta Contracts:  All executory contracts or unexpired leases and any other agreements that were executed or transferred as part of or in connection with the July 2005 sale of one or more of the Debtors' oil and gas businesses to Rosetta and/or any of its affiliates.

225.    Schedules:  The schedules of assets and liabilities, schedules of executory contracts, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

226.    Second Circuit:  The United States Court of Appeals for the Second Circuit.

227.    Second Lien Ad Hoc Committee:  The Unofficial Committee of Second Lien Debtholders.

228.    Second Lien Ad Hoc Committee Transaction Fee:  That certain Transaction Fee, as defined in the Agreement, dated as of December 2, 2005, by and among Houlihan Lokey Howard & Zukin, Wilmington Trust Company as Indenture Trustee, Goldman Sachs as Term Loan Agent, and Calpine.

229.    Second Lien Debt Claim:  Any Claim (not including any Second Lien Unsecured Makewhole Claims) on account of the: (a) Second Priority Senior Secured Floating Rate Notes Due 2007; (b) 8.5% Second Priority Senior Secured Notes Due 2010; (c) 8.75% Second Priority Senior Secured Notes Due 2013; (d) 9.875% Second Priority Senior Secured Notes Due 2011; and (e) Second Priority Senior Secured Term Loan Due 2007.

230.    Second Lien Makewhole Claim:  Any Makewhole Claim on account of the: (a) Second Priority Senior Secured Floating Rate Notes Due 2007; (b) 8.5% Second Priority Senior Secured Notes Due 2010; (c) 8.75% Second Priority Senior Secured Notes Due 2013; (d) 9.875% Second Priority Senior Secured Notes Due 2011; and (e) Second Priority Senior Secured Term Loan Due 2007.

231.    Second Lien Makewhole Settlement Order:  The Bankruptcy Court order entitled, *Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 9019 Approving Amended Stipulation By and Among the Debtors and Debtors in Possession, the Unofficial Committee of*

26

*Second Lien Debtholders and Wilmington Trust, as Indenture Trustee for the Second Lien Fixed Rate Notes*, entered in the Chapter 11 Cases on August 8, 2007 [Docket No. 5567].

232.    Second Lien Secured Makewhole Claim:  Any Second Lien Makewhole Claim determined to be Secured by a Bankruptcy Court order.

233.    Second Lien Unsecured Makewhole Claim:  Any Second Lien Makewhole Claim determined not to be Secured by a Bankruptcy Court order.

234.    Second Priority Senior Secured Floating Rate Notes Due 2007:    The $500,000,000 Second Priority Senior Secured Floating Rate Notes due 2007, issued by Calpine pursuant to that certain indenture dated as of July 15, 2003, between Calpine and Wilmington Trust Company, as trustee.

235.    Second Priority Senior Secured Term Loan Due 2007:  The $750,000,000 Senior Secured Term Loans due 2007, issued pursuant to that certain credit agreement, dated as of July 16, 2003, among Calpine, as borrower, Goldman Sachs Credit Partners, L.P., as sole lead arranger, sole bookrunner and administrative agent and the various co-arrangers, managing agents and lenders named therein.

236.    Secured:  When referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

237.    Securities Act:  The Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law.

238.    Security:  As defined in section 2(a)(1) of the Securities Act.

239.    Senior Note Claim:  Any Claim (including any Senior Note Makewhole Claims, but not including any Subordinated Debt Securities Claims) on account of the: (a) 7.625% Senior Notes Due 2006; (b) 7.75% Senior Notes Due 2009; (c) 7.875% Senior Notes Due 2008; (d) 8.75% Senior Notes Due 2007; and (e) 10.5% Senior Notes Due 2006 (which shall include an Allowed Claim in the amount of $72,000 for the remaining fees and expenses of U.S. Bank National Association, as indenture trustee to the 10.5% Senior Notes Due 2006, incurred through December 14, 2007 (other than fees and expenses incurred after December 14, 2007, with respect to which the Debtors or Reorganized Debtors, as applicable, the Creditors' Committee, and U.S. Bank National Association, as indenture trustee to the 10.5% Senior Notes Due 2006, reserve all their respective rights)).

240.    Senior Note Makewhole Claim:  Any Makewhole Claim on account of the: (a) 7.625% Senior Notes Due 2006; (b) 7.75% Senior Notes Due 2009; (c) 7.875% Senior Notes Due 2008; (d) 8.75% Senior Notes Due 2007; and (e) 10.5% Senior Notes Due 2006.

K&E 12300541.14

241.  Servicer:  An indenture trustee, agent, servicer, or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

242.  SJ Plaza Claim:  That certain Claim of SJ Plaza, LLC. against Calpine, evidenced by claim number 6390, which amends claim number 714 and is classified in Class C-7.

243.  Solicitation Procedures Order:  That certain order entered by the Bankruptcy Court on September 26, 2007, approving certain solicitation procedures for solicitation of votes on the Plan [Docket No. 6136].

244.  South Point Joint Venture Claims:  Those certain Claims Filed by the South Point Joint Venture as Proof of Claim numbers 6400 and 6401.

245.  Subordinated Debt Securities Claim:  Any Claim of the type described in and subject to subordination pursuant to section 510(b) of the Bankruptcy Code relating to the: (a) 4.0% Convertible Senior Notes Due 2006; (b) 4.75% Convertible Senior Notes Due 2023; (c) 6.00% Contingent Convertible Notes Due 2014; (d) 8.5% Senior Notes Due 2011; (e) 8.625% Senior Notes Due 2010; (f) 7.625% Senior Notes Due 2006; (g) 7.75% Senior Notes Due 2009; (h) 7.875% Senior Notes Due 2008; (i) 8.75% Senior Notes Due 2007; (j) 10.5% Senior Notes Due 2006; (k) ULC1 Notes; (l) ULC2 8.375% Senior Notes Due 2008; (m) ULC2 8.875% Senior Notes Due 2011; and (n) 7.75% Contingent Convertible Notes Due 2015.

246.  Subordinated Equity Securities Claim:  Any Claim of the type described in and subject to subordination pursuant to section 510(b) of the Bankruptcy Code relating to any Interest.

247.  Subordinated Note Claim:  Any Claim (including any Subordinated Note Makewhole Claim, but not including any Subordinated Debt Securities Claims) on account of the 7.75% Contingent Convertible Notes Due 2015, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the Third Supplemental Indenture, dated as of June 23, 2005.

248.  Subordinated Note Makewhole Claim:  Any Makewhole Claim on account of the 7.75% Contingent Convertible Notes Due 2015.

249.  Supremacy Clause:  Paragraph 2 of Article VI of the United States Constitution.

250.  Texas Taxing Authority:  Eastland County, Texas, Freestone County, Texas, Harrison County, Texas, Harrison Central Appraisal District, Beckville ISD, Cayuga ISD, Chambers County, Cisco ISD, Cisco Junior College, Coppell ISD, Dallas County, Deer Park ISD, City of Edinburg, Fort Bend County, Galveston County, Harris County, Edinburg CISD, South Texas College, South Texas ISD, Houston ISD, Katy ISD, Liberty County, Nueces County and Webb CISD.

251.  Transaction Structuring Plan:  The detailed step plan created pursuant to section 2.6 of the CCAA Settlement to implement the transactions contemplated by the CCAA Settlement in an efficient manner.

252. TransCanada/NOVA Contracts: Those certain Contracts identified on Exhibit 20 to the Plan Supplement.

253. TransCanada PipeLines Limited Claims: Those certain Claims as evidenced in the Proof of Claims or amended Proof of Claims filed by TransCanada PipeLines Limited.

254. Transwestern Claim: That certain claim of Transwestern Pipeline Company, LLC Allowed by the order, dated October 25, 2007, entitled *Stipulation and Agreed Order Resolving and Allowing Claims, Terminating Agreements, and Maintaining Agreements Between the Debtors and Transwestern Pipeline Company, LLC* [Docket No. 6910], which Claim is classified in Class C-8.

255. ULC1 8.5% Senior Notes Due 2008: The $2,030,000,000 8.5% Senior Notes due May 1, 2008, issued by Calpine Canada Energy Finance ULC pursuant to the ULC1 Indenture.

256. ULC1 8.75% Senior Notes Due 2007: The (CAD) $200,000,000 8.75% Senior Notes due October 15, 2007, issued by Calpine Canada Energy Finance ULC pursuant to the ULC1 Indenture.

257. ULC1 Filed Amount: The sum of $2,124,356,213.11, being the stated amount of the General Unsecured Claim, as of the Petition Date, of the ULC1 Indenture Trustee, on behalf of the ULC1 Noteholders, against Calpine related to the ULC1 Notes.

258. ULC1 Indenture: That certain Indenture, dated as of April 25, 2001, between Calpine Canada Energy Finance ULC and Wilmington Trust Company, as indenture trustee, as amended by that certain Amended and Restated Indenture, dated as of October 16, 2001, between Calpine Canada Energy Finance ULC and Wilmington Trust Company, as indenture trustee.

259. ULC1 Indenture Trustee: HSBC Bank USA, National Association, as successor indenture trustee under the ULC1 Indenture.

260. ULC1 Indenture Trustee Fees: The reasonable fees, costs, and expenses of the ULC1 Indenture Trustee, including the reasonable fees, costs, and expenses of its U.S. and Canadian counsel, incurred, and to be incurred, by the ULC1 Indenture Trustee in connection with the Chapter 11 Cases and the CCAA Proceedings through the date of final distribution in respect of the ULC1 Settlement Claims.

261. ULC1 Noteholder: Any holder of a ULC1 Note.

262. ULC1 Noteholders Ad Hoc Committee: The informal committee of certain ULC1 Noteholders, as described more particularly in certain verified statements filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2019 at docket numbers 2823, 3285, and 5353, respectively, as may be updated further.

263. ULC1 Noteholders Ad Hoc Committee Fees: The reasonable fees, costs, and expenses of the ULC1 Noteholders Ad Hoc Committee, including the reasonable fees, costs, and expenses of its U.S. and Canadian counsel and its financial adviser, incurred, and to be incurred,

K&E 12900541 14

by the ULC1 Notcholders Ad Hoc Committee in connection with the Chapter 11 Cases and the CCAA Proceedings through the date of final distribution in respect of the ULC1 Settlement Claims, in an amount not to exceed $8 million.

264.   ULC1 Notes:  The ULC1 8.5% Senior Notes Due 2008 and the ULC1 8.75% Senior Notes Due 2007.

265.   ULC1 Settlement Claim:  Any Claim (including those held by the Debtors as of the Petition Date) arising under or relating to the ULC1 Indenture, as such Claims have been compromised and settled pursuant to the CCAA Settlement.

266.   ULC2 8.375% Senior Notes Due 2008:  The 175,000,000 8.375% Senior Notes due October 15, 2008, issued pursuant to that certain Indenture, dated as of October 18, 2001, between Calpine Canada Energy Finance I ULC and Wilmington Trust Company, as trustee.

267.   ULC2 8.875% Senior Notes Due 2011:  The £200,000,000 8.875% Senior Notes due October 15, 2011, issued pursuant to that certain Indenture, dated as of October 18, 2001, between Calpine Canada Energy Finance II ULC and Wilmington Trust Company, as trustee.

268.   Unclaimed Distribution:  Any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

269.   Uniform Commercial Code:  The Uniform Commercial Code as in effect on the Effective Date, as enacted in the applicable state.

270.   Unimpaired:  With respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

271.   Unsecured Claim:  Any Senior Note Claim, General Note Claim, Subordinated Note Claim, ULC1 Settlement Claim, Canadian Guarantee Claim, Canadian Intercompany Claim, Rejection Damages Claim, General Unsecured Claim, Unsecured Makewhole Claim, Unsecured Convenience Class Claim, Subordinated Debt Securities Claim, and Subordinated Equity Securities Claim.

272.   Unsecured Convenience Class Claim:  Any: (a) Unsecured Claim (including interest accrued only as of the Petition Date) that is $50,000 or less or (b) General Unsecured Claim in excess of $50,000 which the Holder thereof, pursuant to such Holder's ballot or such other election accepted by the Debtors elects to have reduced to the amount of $50,000 and to be treated as an Unsecured Convenience Class Claim; provided, however, that an Unsecured Convenience Class Claim does not include a Claim on account of publicly or privately held securities.

273.   Unsecured Makewhole Claim:  Any First Lien Makewhole Claim, Second Lien Makewhole Claim, or CalGen Unsecured Makewhole Claim.

30

274.   Voting Deadline:  November 30, 2007.

275.   Yellow Brick Road Claim:  That certain Allowed Claim of Yellow Brick Road LLC against Calpine as provided for in the stipulation, dated  June 26, 2007, entitled *Stipulation and Consent Order Implementing Approved Settlement of Claims of the Indenture Trustee Relating to the Rumford and Tiverton Facilities* [Docket No. 5089].

B.     Rules of Interpretation and Computation of Time:

1.     Rules of Interpretation:  For purposes of the Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references in the Plan to Articles are references to Articles of the Plan or to the Plan; (f) unless otherwise specified, all references in the Plan to exhibits are references to exhibits in the Plan Supplement; (g) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (j) unless otherwise set forth in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

2.     Computation of Time:  In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

31

C.    Reference to Monetary Figures:  All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

D.    Reference to the Debtors or Reorganized Debtors:  Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III.

A.    DIP Facility Claims:  In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Debtors shall either convert the DIP Facility into the New Credit Facility or pay the DIP Facility Claims in full in Cash.

B.    Administrative Claims:  Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder thereof shall be paid in full in Cash in accordance with the terms of the applicable contract, if any.

C.    Priority Tax Claims:  In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, unless otherwise agreed (with the consent of the Creditors' Committee), each Holder thereof shall be paid in full in Cash pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT
## OF CLAIMS AND INTERESTS

A.    Classification of Claims and Interests:  All Claims and Interests, except DIP Facility Claims, Administrative Claims, and Priority Tax Claims, are classified in the Classes set forth in ARTICLE III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

32

1.    Substantive Consolidation of Debtors:  Pursuant to ARTICLE IV.A, the Plan provides for the substantive consolidation of the Estates into a single Estate for all purposes associated with Confirmation and Consummation.  As a result of the substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate identification of the Debtors.

2.    Class Identification:  Below is a chart assigning each Class a letter and, in some cases, a number for purposes of identifying each separate Class.

| Class | Claim or Interest Type |
|---|---|
| A-1 | First Lien Debt Claims |
| A-2 | Second Lien Debt Claims |
| A-3 | Other Secured Claims |
| B | Other Priority Claims |
| C-1 | Senior Note Claims |
| C-2 | General Note Claims |
| C-3 | Subordinated Note Claims |
| C-4 | ULC1 Settlement Claims |
| C-5 | Canadian Guarantee Claims |
| C-6 | Canadian Intercompany Claims |
| C-7 | Rejection Damages Claims |
| C-8 | General Unsecured Claims |
| C-9 | Unsecured Makewhole Claims |
| C-10 | Unsecured Convenience Class Claims |
| C-11 | Intercompany Claims |
| C-12 | CalGen Makewhole Claims |
| D | Subordinated Debt Securities Claims |
| E-1 | Interests |
| E-2 | Subordinated Equity Securities Claims |
| E-3 | Intercompany Interests |

B.    Treatment of Classes of Claims and Interests

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below.

33

1.    Class A-1—First Lien Debt Claims

   a.    Classification: Class A-1 consists of all First Lien Debt Claims.

   b.    Treatment: Each Allowed First Lien Debt Claim (not including any First Lien Secured Makewhole Claims), already has been paid in full in Cash pursuant to the First Lien Repayment Order.  In satisfaction of each Allowed First Lien Secured Makewhole Claim, each Holder thereof shall be paid in full in Cash.

   c.    Interest Accrued After the Petition Date:  Allowed Claims in Class A-1 shall not include interest; provided, however, that any Allowed First Lien Secured Makewhole Claim shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.

2.    Class A-2—Second Lien Debt Claims

   a.    Classification: Class A-2 consists of all Second Lien Debt Claims.

   b.    Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class A-2, each Allowed Second Lien Debt Claim shall be paid in full in Cash, which, with respect to any portion of the Disputed Second Lien Debt Claim that is ultimately Allowed pursuant to a Final Order, may include Cash generated pursuant to ARTICLE VII.D.9 from the sale of New Calpine Common Stock from the New Calpine Stock Reserve reserved on account of such Claim pursuant to ARTICLE VII.C.3.

   c.    Interest Accrued After the Petition Date:  Allowed Claims in Class A-2 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by a Final Order to the extent not already paid or waived pursuant to the Cash Collateral Order; provided, however, that any portion of the Claims in Class A-2 consisting of Allowed Second Lien Secured Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court to the extent not already paid or waived pursuant to the Cash Collateral Order. With respect to the Second Priority Senior Secured Term Loan Due 2007, the contract rate is not less than the base rate.

3.    Class A-3—Other Secured Claims

   a.    Classification: Class A-3 consists of all Other Secured Claims, against the applicable Debtor.

   b.    Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class A-3, each such Allowed Claim shall be: (i) Reinstated; (ii) paid in full in Cash; or (iii) satisfied in full by a return to such Holder of the collateral securing such Allowed Claim.  The Bethpage Claims shall be Reinstated, and the Debtors and the holders of the Bethpage Claims reserve their

respective rights under the Bethpage Notes, the Bethpage Credit Agreements and all related agreements and nothing in the Plan (including, without limitation, Sections V(H) and VII(C)(3)) or the Confirmation Order alters, amends, or modifies such rights.

c.    Interest Accrued After the Petition Date:  Allowed Claims in Class A-3 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by the Bankruptcy Court or, if there is no contract, then at the Federal Judgment Rate; provided, however, that (i) the Allowed ASM, Hain, And Sierra Group Claims in Class A-3 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of eight and one-half percent and (ii) the Liquidity Solutions Claims in Class A-3 shall be Allowed in the full filed amount and shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of eight and one-quarter percent.

4.    Class B—Other Priority Claims

a.    Classification:  Class B consists of all Other Priority Claims.

b.    Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class B, each Holder thereof shall be paid in full in Cash.

c.    Interest Accrued After the Petition Date:  Allowed Claims in Class B shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate.

5.    Class C-1—Senior Note Claims

a.    Classification:  Class C-1 consists of all Senior Note Claims.

b.    Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-1 (including any Allowed Senior Note Makewhole Claims), each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.  To the extent the distribution of New Calpine Common Stock to be made to Holders of Allowed Senior Note Claims will not result in payment in full of all principal and interest accrued as of the Petition Date under the Senior Note indentures, the Holders of Allowed Senior Note Claims will receive as part their distribution any distribution that otherwise would be made to the Holders of Allowed Subordinated Note Claims until all principal and interest accrued as of the Petition Date under the Senior Note indentures is paid in full as provided for in ARTICLE III.B.7.b.

c.    Interest Accrued After the Petition Date:  Allowed Claims in Class C-1 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by the Bankruptcy Court; provided, however, that the Allowed Senior Note Makewhole Claims shall include interest accrued

after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.

6.    Class C-2—General Note Claims

a.    <u>Classification</u>: Class C-2 consists of all General Note Claims.

b.    <u>Treatment</u>: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-2 (including any Allowed General Note Makewhole Claims), each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

c.    <u>Interest Accrued After the Petition Date</u>: Allowed Claims in Class C-2 shall include unpaid interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by the Bankruptcy Court; <u>provided, however</u>, that Allowed General Note Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.

7.    Class C-3—Subordinated Note Claims

a.    <u>Classification</u>: Class C-3 consists of all Subordinated Note Claims.

b.    <u>Treatment</u>: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-3 (including any Allowed Subordinated Note Makewhole Claims), each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full; <u>provided, however</u>, that the Holders of Allowed Subordinated Note Claims shall be deemed to consent to the distribution of any portion of their pro rata share of the New Calpine Common Stock to Holders of Allowed Senior Note Claims necessary to satisfy in full any portion of such Allowed Senior Note Claims attributable to principal and interest accrued as of the Petition Date; <u>provided further, however</u>, that any obligation of the Holders of Allowed Subordinated Note Claims to consent, or any consent already granted by such Holders, to the distribution of any portion of their pro rata share of the New Calpine Common Stock to Holders of Allowed Senior Note Claims to satisfy any amounts other than principal and interest accrued as of the Petition Date as part of the Intercreditor Subordination Dispute shall be determined by a court of competent jurisdiction; <u>provided further, however</u>, that the Intercreditor Escrow shall be distributed to the Intercreditor Subordination Dispute Escrow Account pending resolution of the Intercreditor Subordination Dispute by Final Order. Upon distribution of the Intercreditor Escrow to the Intercreditor Subordination Dispute Escrow Account, such distributions shall be deemed to satisfy in full the obligations of the Debtors or Reorganized Debtors, as applicable, under the Plan with respect to amounts so distributed and no additional interest shall accrue against the Debtors or Reorganized Debtors, as applicable, on account of such satisfied Claims or distributions.

c.    <u>Interest Accrued After the Petition Date</u>: Allowed Claims in Class C-3 shall include interest accrued after the Petition Date through the Interest Accrual

36

Limitation Date at the contract rate determined by the Bankruptcy Court; provided, however, that Allowed Subordinated Note Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.

8.    Class C-4—ULC1 Settlement Claims

      a.    Classification: Class C-4 consists of all ULC1 Settlement Claims.

      b.    Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed ULC1 Settlement Claim in Class C-4, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full. The aggregate amount of the distribution of the New Calpine Common Stock Pool For Creditors to be made hereunder on account of Allowed ULC1 Settlement Claims in Class C-4 shall be calculated based upon the total amount of the ULC1 Settlement Claims being equal to U.S. $3,505,187,751.63; provided, however, that the aggregate amount of such distribution to be made hereunder on account of all Allowed ULC1 Settlement Claims shall not exceed an amount equal to the aggregate of (i) the outstanding principal balance of the ULC1 Notes (together with any accrued and unpaid interest thereon as of the Petition Date), as set forth in section 3.2(a)(ii)(A) of the CCAA Settlement, plus (ii) accrued and unpaid interest on the ULC1 Filed Amount from the Petition Date up to and including the date set forth in section 3.2(a)(ii)(B) of the CCAA Settlement at the contract rate (including interest compounded semi-annually, as set forth in section 3.2(a)(ii)(B) of the CCAA Settlement), plus (iii) the ULC1 Noteholders Ad Hoc Committee Fees, plus (iv) the ULC1 Indenture Trustee Fees, in each of the foregoing instances, subject to the foreign exchange adjustment described in ARTICLE III.B.8.d; provided, however, that the aggregate amount of such distribution to be made hereunder on account of all Allowed ULC1 Settlement Claims shall not include the ULC1 Noteholders Ad Hoc Committee Fees or the ULC1 Indenture Trustee Fees to the extent such fees are paid pursuant to ARTICLES IX.A.7 and 8. Distributions to Holders of Allowed ULC1 Settlement Claims as provided herein are in accordance with the CCAA Settlement and the Transaction Structuring Plan and shall satisfy all obligations of both the Debtors and the Canadian Debtors and their estates with respect to ULC1 Settlement Claims.

      c.    Interest Accrued After the Petition Date: Allowed ULC1 Settlement Claims shall include interest accrued at the contract rate (including interest compounded semi-annually, as set forth in section 3.2(a)(ii)(B) of the CCAA Settlement) from the Petition Date up to and including the date set forth in section 3.2(a)(ii)(B) of the CCAA Settlement, all as set forth in the CCAA Settlement; provided, however, that such inclusion of interest shall not increase the total distribution limitation contained in section 3.2(b)(ii) of the CCAA Settlement.

      d.    Foreign Currency Exchange Rate: Certain components of the ULC1 Settlement Claims are denominated in Canadian dollars. Without limitation, the indebtedness evidenced by the ULC1 8.75% Senior Notes Due 2007, including principal, and accrued and unpaid interest thereon, and portions of the ULC1 Noteholders Ad Hoc

K&E 12390541.14

Committee Fees and the ULC1 Indenture Trustee Fees relating to the services of Canadian professionals are and will be denominated in Canadian dollars. The respective amounts of such components shall be Allowed in the Chapter 11 Cases and distributions in respect thereof under the Plan shall be calculated in U.S. dollars in an amount yielded by the conversion from Canadian dollars at the noon spot rate effective on the fifth Business Day prior to the Distribution Date for U.S. currency of Scotiabank, and such conversion shall be performed by Calpine and subject to the approval of the ULC1 Indenture Trustee.

      c.      <u>Application of Distributions Under the Plan</u>: Any distribution received by the ULC1 Indenture Trustee under the Plan shall be applied as follows: first, to the ULC1 Indenture Trustee Fees and the ULC1 Noteholders Ad Hoc Committee Fees; second, to interest accrued after the Petition Date; and third, to the ULC1 Filed Amount. The portion of any such distribution that is allocable to the ULC1 Ad Hoc Committee Fees shall be remitted by the ULC1 Indenture Trustee to those ULC1 Noteholders who paid such fees in the first instance in accordance with written instructions to be delivered to the ULC1 Indenture Trustee by counsel to the ULC1 Noteholders Ad Hoc Committee. The ULC1 Indenture Trustee may conclusively rely on such instructions delivered by counsel to the ULC1 Noteholders Ad Hoc Committee and shall have no liability for remitting to such ULC1 Noteholders in accordance with such instructions the portion of such distribution that is allocable to the ULC1 Noteholders Ad Hoc Committee Fees.

9.    <u>Class C-5—Canadian Guarantee Claims</u>

      a.      <u>Classification</u>: Class C-5 consists of all Canadian Guarantee Claims.

      b.      <u>Treatment</u>: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-5, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full after subtracting any payments received on account of the underlying obligation in the CCAA Proceedings; <u>provided</u>, <u>however</u>, that the Canadian Re-Toll Claim shall be deemed Allowed as of the Effective Date in the amount of $190,000,000, which amount will be satisfied entirely from the Estates and not by any funds of any Canadian Debtors, as set forth in that certain *Stipulation and Agreed Order Resolving the Objection of Harbinger and the Claims of Calpine Power L.P.*

      c.      <u>Interest Accrued After the Petition Date</u>: Allowed Claims in Class C-5 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the default rate provided in the applicable indenture or, if there is no indenture, then at the Federal Judgment Rate.

10.    <u>Class C-6—Canadian Intercompany Claims</u>

      a.      <u>Classification</u>: Class C-6 consists of all Canadian Intercompany Claims.

      b.      <u>Treatment</u>: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-6, each Holder thereof shall

K&E 12300541.14

receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full, subject to the cap contained in the CCAA Settlement.

      c.     <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class C-6 shall include interest consistent with, and except as may otherwise be specifically provided by, the terms of the CCAA Settlement.

11.     <u>Class C-7—Rejection Damages Claims</u>

      a.     <u>Classification</u>:  Class C-7 consists of all Rejection Damages Claims.

      b.     <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-7, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

      c.     <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class C-7 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate unless, upon application by the Holder of such Claim Filed before the Voting Deadline, the Bankruptcy Court orders otherwise prior to or in connection with the Confirmation Hearing; <u>provided</u>, <u>however</u>, that (i) the Allowed Yellow Brick Road Claim shall include, and shall be entitled to, interest accrued and accruing from December 20, 2005 through the Interest Accrual Limitation Date at a rate per annum of seven and one-half percent; (ii) the Allowed BIT Holdings Claim shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of seven and three-quarters percent; (iii) the Allowed SJ Plaza Claim shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of seven and three-quarters percent; (iv) the Allowed GTN Net Allowed Claim and the PNGTS Net Allowed Claim shall accrue interest after the Petition Date through the Interest Accrual Limitation Date as set forth in that certain Stipulation and Agreed Order Between and Among the Debtors, Portland Natural Gas Transmission System, Gas Transmission Northwest Corporation, Transcanada Pipelines Limited, and Nova Gas Transmission Resolving and Allowing Claims and Terminating Agreements.

12.     <u>Class C-8—General Unsecured Claims</u>

      a.     <u>Classification</u>:  Class C-8 consists of all General Unsecured Claims.

      b.     <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-8, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

      c.     <u>Interest Accrued After the Petition Date</u>:  Unless otherwise agreed, Allowed Claims in Class C-8 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate unless, upon application by the Holder of such Claim Filed before the Voting Deadline, the

Bankruptcy Court orders otherwise prior to or in connection with the Confirmation Hearing; provided, however, that (i) Allowed ASM, Hain, And Sierra Group Claims in Class C-8 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of eight and one-half percent; (ii) Allowed Quadrangle and JPMorgan Claims shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of eight and one-quarter percent; (iii) the Allowed Credit Suisse Claim shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of nine percent; and (iv) the Allowed Transwestern Claim shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date as a rate per annum of seven and three-quarters percent.

      d.    Election Rights: Each Holder of an Allowed Claim in Class C-8 may elect to be treated as a Holder of an Allowed Unsecured Convenience Class Claim in Class C-10, as applicable, by electing to reduce its Allowed Claim to $50,000 in complete satisfaction of such Allowed Claim. Any such election must be made on the Ballot, and except as may be agreed to by the Debtors, with the consent of the Creditors' Committee, or Reorganized Debtors, no Holder of a Claim can elect the treatment described below after the Voting Deadline. Upon such election, the Claim of such Holder shall be automatically reduced to $50,000.

13.    Class C-9—Unsecured Makewhole Claims

      a.    Classification: Class C-9 consists of all Unsecured Makewhole Claims.

      b.    Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-9, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

      c.    Interest Accrued After the Petition Date: Allowed First Lien Unsecured Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court. Allowed Second Lien Unsecured Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court. Allowed CalGen Unsecured Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.

14.    Class C-10—Unsecured Convenience Class Claims

      a.    Classification: Class C-10 consists of all Unsecured Convenience Class Claims.

      b.    Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-10, each Holder thereof shall be paid in full in Cash.

40

c.     Interest Accrued After the Petition Date:  Allowed Claims in Class C-10 shall not include any interest accrued after the Petition Date.

15.    Class C-11—Intercompany Claims

a.     Classification:  Class C-11 consists of all Intercompany Claims.

b.     Treatment:    At the Debtors' or Reorganized Debtors' option, in consultation with the Creditors' Committee, and except as otherwise provided in the Plan, Holders of Claims in Class C-11 shall have such Claims Reinstated or receive no distribution on account of such Claims.

16.    Class C-12—CalGen Makewhole Claims

a.     Classification:  Class C-12 consists of all CalGen Makewhole Claims.

b.     Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-12, each Holder thereof shall be paid in full with Cash, which may include proceeds generated from the sale of New Calpine Common Stock from the New Calpine Stock Reserve pursuant to ARTICLE VII.D.9.  No factual finding or legal conclusion in the Confirmation Order or in connection with the Plan that substantive consolidation of the Estates is appropriate shall affect, prejudice, or impair the CalGen Lenders' position, with respect to their alleged CalGen Makewhole Claims (which in the case of Claims for default interest shall be adjudicated as soon as reasonably practicable after the Effective Date consistent with the Bankruptcy Court's schedule), that CalGen and its direct and indirect Debtor subsidiaries are solvent.  The Debtors and the CalGen Lenders shall stipulate as to the solvency of CalGen and its direct and indirect Debtor subsidiaries solely for purposes of any future litigation regarding the CalGen Lenders' alleged entitlement to CalGen Makewhole Claims.

c.     Interest Accrued After the Petition Date:  Allowed CalGen Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by Final Order.

17.    Class D—Subordinated Debt Securities Claims

a.     Classification:    Class D consists of all Subordinated Debt Securities Claims.

b.     Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class D, to the extent all Holders of Allowed Claims (other than Subordinated Debt Securities Claims and Subordinated Equity Securities Claims) have been paid in full, each Holder of an Allowed Class D Claim shall receive a pro rata distribution of the New Calpine Common Stock Pool For Subordinated Debt Securities Claimants until paid in full.

41

c.  <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class D shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate.

18  <u>Class E-1—Interests</u>

a.  <u>Classification</u>:  Class E-1 consists of all Interests in Calpine.

b.  <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Interest in Class E-1, the Holders of Interests in Class E-1 shall receive a pro rata share of the New Calpine Warrants.

19.  <u>Class E-2—Subordinated Equity Securities Claims</u>

a.  <u>Classification</u>:  Class E-2 consists of all Subordinated Equity Securities Claims.

b.  <u>Treatment</u>:  Holders of Claims in Class E-2 shall not receive a distribution from the Estates under the Plan and may only recover from applicable insurance proceeds, if any.

20.  <u>Class E-3—Intercompany Interests</u>

a.  <u>Classification</u>:  Class E-3 consists of all Intercompany Interests.

b.  <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Interest in Class E-3, Interests in Class E-3 shall be Reinstated for the benefit of the Holders thereof in exchange for Reorganized Debtors' agreement to make certain distributions to the Holders of Allowed Unsecured Claims and Interests under the Plan, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors.

C.  <u>Class Voting Rights</u>:  The voting rights of each Class are as follows.

1.  <u>Classes Entitled to Vote</u>:  The following Classes are Impaired and thus entitled to vote to accept or reject the Plan.

| Classes |
| --- |
| C-1 |
| C-2 |
| C-3 |
| C-4 |
| C-5 |

| Classes |
| --- |
| C-6 |
| C-7 |
| C-8 |
| C-9 |
| C-10 |
| D |
| E-1 |
| E-2 |

2.    Presumed Acceptance of Plan:  The following Classes are Unimpaired and deemed to accept the Plan or are Impaired but deemed to accept the Plan.  Therefore, such Classes are not entitled to vote to accept or reject the Plan and the vote of such Holders of Claims and Interests shall not be solicited.

| Classes |
| --- |
| A-1 |
| A-2 |
| A-3 |
| B |
| C-11 |
| C-12 |
| E-3 |

D.    Acceptance or Rejection of the Plan

1.    Acceptance by Impaired Classes of Claims:  Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

2.    Acceptance by Impaired Classes of Interests:  Pursuant to section 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests has accepted the Plan if the Holders of at least two-thirds in amount of the Allowed Interests of such Class actually voting have voted to accept the Plan.

3.    Tabulation of Votes:  The Debtors will tabulate all votes on the Plan on a consolidated basis for the purpose of determining whether the Plan satisfies sections 1129(a)(8)

K&E 12300541 14

and (10) of the Bankruptcy Code. All votes on account of Allowed Claims and Interests shall be counted as if Filed against a single consolidated Estate.

    4.   <u>Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code</u>: Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

    5.   <u>Controversy Concerning Impairment</u>: If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.   <u>Substantive Consolidation</u>: The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation.

    If substantive consolidation of all of the Estates is ordered, then on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of Calpine for all purposes associated with Confirmation and Consummation, and all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors. Substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases. Any alleged defaults under any applicable agreement with the Debtors, the Reorganized Debtors, or the Affiliates arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date. Notwithstanding anything in the Plan or in the Confirmation Order to the contrary, the entry of the Confirmation Order ordering substantive consolidation of the Estates shall not have any effect upon the separate and distinct legal entities as they existed at the time of any prepetition transaction that is the subject of any litigation asserting claims for fraudulent conveyance; <u>provided</u>, <u>however</u>, that the foregoing provisions shall not serve to prejudice or compromise whatever rights, if any, Calpine or Reorganized Calpine, as applicable, may have to contend in any pending or future adversary proceeding that Calpine or Reorganized Calpine, as applicable, may prosecute claims for fraudulent conveyance arising from transfers made by one or more of its affiliates based on any theory or doctrine, including any federal, state, or common law alter-ego, veil-piercing, or any other theory or doctrine that would permit or require the disregard of corporate separateness, or facts as they existed at the time of the transaction in question.

K&E 17400541.14

B.     Sources of Consideration for Plan Distributions:  The Reorganized Debtors shall fund distributions under the Plan with Cash on hand, existing assets, the post-Confirmation borrowings described below, and the issuance of New Calpine Plan Securities.

1.     New Credit Facility:  On the Effective Date, the Reorganized Debtors shall enter into the New Credit Facility.  Confirmation shall be deemed approval of the New Credit Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the New Credit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the New Credit Facility documents and such other documents as the New Credit Facility Lenders may reasonably require to effectuate the treatment afforded to such lenders pursuant to the New Credit Facility, subject to such modifications as the Reorganized Debtors, with the consent of the Creditors' Committee as to material modifications, may deem to be reasonably necessary to consummate such New Credit Facility.  The Reorganized Debtors may use the New Credit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan, such as the payment of Administrative Claims, and satisfaction of ongoing working capital needs.  To the extent doing so would violate the project financing agreements related to the Greenleaf Project and the Agnews Project, the Debtors shall not pledge any of the assets of O.L.S. Energy-Agnews, Inc., Calpine Greenleaf, Inc. and Calpine Greenleaf Holdings, Inc. to the New Credit Facility Lenders under the New Credit Facility, and O.L.S. Energy-Agnews, Inc., Calpine Greenleaf, Inc. and Calpine Greenleaf Holdings, Inc. shall not guarantee the Debtors' obligations to the New Credit Facility Lenders under the New Credit Facility.

2.     New Calpine Common Stock:  On the Effective Date, Reorganized Calpine shall issue New Calpine Common Stock (based upon the New Calpine Total Enterprise Value) for distribution as follows: (a) all New Calpine Common Stock to be issued under the Plan shall be distributed to the New Calpine Common Stock Pool For Creditors (after setting aside sufficient New Calpine Common Stock to fund the Management and Director Equity Incentive Plan); (b) after all Allowed Claims (excluding Subordinated Debt Securities Claims and Subordinated Equity Securities Claims) are satisfied in full, any remaining New Calpine Common Stock to be issued under the Plan shall be distributed to the New Calpine Common Stock Pool For Subordinated Debt Securities Claimants; and (c) after all Allowed Subordinated Debt Securities Claims are satisfied in full, any remaining New Calpine Common Stock to be issued under the Plan shall be cancelled.

3.     New Calpine Warrants:  On the Effective Date, Reorganized Calpine shall issue the New Calpine Warrants for distribution to Holders of Interests in Class E-1.

C.     Section 1145 Exemption:  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities contemplated by the Plan and any and all settlement agreements incorporated herein, including the New Calpine Plan Securities, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code any Securities contemplated by the Plan and any and all settlement agreements incorporated therein, including the New

45

Calpine Plan Securities, will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such Securities and instruments; and (iii) applicable regulatory approval.

D.    Listing Rights:  Reorganized Calpine shall use reasonable efforts to list the New Calpine Common Stock on a national securities exchange or for quotation on a national automated interdealer quotation system on the Effective Date, but shall have no liability if it is unable to do so.    Entities receiving distributions of New Calpine Common Stock, by accepting such distributions, shall be deemed to have agreed to cooperate with the Reorganized Debtors' reasonable requests to assist them in their efforts to list the New Calpine Common Stock on a national securities exchange or quotation system.

E.    Restrictions on Resale of Securities to Protect Net Operating Losses:  The Reorganized Calpine Charter shall contain the restrictions on the transfer of New Calpine Common Stock in the same form and substance as those contained in the New Calpine Trading Restriction Term Sheet to minimize the likelihood of any potential adverse federal income tax consequences resulting from an ownership change (as defined in section 382 of the Internal Revenue Code) in Reorganized Calpine.

F.    Issuance and Distribution of the New Calpine Plan Securities:  The New Calpine Plan Securities, when issued or distributed as provided in the Plan, will be duly authorized, validly issued, and, if applicable, fully paid and nonassessable.  Each distribution and issuance referred to in ARTICLE III shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

G.    Corporate Existence:  Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

H.    Vesting of Assets in the Reorganized Debtors:  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the New Credit Facility and Claims pursuant to the DIP Facility that by their terms survive termination of

K&E 17105341.14

the DIP Facility). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

l.    Cancellation of Debt and Equity Securities and Related Obligations: On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the Old Calpine Common Stock and any other Certificate, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, other instruments or documents evidencing indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old Calpine Common Stock and any other Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements or Certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, that notwithstanding Confirmation, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (w) allowing Holders to receive distributions under the Plan; (x) allowing a Servicer to make distributions on account of such Claims or Interests as provided in ARTICLE VII; (y) permitting such Servicer to maintain any rights and Liens it may have against property other than the Reorganized Debtors' property for fees, costs, and expenses pursuant to such indenture or other agreement; and (z) governing (i) the rights and obligations of non-Debtor parties to such agreements vis-à-vis each other, (ii) determination of the rights and obligations of non-Debtor parties with respect to the subordination provisions of any indenture in favor of the non-Debtor parties of any other indenture, including the calculation of such rights and obligations, and (iii) the reimbursement and indemnification obligations, if any, of the Debtors in favor of an indenture trustee that is party to the Intercreditor Subordination Dispute solely with respect to fees and expenses incurred, if any, by such indenture trustee after the Confirmation Date in connection with the Intercreditor Subordination Dispute, subject to the Debtors' or Reorganized Debtors', as applicable, and Creditors' Committee's rights to object to any such fees and expenses; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors not otherwise specifically provided for herein. The Reorganized Debtors shall not have any obligations to any Servicer for any fees, costs, or expenses, except as expressly otherwise provided in the Plan. Notwithstanding the foregoing, the indenture governing the First Lien Debt Claims and any related documents thereto governing the rights and obligations of the Debtors and non-Debtor parties with respect to the First Lien Debt Claims shall survive for purposes of the First Lien Makewhole Claim litigation, until such time as the First Lien Debt Claims have been Allowed by a Final Order and the obligations are satisfied in accordance with the terms of the Plan or the First Lien Debt Claims have been disallowed by Final Order. Notwithstanding the foregoing, the indentures and the credit

47

agreement governing the Second Lien Debt Claims and any related documents thereto governing the rights and obligations of the Debtors and non-Debtor parties with respect to the Second Lien Debt Claims shall survive solely for purposes of permitting the Indenture Trustees for the Second Lien Debt Claims and the Administrative Agent to litigate the Disputed Second Lien Debt Claim, until such time as the Disputed Second Lien Debt Claim shall have been determined by a Final Order and all obligations in respect of the Disputed Second Lien Debt Claim are satisfied in accordance with the terms of the Plan.  Nothing in the Plan or Confirmation Order shall limit or otherwise affect the continuing effectiveness of the bonds, indentures, and other documents related to the KIAC And Nissequogue Leasehold Interests and the Hidalgo Leasehold Interest. Notwithstanding the foregoing, the notes, the indentures, and other related documents governing the 4.0% Convertible Senior Notes Due 2006, 4.75% Convertible Senior Notes Due 2023, 6.00% Contingent Convertible Notes Due 2014, 7.625% Senior Notes Due 2006, 7.75% Senior Notes Due 2009, 7.875% Senior Notes Due 2008, 8.5% Senior Notes Due 2011, 8.625% Senior Notes Due 2010, 8.75% Senior Notes Due 2007, 7.75% Contingent Convertible Notes Due 2015, and 10.5% Senior Notes Due 2006 shall survive for purposes of prosecuting or defending any matter, action or proceeding with respect to any and all rights and claims thereunder, including conversion right claims, any Makewhole Claims not previously resolved, any issues or claims with respect to the calculation of post-petition interest, or allowance and payment of indenture trustee fees and expenses (collectively, the "Bond Claims and Rights") until such time as the Bond Claims and Rights have been (1) Allowed by a Final Order and the obligations are satisfied in accordance with the terms of the Plan, (2) disallowed by Final Order, or (3) otherwise resolved; provided, however, the Debtors or Reorganized Debtors, as applicable, and the Creditors' Committee, reserve all their rights in any way related to the Bond Claims and Rights.

J.      Restructuring Transactions:  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; (4) the Roll-Up Transactions; and (5) all other actions that the Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Roll-Up Transactions.  The form of each Roll-Up Transaction shall be determined by the Reorganized Debtor that is party to such Roll-Up Transaction.  Implementation of the Roll-Up Transactions shall not affect any distributions, discharges, exculpations, releases, or injunctions set forth in the Plan.  Prior to the Effective Date, the Debtors shall have obtained the reasonable consent of the Creditors' Committee regarding their intentions with respect to the Roll-Up Transactions.

K.      Post-Confirmation Property Sales:  To the extent the Debtors or Reorganized Debtors, as applicable, sell any of their property prior to or including the date that is one year after Confirmation, the Debtors or Reorganized Debtors, as applicable, may elect to sell such property pursuant to sections 363, 1123, and 1146(a) of the Bankruptcy Code.

L.    Corporate Action: Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity. Without limiting the foregoing, such actions may include: the adoption and filing of the Reorganized Calpine Charter and Reorganized Calpine Bylaws; the appointment of directors and officers for the Reorganized Debtors; the adoption, implementation, and amendment of the Management and Director Equity Incentive Plan; and consummation or implementation of the New Credit Facility.

M.    Certificate of Incorporation and Bylaws: The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors (other than Calpine) shall be amended in a form reasonably acceptable to the Creditors' Committee as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code. The certificate of incorporation and bylaws of Calpine shall be amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code, and the form and substance of the Reorganized Calpine Charter and Reorganized Calpine Bylaws shall be included in the Plan Supplement not less than fourteen days before the Voting Deadline. The certificate of incorporation of Reorganized Calpine shall be amended to, among other things: (1) authorize the issuance of the shares of New Calpine Common Stock; (2) authorize the issuance of the New Calpine Warrants; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include (a) a provision prohibiting the issuance of non-voting equity securities and (b) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends. On or as soon as reasonably practicable after the Effective Date, to the extent required, each of the Reorganized Debtors (other than Reorganized Calpine) shall file new certificates of incorporation (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) in a form reasonably acceptable to the Creditors' Committee with the secretary (or equivalent state officer or Entity) of the state under which each such Reorganized Debtor is or is to be incorporated or organized. On or as soon as reasonably practicable after the Effective Date, to the extent required, Reorganized Calpine shall file the Reorganized Calpine Charter with the secretary (or equivalent state officer or Entity) of the state under which Reorganized Calpine is or is to be incorporated or organized. After the Effective Date, each Reorganized Debtor may amend and restate its new certificate of incorporation and other constituent documents as permitted by the relevant state corporate law.

N.    Effectuating Documents, Further Transactions: On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the

49

Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

O.    Exemption from Certain Transfer Taxes and Recording Fees:  Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FERC filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.    Directors and Officers of Reorganized Calpine:  On the Effective Date, the term of the current members of the board of directors of Calpine shall expire, and the initial board of directors of Reorganized Calpine shall consist of the Persons selected in accordance with the Board Selection Term Sheet, a copy of which shall be included in the Plan Supplement.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of any Person proposed to serve as an officer or director of Reorganized Calpine shall have been disclosed at or before the Confirmation Hearing or such earlier date as required by the Board Selection Term Sheet.  To the extent any Person proposed to serve as a board member or an officer of Reorganized Calpine is an Insider, the nature of any compensation for such Person shall have been disclosed at or before the Confirmation Hearing.  The classification and composition of the board of directors of Reorganized Calpine shall be consistent with the Reorganized Calpine Charter and the Reorganized Calpine Bylaws.  Each director or officer of Reorganized Calpine shall serve from and after the Effective Date pursuant to the terms of the Reorganized Calpine Charter, the Reorganized Calpine Bylaws, or other constituent documents, and applicable state corporation law.

Q.    Directors and Officers of Reorganized Debtors Other Than Calpine:  Unless otherwise provided in the Debtors' disclosure pursuant to section 1129(a)(5) of the Bankruptcy Code, the officers and directors of each of the Debtors other than Calpine shall continue to serve in their current capacities after the Effective Date.  The classification and composition of the boards of directors of the Reorganized Debtors other than Reorganized Calpine shall be consistent with their respective new certificates of incorporation and bylaws.  Each such director or officer shall serve from and after the Effective Date pursuant to the terms of such new certificate of incorporation, bylaws, other constituent documents, and applicable state corporation law.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of any

50

Person proposed to serve as an officer or director of the Reorganized Debtors other than Reorganized Calpine shall have been disclosed at or before the Confirmation Hearing.

R.    Employee and Retiree Benefits:   Except with respect to any Rejected Employment Agreements, on and after the Effective Date, the Reorganized Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; (2) distribute or reallocate any unused designated employee success fee and bonus funds related to Confirmation and Consummation in the ordinary course of their business; and (3) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement that is not a Rejected Employment Agreement will not entitle any Person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

S.    Management and Director Equity Incentive Plan:   The Reorganized Debtors shall implement the Management and Director Equity Incentive Plan, which shall be deemed effective as of the Effective Date.  The terms of the Management and Director Equity Incentive Plan shall be set forth in the Plan Supplement and provide for aggregate grants of New Calpine Common Stock to certain management, employees, and directors of certain of the Reorganized Debtors of between 2% to 3% of the New Calpine Common Stock (inclusive of initial grants and reserves for future grants) to be issued under the Plan.  The compensation committee of the board of directors of Calpine will determine in advance of the Voting Deadline the terms and conditions of the initial grants and the recipients thereof (provided that the Creditors' Committee's consent, which shall not be unreasonably withheld, shall be obtained in connection with the terms and conditions of any initial grants and the recipients thereof).  The Debtors will disclose in an exhibit to the Plan Supplement on or before the Plan Supplement Filing Deadline the terms and conditions of the initial grants, the amount of the initial grant for each Named Executive Officer position, and the aggregate amount of the initial grants for all other recipients.  With respect to Robert P. May, as Chief Executive Officer of Reorganized Calpine, if Mr. May has not entered into a new employment agreement with Reorganized Calpine within six months after the Effective Date, the initial grant under the Management and Director Equity Incentive Plan to Mr. May shall be null and void and Mr. May shall not be entitled to any additional compensation on account thereof; provided, however, that if there is a change in control in Reorganized Calpine while Mr. May is employed as the Chief Executive Officer within six months after the Effective Date, the initial grant under the Management and Director Equity Incentive Plan to Mr. May shall vest and remain in full force and effect regardless of whether Mr. May entered into a new

employment agreement with Reorganized Calpine within six months after the Effective Date. All other terms and conditions of the Management and Director Equity Incentive Plan shall be determined by the board of directors of Reorganized Calpine. For purposes hereof, "change in control" shall mean the sale of all or substantially all of the assets of the Reorganized Debtors or the acquisition by one or more related entities of 50.1% or more of the New Calpine Common Stock. The board of directors of Reorganized Calpine shall determine the permanent long-term Chief Executive Officer of Reorganized Calpine and shall also discharge its other fiduciary duties in good faith and in accordance with applicable laws and regulations.

T.     <u>Creation of Professional Fee Escrow Account</u>:  On the Effective Date, the Reorganized Debtors shall establish the Professional Fee Escrow Account and reserve an amount necessary to pay all of the Accrued Professional Compensation.

U.     <u>Preservation of Rights of Action</u>:  In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court, except with respect to any actions pending as of the Effective Date to which the Creditors' Committee is a party in which case all of the foregoing rights shall be as they were immediately before the Effective Date.

K&E 12300541.14

V.   Rights of Action Against Pipelines: To the extent the Debtors have any Causes of Action or claims against Gas Transmission Northwest Corporation or Portland Natural Gas Transmission System arising under the GTN/PNGTS Contracts or under the Bankruptcy Code or other applicable bankruptcy law as of the date of the *Stipulation and Agreed Order Between and Among the Debtors, Portland Natural Gas Transmission System, Gas Transmission Northwest Corporation, TransCanada Pipelines Limited, and NOVA Gas Transmission Resolving and Allowing Claims and Terminating Agreements*, such Causes of Action or claims are hereby expressly waived, relinquished, and released.   To the extent the Debtors have any Causes of Action or claims against NOVA Gas Transmission Ltd. or TransCanada PipeLines Limited arising under the TransCanada/NOVA Contracts or under the Bankruptcy Code or other applicable bankruptcy law as of the date of this Stipulation, such Causes of Action or claims are hereby expressly waived, relinquished, and released.

## ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.   Assumption and Rejection of Executory Contracts and Unexpired Leases: Except as otherwise provided in the Plan, the Debtors' executory contracts or unexpired leases not assumed or rejected pursuant to a Bankruptcy Court order prior to the Effective Date shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those executory contracts or unexpired leases: (1) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; (2) listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement; (3) that are Intercompany Contracts, in which case such Intercompany Contracts are deemed automatically assumed by the applicable Debtor as of the Effective Date, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement; (4) that are the subject of a motion to assume or reject pending on the Effective Date (in which case such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (5) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; (6) that are Rosetta Contracts whose treatment under the Plan is provided for in ARTICLE V.A.3; (7) that are Oil and Gas Contracts whose treatment under the Plan is provided for in ARTICLE V.A.4; or (8) that are otherwise expressly assumed or rejected pursuant to the Plan (including ARTICLE V as set forth below). Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of such executory contracts and unexpired leases in the Plan are effective as of the Effective Date.  Each such executory contract and unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order.   Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the schedules of executory contracts or unexpired leases identified in ARTICLE V and in the Plan Supplement at any time through and including the later of fifteen days after the Effective Date or such other date as set forth in ARTICLE V.C; provided, however, that this sentence shall not apply to: (1)

53

the executory contracts or unexpired leases with: (a) Hess Corporation (formerly known as Amerada Hess Corporation); (b) the Industrial Development Corporation of the City of Edinburg, Texas; (c) BP Amoco Chemical Co. and BP Energy Company; (d) Enbridge Pipelines (Bamagas Intrastate) L.L.C. f/k/a BAMAGAS Company; (e) Spectra Energy Corporation, Texas Eastern Transmission LP (f/k/a Texas Eastern Transmission Corporation), Egan Hub Storage LLC, Moss Bluff Hub Partners LP, Gulfstream Natural Gas System, and Maritimes & Northeast US; (f) Energy Transfer Fuel, L.P., ETC Marketing, Inc., and Houston Pipeline Co. LP.; or (g) The Dow Chemical Company and its affiliates, or (2) Intercompany Contracts relating to the Deer Park Energy Center LP, a non-Debtor Affiliate.

1.     Indemnification Obligations:  Each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such Indemnification Obligation is executory, unless such Indemnification Obligation previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Indemnification Obligations for Former Employees" in the Plan Supplement.  Notwithstanding the foregoing, an Indemnification Obligation to any Person who as of the Petition Date no longer was a director, officer, or employee of a Debtor, shall terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise, as of the Effective Date; provided, however, that the Reorganized Debtors reserve the right to honor or reaffirm Indemnification Obligations other than those terminated by a prior or subsequent order of the Bankruptcy Court, whether or not executory, in which case such honoring or reaffirmation shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation.  Each Indemnification Obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

2.     Treatment of FERC Jurisdictional Contracts:  Each FERC Jurisdictional Contract shall be deemed automatically assumed as of the Effective Date pursuant to section 365 and 1123 of the Bankruptcy Code, unless such FERC Jurisdictional Contract was: (a) previously terminated by mutual agreement by the Debtors and the counterparty or counterparties to such FERC Jurisdictional Contract; (b) previously the subject of a written notice from the Debtors to the counterparty or counterparties stating that such FERC Jurisdictional Contract was repudiated; or (c) subject of a motion to reject pending as of the Effective Date ("Rejection Motion").  The GTN/PNGTS Contracts shall be terminated by mutual agreement according to the terms of the Stipulation and Agreed Order Between and Among the Debtors, Portland Natural Gas Transmission System, Gas Transmission Northwest Corporation, Transcanada Pipelines Limited, and Nova Gas Transmission Resolving and Allowing Claims and Terminating Agreements.

3.     Treatment of Rosetta Contracts:  Notwithstanding any language herein to the contrary, by stipulation and agreement of the Debtors and Rosetta incorporated herein, the deadline to assume or reject the Rosetta Contracts is and shall be extended to fifteen days following entry of a Final Order in the Rosetta Adversary Proceeding.  All rights and duties of the Debtors, Reorganized Debtors, and Rosetta under the Bankruptcy Code with respect to assumption or rejection of the Rosetta Contracts, including the right to argue that certain or all of the Rosetta Contracts are interrelated and form one integrated agreement, rights of offset or cure,

or right to election under section 365(i) of the Bankruptcy Code, are expressly reserved as they relate to the Rosetta Contracts. In the event that Rosetta prevails in the Adversary Proceeding, the Debtors or Reorganized Debtors, as applicable, shall, within twenty days of the entry of final, non-appealable judgment in favor of Rosetta, File a motion to assume the Rosetta Contracts and shall include therein a statement of the cure amount (if any) they propose to pay in respect of the assumption of the Rosetta Contracts. In the event Rosetta disputes such cure amounts, the proper cure amounts will be determined by the Bankruptcy Court and any cure amounts found to be due shall be paid by the Reorganized Debtors to Rosetta in Cash and, as a result, the Debtors shall not be required to reserve any amounts on account of such cure Claims.

    4.    <u>Treatment of Oil and Gas Contracts</u>: Notwithstanding any language herein to the contrary, by stipulation and agreement of the Debtors and Petersen incorporated herein, the deadline to assume or reject the Oil and Gas Contracts is and shall be extended to fifteen days following entry of a Final Order in the Rosetta Adversary Proceeding. All rights and duties of the Debtors, Reorganized Debtors, Petersen, and any other applicable counterparty under the Bankruptcy Code with respect to assumption or rejection of the Oil and Gas Contracts, including the right to argue that certain or all of the Oil and Gas Contracts are interrelated and form one integrated agreement, rights of offset or cure, or right to election under section 365(i) of the Bankruptcy Code, are expressly reserved as they relate to the Oil and Gas Contracts. In the event that Rosetta prevails in the Adversary Proceeding, the Debtors or Reorganized Debtors, as applicable, shall, within twenty days of the entry of final, non-appealable judgment in favor of Rosetta, File a motion to assume the Oil and Gas Contracts, to the extent they have not already been assumed, and shall include therein a statement of the cure amount (if any) they propose to pay in respect of the assumption of the Oil and Gas Contracts. In the event Petersen or other applicable counterparty disputes such cure amounts, the proper cure amounts will be determined by the Bankruptcy Court and any cure amounts found to be due shall be paid by the Reorganized Debtors to Petersen, or other counterparty, as applicable, in Cash and, as a result, the Debtors shall not be required to reserve any amounts on account of such cure Claims. Nothing contained herein shall be construed to prevent the Debtors from deciding to assume or reject the Oil and Gas Contracts prior to the outside deadline established above or Petersen from seeking an earlier determination for cause shown.

    5.    <u>Treatment of California Energy Commission Agreements</u>:

    a.    <u>Rejected California Energy Commission Agreements</u>: Notwithstanding any language herein to the contrary, the Debtors hereby reject the Rejected California Energy Commission Agreements. California Energy Commission stipulates that there are zero dollars in damages on account of the rejection of these contracts. California Energy Commission will terminate these agreements pursuant to their terms or as otherwise required by state law and no expenses shall be reimbursed on account of any of these agreements.

    b.    <u>Assumed July 14 California Energy Commission Agreement</u>: Notwithstanding any language herein to the contrary, the Debtors hereby assume the Assumed July 14 California Energy Commission Agreement with a zero dollar cure. Reorganized Calpine shall complete performance of this grant agreement by completing a final report before the end date of the grant agreement on March 31, 2008.

55

c.    Assumed  July  1  California  Energy  Commission  Agreement:
Notwithstanding any language herein to the contrary, the Debtors hereby assume the
Assumed July 1 California Energy Commission Agreement.    California Energy
Commission agrees to reimburse Reorganized Calpine for its expenses that are eligible to
be reimbursed under the terms of this agreement, up to a ceiling amount of $152,000.
Reorganized Calpine agrees to complete a final report, detailing the work performed and
tasks completed and agrees that it will determine the actual amount of reimbursable
expenses incurred and reimbursable, but not yet invoiced to California Energy
Commission.    The amount which California Energy Commission agrees to pay
Reorganized Calpine pursuant to this agreement will be the actual accounting of the
invoices that will be billed to California Energy Commission, not the agreement ceiling
amount of $219,000.    Reorganized Calpine agrees to invoice California Energy
Commission by March 31, 2008, when the grant terminates. The Debtors or Reorganized
Debtors, as applicable, and California Energy Commission agree that the Assumed July
21 California Energy Commission Agreement shall terminate pursuant to its own terms
on March 31, 2008.

6.    Treatment of Ace Agreements:  Notwithstanding anything to the contrary in the
Plan or the Confirmation Order, all of the pre- and postpetition agreements between the Debtors
and members of the ACE group of companies will remain in full force and effect, and will be
performed according to their terms by the Reorganized Debtors and the ACE companies. The
Debtors and the ACE companies reserve their respective rights under the insurance and surety
agreements and applicable non-bankruptcy law and nothing in the Plan or Confirmation Order
will alter, amend, or modify such rights.

7.    Treatment of the Hess Agreement:  On the Effective Date, the Hess Agreement
shall be assumed, and Cure in connection with such assumption shall be made as follows:
(a) Claim No. 3781 shall be a Class C-8 Allowed Claim in the amount of $9,391,977.90;
(b) Claim No. 3778 shall be a Class C-8 Allowed Claim in the amount of $249,999; (c) Hess
shall be entitled to an additional Class C-8 Allowed Claim in the amount of $100,000 for
attorney's fees and costs; and (d) Hess shall be entitled to an Allowed Administrative Claim
under section 503(b)(9) of the Bankruptcy Code in the amount of $3,814,317.06. The Class C-8
Allowed Claims and the Allowed Administrative Claim shall include postpetition interest at the
rate set forth in Section 6.5 of the Hess Agreement. The Allowed C-8 Claims and the Allowed
Administrative Claim shall be paid in full with Cash, which may include proceeds generated
from the sale of New Calpine Common Stock from the New Calpine Stock Reserve pursuant to
ARTICLE VII.D.9.  The Allowed Administrative Claim shall be paid within ten (10) days of the
Effective Date.  The following shall be deemed withdrawn with prejudice as of the Effective
Date: (a) the *Objection of Hess Corporation to Debtors' Request to Reject Agreement Between
KIAC Partners and Hess Corporation and Limited Objection to Confirmation of Plan with
Respect to KIAC Partners Pursuant to Section 1129(a)(3) of the Bankruptcy Code* [Docket No.
7109], (b) the Hess Adversary Proceeding, and (c) Claim No. 3782.

B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases:  With respect
to each of the Debtors' executory contracts or unexpired leases listed on the schedule of
"Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a
proposed Cure, and the assumption of such executory contract or unexpired lease may be

56

EXHIBIT A
PART 7

conditioned upon the disposition of all issues with respect to Cure. Any provisions or terms of the Debtors' executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure. Except with respect to executory contracts and unexpired leases in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the Claims and Solicitation Agent on or before the Cure Bar Date. Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors, in consultation with the Creditors' Committee, or Reorganized Debtors, as applicable, and the counterparty to the executory contract or unexpired lease. Any counterparty to an executory contract and unexpired lease that fails to object timely to the proposed assumption of any executory contract or unexpired lease will be deemed to have consented to such assumption. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease; provided, however, that this sentence shall not apply to The Dow Chemical Company and its affiliates.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

C.    Executory Contracts and Unexpired Leases Relating to Projects to be Sold or Surrendered:  Each of the Debtors' executory contracts and unexpired leases listed on the

schedule of "Conditionally Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement shall be deemed assumed by the contracting Debtors or Reorganized Debtor, as applicable, on a conditional basis pursuant to sections 365 and 1123 of the Bankruptcy Code, provided that the Debtors, with the reasonable consent of the Creditors' Committee, or Reorganized Debtors, as applicable, may alter the treatment of such listed executory contracts and unexpired leases through the later of a date that is sixty days after the Effective Date or such other date as set forth in ARTICLE V.A, at which time the executory contracts and unexpired leases remaining on such list are unconditionally assumed so that the Cure provisions of ARTICLE V.B shall apply, and the executory contracts and unexpired leases no longer remaining on such list are unconditionally rejected or repudiated all pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise.

D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases: Rejection or repudiation of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated executory contracts.

E.    Claims Based on Rejection or Repudiation of Executory Contracts and Unexpired Leases: Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be Filed with the Claims and Solicitation Agent no later than thirty days after the later of the Effective Date or the effective date of rejection or repudiation. Any Proofs of Claim arising from the rejection or repudiation of the Debtors' executory contracts or unexpired leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases shall be classified as Rejection Damages Claims and shall be treated in accordance with ARTICLE III.B.11.

F.    Intercompany Contracts, Contracts, and Leases Entered Into After the Petition Date: Intercompany Contracts, contracts, and leases entered into after the Petition Date by any Debtor, and any executory contracts and unexpired leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business. For the avoidance of doubt, if approved by an order of the Bankruptcy Court, the transactions contemplated by that certain *Motion For Entry Of An Order Pursuant To Sections 105, 363 And 365 Of The Bankruptcy Code And Bankruptcy Rule 9019 Authorizing And Approving (I) Entry Into Settlement Agreement With Lease Financing Parties Related To Pasadena Cogeneration L.P., (II) Assumption Of Certain Pasadena Facility Transaction Documents, (III) Amendment Of Certain Pasadena Facility Transaction Documents And (IV) The Post-Petition Execution Of*

*Certain Agreements Related To The Pasadena Facility*, filed on November 21, 2007, [Docket No. 6669], shall be binding upon the applicable Reorganized Debtors and the counterparties to such transactions, notwithstanding anything contained in the Plan or the Confirmation Order to the contrary. Notwithstanding anything in the Plan, the Plan Supplement, or the Confirmation Order to the contrary, with respect to Merrill Lynch Commodities, Inc., to the extent that the Stipulation and Order entered by the Bankruptcy Court on or about June 30, 2006 (the "Merrill Lynch Stipulation") [Docket No. 2099] is inconsistent with the Plan, the Plan Supplement, or Confirmation Order, the Merrill Lynch Stipulation shall govern. Notwithstanding anything in the Plan to the contrary, the Plan shall not modify or alter any executory contract or unexpired lease relating to the Greenleaf Project or the Agnews Project assumed pursuant to a Bankruptcy Court order prior to the Effective Date.

G.    Guarantees Issued or Reinstated After the Petition Date:  Those guarantee obligations of any Debtor listed in the Plan Supplement shall be deemed Reinstated on the Effective Date, and such obligations, as well as any other guarantee obligations of any Debtor incurred after the Petition Date, shall be performed by the applicable Reorganized Debtor in the ordinary course of business pursuant to the terms thereof.

H.    Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions:  All executory contracts and unexpired leases to be assumed, or conditionally assumed, under the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code shall be deemed so assumed, or so conditionally assumed, without giving effect to any provisions contained in such executory contracts or unexpired leases restricting the change in control or ownership interest composition of any or all of the Debtors, and upon the Effective Date (1) any such restrictions shall be deemed of no further force and effect and (2) any breaches that may arise thereunder as a result of Confirmation or Consummation shall be deemed waived by the applicable non-Debtor counterparty.

I.    Modifications, Amendments, Supplements, Restatements, or Other Agreements:  Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

J.    Reservation of Rights:  Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder. Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, any failure of the Hidalgo Indenture Trustee to assert or

pursue objections to the Plan or object to any relief sought by the Debtors in the Chapter 11 Cases, nor anything contained in the Plan, shall constitute an admission by the Hidalgo Indenture Trustee that the Hidalgo Lease is in fact an executory contract or unexpired lease (rather than a financing transaction). If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. Confirmation shall have no preclusive effect in any case or proceeding other than the Chapter 11 Cases with respect to the issue of whether the Hidalgo Lease is an unexpired lease or executory contract (rather than a secured financing). If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

K.    Nonoccurrence of Effective Date: In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

A.    Allowance of Claims and Interests: After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action referenced in ARTICLE IV.U.

B.    Claims and Interests Administration Responsibilities: Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.    Estimation of Claims and Interests: Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall

constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.    Adjustment to Claims and Interests Without Objection:  Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  Beginning on the end of the first full calendar quarter that is at least ninety days after the Effective Date, the Reorganized Debtors shall publish every calendar quarter a list of all Claims or Interests that have been paid, satisfied, amended, or superseded during such prior calendar quarter.

E.    Time to File Objections to Claims:  Any objections to Claims shall be Filed on or before the later of (1) the date that is one year after the Effective Date and (2) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, whether fixed before or after the date that is one year after the Effective Date.

F.    Disallowance of Claims or Interests:  Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims Filed on account of an Indemnification Obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.  All Claims Filed on account of a guarantee Reinstated pursuant to ARTICLE V.G shall be deemed satisfied and expunged from the Claims Register, without any further notice to or action, order, or approval of the Bankruptcy Court.  All Claims Filed on account of an employee benefit referenced in ARTICLE IV.R shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

**EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM (INCLUDING SUBORDINATED DEBT AND EQUITY SECURITIES CLAIMS) FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED**

K&E 12300541.14

TIMELY FILED BY A BANKRUPTCY COURT ORDER; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE FOREGOING SENTENCE SHALL NOT APPLY TO ANY CLAIMS, CLAIM AMENDMENTS, OR CLAIM SUPPLEMENTS THAT HAVE BEEN FILED OR ALLEGEDLY WERE FILED AFTER THE BAR DATE ON BEHALF OF HOLDERS OF THE (1) 4.75% CONVERTIBLE SENIOR NOTES DUE 2023, (2) 6.00% CONTINGENT CONVERTIBLE NOTES DUE 2014, AND (3) 7.75% CONTINGENT CONVERTIBLE NOTES DUE 2015, TO THE EXTENT SUCH CLAIMS, CLAIM AMENDMENTS, OR CLAIM SUPPLEMENTS ARE DETERMINED BY FINAL ORDER TO BE ALLOWED CLAIMS, WHICH DETERMINATION SHALL BE MADE WITHOUT REFERENCE TO THE FOREGOING SENTENCE; <u>PROVIDED</u> <u>FURTHER</u>, <u>HOWEVER</u>, THAT NOTHING IN THIS SENTENCE OR THE PLAN SHALL IN ANY WAY BE CONSTRUED TO ALLOW OR DISALLOW THE CLAIMS, CLAIM SUPPLEMENTS, OR CLAIM AMENDMENTS THAT HAVE BEEN FILED OR ALLEGEDLY WERE FILED AFTER THE BAR DATE ON BEHALF OF HOLDERS OF THE (1) 4.75% CONVERTIBLE SENIOR NOTES DUE 2023, (2) 6.00% CONTINGENT CONVERTIBLE NOTES DUE 2014 AND (3) 7.75% CONTINGENT CONVERTIBLE NOTES DUE 2015, THAT HAVE BEEN DISALLOWED PURSUANT TO THE BANKRUPTCY COURT'S *ORDER GRANTING DEBTORS' LIMITED OBJECTION TO CONVERTIBLE NOTEHOLDERS CLAIM NOS. 2404, 2821, 2823, 6247, 6249, 6280, 6299 AND 6300* [DOCKET NO. 5595], ENTERED ON AUGUST 10, 2007, WHICH ORDER IS CURRENTLY THE SUBJECT OF AN APPEAL; <u>PROVIDED</u> <u>FURTHER</u>, <u>HOWEVER</u>, THAT NOTHING IN THIS SENTENCE SHALL MODIFY ANY OTHER PROVISION OF THE PLAN RELATING TO THE NEW CALPINE STOCK RESERVE AND ESTIMATION OF CLAIMS; <u>PROVIDED</u> <u>FURTHER</u>, <u>HOWEVER</u>, THAT THE FOREGOING SHALL NOT PREJUDICE ROSETTA'S RIGHT, IF ANY, TO FILE PROOFS OF CLAIM IN ACCORDANCE WITH SECTION 502(h) OF THE BANKRUPTCY CODE OR OTHERWISE UPON THE CONCLUSION OF THE ROSETTA ADVERSARY PROCEEDING NOR THE DEBTORS' OR REORGANIZED DEBTORS', AS APPLICABLE, RIGHTS TO OBJECT ON ANY GROUNDS TO ANY SUCH PROOFS OF CLAIM FILED BY ROSETTA.  NOTWITHSTANDING THE FOREGOING, THE SOUTH POINT JOINT VENTURE CLAIMS SHALL BE DEEMED TIMELY FILED; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT (1) THE DEBTORS OR REORGANIZED DEBTORS, AS APPLICABLE, RESERVE THEIR RIGHTS TO OBJECT TO THE SOUTH POINT JOINT VENTURE CLAIMS ON ANY GROUNDS OTHER THAN TIMELINESS AND (2) THE ALLOWED AMOUNT OF THE SOUTH POINT JOINT VENTURE CLAIMS, IF ANY, SHALL BE CAPPED AT THE LESSER OF $750,000 OR 80% OF THE FINAL TAX LIABILITY OF THE SOUTH POINT JOINT VENTURE, AS EMBODIED IN A FINAL, NON-APPEALABLE ORDER OR ADMINISTRATIVE DETERMINATION, OR A SETTLEMENT BETWEEN THE SOUTH POINT JOINT VENTURE AND THE ARIZONA DEPARTMENT OF REVENUE.

G.    Offer of Judgment: The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim or Interest must pay the costs incurred by the

K&E 12300054 14

Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

H.    Amendments to Claims:  On or after the Effective Date, except as provided in ARTICLE V.E, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    Total Enterprise Value for Purposes of Distributions Under the Plan and the New Calpine Stock Reserve:  Distributions of New Calpine Common Stock to Holders of Allowed Claims, and the establishment and maintenance of the New Calpine Stock Reserve, both as described below, shall be based upon, among other things, the New Calpine Total Enterprise Value.  For purposes of distribution, the New Calpine Common Stock shall be deemed to have the value assigned to it based upon, among other things, the New Calpine Total Enterprise Value regardless of the date of distribution.

B.    Distributions on Account of Claims and Interests Allowed as of the Effective Date:  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties (which, prior to its dissolution, shall include the Creditors' Committee) and subject to the establishment of the New Calpine Stock Reserve, initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Administrative Claims for taxes asserted by the Texas Taxing Authority and the Louisiana Department of Revenue shall accrue interest and, in the event they become delinquent, penalties at the applicable state-law rate and to the extent provided by state law, and (3) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in full in Cash on the Distribution Date or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law; provided, however, that for the Allowed Priority Tax Claims asserted by the Louisiana Department of Revenue, the interest rate provided by applicable non-bankruptcy law shall be determined in accordance with section 511(b) of the Bankruptcy Code.

C.    Distributions on Account of Claims Allowed After the Effective Date:

1.    Payments and Distributions on Disputed Claims:  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, and subject to the establishment of the New Calpine Stock Reserve, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim or Interest; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the

Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law; provided further, however, that for the Allowed Priority Tax Claims asserted by the Louisiana Department of Revenue, the interest rate provided by applicable non-bankruptcy law shall be determined in accordance with section 511(b) of the Bankruptcy Code.

2.    Special Rules for Distributions to Holders of Disputed Claims: Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed; provided, however, that the Reorganized Debtors shall make distributions to Holders of Allowed First Lien Debt Claims, Allowed Second Lien Debt Claims, Allowed Other Secured Claims, Allowed General Note Claims, Allowed Senior Note Claims, and Allowed Subordinated Note Claims on account of the Allowed portion of such Holders' Claims; provided further, however, that with respect to any separately-Filed Claim of the United States of America or any Governmental Unit thereof that is a Disputed Claim, as each such Disputed Claim becomes an Allowed Claim, such Allowed Claim shall be paid in accordance with the provisions of the Plan, notwithstanding the fact that other Disputed Claims of the United States of America or any Governmental Unit thereof have not been Allowed. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims pursuant to ARTICLE VII.C.3. Subject to ARTICLE VII, all distributions made pursuant to the Plan on account of an Allowed Claim shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class.

3.    Reserve of New Calpine Common Stock: On the Effective Date, the Reorganized Debtors shall maintain in reserve shares of New Calpine Common Stock as the New Calpine Stock Reserve to pay Holders of Allowed Claims pursuant to the terms of the Plan. The amount of New Calpine Common Stock withheld as a part of the New Calpine Stock Reserve for the benefit of a Holder of a Disputed Claim shall be equal to the lesser of: (a) the number of shares necessary to satisfy the distributions required to be made pursuant to the Plan based on the asserted amount of the Disputed Claim or, if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtors, in consultation with the Creditors' Committee, elect to withhold on account of such Claim in the New Calpine Stock Reserve; (b) the number of shares necessary to satisfy the distributions required to be

64

made pursuant to the Plan for such Disputed Claim based on an amount as estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code for purposes of allowance; or (c) the number of shares necessary to satisfy the distributions required to be made pursuant to the Plan based on an amount as may be agreed upon by the Holder of such Disputed Claim and the Reorganized Debtors. As Disputed Claims are Allowed, the Distribution Agent shall distribute, in accordance with the terms of the Plan, New Calpine Common Stock to Holders of Allowed Claims, and the New Calpine Stock Reserve shall be adjusted. The Distribution Agent shall withhold in the New Calpine Stock Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the New Calpine Common Stock initially withheld in the New Calpine Stock Reserve, to the extent that such New Calpine Common Stock continues to be withheld in the New Calpine Stock Reserve at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of Holders of Disputed Claims whose Claims, if Allowed, are entitled to distributions under the Plan. Nothing in the Plan shall require the Reorganized Debtors to reserve New Calpine Common Stock on account of agreements, programs, and plans the Debtors may continue to honor after the Effective Date pursuant to ARTICLE IV.R and no such New Calpine Common Stock shall be so reserved. The Reorganized Debtors may (but are not required to) request estimation for any Disputed Claim that is contingent or unliquidated, as set forth in ARTICLE VI.C.

The LSP Shares shall be issued on the Effective Date, and, to the extent the approvals outlined below have not been received and to the extent necessary to comply with applicable law, placed in the New Calpine Stock Reserve. The LSP Shares shall be distributed to the LS Entities and the Luminus Entities or their designees, respectively, from the New Calpine Stock Reserve immediately upon the receipt by the LS Entities or the Luminus Entities, respectively, of any approval of the New York State Public Service Commission required in connection with the issuance of the LSP Shares to the LS Entities or the Luminus Entities, respectively; provided, however, that, to the extent that the Debtors or Reorganized Debtors, as applicable, are required to obtain approval of FERC pursuant to section 203 of the Federal Power Act, 16 U.S.C. §§ 824n-824n, with respect to the issuance of any LSP Shares to the LS Entities or the Luminus Entities, respectively, any LSP Shares in excess of 9.9 percent of the total amount of issued and outstanding New Calpine Common Stock that are held by the LS Entities or the Luminus Entities, respectively, together, in each case, with any Entities that are determined to be their "affiliates" under section 203 of the Federal Power Act, shall remain in the New Calpine Stock Reserve, and shall be distributed to the LS Entities or the Luminus Entities or their designees, respectively, immediately: (a) upon the Debtors or Reorganized Debtors, as applicable, obtaining any approval from FERC under section 203 of the FPA required with respect to the issuance to the LS Entities or the Luminus Entities, respectively, of the LSP Shares or (b) at such time as a given distribution to the LS Entities or the Luminus Entities, respectively, would not cause their holdings of New Calpine Common Stock, together with the holdings of any Entities that are determined to be their "affiliates" under section 203 of the Federal Power Act, to exceed 9.9 percent of the total amount of the issued and outstanding New Calpine Common Stock. Notwithstanding the foregoing, the LS Entities and the Luminus Entities shall at all times have the right, in their sole discretion, to direct the Distribution Agent to sell or otherwise dispose of any of their LSP Shares held in the New Calpine Stock Reserve, and the Distribution Agent shall immediately sell or dispose of such LSP Shares upon receiving and in accordance with any such direction from the LS Entities or the Luminus Entities, as applicable. Any dividends and

distributions (except for proceeds relating to any disposition of LSP Shares as set forth above which shall be immediately distributed to the LSP Entities or the Luminus Entities, as the case may be) related to the LSP Shares held in the New Calpine Stock Reserve that accrue on or after the Effective Date shall also be held in the New Calpine Stock Reserve, and shall be distributed directly to the LS Entities or the Luminus Entities or their designees, as applicable, at the time the LSP Shares to which they relate are distributed to the LS Entities or the Luminus Entities or their designees.

Notwithstanding anything in the applicable Holder's Proof of Claim or otherwise to the contrary, the Holder of a Claim shall not be entitled to receive or recover a distribution under the Plan on account of a Claim in excess of the lesser of the amount: (a) stated in the Holder's Proof of Claim, if any, as of the Distribution Record Date, plus interest thereon to the extent provided for by the Plan; (b) if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtors, in consultation with the Creditors' Committee, elect to withhold on account of such Claim in the New Calpine Stock Reserve and set forth in the Plan Supplement, or such other amount as may be estimated by the Bankruptcy Court prior to the Confirmation Hearing; or (c) if a Claim has been estimated, the amount deposited in the New Calpine Stock Reserve to satisfy such Claim after such estimation.

For purposes of any shareholder vote occurring after the Effective Date, the Distribution Agent or Servicer, as applicable, shall be deemed to have voted any New Calpine Common Stock held in the New Calpine Stock Reserve in the same proportion as all outstanding shares properly cast in such shareholder vote.

4.    Tax Reporting Matters:  Subject to definitive guidance from the Internal Revenue Service or an applicable court to the contrary (including the receipt by the Reorganized Debtors of a private letter ruling or the receipt of an adverse determination by the Internal Revenue Service upon audit, if not contested by the Reorganized Debtors), the Reorganized Debtors shall treat the New Calpine Stock Reserve as a single trust, consisting of separate and independent shares to be established with respect to each Disputed Claim, in accordance with the trust provisions of the Internal Revenue Code, and, to the extent permitted by law, shall report consistently with the foregoing for federal, state, and local tax purposes. All Holders of Claims shall report, for federal, state, and local tax purposes, consistently with the foregoing.

D.    Delivery of Distributions

1.    Record Date for Distributions:  On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions pursuant to ARTICLE VII shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate is transferred twenty or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Distribution Agent:  The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims and Interests governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.

3.    Delivery of Distributions in General:  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Interests shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim or Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Interest is Filed or if the Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim or Interest; (d) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Except as provided in ARTICLES IV.I and IX.A.7, distributions under the Plan on account of Allowed Claims and Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.  Distributions to holders of publicly traded Certificates will be made in accordance with ARTICLE VII.D.10.

4.    Accrual of Dividends and Other Rights:  For purposes of determining the accrual of dividends or other rights after the Effective Date, the New Calpine Common Stock shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed even though the Reorganized Debtors shall not pay any such dividends or distribute such other rights until distributions of the New Calpine Common Stock actually take place.  Except as specifically otherwise provided in the Plan, in no event shall interest accrue after the Interest Accrual Limitation Date on account of any satisfied portion of an Allowed Claim or Interest.

5.    Allocation Between Principal and Accrued Interest:  Except as otherwise provided in the Plan, distributions on account of Allowed Claims and Interests shall be treated as allocated first to principal and interest accrued as of the Petition Date and thereafter, to the extent the New Calpine Total Enterprise Value is sufficient to satisfy such principal and interest accrued as of the Petition Date, any interest accrued from the Petition Date through the Interest Accrual Limitation Date.

6.    Compliance Matters:  In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

67

Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7.    Foreign Currency Exchange Rate:  Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Unsecured Claim asserted in currency(ies) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Tuesday, December 20, 2005, as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal, National Edition*, on December 21, 2005.

8.    Fractional, De Minimis, Undeliverable, and Unclaimed Distributions:

a.    Fractional Distributions:  Notwithstanding any other provision of the Plan to the contrary, payments of fractions of shares of New Calpine Common Stock or New Calpine Warrants shall not be made and shall be deemed to be zero, and the Distribution Agent shall not be required to make distributions or payments of fractions of dollars. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

b.    De Minimis Distributions:  Neither the Distribution Agent nor any Servicer shall have any obligation to make a distribution on account of an Allowed Claim or Interest from the New Calpine Stock Reserve or otherwise if: (i) the aggregate amount of all distributions authorized to be made from such New Calpine Stock Reserve or otherwise on the Periodic Distribution Date in question is or has an economic value less than $10,000,000, based on Calpine's Total Enterprise Value, unless such distribution is a final distribution or (ii) the amount to be distributed to the specific Holder of an Allowed Claim or Interest on the particular Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $500.

c.    Undeliverable Distributions:  If any distribution to a Holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors pursuant to ARTICLE VII.D.8.d, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

68

d.    Reversion:  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors and, to the extent such Unclaimed Distribution is New Calpine Common Stock or New Calpine Warrants, shall be deemed cancelled. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

9.    Manner of Payment Pursuant to the Plan:  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer.  Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims and Interests shall be null and void if not negotiated within ninety days after issuance, but may be requested to be reissued until the distribution revests in the Reorganized Debtors pursuant to ARTICLE VII.D.8.d.  The Debtors, with the consent of the Creditors' Committee, or Reorganized Debtors, as applicable, may (a) agree with any Holder of an Allowed Claim that is to receive New Calpine Common Stock under the Plan to satisfy such Allowed Claim with Cash generated from the sale of New Calpine Common Stock, (b) satisfy an Allowed CalGen Makewhole Claim with Cash generated from the sale of New Calpine Common Stock, and (c) satisfy any portion of the Disputed Second Lien Debt Claim that is ultimately Allowed pursuant to a Final Order with Cash generated from the sale of New Calpine Common Stock reserved on account of such Claim pursuant to ARTICLE VII.C.3; provided, however, that the Reorganized Debtors may only take actions provided in (c) through a resolution of the board of directors of Reorganized Calpine.

10.    Surrender of Cancelled Instruments or Securities:  On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall surrender such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer).  Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.  No distribution of property pursuant to the Plan shall be made to or on behalf of any such Holder unless and until such Certificate is received by the Distribution Agent or the Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Distribution Agent or the Servicer pursuant to the provisions of ARTICLE VII.D.11.  Any Holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Distribution Agent or the Servicer prior to the first anniversary of the Effective Date, shall have its Claim or Interest discharged with no further action, be forever barred from asserting any such Claim or Interest against the relevant

69

Reorganized Debtor or its property, be deemed to have forfeited all rights, Claims, and Interests with respect to such Certificate, and not participate in any distribution under the Plan; furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary. Notwithstanding the foregoing paragraph, ARTICLE VII.D.10 shall not apply to any Claims Reinstated pursuant to the terms of the Plan.

11.  **Lost, Stolen, Mutilated, or Destroyed Debt Securities:**  Any Holder of Allowed Claims or Interests evidenced by a Certificate that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such Certificate, deliver to the Distribution Agent or Servicer, if applicable, an affidavit of loss acceptable to the Distribution Agent or Servicer setting forth the unavailability of the Certificate, and such additional indemnity as may be required reasonably by the Distribution Agent or Servicer to hold the Distribution Agent or Servicer harmless from any damages, liabilities, or costs incurred in treating such Holder as a Holder of an Allowed Claim or Interest. Upon compliance with this procedure by a Holder of an Allowed Claim or Interest evidenced by such a lost, stolen, mutilated, or destroyed Certificate, such Holder shall, for all purposes pursuant to the Plan, be deemed to have surrendered such Certificate.

E.  **Claims Paid or Payable by Third Parties:**

1.  **Claims Paid by Third Parties:**  The Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid. Except to the extent set forth in the Second Lien Makewhole Settlement Order, nothing in the Plan shall affect the rights of the Holders of Second Lien Debt Claims to exercise the subordination rights granted to them in connection with the 6.00% Contingent Convertible Notes Due 2014 and the 7.75% Contingent Senior Convertible Notes Due 2015. Nothing in this paragraph shall (a) require the Pipelines to return any Claim distributions that otherwise might be interpreted to be required to be returned to the Reorganized Debtors by this paragraph on account of any future sales of pipeline capacity by the Pipelines to third parties or other transportation services by the Pipelines provided to third parties or (b) permit the Debtors to set off any future sales of pipeline capacity by the Pipelines to third parties or other transportation services by the Pipelines against Claim distributions to be made under the Plan.

70

2.    Claims Payable by Third Parties:  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies:  Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F.    Treatment of Interests:  Notwithstanding anything in the Plan to the contrary, any provision in the Plan pertaining to the allowance of, or to potential distributions to be received in respect of, Interests shall only apply to the extent consistent with the distribution provisions in ARTICLES III.B.18, III.B.19, and III.B.20.

## ARTICLE VIII.
### EFFECT OF CONFIRMATION OF THE PLAN

A.    Discharge of Claims and Termination of Interests:  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall

71

be deemed Cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any Governmental Unit thereof. The actions of the Securities and Exchange Commission that: (1) are non-pecuniary, (2) do not relate to collection of a Claim, or (3) do not pursue injunctions that could be reduced to a monetary Claim, are not discharged under ARTICLE VIII.A.

B.    Subordinated Claims: The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto; provided, however, that the Reorganized Debtors must have authority from a Final Order of a court of competent jurisdiction to re-classify any Allowed Subordinated Note Claim other than as set forth in the Plan unless the Holder of such Allowed Subordinated Note Claim consents to such re-classification.

C.    Compromise and Settlement of Claims and Controversies: Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

D.    **Releases by the Debtors: Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on**

or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence. In addition, any and all releases by the Debtors provided for in section 3.6 of the CCAA Settlement are hereby adopted and incorporated as if explicitly set forth herein.

E.    **Exculpation:**   Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan, and therefore are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any Governmental Unit thereof. Nothing in this paragraph shall apply in any action brought by the Securities and Exchange Commission in exercise of its police and regulatory powers.

F.    **Releases by Holders of Claims and Interests:**   Except as otherwise specifically provided in the Plan or Plan Supplement, on and after the Effective Date, Holders of Claims and Interests (a) voting to accept the Plan or (b) abstaining from voting on the Plan and electing not to opt out of the release contained in this paragraph (which by definition, does not include Holders of Claims and Interests who are not entitled to vote in favor of or against the Plan), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or

73

relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Debtor, a Reorganized Debtor, or a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Debtor, the Reorganized Debtor, or the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence. In addition, any and all releases in section 3.6 of the CCAA Settlement are hereby adopted and incorporated as if set forth herein. Nothing in this paragraph shall apply in any action brought by the Securities and Exchange Commission in exercise of its police and regulatory powers. The Phelps Plaintiffs, the United States of America and any Governmental Unit thereof, and the Hawaii Plaintiffs are deemed to have opted out of the releases provided for in this paragraph and, therefore, are not bound by the releases provided for in this paragraph (and any injunctions relating to such releases). Notwithstanding ARTICLE VIII.F and ARTICLE VIII.G, and regardless of whether or how they vote on the Plan, the underwriter defendants in the state court litigation pending on the Petition Date in the Superior Court of California, County of Santa Clara, captioned *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp.*, Case No. 1-04-CV-021465 (Cal. Sup. Ct.) (the "Hawaii Litigation"), will not be, solely by virtue of the Plan, (a) deemed to have released any Claims for contribution in connection with the Hawaii Litigation against any of the director and officer defendants in the Hawaii Litigation, or (b) enjoined from pursuing any such Claims against such defendants.

G.    Injunction: Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to ARTICLE VIII.D or ARTICLE VIII.F, discharged pursuant to ARTICLE VIII.A, or are subject to exculpation pursuant to ARTICLE VIII.E are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the

74

Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, in consultation with the Creditors' Committee, and any such Entity agree in writing that such Entity will: (a) waive all Claims against the Debtors, the Reorganized Debtors, and the Estates related to such action and (b) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

H.     Protection Against Discriminatory Treatment:   Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.     Setoffs:  Except as otherwise expressly provided for in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may setoff against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise; provided, however, that this provision shall have no effect on the setoff rights that may be held by: (a) Tara Energy, Inc.; (b) Manufacturers & Traders Trust Company, in its capacity as indenture trustee for the 7.75% Contingent Convertible Notes Due 2015; (c) Duke Energy Trading and Marketing L.L.C.; (d) Energy

Transfer Fuel, L.P., ETC Marketing, Inc., and Houston Pipeline Co. LP; (e) Spectra Energy Corporation, Texas Eastern Transmission LP (f/k/a Texas Eastern Transmission Corporation), Egan Hub Storage LLC, Moss Bluff Hub Partners LP, Gulfstream Natural Gas System, and Maritimes & Northeast US; (f) Wisconsin Electric Power Company; (g) any BP entities, including BP Products North America Inc., BP Amoco Chemical Company, BP Energy Company, BP Pipelines and BP CanadaEnergy Marketing Corp., and their predecessors and/or successors, if any; or (h) Tampa Electric Company. The setoff(s) and/or netting performed by Reliant Energy Electric Solutions, LLC ("REES") on or about January 26, 2006 in connection with the transactions giving rise to REES' Claim Nos. 2888 and 2889 (the "Setoffs and/or Netting") are not affected by ARTICLE VIII.I. REES is not required to file the motion required by ARTICLE VIII.I in connection with the Setoffs and/or Netting. The Debtors reserve their right to object to REES' Claim Nos. 2888 and 2889; provided, however, that the Debtors may not object to REES' Claims on the basis that REES has not complied with ARTICLE VIII.I.

J.    Recoupment:  In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment; provided, however, that this provision shall have no effect on any recoupment rights of: (1) Manufacturers & Traders Trust Company, in its capacity as indenture trustee for the 7.75% Contingent Convertible Notes Due 2015; (2) Tara Energy, Inc.; (3) Wisconsin Electric Power Company; (4) any BP entities, including BP Products North America Inc., BP Amoco Chemical Company, BP Energy Company, BP Pipelines and BP CanadaEnergy Marketing Corp., and their predecessors and/or successors, if any; or (5) Tampa Electric Company.

K.    Release of Liens:  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to ARTICLE VII and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged (except for charging Liens of the Indenture Trustees to the extent the Indenture Trustee's fees and expenses are not paid pursuant to the Plan), and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns; provided, however, that nothing in the Plan shall release (i) Liens granted by KIAC Partners and Nissequogue Cogen Partners to secure payment of the bonds used to construct the KIAC And Nissequogue Facilities; (ii) Liens granted by Calpine Hidalgo Energy Center, L.P., f/k/a Duke Hidalgo, to the Hidalgo Indenture Trustee and the Industrial Development Corporation of the City of Edinburg, Texas in connection with the Hidalgo Lease and to secure payment of the bonds used to construct the Hidalgo Facility; (iii) the Liens provided to the CalGen Lenders and the CalGen Collateral Agent pursuant to the CalGen Debt Repayment Order; (iv) the Liens securing ad valorem property taxes

76

owed to the Texas Taxing Authority, and such Liens will remain in full force and effect with the same validity, priority and to the same extent provided by state law until satisfaction in full of the tax claim or such portion thereof as is Allowed, and any penalties, fees or interest owed thereon as provided by ARTICLE VII.B; (v) the mortgages, deeds of trust, Liens, pledges, or other security interests granted to: (a) Bankers Commercial Corporation, (b) UNBC Leasing, Inc., and (c) U.S. Bank National Association, not in its individual capacity but solely as owner trustee, in connection with the Debtors' leasing of the Greenleaf Project; and (vi) the mortgages, deeds of trust, Liens, pledges, or other security interests granted to: (a) Verizon Capital Corporation and (b) The Bank of New York Trust Company, NA, not in its individual capacity but solely as owner trustee, in connection with the Debtors' leasing of the Agnews Project.

L.    Document Retention:  On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors in the ordinary course of business.

M.    Reimbursement or Contribution:  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date:  (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

# ARTICLE IX.
## ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

A.    Professional Claims

1.    Final Fee Applications:  All final requests for payment of Claims of a Professional shall be Filed no later than forty-five days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

2.    Payment of Interim Amounts:  Except as otherwise provided in the Plan and subject to ARTICLE IX.A.1, Professionals shall be paid pursuant to the Interim Compensation Order.

3.    Professional Fee Escrow Account:  In accordance with ARTICLE IX.A.4, on the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order. Such funds shall not be considered property of the Reorganized Debtors. The remaining amount

K&E 12300541.14

of Professional Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account when such Claims are Allowed by a Bankruptcy Court order. When all Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors.

4.    Professional Fee Reserve Amount:  To receive payment for unbilled fees and expenses incurred through the Effective Date, on or before the Effective Date, the Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors and the Creditors' Committee.  If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

5.    Post-Effective Date Fees and Expenses:  Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Reorganized Debtors and incurred by the Creditors' Committee in connection with those matters for which it remains in existence after the Effective Date pursuant to the Plan.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

6.    Substantial Contribution Compensation and Expenses:  Except as otherwise specifically provided in the Plan, any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code (with the exception of the Indenture Trustees as set forth in ARTICLE IX.A.7) must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the Administrative Claim Bar Date or be forever barred from seeking such compensation or expense reimbursement.

7.    Indenture Trustee, Administrative Agent, and Collateral Trustee Fees, and Indemnification Obligations:  Unless otherwise ordered by the Bankruptcy Court or specifically provided for in the Plan, all reasonable fees and expenses of the Indenture Trustees, the First Lien Indenture Trustee, the Administrative Agents, and the Collateral Trustee (and their counsel, agents, and advisors) that are provided for under the respective indentures or credit agreements and the Collateral Trust Agreement (including, without limitation, in connection with service on the Creditors' Committee and in connection with distributions under the Plan, but excluding fees and expenses related to litigation of Disputed Claims) shall be paid in full in Cash without a reduction to the recoveries of applicable Holders of Allowed Claims as soon as reasonably practicable after the Effective Date.  Notwithstanding the foregoing, to the extent any fees or expenses of the Indenture Trustees, the First Lien Indenture Trustee, the Administrative Agents,

and the Collateral Trustee are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to Disputed Claims), the Indenture Trustees, the First Lien Indenture Trustee, the Administrative Agents, and the Collateral Trustee may assert their charging liens against any recoveries received on behalf of their respective Holders for payment of such unpaid amounts. The Debtors' contractual indemnification obligations to Indenture Trustees asserting a Second Lien Debt Claim, the Administrative Agents, the Collateral Trustee, and the CalGen Collateral Agent shall be reinstated as unsecured obligations of the Reorganized Debtors. Not later than thirty days after receipt of an invoice, the Reorganized Debtors shall pay the reasonable, actual, and documented fees and expenses incurred by the Indenture Trustee for the Second Lien Debt Claims and the Administrative Agent in connection with litigation over the Disputed Second Lien Debt Claim, provided that such fees and expenses shall not exceed $600,000 in the aggregate. In addition to their reinstated indemnification obligations to the CalGen Collateral Agent, the Reorganized Debtors shall pay, on the Distribution Date, the reasonable, actual, and documented fees and expenses incurred by the CalGen Collateral Agent from March 29, 2007, to November 30, 2007, in consideration for the CalGen Collateral Agent's withdrawal from the appeal of the CalGen Debt Repayment Order and all related orders, provided that such fees and expenses for that period do not exceed $150,000.

8. Payment of ULC1 Noteholders Ad Hoc Committee Fees and ULC1 Indenture Trustee Fees: Notwithstanding anything to the contrary in the Plan, the ULC1 Noteholders Ad Hoc Committee Fees and the ULC1 Indenture Trustee Fees shall be paid in full by the Debtors, on or as soon as reasonably practicable after the Effective Date, in Cash (in U.S. dollars), without the need for application to, or approval of, the Bankruptcy Court as a "substantial contribution" administrative expense under section 503(b) of the Bankruptcy Code. Any of such fees that are denominated in Canadian dollars shall be paid by the Debtors in U.S. dollars in accordance with the provisions of ARTICLE III.B.8.d.

9. Payment of Second Lien Ad Hoc Committee Fees: Notwithstanding anything to the contrary in the Plan, all Claims for reasonable fees and expenses of the professionals and advisors to the Second Lien Ad Hoc Committee shall be paid in full by the Debtors or Reorganized Debtors, as applicable, in accordance with the terms of the Cash Collateral Order.

B. Other Administrative Claims: All requests for payment of an Administrative Claim must be Filed with the Claims and Solicitation Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable, on or before the Administrative Claim Bar Date. Any request for payment of an Administrative Claim pursuant to ARTICLE IX.B that is not timely Filed and served shall be disallowed automatically without the need for any objection by the Debtors or the Reorganized Debtors. The Reorganized Debtors may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that any party with standing objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

# ARTICLE X.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.     Conditions to Confirmation:  The following are conditions precedent to Confirmation that must be satisfied or waived in accordance with ARTICLE X.C:

1     The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors and the Creditors' Committee, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.     The proposed Confirmation Order shall be in form and substance acceptable to the Debtors and the Creditors' Committee.

3.     The terms and conditions of employment or retention of any Persons proposed to serve as Named Executive Officers or directors of Reorganized Calpine, including, without limitation, as to compensation, shall be acceptable to the Debtors and the Creditors' Committee and be set forth in the Plan Supplement to the extent such terms and conditions of employment or retention differ from those in existence on August 21, 2007.

4.     The most current version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including the Reorganized Calpine Bylaws and the Reorganized Calpine Charter) shall have been Filed in form and substance acceptable to the Debtors and the Creditors' Committee.

B.     Conditions Precedent to Consummation:   The following are conditions precedent to Consummation that must be satisfied or waived in accordance with ARTICLE X.C:

1.     The Bankruptcy Court shall have authorized the assumption and rejection of executory contracts and unexpired leases by the Debtors as contemplated by ARTICLE V.

2.     The New Credit Facility shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived, with the reasonable consent of the Creditors' Committee, or satisfied in accordance with the terms thereof, and funding pursuant to the New Credit Facility shall have occurred.

3.     The Confirmation Order shall have become a Final Order in form and substance acceptable to the Debtors and the Creditors' Committee.

4.     The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including the Reorganized Calpine Bylaws and the Reorganized Calpine Charter) shall have been Filed in form and substance acceptable to the Debtors and the Creditors' Committee without prejudice to the Reorganized Debtors' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement.

5.     The Confirmation Date shall have occurred.

K&E 12300541 14

6.      The New Calpine Common Stock shall have been accepted for listing on a national securities exchange or for quotation on a national automated interdealer quotation system.

C.      Waiver of Conditions Precedent:  The Debtors or the Reorganized Debtors, as applicable, with the consent of the Creditors' Committee and in consultation with the Equity Committee, may waive any of the conditions to Confirmation or Consummation set forth in ARTICLE X at any time, without any notice to parties-in-interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.  A failure to satisfy or waive any condition to Confirmation or Consummation may be asserted as a failure of Confirmation or Consummation regardless of the circumstances giving rise to such failure (including any action or inaction by the party asserting such failure).  The failure of the Debtors or Reorganized Debtors, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

D.      Effect of Non-Occurrence of Conditions to Consummation:  Each of the conditions to Consummation must be satisfied or duly waived pursuant to ARTICLE X.C, and Consummation must occur within 180 days of Confirmation, or by such later date established by Bankruptcy Court order.  If Consummation has not occurred within 180 days of Confirmation, then upon motion by a party in interest made before Consummation and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if Consummation occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to ARTICLE X.D or otherwise, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments, or rejections of executory contracts or unexpired leases pursuant to ARTICLE V, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action; (2) prejudice in any manner the rights of such Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor or any other Entity.

E.      Satisfaction of Conditions Precedent to Confirmation:  Upon entry of a Confirmation Order acceptable to the Debtors and the Creditors' Committee, each of the conditions precedent to Confirmation, as set forth in ARTICLE X.A, shall be deemed to have been satisfied or waived in accordance with the Plan.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      Modification and Amendments:  Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Creditors' Committee as to material terms, reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the

81

Debtors expressly reserves its respective rights to revoke or withdraw, or, with the consent of the Creditors' Committee, to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with ARTICLE XI. Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the Debtors' private website at http://www.kccllc.net/calpine. The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

B.     Effect of Confirmation on Modifications:  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     Revocation or Withdrawal of Plan:  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

K&E 12300564.14

3.     Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any executory contract or unexpired lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to ARTICLE V, any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.     Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.     Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.     Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8     Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.     Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in ARTICLE VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to ARTICLE VII.E.1;

K&E 12300541 14

14. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16. Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17. Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19. Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22. Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23. Enforce all orders previously entered by the Bankruptcy Court; and

24. Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.     Immediate Binding Effect: Subject to ARTICLE X.B and notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

B.    Additional Documents:  On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents in form and substance acceptable to the Creditors' Committee as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    Payment of Statutory Fees:  All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.    Dissolution of Committees:  Upon the Effective Date, the Creditors' Committee shall dissolve automatically (except with respect to any pending litigation or contested matter to which the Creditors' Committee is a party, any appeals Filed regarding Confirmation, the resolution of any substantial contribution applications, and the resolution of applications for Professional Claims), and members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; provided, however, that notwithstanding the foregoing: (1) the post-Effective Date Creditors' Committee shall consist of no more than five members; (2) the Creditors' Committee shall automatically dissolve upon payment in full of all Allowed Claims (after reconciliation of all Disputed Claims); (3) any consent or consultation rights of the Creditors' Committee set forth in the Plan will cease to be of any force and effect upon the dissolution of the Creditors' Committee; and (4) after the Effective Date the Creditors' Committee shall retain only those professional advisors or experts on terms that are reasonably acceptable to the Reorganized Debtors or authorized to be retained by further order of the Bankruptcy Court; provided, however, that the Creditors' Committee's professional advisors and experts that have been retained by Bankruptcy Court order prior to the Effective Date shall be deemed reasonably acceptable to the Reorganized Debtors (but not necessarily as to compensation). The Reorganized Debtors shall continue to compensate the Creditors' Committee's professional advisors for reasonable services provided in connection with any of the foregoing post-Effective Date activities.

Upon the Effective Date, the Equity Committee shall dissolve automatically, except with respect to applications for Professional Claims, and members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code.

E.    Reservation of Rights:  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.    Successors and Assigns:  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    Service of Documents

        1.    After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to Debtors |
|---|---|
| Calpine Corporation<br>717 Texas Avenue, Suite 1000<br>Houston, Texas 77002<br>Attn.:  Gregory L. Doody, Esq. | Kirkland & Ellis LLP<br>153 East 53rd Street<br>New York, New York 10022<br>Attn.:  Richard M. Cieri, Esq.<br><br>and<br><br>Kirkland & Ellis LLP<br>200 East Randolph Street<br>Chicago, Illinois 60601<br>Attn.:  Marc Kieselstein, P.C.<br>        David R. Seligman, Esq.<br>        James J. Mazza, Jr., Esq. |
| **United States Trustee** | **Counsel to the DIP Lenders** |
| Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn.:  Paul K. Schwartzberg, Esq. | Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn.:  Peter V. Pantaleo, Esq.<br>        David J. Mack, Esq. |
| **Counsel to the Creditors' Committee** | **Counsel to the Equity Committee** |
| Akin Gump Strauss Hauer & Feld LLP<br>590 Madison Avenue<br>New York, New York 10022-2524<br>Attn.:  Michael S. Stamer, Esq.<br>        Philip C. Dublin, Esq. | Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, New York 10004<br>Attn.:  Brad E. Scheler, Esq.<br>        Gary L. Kaplan, Esq. |
| **Counsel to Second Lien Ad Hoc Committee** | **Counsel to Lenders of New Credit Facility** |
| Paul Weiss Rifkind Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019-6064<br>Attn.:  Alan W. Kornberg, Esq.<br>        Andrew N. Rosenberg, Esq.<br>        Elizabeth R. McColm, Esq. | Simpson Thatcher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn.:  Peter V. Pantaleo, Esq.<br>        David J. Mack, Esq. |

86

2.  After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

3.  In accordance with Bankruptcy Rules 2002 and 3020(c), within ten business days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties having been served with the Confirmation Hearing Notice; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in The Wall Street Journal (National Edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

H.  Term of Injunctions or Stays:  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.  Entire Agreement:  Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.  Governing Law:  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

K.    Exhibits: All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date. After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at http://www.kccllc.net/calpine or the Bankruptcy Court's website at www.nysb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

L.    Nonseverability of Plan Provisions: If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent and, subject to ARTICLE XI.A, the Creditors' Committee's consent; and (3) nonseverable and mutually dependent.

M.    Closing of Chapter 11 Cases: The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.    **Waiver or Estoppel: Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, the Creditors' Committee or its counsel, the Equity Committee or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date. NOTWITHSTANDING ANYTHING CONTAINED IN THE DISCLOSURE STATEMENT TO THE CONTRARY, AS SET FORTH IN THE PLAN, ACTUAL DISTRIBUTIONS UNDER THE PLAN TO CREDITORS AND, IF APPLICABLE, EQUITY SECURITY HOLDERS WILL BE PREDICATED ON THE NEW CALPINE TOTAL ENTERPRISE VALUE AS DETERMINED BY THE BANKRUPTCY COURT. NEITHER A VOTE TO ACCEPT THE PLAN BY A CREDITOR OR EQUITY SECURITY HOLDER, NOR THE ACCEPTANCE OF THE PLAN BY ANY CLASS OF CREDITORS OR EQUITY SECURITY HOLDERS, SHALL IN ANY WAY BE DEEMED TO (I) IMPAIR THE RIGHT OF A CREDITOR OR EQUITY SECURITY HOLDER, OR AD HOC**

COMMITTEE OR OFFICIAL COMMITTEE REPRESENTING THE INTERESTS OF
ANY CLASS OF CREDITORS OR EQUITY SECURITY HOLDERS TO ASSERT IN
CONNECTION WITH CONFIRMATION THAT THE NEW CALPINE TOTAL
ENTERPRISE VALUE IS DIFFERENT FROM THE AMOUNT ESTIMATED BY THE
DEBTORS OR ANY OTHER PARTY OR (II) BE DEEMED A WAIVER OF ANY
PARTY'S RIGHT TO OBJECT TO THE PLAN UNDER BANKRUPTCY CODE
SECTIONS 1129(a)(7) OR 1129(b)(2) BASED ON VALUATION.

O.     Conflicts:  Except as set forth in the Plan, to the extent that any provision of the
Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation
Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or
amendments to any of the foregoing), conflict with or are in any way inconsistent with any
provision of the Plan, the Plan shall govern and control.

New York, New York
Dated:  December 19, 2007


CALPINE CORPORATION (for itself and all other Debtors)


By:     /s/ Gregory L. Doody
Name:   Gregory L. Doody
Title:   Executive Vice President, General Counsel, and Secretary

K&E 12309341 14

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Calpine Corporation, et al.,[1] | ) | |
| | ) | Case No. 05-60200 (BRL) |
| Debtors. | ) | Jointly Administered |
| | ) | |

## NOTICE OF OCCURRENCE OF EFFECTIVE DATE OF DEBTORS' SIXTH AMENDED JOINT PLAN OF REORGANIZATION

**PLEASE TAKE NOTICE THAT** on December 19, 2007, the Honorable Burton R. Lifland, United States Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of New York, entered an order [Docket No. 7256] (the "Confirmation Order") confirming the Sixth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 7237] (as confirmed by the Confirmation Order and as may be amended in accordance with the provisions thereof, the "Plan"). The Confirmation Order and the Plan can be viewed at http://www.kccllc.net/calpine.[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Effective Date for all Debtors occurred on January 31, 2008. Each of the conditions precedent to consummation of the Plan enumerated in Article X.B of the Plan have been satisfied or waived in accordance with the Plan.

Dated:  January 31, 2008
New York, New York

Respectfully submitted,

/s/ David R. Seligman
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Alexandra S. Kelly (AS 2021)
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Counsel for the Debtors

---

[1] A complete list of the 274 Debtors in the above-captioned cases and their respective case numbers can be found at http://www.kccllc.net/calpine.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Plan.

Calpine | Investor Relations | Press Release                                           Page 1 of

 **CALPINE**

**INVESTOR RELATIONS**

Press Release

Calpine Emerges From Chapter 11

Emerges as a Stronger, More Competitive Power Company Poised for Growth

SAN JOSE, Calif. and HOUSTON, Jan. 31 /PRNewswire-FirstCall/ -- Calpine Corporation (Pink Sheets: CPNLQ; NYSE: CPN) announced today that it has successfully emerged from Chapter 11 bankruptcy protection. The company officially concluded its Chapter 11 reorganization after meeting all statutory requirements of the company's Sixth Amended Joint Plan of Reorganization, including successfully closing its $7.3 billion exit financing facility that includes a one-year, $300 million bridge facility that is expected to be paid by the end of the first quarter. Calpine's Plan was confirmed by the United States Bankruptcy Court for the Southern District of New York in an order entered on December 19, 2007.

Calpine's stock is expected to begin "regular way" trading on the New York Stock Exchange on or about February 5, 2008 under the ticker symbol CPN.

"This is a wonderful day for all of us at the new Calpine," said Robert P. May, Calpine's Chief Executive Officer. "We are very proud of what we have been able to accomplish over the past two years. Calpine is now a stronger, more competitive power company poised for growth in the energy industry. We are well positioned for future success, with a healthy balance sheet and a $7.3 billion exit financing facility. On behalf of the Board and management team, we would like to thank the nearly 2,200 Calpine employees for their hard work, perseverance and dedication over the past two years. We'd also like to thank our customers, business partners and the communities we serve for their support throughout this process."

Gregory L. Doody, Calpine's General Counsel, who has also served as the company's Chief Restructuring Officer, said, "Calpine's restructuring was truly remarkable. In just over two years Calpine dramatically improved its capital structure, reducing approximately $7.2 billion in debt while generating a significant recovery for our creditors as a whole. In addition, we enhanced and streamlined our core power generation business. Together, these financial and operating improvements have laid a strong foundation for the future success of Calpine, its stakeholders, customers and employees."

The Court approved Calpine's new nine-member Board of Directors, on November, 20, 2007. The Directors are:

- William J. Patterson -- Chairman of the Board.

- Frank Cassidy -- Member, Compensation Committee.

- Kenneth Derr -- Chair, Compensation Committee.

- Robert C. Hinckley -- Member, Audit Committee and Member, Nominating and Governance Committee.

- Robert P. May -- Chief Executive Officer

- David Merritt -- Chair, Audit Committee.

- W. Benjamin Moreland -- Member, Audit Committee.

- Denise M. O'Leary -- Chair, Nominating and Governance Committee.

- J. Stuart Ryan -- Member, Compensation Committee.

Under the Plan, Calpine intends to issue a total of 485 million shares of reorganized Calpine common stock to holders of allowed claims. The reorganized Calpine common stock will trade on the New York Stock Exchange under the ticker symbol CPN. Calpine anticipates that it will make initial distributions under the Plan to holders of allowed claims and interests on or before February 10, 2008. In addition to the 485 million shares, Calpine will reserve 15 million shares for distribution pursuant to the terms of

Calpine's Management and Director Equity Incentive Programs, which will be implemented pursuant to the terms of the Plan.

In its first distribution, Calpine currently anticipates distributing on account of allowed unsecured claims approximately 423 million shares of reorganized Calpine common stock, each with an imputed value of $17.36 based upon a $8.7 billion reorganized equity value and the face value of the exit financing.

Calpine currently estimates in connection with its first distribution that: (1) general unsecured creditors will receive approximately 84.8 percent of their allowed claims for principal and pre-petition interest; (2) holders of the 7.625 percent Senior Notes Due 2006, 7.75 percent Senior Notes Due 2009, 7.875 percent Senior Notes Due 2008, 8.75 percent Senior Notes Due 2007, and 10.5 percent Senior Notes Due 2006 (the "Senior Notes") will receive approximately 100.0 percent of their allowed claims for principal and pre-petition interest; and (3) holders of the 7.75 percent Contingent Convertible Notes Due 2015 (the "Subordinated Notes") will receive approximately 42.0 percent of their allowed claims for principal and pre-petition interest.

In connection with its first distribution, Calpine also intends to set aside 62 million shares of reorganized Calpine common stock on account of disputed unsecured claims. As claims are resolved, Calpine will make further distributions of reorganized Calpine common stock on a periodic basis in accordance with the terms of the Plan. Based upon the $18.95 billion total enterprise value of Calpine set forth in the Plan and Calpine's current litigation-risk assessment of allowed claims, Calpine currently estimates that: (1) general unsecured creditors will ultimately recover approximately 99.9 percent of their allowed claims for principal and pre-petition interest; (2) holders of the Senior Notes will ultimately recover approximately 100.0 percent of their allowed claims for principal and pre-petition interest; and (3) holders of the Subordinated Notes will ultimately recover approximately 75.0 percent of their allowed claims for principal and pre-petition interest.

In accordance with the Plan, post-petition interest on the Senior Notes and certain related claims will be held in escrow pending the resolution of the Intercreditor Subordination Dispute between the holders of the Senior Notes and holders of the Subordinated Notes described in detail in the Plan. The recoveries for the holders of the Senior Notes and holders of the Subordinated Notes under the Plan depend, in part, on the resolution of the Intercreditor Subordination Dispute. Calpine's estimates regarding the ultimate recoveries under the Plan for the holders of the Subordinated Notes set forth above assume that the holders of the Senior Notes will prevail in the Intercreditor Subordination Dispute, although Calpine currently has not yet taken any position with respect to such dispute.

As part of the Plan, Calpine's old common stock will be cancelled and holders of the old common stock will receive warrants to purchase new Calpine common stock. These warrants will be for an aggregate of approximately 48.5 million shares of new Calpine common stock and will have an exercise price of $23.88 per share. Cashless exercises will not be permitted. The warrants will expire on August 25, 2008. The warrants will be distributed to the holders of the old Calpine common stock pro rata based on the number of shares of old Calpine common stock held at the time of cancellation. Fractional warrants will not be issued.

Calpine Board of Directors:

Frank Cassidy. Prior to his retirement in 2007, Mr. Cassidy was employed at Public Service Enterprise Group, Inc., an energy and energy services company headquartered in New Jersey, since 1969. From 1999-2007, Mr. Cassidy served as President and Chief Operating Officer of PSEG Power LLC, the wholesale energy subsidiary of PSEG, which includes PSEG Nuclear, PSEG Fossil and PSEG Energy Resources & Trade. From 1996-1999, Mr. Cassidy was President and Chief Executive Officer of PSEG Energy Technologies, Inc. Prior to such time, Mr. Cassidy held various positions of increasing responsibility at the Public Service Electric and Gas Company. Mr. Cassidy earned an M.B.A. from Rutgers University in 1974 and has an electrical engineering degree from the New Jersey Institute of Technology. He serves on the Compensation Committee.

Kenneth Derr. Mr. Derr formerly served as Calpine's Chairman of the Board and has been an independent Calpine director since May 2001. In addition, Mr. Derr served as Acting CEO prior to the tenure of current CEO Robert P. May. He retired as the Chairman and Chief Executive Officer of Chevron Corporation in 1999, a position that he held since 1989, after a 39-year career with the company. Mr. Derr obtained a Master of Business Administration degree from Cornell University in 1960 and a Bachelor of Mechanical Engineering from Cornell University in 1959. In addition, he serves as a director of Citigroup, Inc. and

Halliburton Co. Mr. Derr is chair of the Compensation Committee.

Robert C. Hinckley. Mr. Hinckley previously served as Vice President, Strategic Plans and Programs, General Counsel and Secretary, and Chief Operating Officer for Xilinx, Inc., a supplier of programmable logic solutions in San Jose, CA. From 1988 to 1990, Mr. Hinckley was Senior Vice President and Chief Financial Officer of Spectra Physics, Inc., a supplier of laser products. Mr. Hinckley serves on the boards of directors of several private companies and holds a B.S. in engineering from the U.S. Naval Academy and a J.D. from Tulane University Law School. He serves on the Audit Committee and the Nominating and Governance Committee.

Robert P. May. Mr. May joined Calpine as CEO in December 2005. Over the past 30 years Mr. May has served in various senior management and executive positions, including non-executive Chairman of the Board of HealthSouth from July 2004 to October 2005, and as interim President and CEO of Charter Communications, January 2005 to August 2005. From March 2003 to May 2004, he served as HealthSouth's interim CEO, and as interim President of its outpatient and diagnostic division, from August 2003 to January 2004. At Cablevision Systems Corp., where Mr. May was COO and a Director from 1996 to 1998, he was part of an executive team that helped transition the company through new operating strategies and the use of new technologies. He also serves as a member of Charter Communications' Board of Directors and Deutsche Bank Americas' Advisory Board.

David Merritt. Since October 2007 Mr. Merritt has served as Senior Vice President and Chief Financial Officer at iCRETE LLC, a technology company in the building materials industry. He served as Managing Director of Salem Partners, LLC, an investment-banking firm, from October 2003 until September 2007. He has been on the boards of Charter Communications and Outdoor Channel Holdings, Inc. since 2003. He also served as a director of Laser-Pacific Media Corporation from January 2001 through October 2003, and served as chairman of its audit committee. He was with KPMG LLP for 24 years, serving in a variety of capacities during his years with the firm, including 14 years as a partner. Mr. Merritt earned a Bachelor of Science degree in business and accounting from California State University - Northridge. Mr. Merritt is chair of the Audit Committee.

W. Benjamin Moreland. Mr. Moreland has served as Executive Vice President and Chief Financial Officer of Crown Castle International Corporation, which provides broadcast, data and wireless communications infrastructure services in Australia, Puerto Rico, and the U.S. and has served in other senior executive roles at Crown Castle since starting there in 1999. From 1984 to 1999, Mr. Moreland was employed by Chase Manhattan Bank, serving in various roles of increasing responsibility in corporate finance and real estate investment banking. Mr. Moreland earned an M.B.A. from the University of Houston in 1988 and has a finance degree from the University of Texas, Austin. Mr. Moreland was appointed to the board of directors of Crown Castle International Corporation in 2006. He serves on the Audit Committee.

Denise M. O'Leary. Since 1996, Ms. O'Leary has been a private venture capital investor in Woodside, California. From 1983 to 1996, Ms. O'Leary was an associate, then general partner, at Menlo Ventures, a venture capital firm that provides long-term capital and management services primarily to development-stage companies in such industries as Internet infrastructure, semiconductors, software, financial services, and computer hardware. Prior to 1983, Ms. O'Leary held various positions of increasing responsibility in manufacturing engineering and management positions at Spectra Physics, Inc. Ms. O'Leary earned an M.B.A. from Harvard Business School in 1983 and has an industrial engineering degree from Stanford University. She is also a director at Medtronic, Inc. and US Airways Group, Inc. She serves as chair of the Nominating and Governance Committee

William J. Patterson. Mr. Patterson is a managing director of SPO Partners & Co., a private investment partnership that he joined in 1989. SPO may initially hold more than 10 percent of the Company's common stock and may be considered an affiliate of the Company. From 1985 to 1987, Mr. Patterson was a financial analyst at Goldman, Sachs & Co., where he was involved in structuring and arranging financing for leveraged buyouts and in privately placing debt and equity securities. He also served as a director of Plum Creek Timber Company, the largest private timberland owner in the United States, from December 1992 to May 2003. Mr. Patterson earned his M.B.A. in 1989 from the Stanford Graduate School of Business and received his A.B. from Harvard College in 1984. He is Board Chair of the California Academy of Sciences, Chair of the Investment Committee of the Marin Community Foundation, Vice Chair of the Stanford Business School Trust and a former trustee and board president of the Bay Area Discovery Museum. Mr. Patterson is also a Henry Crown Fellow of the Aspen Institute. In addition to serving as Chairman of the Board, he is a member of the Nominating and Governance Committee.

J. Stuart Ryan. Mr. Ryan has been the owner and President of Rydout LLC, an investment firm focused on

the energy sector, since February 2003. He also has been a venture partner with SPO Partners & Co., a private investment partnership, since 2003. SPO may initially hold more than 10 percent of the Company's common stock and may be considered an affiliate of the Company. From 1986 through 2003, Mr. Ryan held various management positions with The AES Corporation, a global power company, including Executive Vice President from February 2000 and Chief Operating Officer from February 2002. He also served as Chairman of the Board of Directors of Indianapolis Power & Light, and as a director of AES Gener, a publicly listed company in Chile. Mr. Ryan is a graduate of the Harvard Business School and has a Chemical Engineering degree from Lehigh University. He currently serves on Lehigh's Global Council and is Chairman of its Asa Packer Society and is also a director of O&M Solutions, a company based in Mauritius that provides technical services to companies developing, constructing and operating power plants in Asia, the Middle East and Africa. He serves on the Compensation Committee.

Calpine Corporation is helping meet the needs of an economy that demands more and cleaner sources of electricity. Founded in 1984, Calpine is a major U.S. power company, currently capable of delivering nearly 24,000 megawatts of clean, cost-effective, reliable, and fuel-efficient electricity to customers and communities in 18 states in the U.S. The company owns, leases, and operates low-carbon, natural gas-fired, and renewable geothermal power plants. Using advanced technologies, Calpine generates electricity in a reliable and environmentally responsible manner for the customers and communities it serves. Please visit http://www.calpine.com for more information.

Forward Looking Statement

In addition to historical information, this release contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. We use words such as "believe," "intend," "expect," "anticipate," "plan," "may," "will" and similar expressions to identify forward-looking statements. Such statements include, among others, those concerning our expected financial performance and strategic and operational plans, as well as all assumptions, expectations, predictions, intentions or beliefs about future events. You are cautioned that any such forward-looking statements are not guarantees of future performance and that a number of risks and uncertainties could cause actual results to differ materially from those anticipated in the forward-looking statements. Such risks and uncertainties include, but are not limited to: (i) the risks and uncertainties associated with the ability to successfully implement Calpine's Plan of Reorganization as confirmed; (ii) our ability to implement our business plan; (iii) financial results that may be volatile and may not reflect historical trends; (iv) seasonal fluctuations of our results; (v) potential volatility in earnings associated with fluctuations in prices for commodities such as natural gas and power; (vi) our ability to manage liquidity needs and comply with covenants related to our existing financing obligations and anticipated exit financing; (vii) the direct or indirect effects on our business of our impaired credit including increased cash collateral requirements in connection with the use of commodity contracts; (viii) transportation of natural gas and transmission of electricity; (ix) the expiration or termination of our power purchase agreements and the related results on revenues; (x) risks associated with the operation of power plants including unscheduled outages; (xi) factors that impact the output of our geothermal resources and generation facilities, including unusual or unexpected steam field well and pipeline maintenance and variables associated with the waste water injection projects that supply added water to the steam reservoir; (xii) risks associated with power project development and construction activities; (xiii) our ability to attract, retain and motivate key employees; (xiv) our ability to attract and retain customers and contract counterparties; (xv) competition; (xvi) risks associated with marketing and selling power from plants in the evolving energy markets; (xvii) present and possible future claims, litigation and enforcement actions; (xviii) effects of the application of laws or regulations, including changes in laws or regulations or the interpretation thereof; and (xix) other risks identified from time-to-time in Calpine's reports and registration statements filed with the SEC, including, without limitation, the risk factors identified in its Annual Report on Form 10-K for the year ended December 31, 2006 and Quarterly Reports on Form 10-Q. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements and Calpine undertakes no obligation to update any such statements. Unless specified otherwise, all information set forth in this release is as of today's date and Calpine undertakes no duty to update this information. For additional information about Calpine's chapter 11 reorganization or general business operations, please refer to Calpine's Annual Report on Form 10-K for the fiscal year ended December 31, 2006, Calpine's Quarterly Reports on Form 10-Q, and any other recent Calpine report to the Securities and Exchange Commission. These filings are available by visiting the Securities and Exchange Commission's website at http://www.sec.gov or Calpine's website at http://www.calpine.com.

SOURCE Calpine Corporation

CONTACT: Media Relations, Mel Scott, 713-570-4553, scottm@calpine.com, or Investor Relations, Norma Dunn, 713-830-8883.

## Gilad, Erez E.

| | |
|---|---|
| **From:** | James Mazza [jmazza@kirkland.com] |
| **Sent:** | Wednesday, January 30, 2008 6:34 PM |
| **To:** | Pollio, Marie C |
| **Cc:** | Ali Kelly; Retter, David; Gilad, Erez E.; Fredericks, Ian; Goldman, Ira; Christian, Jennifer A.; mstamer@akingump.com; Powell, Norman; Dublin, Philip; Reid, Sarah; David Seligman; Paul Zier; Barry Folse; rmcwilliams@alixpartners.com |
| **Subject:** | RE: Calpine - Agreement Reached Regarding Intercreditor Subordination Dispute Escrow Amount |

Based on the e-mails below, I am confirming the agreed amount of the Intercreditor Subordination Dispute Escrow Account to be $169,253,136.11 in New Calpine Common Stock.

Jim Mazza
Kirkland & Ellis LLP
312-861-2393 (telephone)
312-660-7941 (fax)
200 E. Randolph Drive
Chicago, IL 60601

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

| | |
|---|---|
| "Pollio, Marie C." <MPollio@goodwin.com> | **To** "Christian, Jennifer A." <JChristian@KelleyDrye.com>, "James Mazza" <jmazza@kirkland.com> |
| 01/30/2008 04:46 PM | **cc** "Ali Kelly" <akelly@kirkland.com>, "Reid, Sarah" <SREID@KelleyDrye.com>, "Retter, David" <DRETTER@KelleyDrye.com>, "Goldman, Ira" <IGoldman@goodwin.com>, "Fredericks, Ian" <ifredericks@ycst.com>, "Powell, Norman" <NPowell@ycst.com>, "Gilad, Erez E." <egilad@stroock.com>, <mstamer@akingump.com>, "Dublin, Philip" <pdublin@AkinGump.com> |
| | **Subject** RE: Calpine - Agreement Reached Regarding Intercreditor Subordination Dispute Escrow Amount |

Jim

As a result of conversations that U.S. Bank has been having with Calpine and Alix Partners, the outstanding principal amount due on the 10 1/2% Senior Notes has been reduced from $149,210,000 to $139,205,000 to account for bonds that were owned by Calpine but had not previously been cancelled. Therefore, the amount of post-petition interest on account of the 10 1/2% Senior Notes should be reduced from $36,381,151.54 to $33,941,680.85. This, in turn, means that the amount of the reserve described below should be reduced by $2,439,470.69 to $169,253,136.11.

We apologize for the late notice, but this principal reduction was just finalized this afternoon.

Thank you.

Marie

2/20/2008

Page 2 of

Marie C. Pollio
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
860.251.5561  Direct Dial
860.251.5212  Fax
mpollio@goodwin.com
www.shipmangoodwin.com

THE INFORMATION IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL AND INTENDED ONLY FOR THE
RECIPIENT LISTED ABOVE. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE NOTIFY US
IMMEDIATELY BY E-MAIL AND DELETE THE ORIGINAL MESSAGE. THE TEXT OF THIS E-MAIL IS SIMILAR TO
ORDINARY TELEPHONE OR FACE-TO-FACE CONVERSATIONS AND DOES NOT REFLECT THE LEVEL OF
FACTUAL OR LEGAL INQUIRY OR ANALYSIS WHICH WOULD BE APPLIED IN THE CASE OF A FORMAL LEGAL
OPINION.

-----Original Message-----
**From:** Christian, Jennifer A. [mailto:JChristian@KelleyDrye.com]
**Sent:** Wednesday, January 30, 2008 5:04 PM
**To:** James Mazza
**Cc:** Ali Kelly; Reid, Sarah; Retter, David; Goldman, Ira; Pollio, Marie C.; Fredericks, Ian; Powell, Norman; Gilad, Erez E.;
mstamer@akingump.com; Dublin, Philip
**Subject:** Calpine - Agreement Reached Regarding Intercreditor Subordination Dispute Escrow Amount

Jim,

HSBC Bank USA, N.A. and U.S. Bank National Association, the Indenture Trustees for Calpine's senior unsecured debt,
and Manufacturers & Traders Trust Company, the Indenture Trustee for Calpine's 7.75% Contingent Convertible Notes Du
2015 and certain holders of the 7.75% convertible notes, have reached an agreement on the Intercreditor Subordination
Dispute escrow amount. In accordance with the terms of the Plan, please deposit shares of New Calpine Common Stock
representing a total dollar value of **$171,692,606.80** into the Intercreditor Subordination Dispute Escrow Account.

Kindly confirm receipt of this email. Thank you.

Best regards, Jennifer

Jennifer A. Christian, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7792
Fax (212) 808-7897

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in
this communication, unless otherwise
stated, is not intended and cannot be used for the purpose of avoiding tax-
related penalties.

The information contained in this E-mail message is privileged,
confidential, and may be protected from disclosure;
please be aware that any other use, printing, copying, disclosure or

2/20/2008

dissemination of this communication may be
subject to legal restriction or sanction. If you think that you have
received this E-mail message in
error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and
are believed to be free of any virus or
other defect that might affect any computer system into which it is
received and opened. However, it is the
responsibility of the recipient to ensure that it is virus free and no
responsibility is accepted by Kelley
Drye & Warren LLP for any loss or damage arising in any way from its use.

••••••••••••••••••••••••••••••••••••••••••••••••••••••
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
••••••••••••••••••••••••••••••••••••••••••••••••••••••